Keri Curtis Axel (Bar No. 186847)
 kaxel@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
 smalzahn@waymakerlaw.com
Ashley E. Martabano (Bar No. 236357)
 amartabano@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

Christopher Pelham (Bar No. 241068)
 christopher.pelham@nortonrosefulbright.com
Abigail G. Urquhart (Bar No. 310547)
 abigail.urquhart@nortonrosefulbright.com
Alex Scandroli (Bar No. 345278)
 alex.scandroli@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile:  (213) 892-9494

*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| LOS ANGELES HOMELESS SERVICES AUTHORITY, a joint powers authority,<br><br>       Plaintiff,<br><br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES | Case No. 2:26-cv-7056<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF:**<br><br>**1. Violation of the APA for agency action in excess of authority and contrary to law (5 U.S.C. §§ 702, 704, 706(1), (2)(A)-(D);**<br><br>**2. Violation of the APA for arbitrary and capricious agency action (5 U.S.C. § 706(2)(A));** |

COMPLAINT

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as the Secretary of the U.S. Department of Housing and Urban Development; and DOES 1-10,

Defendants.

**3. Violation of Separation of Powers / Spending Clause / Take Care Clause / Ultra Vires (U.S. Const., Art. I, Art. II); and**

**4. Usurping State Power (U.S. Const. Amend. X)**

**INTRODUCTION**

1.      On June 11 and June 18, 2026, the plaintiff Los Angeles Homeless Services Authority ("LAHSA"), a Joint Powers Agency of the City of Los Angeles ("City") and the County of Los Angeles ("County"), received letters from the United States Department of Housing and Urban Development ("HUD") suspending LAHSA from participation in federal government programs based on purported violations of public agreements, although the letters cite not a single agreement, much less any evidence to support a violation. The bases for the suspension letters are pretextual in any event: what the Trump Administration wants is to eliminate the regional Continuum of Care (or "CoC") Program created by Congress that gives local authorities discretion over projects submitted for federal funding.

2.      LAHSA is the backbone of the Los Angeles CoC, and the hub for the administration of federal, City and County funds supporting persons experiencing homelessness in Los Angeles County. The federal funds administered by LAHSA directly support more than 11,000 people, generally in permanent housing. LAHSA also runs the massive information technology system that registers and tracks all applicants for services and provides the annual reports that Congress and the State of California require to evaluate the effectiveness of relief. It coordinates other data management systems that help match unhoused persons with services and permanent housing. It also conducts the federally-mandated "point in time" count of unsheltered people, a massive undertaking requiring specialized expertise. Finally, LAHSA is the single applicant for all federal funding for the region, working with its local partners and stakeholders to coordinate the distribution of more than $200 million in federal funding.

3.      LAHSA cannot just suspend these important, often Congressionally-mandated tasks. LAHSA's mission and its critical operations are funded not only by HUD but also by the State of California, the City, and the County. HUD's purported

1
COMPLAINT

suspension of LAHSA violates the Administrative Procedure Act, is unconstitutional, and ultra vires. The harm would be irreparable.

4.     Congress's strategy toward treating the problem of homelessness has not changed since it passed the Homeless Emergency Assistance and Rapid Transition to Housing ("HEARTH") Act (42 U.S.C. §§ 11381-11389) in 2009. The HEARTH Act was designed to support local communities in responding to homelessness by recognizing local or regional "Continuums of Care" ("CoCs"), bodies responsible for coordinating funding from HUD and other available resources for homelessness response within a geographic area. 24 C.F.R. § 578.3.

5.     In creating the CoC Program, Congress recognized the importance of a local entity evaluating and ranking projects such that federal funding could be balanced with state and local efforts to create stability in the services provided to the unhoused.

6.     Across five presidential administrations, including as recently as January 2025, bipartisan legislation has funded and reaffirmed the CoC Program's regional approach. But the Trump Administration has made clear it wants to scrap the program entirely in favor of a homelessness policy favoring criminal enforcement, drug treatment, institutionalization and civil commitment of the mentally ill. E.O. July 24, 2025, "Ending Crime and Disorder on America's Streets." It further desires to eliminate the CoC Program, which it has called "burdensome," "failed," "harmful," and "unaccountable."[1] In its 2027 Budget, released April 3, 2026, the Administration proposes to do just that, defunding the regional CoCs and expressly calling out LAHSA, the nation's largest CoC, as an "example of the need to overhaul the . . . CoC system." (*Id.*)

7.     Not content to make its case for policy change first to Congress, on June 11, 2026, HUD delivered to LAHSA a Notice of Suspension, claiming that,

---

[1] Found at *https://www.whitehouse.gov/wpcontent/uploads/2026/04/budget_fy2027.pdf*

based on a previously-unknown and apparently just initiated HUD Office of Inspector General ("OIG") investigation, it was immediately suspending LAHSA as a federal contractor. The letter claims that there is evidence that LAHSA has violated "the terms of a public agreement or transaction" but cites not a single agreement or transaction.

8.     HUD Secretary Scott Turner has subsequently claimed that HUD "investigated LAHSA" and found "waste, fraud and abuse,"[2] but this is false. The letter contains no HUD investigative findings at all but relies on a mash-up of old news articles, comments from public officials taken out of context, and findings from routine public audits that included recommendations that were all appropriately actioned. The letter also contains several serious factual misstatements and omits necessary context. It also cites a potential conflicts of interest issue that LAHSA resolved to HUD's satisfaction in April 2026. Then the letter erroneously claims that LAHSA falsely certified the existence of internal controls and compliance policies. The purported bases for the letter are, in every respect, unsupported by evidence and flawed.

9.     The letters are a baseless attempt to eliminate the largest CoC in the United States, the Los Angeles CoC ("LA CoC"), and LAHSA, the entity that is responsible for most of the CoC's Congressionally-mandated functions.

10.     Any doubt about whether the suspension was merely a back door attempt to eliminate the LA CoC was removed when, on June 18, 2026, HUD sent LAHSA another letter. This letter purports to suspend not only LAHSA but indeed the entire Los Angeles CoC (85 cities including the City) from submitting a "Consolidated Application" for 2026 grant funding, although the Consolidated Application is required by statute and regulation. Without any findings whatsoever,

---

[2] *See https://www.youtube.com/watch?v=l_WucQmUTXw*

the June 18 Letter also purported to suspend LAHSA from carrying out "the programmatic functions delegated to it by the [Los Angeles CoC]."

11. These delegated functions, which are not addressed in either letter, are not insignificant. LAHSA wears multiple hats on behalf of the LA CoC:

a. LAHSA is the Collaborative Applicant, responsible for the annual Consolidated Application that provides support for the more than $200 million in federal funding available for homeless services in Los Angeles.

b. LAHSA runs the information hub for the region's homelessness assistance program, the Homeless Management Information System ("HMIS"), a federally-mandated software system used by over 300 agencies and nearly 8,000 individual users to track and serve the unhoused population. Congress requires this data to be kept and submitted in certain mandatory reports. LAHSA cannot simply flip off the switch on a system that is not only relied upon by federal, state, and local authorities, but whose largest funder is not HUD but the County of Los Angeles.

c. LAHSA administers the Coordinated Entry System ("CES"), a system that matches unhoused persons with various types of assistance, and without which unhoused individuals cannot be matched with providers of permanent housing.

d. LAHSA conducts the annual Los Angeles County-wide count of the sheltered and unsheltered population, the Point-In-Time ("PIT") count, another HUD-required function.

e. LAHSA is itself a grantee of federal funds, which it receives on behalf of more than 54 sub-grantees who receive more than a cumulative 50 grants.

4

COMPLAINT

12.     HUD's actions violate the Administrative Procedure Act ("APA"). They are contrary to law and exceed HUD's authority. HUD has failed to identify any public agreement or transaction that LAHSA has violated, failed to set forth "adequate evidence" and the "reasoned decision making" that would support LAHSA's suspension, and failed to consider the effect of its suspension decision on the unhoused persons of Los Angeles and the providers who support them.

13.     HUD's actions are also in violation of the United States Constitution. HUD's purported disqualification of the entire LA CoC from submitting a Consolidated Application, as it is required by Congress to do, violates the Separation of Powers Clause and the Take Care Clause of the Constitution by overriding the express dictates of Congress. The LA CoC disqualification, and HUD's instruction in the June 18 Letter that "eligible entities" should just "submit their grant requests directly to HUD" is ultra vires. And the effective crippling of state and local functions violates the important principles of federalism embodied in the Tenth Amendment. Also a violation of the separation of powers and the Take Care Clause is HUD's failure to fulfill its Congressional obligation to fund LAHSA's 2025 grant awards, which threatens immediate harm to the more than 54 homeless services providers—some of whom actively serve women and children fleeing domestic abuse—who are now self-funding their operations and threatened with bankruptcy while HUD fails to pay the awards that Congress obligated it to pay.

14.     HUD's actions are effectively final agency actions, despite the fact that the letters provide a 30-day window to respond. Were LAHSA to suspend its important functions immediately, as HUD apparently wants it to do, it would disrupt the entire homeless services network in Los Angeles, which serves over 70,000 people experiencing homelessness, including children. In 2024, with LAHSA in the lead, the integrated system of federal, state, county, and city funding in the LA CoC placed almost 28,000 in permanent housing. This pipeline would stop immediately

without LAHSA's critical roles as HMIS lead and CES coordinator. This is a final administrative action given its immediate harmful effects.

15. HUD has failed even to consider the harm that would come to the unhoused population if LAHSA were to suspend carrying out each of its important roles. Suspending LAHSA as the Collaborative Applicant would literally threaten more than 11,000 people, including more than 1,900 children, with eviction from federally-funded supportive housing. There can be no doubt that irreparable harm is an inexorable consequence of the LAHSA suspension.

## THE PARTIES

16. Plaintiff LAHSA is a joint powers authority of the City and County of Los Angeles, created in 1993 to address the problem of homelessness in Los Angeles County. LAHSA is the lead agency in the HUD-funded LA CoC and coordinates and manages federal, state, county, and city funds for programs providing shelter, housing, and services to people experiencing homelessness. LAHSA partners with more than 100 nonprofit partner agencies that assist people experiencing homelessness achieve independence and stability in permanent housing. LAHSA's partner agencies provide a range of programs ranging from outreach, access centers, emergency shelters, safe havens, transitional and permanent housing, and prevention, along with the necessary supportive services designed to provide the tools and skills to achieve stable housing.

17. Defendant Donald J. Trump is the President of the United States. He is being sued in his official capacity only.

18. Defendant HUD is an executive department of the United States government that is responsible for administering federal housing and urban development laws. Its functions include providing affordable housing assistance, enforcing fair housing laws, supporting homeownership programs, and administering grants for urban development and disaster recovery. HUD is

6

COMPLAINT

headquartered at The Robert C. Weaver Federal Building, 451 7th Street, S.W., Washington, DC 20410.

19.    Defendant Scott Turner is the Secretary of HUD. He is being sued in his official capacity only. Turner maintains an office at 451 7th Street, S.W., Washington, DC 20410.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution and the APA, 5 U.S.C. § 551 *et seq*. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

21.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; the plaintiff is located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

**A.    Congress's Approach to Addressing and Alleviating Homelessness: the Local Continuum of Care**

22.    The Continuum of Care Program ("CoC Program") is Congress's primary response to homelessness, supporting housing and other essential services for hundreds of thousands of formerly unhoused people, including many disabled and older individuals, veterans, and families. The backbone of the CoC Program is funding permanent housing and, along with it, supporting long-term community stability. It promotes this housing stability by prioritizing the renewals of local, effective projects and guarding against dramatic funding fluctuations for each community from year to year. This approach provides stability for the individuals

7
COMPLAINT

and families it serves, promotes safer communities, and reduces burdens on local law enforcement, hospital, and emergency shelter resources.

23.    In 1987, Congress enacted what became the McKinney-Vento Homeless Assistance Act ("McKinney-Vento Act") "to meet the critically urgent needs of the homeless of the Nation" and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b). In enacting the law, Congress recognized that "the Federal Government has a clear responsibility and an existing capacity to fulfill a more effective and responsible role to meet the basic human needs and to engender respect for the human dignity of the homeless." *Id.* § 11301(a)(6).

24.    For 20 years following the passage of the McKinney-Vento Act, HUD administered three separate programs—the Supportive Housing program, Shelter Plus Care program, and Section 8 Moderate Rehabilitation SRO program—that "focuse[d] on the longer-term housing and services needs of homeless individuals and families."[3]

25.    Congress passed the HEARTH Act in 2009, amending the McKinney-Vento Act to consolidate these three programs under the umbrella of the CoC Program. 42 U.S.C. §§ 11381-11389. The HEARTH Act created regional CoCs to be responsible to coordinate federal funds and other available resources for homelessness response within a geographic area. 24 C.F.R. § 578.3.

26.    The CoC Program seeks to end homelessness by relying on local stakeholders to effect a comprehensive local plan.[4] The CoC Program funds a

---

[3] Libby Perl, Cong. Rsch. Serv., RL33764, *The HUD Homeless Assistance Grants: Programs Authorized by the HEARTH Act,* (2017)*,* p. 10, available at *https://www.congress.gov/crs_external_products/RL/PDF/RL33764/RL33764.45.pdf*.

[4] 24 C.F.R. §578.1(b)(1)(2024).

8
COMPLAINT

variety of programs that support homeless individuals and families, including by providing permanent or transitional housing through construction, acquisition, rehabilitation, or rental assistance, providing rehousing support, and providing supportive services, which include, but are not limited to, childcare, job training, healthcare, mental health services, trauma counseling, and life skills training. *See* 42 U.S.C. §§ 11360(29), 11383.

27.    In the HEARTH Act, Congress expressly prioritized year-after-year renewals of grants. The statute requires HUD to "increase the estimated need amount" for a particular geographic area as "necessary to provide 1 year of renewal funding for all expiring [CoC grant] contracts" for an area. 42 U.S.C. § 11386a(b)(2)(B)(iii); *see also* 42 U.S.C. § 11386a(c) (HUD may adjust the geographic need formula "as necessary[] to ensure that each [CoC] has sufficient funding to renew all qualified projects for at least one year""). Congress also has taken steps to ensure that renewal projects could provide the same level of service despite rising costs. *See, e.g.*, *id.* § 11382(f); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, 138 Stat 25, 363 (2024) (authorizing HUD to "make reasonable adjustments to renewal amounts to enable renewal projects to operate at substantially the same levels."). One of the jobs of the Collaborative Applicant is to identify projects that qualify for the prioritized renewal funding, which are generally automatically approved by HUD.

**B.    Congress Designed the CoC Program to Prioritize Funding Consistency and  Respect for Local Decision-Making**

28.    In codifying the CoC Program, Congress sought, among other things, to "promote community-wide commitment to the goal of ending homelessness," to help rehouse people "while minimizing the trauma and dislocation" that homelessness causes, and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

9
COMPLAINT

29.     Three key aspects of the CoC Program contribute to its ability to meet these statutory requirements. The program (1) prioritizes the funding of permanent housing; (2) gives local communities a central role in determining how best to eradicate homelessness in their areas, and (3) encourages stability by prioritizing the renewal of funding where such funding is needed and has previously been used effectively. 42 U.S.C. § 11386b(d)(2).

30.     Congress has expressly recognized that the local CoC is an "integral local function" that is "necessary to generate the local strategies for ending homelessness."[5] Under the statute, a local CoC coordinates the process of applying for CoC program funds for that community through an entity called the "Collaborative Applicant," which "shall be established for a geographic area by the relevant parties in that geographic area." 42 U.S.C. § 11360a(a).

31.     The primacy of local decision-making is further codified by HUD in an interim rule that has been in effect since 2012, (*see* 24 CFR Part 578, Homelessness Emergency Assistance and Rapid Transition to Housing; Continuum of Care Program ("CoC Interim Rule")) which, per HUD, "governs the CoC Program."[6] The Interim Rule requires that a CoC be established by representatives from "relevant organizations within a geographic area," which can include "nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, hospitals, universities, affordable housing developers, law enforcement, and organizations that serve veterans and homeless and formerly homeless individuals." The CoC board must be representative of the



---

[5] Prevent Mortgage Foreclosures and Enhance Mortgage Credit Availability, Pub. L. No. 111-22, § 1002, 123 Stat 1632, 1664 (2009) *codified at* 42 U.S.C. § 11301.

[6] *See* Introductory Guide to the CoC Program, July 14, 2012, at *https://files.hudexchange.info/resources/documents/CoCProgramIntroductoryGuide.pdf ("CoC Introductory Guide").*

organizations and projects serving the community's homeless residents, and must have at least one homeless or formerly homeless member.[7] The Preamble for the Interim Rule explains the logic for this requirement: centralized, local control is designed to respond "to local needs and conditions." Preamble, 24 CFR Part 578. This preamble further reflects HUD's observation that local CoC operation is important in ensuring the success of homeless assistance and prevention programs in communities. *Id.*

32.    The Collaborative Applicant is responsible for applying for funding on behalf of entities within the CoC's geographic area. 42 U.S.C. § 11360a(a). In HUD's words: "The Collaborative Applicant is the entity the CoC designates to submit the annual CoC Program Competition application and apply for planning funds on its behalf."[8] Each CoC must run a local competition to determine what projects and service providers will be part of its federal application, and how it will rank them. 42 U.S.C. § 11382; 24 C.F.R. § 578.9. The Collaborative Applicant then applies on behalf of the CoC and all project applicants in that region.

### C.    Timing and Administration of the Consolidated Application

#### 1.    Annual Administration of the CoC Program

33.    The HEARTH Act sets forth various requirements for HUD's administration of the CoC Program. In addition to the requirements described above, the statute establishes timing requirements, eligibility and selection criteria, and conditions to which grantees must agree, as well as other mandates. 42 U.S.C. § 11386.

34.    For one, the statute establishes timing requirements to ensure that funds are awarded promptly to the communities that need them. It provides that "the

---

[7] *See id.* at n.1.

[8] *See* https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-governance/coc-roles/collaborative-applicant/

11
COMPLAINT

Secretary shall release a notification of funding availability"—also known as a "notice of funding opportunity" or "NOFO"—for CoC grants "for a fiscal year not later than 3 months after" Congress has enacted the relevant appropriations statute. 42 U.S.C. § 11382(b). It then must announce conditional awards "within 5 months" after the NOFO application deadline. *Id.* § 11382(c)(2)(A). And once a recipient meets all relevant requirements for a final award (such as obtaining matching funds and passing environmental review), HUD must "obligate the funds for the grant involved" within 45 days. *Id*. § 11382(d)(2).

35.    HUD awards funds to eligible recipients through a national competition between geographic areas based on criteria including previous performance regarding homelessness according to metrics specified in the statute. 42 U.S.C. § 11386a(b). The competition period begins when HUD publishes the Fiscal Year ("FY") CoC Program Competition NOFO and ends when HUD issues the final funding announcement for that year's conditionally awarded funds.[9]

36.    Before a Collaborative Applicant can submit an application as part of any year's CoC Program Competition, the applicant must be registered with HUD for that fiscal year. Collaborative Applicants must complete their registration using HUD's web-based portal. The registration process only applies to Collaborative Applicants who will register to submit the annual CoC Consolidated Application for CoC Program funds. The registration process does not apply to project applicants or private individuals as HUD does not provide funding to private individuals, and all project applications must be submitted by the Collaborative Applicant to the

---

[9] March 20, 2026 Notice CPD-26-03 re Continuum of Care Program Registration, at 3 *available at https://www.hud.gov/sites/default/files/OCHCO/documents/CPD-26-03.pdf*

COMPLAINT

Department during the CoC Program competition as described in the applicable NOFO.[10]

37.	HUD itself tells applicants not to change Collaborative Applicants mid-stream: "Generally, the Collaborative Applicant approved by the Department during the CoC Program Registration process prior to each FY CoC Program Competition must be the same organization that will submit the CoC Consolidated Application (the CoC Application, CoC Priority Listing that lists all project applications accepted and ranked or rejected in the CoC local competition, and the Project Application(s)) during the CoC Program Competition." There are limited circumstances by which a Collaborative Applicant can be changed, and it would require HUD approval.[11]

38.	Although the Collaborative Applicant registration period generally opens the second Tuesday of each January with a due date in April, this year, HUD did not open the registration until April 1 and set an April 23 due date. As it has been for decades, LAHSA was timely registered and approved by HUD. Accordingly, as the LA CoC's registered Collaborative Applicant, only LAHSA can access the application documents on behalf of the LA CoC.

39.	HUD published the 2026 NOFO on June 1, 2026, but the application itself has not been published. The application deadline is August 26, 2026.[12]

### 2.	The Consolidated Application

40.	Following statutory directives, HUD's regulations specify that, after "enactment of the annual appropriations act" each year, HUD will calculate for each

---

[10] *Id.* at 2.

[11] *Id* at 5.

[12] *See* June 18, 2026 HUD letter re "Notice of Findings and Proposed Remedial Action, , *available at*, *https://www.hud.gov/sites/default/files/OCHCO/documents/CPD-26-03.pdf*

13
COMPLAINT

CoC the sum of "all projects within the [COC] eligible to apply for renewal in that fiscal year's competition." 24 C.F.R. § 578.17(a)-(b)(2). This amount is known as the annual renewal demand (ARD) and is the "maximum award amount" for that geographic area (unless their formula-based need amount is higher, which is rare).[13] 24 C.F.R. § 578.17(b).

41.     In submitting the Consolidated Application, HUD asks the Collaborative Applicant to rank project applicants in two tiers. Tier 1 projects are the renewals that the Applicant identifies as most critical to meeting community needs, and HUD will typically fund all Tier 1 projects. Because Tier 1 funding is relatively assured, CoCs can and do rely in advance on the likelihood of approval of the Tier 1 projects, which helps bring stability to the system and allows local leaders to prioritize other types of projects.

42.     Tier 1 projects also generally receive the vast majority of funding: Each year, HUD identifies the percentage of funds available for Tier 1 projects as a percentage of each geographic area's ARD. For example, in FY 2024, Tier 1 was set at 90 percent of each CoC's ARD. "HUD's intent" has been "to continue to fund projects that are currently serving people to avoid having them experience homelessness again."[14]

43.     Tier 2 projects are less assured: they are subject to a national competition, and HUD awards the funding available for Tier 2 projects to the projects that score highest under the competition's criteria.[15]

---

[13] *See, e.g.,* HUD, CoC Estimated Annual Renewal Demand Report – revised (2024), *https://perma.cc/NZ8X-6QCT.*

[14] HUD, Determining the Amount of Available CoC Program Funds 4, *available at https://perma.cc/M6VL-G5T4.*

[15] 24 C.F.R. § 578.17.

14
COMPLAINT

44.    As a practical matter, since funding for projects ranked in Tier 1 is protected, CoCs can reliably balance between prioritizing renewing existing projects that are critical to maintaining the current level of services and meeting new community needs when ranking projects in Tier 2 in their local competitions.

**D.    LAHSA**

45.    By Congressional design and HUD regulation, all CoCs must delegate an entity to serve in four key roles: (1) as the Collaborative Applicant, which functions as the System's CEO or strategist; (2) as the HMIS Lead, which is akin to a data and systems manager responsible for the local information technology system used to collect client-level data and data on the provision of housing and services to individuals and families at risk of and experiencing homelessness; (3) as the CES coordinator, which serves as an operations manager for client flow (*see* § 24 C.F.R. 578.7); and (4) as administrator of the PIT count. LAHSA also serves in a fifth role, common to many Collaborative Applicants, which is acting as a grantee, receiving funding for its own function and submitting funding and reimbursement requests on behalf of subgrantees, who are service providers providing directly services to the unhoused.

46.    In many regional CoC's, these functions are performed by different entities but in Los Angeles, the largest CoC in the United States, LAHSA performs them all.

1.    LAHSA as Collaborative Applicant

47.    The LA CoC Governance Charter appoints LAHSA as the Collaborative Applicant, which requires it to coordinate the applications of all government entities and service providers to the unhoused in the region, weighing the objectives discussed above. In its capacity as the Collaborative Applicant, LAHSA functions as the system's strategic leader—setting the vision, aligning stakeholders, and serving as the primary interface with HUD. It is responsible for developing and submitting the CoC's consolidated funding application, ensuring

15

COMPLAINT

that local priorities are reflected in project selection, and guiding system-wide planning efforts to reduce homelessness. Through this role, LAHSA establishes governance structures, coordinates policy development, and ensures compliance with federal requirements, acting much like a "system CEO" that steers both strategy and accountability.

        2.      <u>LAHSA as HMIS Lead: Tracking the Unhoused and Providing Key Data to Government And Stakeholders</u>

48.     Along with being the Los Angeles CoC lead applicant, LAHSA is also responsible for operating as the HMIS Lead for the LA CoC and the Glendale, Pasadena and Long Beach CoCs. The HMIS is a complex, federally mandated database that tracks demographic and service usage data, including a census of people using homelessness-related services. This data is mission-critical for all federal, state and local policy matters, and all service providers aiding the unhoused. As stated in LAHSA's HMIS Policies and Procedures, "[t]o end homelessness, a community must know the scope of the problem . . . . Reliable data enables a community to work confidently toward its goals as it measures outputs, outcomes, and impacts."[16]

49.     The HMIS database serves multiple core functions and is the conduit through which all services flow to the unhoused in Los Angeles. It is the database through which LAHSA and service providers connect people with housing and related services. Once a person is in the HMIS database, they can then be matched with housing and services offered by service providers. In fact, entry into HMIS is required by federal, state and local funders before an applicant can be placed into permanent housing. If the HMIS database were shut down, no applicants could be matched with housing, including the more than 27,000 people currently on the

---

[16] *See https://www.lahsa.org/documents?id=1128-la-hmis-policies-and-procedures.pdf.*

HMIS waitlist for permanent housing. Furthermore, if the HMIS database were nonfunctional, persons newly experiencing homelessness could not be given an assessment and added to the database at all, blocking them from getting in the housing queue completely.

50.    Federal regulations also require that LAHSA use HMIS to record client data and report to HUD on program performance. Federal regulations also require LAHSA, as the HMIS Lead for the LA CoC, to annually submit several detailed reports to HUD. Failure to submit these annual reports could result in the CoC's compliance rating lowered at HUD, which in turn could result in the loss of millions of dollars in annual funding. California state law also mandates the use of an HMIS system for receiving homelessness service funding. If LAHSA were no longer to operate its HMIS database, that critical funding would be jeopardized. Moreover, it would be exceedingly difficult for another entity to replace LAHSA because of the level of expertise required. It can take almost a year for a skilled worker to reach full operational proficiency in the system.

51.    LAHSA is not only the HMIS Lead for the LA CoC, it also holds the related dual role of HMIS Implementation Manager—making LAHSA uniquely irreplaceable in the regional homeless services infrastructure. As the HMIS Implementation Manager, LAHSA is also responsible for ensuring the maintenance and ongoing operational functionality of the HMIS database, which includes working with the database vendor on upgrades and customizations, ensuring software is up to date, and developing training materials for HMIS users.

52.    The Los Angeles CoC HMIS is, by a massive margin, the largest in the country. At any given time, LAHSA's HMIS system includes profiles for about 350 participating agencies, along with profiles for 200,000 to 250,000 individual program participants. For context, the next largest HMIS in the country, which covers the entire state of Washington, has only 4,000 users.

17
COMPLAINT

53.      Administering such a massive, complex database requires a highly trained and specialized staff. Currently, LAHSA employs 60 data specialists to administer HMIS. Because of the technical, database-specific nature of these specialists' work, another entity cannot simply take over the database, and critical data would be lost if LAHSA simply suspends its efforts..

### 3.     LAHSA as CES Lead:  Matching Persons Experiencing Homelessness With Services and Permanent Housing

54.      As the Coordinated Entry System ("CES") coordinator, LAHSA oversees the operational flow of individuals and families through the homelessness response system. The CES is a federally mandated system that manages a standardized, equitable process for accessing housing and services, ensuring that those with the highest needs are prioritized appropriately. LAHSA coordinates assessments, referrals, and placements across the provider network, maintains by-name lists, and monitors system performance to address disparities and improve outcomes. In this operational role, LAHSA acts as the "manager of client flow," ensuring that resources are matched efficiently and fairly to those in need.

55.      As the CES Coordinator, LAHSA ensures that two databases, HMIS (discussed in detail above) and the Resource Management System ("RMS") work in harmony to match people with available housing. The RMS is a database that hosts real time inventory of available housing resources across the CoC. LAHSA employs a specialized staff of 30 employees to run the CES matching team to ensure that individuals are placed in homes as quickly as possible once a match has been made. This staff completely relies on accurate, operational HMIS and RMS databases to perform their work.

56.      The CES program depends on the continued functionality of both the HMIS and RMS databases in order to generate the thousands of housing matches LAHSA makes each year. If the functionality of HMIS or RMS were disrupted, or LAHSA's role in running CES were suspended, no new housing matches could be

18

COMPLAINT

generated, and the over 27,000 people currently on the waitlist for permanent housing would be stuck in limbo, with no viable way to get housing placement. Furthermore, if the RMS database were nonfunctional, LAHSA's CES team would not know how many housing units were available, which could result in people sleeping in the streets while vacant units go unfilled.

### 4.    LAHSA as Administrator of the PIT Count

57.    HUD mandates that a PIT Count be conducted biannually. The agency relies on these PIT Counts to provide an Annual Homelessness Assessment Report to  Congress that provides critical information, such as nationwide estimates of the unhoused population, and includes information about the demographic characteristics of unhoused persons, service use patterns, and the capacity to house persons experiencing homelessness.

58.    For the last ten years, the LA and related CoCs in Los Angeles County have elected to conduct a PIT count every year. The LA CoC has delegated this responsibility to LAHSA. This duty requires LAHSA to design and execute an enumeration methodology that is fully compliant with HUD standards. Operationally, LAHSA manages the logistics of the unsheltered Adult street count by recruiting, training, and deploying community volunteers, public employees, and professional outreach workers across LA CoC census tracts.

59.    LAHSA also partners with academic institutions to conduct detailed demographic surveys and executes rigorous data validation and quality assurance protocols.

60.    Concurrently, the agency directs the sheltered Housing Inventory Count in coordination with emergency, transitional, and safe haven housing providers LAHSA formally submits this finalized data to HUD to secure and maintain the region's eligibility for federal homeless services funding.

61.    LAHSA released the final results from 2025 PIT Count on October 25, 2025, and completing HUD's validation process.

62.     For 2026, LAHSA conducted the unsheltered PIT Count in January, and submitted its initial data to HUD in the spring. LAHSA is currently reviewing its 2026 PIT Count data with a HUD-contracted Technical Assistance provider. If the proposed HUD suspension takes effect, LAHSA likely will not be able to complete its 2026 PIT Count process. Should that occur, HUD would not have an accurate count for the Los Angeles area (the largest homeless population in the country) to include in its Annual Homelessness Assessment Report to Congress. And, since HUD mandates that the PIT Count occur within a 10-day period at the end of January, it would be difficult for the LA CoC to conduct the 2027 PIT Count.

### 5.     LAHSA as Grant Recipient for Itself and Subgrantees

#### (a)     The Grant Cycle

63.     HUD operates under a reimbursement model, whereby grantees are expected to provide services first and then submit requests for reimbursement. No requests for reimbursement can be processed until HUD has confirmed an award with a fully executed grant agreement. It is only after these grant agreements are executed that a grantee can submit a request for reimbursement to HUD.

64.     After award letters are sent, recipients generally rely on the promise of federal dollars in their operations, even though there is often a significant delay between the issuance of award letters and the provision of executed grant agreements. During this period, grantees are in a form of limbo—they have the promise of funds but no executed grant agreement they could use to demand payment, and no funds available to draw down.

#### (b)     LAHSA as Grantee

65.     In conjunction with HUD's national priorities for CoCs, the LA CoC's portfolio of grants, as submitted by LAHSA as the Collaborative Applicant, is over 90 percent dedicated to permanent housing, with 75 percent allocated to permanent supportive housing for individuals with disabilities who require housing on a long-

20
COMPLAINT

term basis. LAHSA's own organizational portfolio, as a direct grant applicant whose applications are included in the Consolidated Application, includes transitional housing for youth and domestic violence survivors in addition to permanent housing.

66. In 2026, LAHSA had FY 2024 grant agreements with service providers that were due to expire during the first and second quarters of this calendar year— between January 31, 2026 and June 30, 2026—for which it did not receive FY 2025 grant agreements until May. By the time LAHSA received the grant agreements, six grants had expired, with another two expiring at the end of May and six expiring at the end of June, including the CoC Planning Grant (awarded to the Collaborative Applicant). LAHSA has signed and returned these agreements to HUD, but HUD has not countersigned them. Accordingly, for these fourteen expired or expiring grants, HUD has not signed grant agreements, preventing the subgrantees from being reimbursed. For the twelve service providers that operate most of these projects, they are floating their own costs with no immediate path to reimbursement for the funds that HUD agreed to—and was in fact ordered by Congress—to provide.

(c)    LAHSA's Subgrantees

67. Many of LAHSA's subrecipients, who are direct providers of services to the unhoused, do not have the resources or bandwidth to compile or oversee all that is required to submit an application to HUD. They rely on LAHSA and cooperate with it to assemble the information needed to submit applications, and to seek reimbursements, on their behalf. The projects for which HUD has approved awards but which have not received an executed 2025 grant agreement include grants to the following organizations: 1736 Family Crisis Center; A Community of Friends; The People Concern; Jewish Family Services; House of Ruth Claremont; SRO Housing Corporation; Penny Lane; Rainbow Services; Jenesse Center; Project New Hope; Antelope Valley Domestic Violence Council; and Downtown Women's

21
COMPLAINT

Center. All of these service providers are currently waiting for a new grant agreement and corresponding subcontract with LAHSA and are attempting to operate while their funding has already expired.

68.    Although CoC funding is typically reimbursed retroactively from the grant start date—meaning these organizations routinely float costs annually—HUD's suspension threatens to leave them without the funds they need to continue operating. These organizations are soon likely to face an urgent lack of funds that may threaten their ability to continue providing critical services to the unhoused under HUD's suspension notice.

### E.    The Trump Administration Seeks to Contravene Congressional Priorities for Homelessness Funding

#### 1.    The Administration Signals Its Intent to Change Policy on Homelessness and to Defund the LA CoC

69.    On July 24, 2025, President Trump issued an Executive Order embracing a new policy focused on "ending crime and disorder" on the streets by prioritizing criminal enforcement, drug treatment, institutionalization and civil commitment of the mentally ill.[17]

70.    That same week, Amy Perkins, a LAHSA Commission member and homeless advisor to L.A. County Supervisor Lindsey Horvath, met with senior representatives of HUD, and a senior political appointee told her that he would recommend there be no HUD funding coming to Los Angeles.

#### 2.    HUD Issues the Unlawful Policy-Driven FY 2025 NOFO

71.    Congress has regularly appropriated funds for the CoC Program since the Program's inception. Prior to the change in administration, in a bipartisan bill, Congress authorized HUD to run a single competition to cover awards for both fiscal year 2024 and 2025. Consolidated Appropriations Act, 2024, Pub. L. No. 118-

---

[17] Exec. Order No. 14,321, "Ending Crime and Disorder on America's Streets," 90 Fed. Reg. 35,817 (July 29, 2025).

42, div. F, tit. II, § 242. This allowed HUD to solicit and review applications once and use the results of that competition to make awards both for fiscal year 2024 and, once funds were appropriated, for fiscal year 2025.

72.     Consistent with Congressional mandates and HUD's practices for nearly a decade, HUD issued a NOFO for fiscal years 2024 and 2025 ("the FY24-25 NOFO"), which prioritized permanent housing solutions to homelessness. Communities undertook their local processes and applied to the FY24-25 NOFO. HUD made fiscal year 2024 awards in January 2025. Funding became available for fiscal year 2025 awards in March 2025. On March 15, 2025, a bipartisan Congress then enacted a continuing resolution appropriating $3.544 billion for the CoC and related programs. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12).

73.     Because HUD had issued a two-year NOFO, no new fiscal year 2025 NOFO was required. If, however, HUD wanted to issue a new NOFO for awarding 2025 funds, it was required to do so within three months, that is, by June 15, 2025. See 42 U.S.C. § 11382(b). But HUD did not issue a new NOFO by June 15, 2025.

74.     Rather, on July 3, 2025, HUD announced its intention to publish a new NOFO for fiscal year 2025 CoC awards. It provided few details beyond stating that the NOFO would "seek to provide opportunities for new types of projects including street outreach and transitional housing programs" and inviting applicants to "prepare for an application focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants."[18]

75.     Congress took notice. On November 13, 2025, members of the United States Senate, including Patty Murray, the Vice Chair of the Senate Committee on

---

[18] HUD Email to CoCs re Important FY2025 CoC Competition Updates, *See https://ciceroinstitute.org/news-media/fy-2025-hud-notice-of-funding-opportunity*.

Appropriations, sent HUD Secretary Turner a letter to express "deep concerns regarding the instability the entire homeless support system could face if funding delays, uncertainty, and rushed policy changes continue."[19] The letter noted that HUD's planned 2025 NOFO appeared to propose "harmful and potentially illegal changes that could result in nearly 200,000 older adults, chronically homeless Americans with disabilities, veterans, and families being forced back onto the streets."[20]

76.    The Senators' letter noted that, on January 20, 2025, HUD had "spark[ed] chaos and disrupt[ed] grantee operations" when it imposed "new and likely illegal conditions" on receipt of previously awarded CoC grants, proposed eliminating the CoC Program altogether, and "repeat[ed] rhetoric used by the President to villainize homeless people."[21] The Senators concluded that HUD's "actions raise[d] serious questions and concerns about whether HUD [was] intentionally violating the law to prevent Congressionally appropriated funds from reaching the people and communities they were intended to support."[22]

77.    On November 13, 2025, 2025, eight months after Congress appropriated fiscal year 2025 funds for the CoC Program and mere weeks before awards would have been issued, HUD issued a new fiscal year 2025 NOFO (the "FY25 NOFO"). In one sentence of the 128-page FY25 NOFO, HUD rescinded the

---

[19] Letter from Senator Patty Murray et al. to HUD Secretary Scott Turner, November 13, 2025. *See https://www.appropriations.senate.gov/imo/media/doc/251113_letter_to_hud_on_coc_nofo.pdf*

[20] *Id.*

[21] *Id.*

[22] *Id.*

FY24-25 NOFO with no explanation.[23] This rescission followed Administration efforts to leverage federal funding to advance the Executive Branch's own agenda without congressional authorization.

78.    In HUD's own words, the FY25 NOFO was intended to effect "the most significant policy reforms and changes in the program's history."[24]

### 3.    The District Court of Rhode Island Enjoins the FY25 NOFO

79.    The FY25 NOFO was shortly thereafter challenged in two lawsuits filed in the United States District Court for the District of Rhode Island: one filed by a coalition of national nonprofits, CoC providers, and municipal governments: *National Alliance to End Homelessness v. United States Department of Housing and Urban Development*, Case No. 1:25-cv-00636, filed December 1, 2025; and the second filed by a group of Attorneys General, *State of Washington et al. v. United States Department of Housing and Urban Development*, filed November 25, 2025.

80.    Plaintiffs sought preliminary and permanent relief to enjoin the FY25 NOFO, arguing that it lacked Congressional authorization, was contrary to relevant statutes and regulations, was published late, and lacked satisfactory reasoning by turning away from a decade of prioritizing evidence-based approaches to reduce homelessness. Plaintiffs further argued that HUD's actions would cause devastating and irreparable harms to the plaintiffs and their associations' members, as well as to the people who rely on them for housing and services.

81.    HUD withdrew the NOFO on December 8, 2025, just prior to a hearing on the preliminary relief requested by the plaintiffs. On December 23, 2025, the

---

[23] HUD, FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO at 15, *https://perma.cc/7MSQ-5FHQ (FY25 NOFO).*

[24] HUD Sec. Scott Turner Leads Monumental Reforms to Homelessness Program, Ending Biden-Era Slush Fund (Nov. 13, 2025), *https://perma.cc/334N-5AWQ.*

district court issued orders in both matters staying the 2025 NOFO and ordering HUD to preserve the status quo ante.

### 4. Congress Mandates That HUD Fund the CoCs Per Statute

82. On February 3, 2026, Congress stepped in. The Consolidated Appropriations Act of 2026 (H.R. 7148 (the "CAA")) included budget increases for HUD, such as earmarking over $4 billion for homeless services—an increase of $366 million. Section 244 of the CAA further required HUD to immediately non-competitively renew all projects expiring in quarter one (January through March) of 2026 for a 12-month period. The bill gave HUD until April 1 to make awards for quarter two and, if it failed to meet that deadline, required HUD to non-competitively renew all projects expiring in quarter two (April through June) of 2026 for a 12-month period. The bill gave HUD until July 1 to make awards for quarters three and four (July through December) of 2026 and, if it failed to meet that deadline, it was required to non-competitively renew all projects expiring in quarters three and four.

83. On March 31, 2026, HUD announced FY 2025 renewal award funding for projects that expired in quarter one (January through March 2026). All LA CoC projects expiring in the first quarter were renewed as part of this announcement. HUD has issued these grant agreements to LAHSA, but LAHSA has not received the countersigned agreements, and therefore has received no funding for these grants. The service providers operating as subgrantees under these agreements therefore have been providing services in anticipation of being paid but their funding lapsed in quarter one and they are carrying their own operations without reimbursement.

84. On April 27, 2026, HUD announced FY 2025 renewal award funding for projects that expired in quarter two (April through June 2026). All LA CoC projects expiring in the second quarter were renewed as part of this announcement. HUD has issued these grant agreements to LAHSA but LAHSA has not received the

26

countersigned agreements, and therefore has received no funding for these grants. The service providers operating as subgrantees under these agreements therefore have been providing services in anticipation of being paid but their funding lapsed, or will lapse, at some point in quarter two and they have or will soon be carrying their own operations without reimbursement.

85. On May 21, 2026, HUD announced FY 2025 renewal award funding for projects that expire in quarters three and four (July through December 2026). All LA CoC projects expiring in these quarters were renewed as part of this announcement, but HUD has not yet issued grant agreements for these projects.

86. In total, the LA CoC was awarded more than $200 million through the FY 25 HUD awards, but HUD has not signed and funded the grant agreements for any 2025 awards made to LAHSA, despite being legally required to do so. That means that the service providers covered by the awards cannot be paid. Twelve LAHSA-funded organizations are already operating under expired grant agreements, which means they are funding their own operations but anticipating the federal funds guaranteed by the award letters. Without the promised funding, these organizations may not be able to continue to serve the needs of the unhoused in Los Angeles.

5. The President's Fiscal Year 2027 Budget

87. On April 3, 2026, the White House released President Trump's 2027 budget, which proposes to entirely eliminate the CoC program, calling it "failed and harmful," and "administratively burdensome."[25] The budget expressly attacked LAHSA, calling it "an example of the need to overhaul the unaccountable CoC system" and alleging (1) that LAHSA "has an abysmal record of reducing what is the highest number of street individuals in the United States, and (2) an independent audit issued in March 2025 found that LAHSA failed to accurately track billions of

---

[25] *See supra* n.1.

27
COMPLAINT

Federal and local dollars."[26] Both of these claims are false, but closely track similar false claims in the June 11 letter addressed below.

### F.      The Suspension Letters

#### 1.      The June 11 Suspension Notice

88.      On June 11, 2026, HUD Deputy Secretary Andrew D. Hughes sent a letter (the "June 11 Letter") to LAHSA CEO Gita O'Neill advising that HUD's Office of Inspector General ("OIG") had opened an investigation into LAHSA[27] due to "[i]nformation that has come to light demonstrating that LAHSA may have committed violations of federal law in performing its obligations under HUD grant agreements." The letter, however, provided no detail about the scope or nature of that investigation, citing "privilege." (June 11 Letter at 2 n.1.)

89.      The June 11 Letter advised that, because of that investigation, the scope of which HUD claimed was privileged, the agency was "immediately suspending LAHSA from future participation in . . . transactions as a participant or principal, with HUD" and all other federal agencies pending the investigation's outcome.

90.      As a legal basis for suspension, HUD purported to rely not on a statute enacted by Congress or a regulation promulgated by HUD itself, but on the Office of Management and Budget regulation codified at 2 C.F.R. §180.700. The June 11 Letter advised that, under OMB regulation 2 C.F.R. §180.700(b) HUD has "more than adequate evidence to suspect" a basis for LAHSA's debarment (the causes for which are enumerated at 2 C.F.R. § 180.800), and that LAHSA's immediate suspension was "necessary to protect the public interest" as required by 2 C.F.R. § 180.700(c).

91.      According to HUD, LAHSA's purported violations of "the terms of numerous public agreements or transactions" were serious enough to "affect the

---

[26] *Id.*

[27] Prior to the letter, LAHSA was not aware of any OIG investigation into LAHSA.

integrity of multiple HUD funding programs under [2 C.F.R. §] 180.800(b), and that LAHSA's actions and inactions affect its present responsibility under [2 C.F.R. §] 180.800(d)."

92. The June 11 Letter asserts three categories of purported violations to support its decision to suspend LAHSA with immediate effect. First, HUD contends that LAHSA has "chronic and systemic" problems with financial management and internal controls. Specifically, HUD claimed that, since November 2024, "audits, assessments, and lawsuits reveal consistent and continued failures related to" payments to service providers, as well as with monitoring and integrity programs. However, none of those many "audits, assessments, and lawsuits" that HUD cites relate to fraud or misrepresentations by LAHSA.

93. Indeed, not a single one of the materials HUD cites, including public statements, details allegations of fraud or criminal conduct by LAHSA itself. Instead, HUD bases its suspension decision on a suspected "'[v]iolation of the terms of a public agreement or transaction so serious as to affect the integrity of a Federal Agency program.'" (June 11 Letter at 2 (quoting 2 C.F.R. § 180.800(b).) But the June 11 Letter does not identify any particular agreement, transaction or contract term that LAHSA violated for any specific time period. (*See* June 11 Letter at 4, n.6 (vaguely referring to regulatory requirements related to financial management, internal controls, conflicts of interest and mandatory disclosures that "are incorporated into the program-specific regulations governing HUD grant programs").) Nor does it assert that any violations by LAHSA were "willful," as contemplated by § 180.800(b).

94. HUD does not cite *any* evidence contemplated by 2 C.F.R. § 180.705. This may be because there are no indictments, judgments, official findings, or affidavits to cite. Instead, HUD supports its position with an amalgamation of uncorroborated hearsay information apparently cherry-picked from the internet. Among other things, it cites to online articles from LAist, a local news source, for

29

COMPLAINT

stories about LAHSA's former CEO who resigned in the summer of 2025. HUD repeatedly mischaracterizes facts. For example, it describes and attaches a November 14, 2024 LA City Controller Announcement, stating that "LAHSA failed to spend $513 million in public funds that were budgeted during fiscal year 2024, pointing to a lack of staff and old technology." However, the facts referenced in this announcement concern the City of Los Angeles, not LAHSA.

95.   Similarly, most of the audits, reviews, assessments, letters, news articles, and statements at public hearings are not relevant to federal funding at all, but address state and local grants and programs. What the letter does not state—but HUD well knows—is that state and local frameworks for funding are fundamentally distinct from the federal framework. For example, state and local funders impose a cost-reimbursable payment model—under which providers must first incur expenses, submit invoices, and then await reimbursement. This structure is dictated by the funders, not by LAHSA. By contrast, the federal drawdown process makes funds available to grantees and subgrantees within approximately three business days, and as a result, outstanding payables against federal funding have rarely exceeded 30 days. Criticisms of payment delays under the state and local model therefore say nothing about LAHSA's administration of federal funds.

96.   The only audits that are relevant to LAHSA's compliance with federal laws and regulations are the federal audits, which include the Single Audit and HUD OIG Audits. The annual independent audit—which includes both a financial statement audit and a Single Audit evaluating compliance with major federal programs, such as its performance in its roles as CoC Lead Applicant, HMIS Lead, and CoC Coordinator—is conducted by an independent CPA firm. The most recent Single Audit concluded that LAHSA's financial statements were "presented fairly in all material respects." The Single Audit also concluded that LAHSA was in compliance with requirements related to its major federal programs, consistent with prior fiscal years. In other words, LAHSA most recently had a clean Single Audit.

COMPLAINT

97.    With respect to the HUD OIG audits—the only other audit directly relevant to federal program compliance—there are no significant unresolved findings: the 2007 audit findings are resolved, and, of the 2022 findings, two are fully implemented and one is in progress, with full implementation underway. Further, none of the findings go to the integrity of LAHSA's internal controls over federal funds, or indicate any violation of a HUD agreement.

98.    Rather than address LAHSA's recent comprehensive Single Audit, HUD tries to create smoke by cherry-picking notes from historical audits and reviews. Many of these, as noted above, have nothing to do with federal funding. Further, public entities such as LAHSA are subject to routine and rigorous audits for the very purpose of constantly improving internal controls in the interest of public integrity. LAHSA's job is to implement the suggested corrections, as it has. In the past several years, LAHSA has made significant improvements to its internal audit and control functions. LAHSA currently maintains a robust and independent Internal Audit function that reports directly to, and takes direction from, the Commission, with only dotted-line reporting to the interim CEO.

99.    Next, the June 11 Letter extensively discusses a potential conflict of interest issue that LAHSA resolved to HUD's satisfaction in April 2026. The issue arose in October 2024, when LAHSA approved a $2.1 million contract with a service provider that employed the husband of LAHSA's then-Chief Executive Officer, Dr. Va Lecia Adams Kellum.[28] The June 11 Letter does not mention or acknowledge that LAHSA's outside counsel, following an internal investigation, found that Dr. Adams Kellum did not participate in LAHSA's initial decision to contract with, or how much to disburse to, the service provider (those decisions were made before Dr. Adams Kellum became LAHSA's CEO).

---

[28] Dr. Adams Kellum resigned in July 2025 and has not been involved with LAHSA for over a year.

31
COMPLAINT

100.   The June 11 Letter further claims that while LAHSA did not maintain a formal, written conflict of interest policy in the past, that issue was only rectified with LAHSA's adoption of such a policy on September 26, 2025. This is one of several critical misstatements in the June 11 Letter— LAHSA's written conflict of interest policy dates back to at least 2001 (although last September it amended that policy to include a procedure for seeking HUD waivers of potential conflicts). The letter also does not mention or acknowledge that LAHSA nevertheless strengthened its conflict of interest policies after the internal investigation regarding Dr. Adams Kellum, to provide rules on when staff should seek conflict waivers under 24 CFR § 578.95(d)(2). Nor does it admit that, after LAHSA updated its conflict of interest policy, HUD closed its own investigation into the matter.

101.   Accordingly, while the June 11 Letter claims that HUD has "reason to suspect" that LAHSA has conflict of interest problems beyond this isolated incident, HUD provides no evidence to support this contention.

102.   In summary, none of the assortment of internet citations that HUD threw together in the June 11 Letter provides "reasoning" supporting its conclusion that any conduct is "so serious as to affect the integrity of a Federal agency program;" nor does HUD identify "[a]ny other cause that is so serious or compelling in nature that it affects [LAHSA's] present responsibility." *See* 2 C.F.R. § 180.800(b), (d).

103.   Finally, HUD asserts that suspension is appropriate because, in its recurring applications for COC funds, LAHSA submitted periodic statements to HUD certifying that LAHSA maintained adequate accounting systems, conflict of interest protocols, and other compliance safeguards. Much of this relies on the aforementioned audit issues, which do not support a lack of compliance safeguards, much less false certifications about them. Indeed, HUD fails to accurately identify any missing policies or financial controls. The purported bases for the June 11 Letter are, in sum, wholly flawed.

32
COMPLAINT

104.   Based on these purported violations, HUD issued its suspension with immediate effect on June 11, 2026. The June 11 Letter advised LAHSA that it could contest the suspension by submitting a written request for a hearing within 30 days. Although the June 11 Letter purports to have immediate effect, it was unclear whether the suspension applied only to future grants, whether it constituted a complete freeze on LAHSA spending, which would affect the millions of dollars in service provider payments currently due, or whether it applied to LAHSA's role as Collaborative Applicant, HMIS lead, and CES coordinator.

### 2.   The June 18 CoC Suspension

105.   On June 18, 2026, HUD followed up with a short second letter (the "June 18 Letter"), this one from Ronald J. Kurtz, Assistant Secretary for Community Planning and Development. The June 18 Letter, entitled "Notice of Findings and Proposed Remedial Action," contains no fact findings at all, presumably relying on the hodgepodge of internet sources cited in the June 11 letter.

106.   The June 18 Letter states that, pending the outcome of a HUD-OIG investigation, "LAHSA is no longer eligible to serve as a collaborative applicant for the [LA] CoC or apply for" the FY 2026 NOFO. Further, it states that LAHSA may not act on behalf of the LA CoC "either as its collaborative applicant *or in its other delegated duties*[,]" which presumably includes its HMIS, CES, and PIT count responsibilities

107.   HUD bases these sweeping conclusions on a purported finding that "the [LA] CoC and LAHSA, as the collaborative applicant, do not meet the requirements of 42 U.S.C. § 11360a and 24 C.F.R. part 578 subpart B." But it fails to identify any "requirement" that LAHSA does not meet.  The letter then goes on then to state that "because LAHSA is unable to act as its collaborative applicant, the [LA] COC is unable to execute its responsibilities as outlined in 24 CFR §578.7 and §578.9." In other words, the letter purports to disqualify not only LAHSA but also the LA CoC, without any statutory or regulatory basis to do so.

33
COMPLAINT

108. Finally, the letter states that, in lieu of a Consolidated Application by a Collaborative Applicant as mandated by Congress, it finds it in the "public interest to allow eligible entities to submit their grant request directly to HUD period."

## FIRST CLAIM

**Violation of the Administrative Procedure Act –**

**5 U.S.C. §§ 702, 704, 706(1), (2)(A)-(D)**

**Against All Defendants**

**(Agency Action In Excess of Constitutional and Statutory Authority, Contrary to Law, and Not In Accordance With Law)**

109. Plaintiff incorporates the above paragraphs as if fully set forth herein.

110. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be (A) . . . not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity;" "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "(D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A)-(D).

111. An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704. Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

112. Defendants' actions constitute "[a]gency action made reviewable by statute," 5 U.S.C. § 704; 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704. HUD's suspension of LAHSA has immediate and direct effect, with concrete consequences that qualifies as a final agency action subject to review under the APA. Indeed, "[a] suspension is effective when the suspending official signs the decision to suspend." 2 C.F.R. § 180.710.

113.    LAHSA is a state-created entity jointly formed in 1992 by the City of Los Angeles and the County of Los Angeles to combat homelessness—a quintessential local problem. "Functionally, LAHSA is the primary entity responsible for implementing the funding provided by the City for homelessness-related services." *LA All. for Human Rights v. City of L.A.*, 792 F. Supp. 3d 1049, 1060 (C.D. Cal. 2025). Among other things, California law requires LAHSA to maintain HMIS operations on a statewide basis, which matches individuals to state-funded and locally funded housing and services. *See, e.g.,* Cal. Health and Safety Code § 50222.

114.    As discussed above, HUD's suspension of LAHSA purports to prohibit LAHSA from, *inter alia*, carrying out programmatic functions delegated to it by the LA CoC, serving as the collaborative applicant for the LA CoC, and applying for federal funding under the CoC Program for fiscal year 2026, and declares that the LA CoC is unable to execute its responsibilities and thus ineligible for federal funding.

115.    HUD's suspension also purports to prohibit LAHSA from carrying out its other delegated duties, including the critical HMIS and CES systems, which track individuals applying for and receiving services throughout the County, as well as it duty to conduct the PIT Count. The HMIS data and PIT Count data are required by Congress and used at all levels of government to make policy decisions. LAHSA's CES role is also required by HUD's own regulations. It would contravene Congressional intent for LAHSA to simply suspend these roles. HUD identifies no contractual violations or other serious issues that address these programmatic functions in any way. HUD cannot simply abandon these functions, and this Court should not "rubber-stamp" HUD's decision, as it is "inconsistent with "HUD's] statutory mandate" and "frustrate[s] the congressional policy" underlying the HEARTH Act. *Ocean Advocs.*, 402 F.3d at 859.

116.   LAHSA's suspension contravenes Congressional mandates to fund FY 25 projects consistent with FY 24 grants. At present, there are multiple service providers without executed grant agreements that HUD was statutorily required to provide; these providers may be forced to cease operations absent the previously awarded funding.

117.   In various ways, HUD's actions as described above are in excess of its constitutional and statutory authority, contrary to law, and not in accordance with law. HUD's actions impermissibly interfere with the core sovereign police functions of state and local governments, violates federal statutes and congressional appropriations that require HUD to fund federal grants under the CoC Program throughout the country, and disregards the legitimate reliance interests of LAHSA and service providers in the LA CoC.

118.   Moreover, HUD lacks valid statutory or regulatory authority to take the actions described above. Nothing in the OMB Guidelines or any other law or regulation authorizes HUD to use the suspension or debarment mechanism as an end-run around its statutory funding obligations for the CoC Program set forth in 42 U.S.C. §§ 11381-11389.

119.   HUD's actions jeopardize $241 million dollars in federal funding for an entire geographic region in need of those funds.

120.   Plaintiff and the individuals it services have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2, including by cutting off critical revenue that ensures over 11,000 people are housed or sheltered, including 982 families, 2,223 children, 89 veterans, and 1,647 seniors.

/ / /

/ / /

/ / /

## SECOND CLAIM

### Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A)

### Against All Defendants

### (Arbitrary and Capricious Agency Action)

121.   Plaintiff incorporates the above paragraphs as if fully set forth herein.

122.   Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A).

123.   Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Ohio v. Envtl. Prot. Agency*, 603 U.S. 279, 292 (2024) (quotation omitted). The APA requires that agencies provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (quotation omitted) (alteration in original).

124.   HUD's actions as described above are arbitrary, capricious, and an abuse of discretion in multiple ways.

125.   A suspension is a "serious" action, 2 C.F.R. § 180.700, and may only be used "to exclude persons who are not presently responsible from Federal programs." 2 C.F.R. § 180.125(b). As pertinent here, a suspending official may impose suspension only where that official determines both (1) "adequate evidence" exists for a cause for debarment and (2) "[i]mmediate action is necessary to protect the public interest." 2 C.F.R. §§ 180.700, 180.800 (listing recognized causes for debarment).

126.   HUD failed to set forth a reasoned, evidence-based explanation for its conclusion that "adequate evidence" exists to suspect a cause for debarment under 2

C.F.R. § 180.800(b) or (d). HUD does not cite any evidence contemplated by 2 C.F.R. § 180.705 in its June 11, 2026 Suspension Notice. Instead, HUD supports its position with an amalgamation of uncorroborated hearsay information apparently cherry-picked from the internet including online articles from LAist, a local news source.

127.   Most of the audits, reviews, assessments, letters, news articles, and statements at public hearings are not relevant to federal funding at all, but address state and local grants and programs. State and local frameworks for funding are fundamentally distinct from the federal framework.

128.   LAHSA's annual independent audit—which includes both a financial statement audit and a Single Audit evaluating compliance with major federal programs, such as its performance in its roles as CoC Lead Applicant, HMIS Lead, and CoC Coordinator—is conducted by an independent CPA firm. The most recent Single Audit concluded LAHSA's financial statements were "presented fairly in all material respects." The Single Audit also concluded that LAHSA was in compliance with requirements related to its major federal programs, consistent with prior fiscal years.

129.   Moreover, HUD does not provide reasoning supporting its conclusion that any breaches or other past conduct are "so serious as to affect the integrity of a Federal agency program;" nor does HUD identify "[a]ny other cause that is so serious or compelling in nature that it affects [LAHSA's] present responsibility." *See* 2 C.F.R. § 180.800(b), (d). None of the findings in the Single Audit go to the integrity of LAHSA's internal controls over federal funds, or indicate any violation of a HUD agreement.

130.   HUD also failed to provide a reasoned explanation as to why an immediate suspension of LAHSA, in all of its delegated roles, is necessary to protect the public interest. The references in the Suspension Notice date back as far as 2007 and do not demonstrate a lack of present responsibility. LAHSA currently

COMPLAINT

maintains a robust and independent Internal Audit function that reports directly to, and takes direction from, the Commission, with only dotted-line reporting to the interim CEO.

131.   HUD also failed to consider how a blanket suspension on LAHSA will hurt tens of thousands of the Los Angeles region's neediest residents, and it will without question stymie HUD's stated goal of reducing homelessness. HUD also failed to account for the substantial reliance interests of sub-grantees, the local government, and the unhoused—all of which rely on LAHSA.

132.   The terms of the suspension set forth in the June 11 Letter are also arbitrary and capricious because they are vague and indiscernible and fail to provide a sufficiently reasoned basis to guide compliance.

133.   The June 18 letter is further arbitrary and capricious.  Among other things, it prescribes broad remedies, including finding that LAHSA and the LA CoC both have failed "to meet the requirements of 42 U.S.C. § 11360a and 24 C.F.R. part 578 subpart B." But it fails to identify any  "requirement" that LAHSA or the LA CoC does not meet.  The letter then goes on then to state the unfounded conclusion that "because LAHSA is unable to act as its collaborative applicant, the [LA] COC is unable to execute its responsibilities as outlined in 24 CFR §578.7 and §578.9."

134.   The June 18 letter also provides no basis to support its proposed remedial measure that "eligible entities" "submit their grant request directly to HUD," which directly contravenes the statute and Congressional policy favoring local stakeholders participating in the ranking of applications through the local CoC, the Collaborative Applicant, and the Consolidated Application.

135.   Plaintiff and the individuals it serves have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702, including by cutting off critical revenue that ensures over 11,000 people are housed or sheltered, including 982 families, 2,223 children, 89 veterans, and 1,647 seniors.

COMPLAINT

**THIRD CLAIM**

**Violation of Separation of Powers / Spending Clause / Take Care Clause / Ultra Vires Action – U.S. Const., Art. I, Art. II**

**Against All Defendants**

136.   Plaintiff incorporates the above paragraphs as if fully set forth herein.

137.   The Constitution vests in Congress legislative power, including the spending power, *see* U.S. Const., art. I, § 8, cl. 1, and the appropriations power, *see* U.S. Const., art. I, § 9, cl. 7.

138.   "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and citing *id.*, No. 51, at 350).

139.   The separation of powers doctrine thus represents perhaps the central tenet of our constitution, *see, e.g., Trump v. United States*, 603 U.S. 593, 637–38 (2024); *W. Va. v. Envtl. Prot. Agency*, 597 U.S. 697, 723–24 (2022); *Seila Law LLC*, 591 U.S. at 227, and consistent with these principles, the executive acts at the "lowest ebb" of its constitutional authority and power when it acts contrary to the express or implied will of Congress. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

140.   Pursuant to the separation of powers doctrine, the Executive Branch may not "claim[] for itself Congress's exclusive spending power, . . . [or] coopt Congress's power to legislate." *City & Cty. of S.F. v. Trump*, 897 F.3d 1225 1234 (9th Cir. 2018).

141.   Instead, the Constitution vests executive power in the President and imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

142.   Congress exercised its Article I legislative and spending authority to authorize the federal grants and contracts Defendants have placed under review and threatened to—and imminently will—cancel and/or withdraw.

143.   HUD's suspension of LAHSA and the LA CoC is incompatible with and directly contravenes congressional policy as enshrined in statutory law. HUD's suspension unlawfully prevents LAHSA from continuing to perform the statutorily designated functions of the Collaborative Applicant, by, *inter alia*, distributing funds to project sponsors as required by 42 U.S.C. § 11382(d)(3), complying with its federal reporting obligations as required by 42 U.S.C. § 11360a(f)(3), and participating in the FY 2026 NOFO process as contemplated by 42 U.S.C. § 11360a(a). It also suspends LAHSA from all of its "delegated duties"— including those expressly mandated by Congress. These actions are ultra vires.

144.   HUD's attempt to supplant local judgment and abolish the CoC Program in Los Angeles through its proposed remedy of disqualifying both LAHSA and the LA CoC from submitting a Consolidated Application and instead taking only direct applications is also ultra vires and violates the Separation of Powers and the Take Care clause.

145.   HUD seeks to withhold funding from LAHSA to achieve the Executive Branch's political aims and not to faithfully execute the appropriations made by Congress. Defendants' actions alleged herein represent an unconstitutional usurpation of the spending power of Congress, an unconstitutional effort to amend Congressional appropriations, and a violation of the separation of powers. They also are ultra vires.

146.   Federal courts have the equitable power to enjoin unlawful actions by executive officials. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). This Court can and should exercise its equitable power to enter appropriate declaratory and injunctive relief.

/ / /

41

COMPLAINT

## FOURTH CLAIM

### Usurping State Power – U.S. Const. Amend. X

### Against All Defendants

147.   "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., Amend. X.

148.   "In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 533 (2012) ("*NFIB*"). The states "thus can and do perform many of the vital functions of modern government," *i.e.*, the "general power of governing," known as the "police power." *Id.* at 535-36; *see also Printz v. United States,* 521 U.S. 898, 919 (1997) (states retain "a residuary and inviolable sovereignty" (quoting The Federalist No. 39, at 245 (J. Madison)).

149.   Addressing homelessness is the province of "the people and their elected leaders." *See City of Grants Pass, Or. v. Johnson*, 603 U.S. 520, 556 (2024); *LA All. for Human Rights*, 792 F. Supp. 3d at 1092 ("only the voters of Los Angeles have the power to elect representatives to solve these problems").

150.    By suspending LAHSA from performing its "programmatic functions" (*see* June 18 Letter), the federal government has prevented the state and its local government agencies from performing this core state function.

151.   The suspension of LAHSA as a collaborative applicant further disables the state and its local government agencies from being able to carry out the functions of the CoC.

152.   Ultimately, the suspension of LAHSA cripples the state and its local government agencies from addressing homelessness in Los Angeles County, a function reserved for state and local governments. *See City & Cty. of S.F.*, 897 F.3d at 1243 (affirming statewide injunction of policy "intend[ed] to cripple jurisdictions that do not assist in enforcing federal immigration policy"); *Wash. v. United States*

42

COMPLAINT

*Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 878–81 (2020) (ruling that Washington state had stated claims against federal agencies under the APA and the Tenth Amendment concerning a civil arrest policy in or near state courthouses).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court:

A.      Postpone and stay all agency actions set forth in the June 11 and June 18 Letters to LAHSA from HUD pending further judicial review under 5 U.S.C. § 705.

B.      Temporarily, preliminarily and permanently enjoin Defendants, including their agents, servants, employees, partners, and any person acting in concert with them and any person affiliated with them, from suspending, barring, excluding or taking any other adverse action to prevent LAHSA from:

1.      Providing homelessness services or from participating in the CoC Program or any other federal program, as a participant, principal, or Collaborative Applicant;

2.      Carrying out the programmatic functions or other responsibilities delegated to it by the LA CoC, including but not limited to LAHSA's existing functions as HMIS Lead and CES Coordinator and all other programmatic functions, including conducting the PIT count;

3.      Seeking, obtaining or processing reimbursement or payment from HUD on its own behalf or on behalf of other eligible service providers in the LA CoC, pursuant to grant awards and/or cooperative grant agreements previously issued by HUD under the CoC Program for fiscal years 2025, 2024, 2023, and 2022 Special Unsheltered NOFO;

4.      Distributing federal, state, or local grant funds to eligible service providers in the LA CoC;

/ / /

/ / /

43
COMPLAINT

5.     Applying for funding on behalf of the LA CoC under HUD's Fiscal Year (FY) 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants Notice of Funding Opportunity (NOFO); or otherwise;

6.     Preventing the LA CoC from participating in or executing its responsibilities under the CoC Program.

C.     Declare unlawful the suspension and any future debarment of LAHSA and any related actions, including any withholding, withdrawal, termination or cancellation of grant awards, cooperative grant agreements, or federal funding under the CoC Program to LAHSA or its partners;

D.     Award LAHSA its reasonable attorneys' fees and costs in accordance with law; and

E.     Award such other relief as the Court deems just and proper.

DATED: June 29, 2026        WAYMAKER LLP

By:  */s/ Keri Curtis Axel*
KERI CURTIS AXEL
*Attorneys for Plaintiff Los Angeles Homeless Services Authority*

DATED: June 29, 2026        NORTON ROSE FULBRIGHT US LLP

By:  */s/ Christopher Pelham*
Christopher Pelham
*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*

COMPLAINT