Keri Curtis Axel (Bar No. 186847)
kaxel@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
smalzahn@waymakerlaw.com
Ashley E. Martabano (Bar No. 236357)
amartabano@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

Christopher Pelham (Bar No. 241068)
christopher.pelham@nortonrosefulbright.com
Abigail G. Urquhart (Bar No. 310547)
abigail.urquhart@nortonrosefulbright.com
Alex Scandroli (Bar No. 345278)
alex.scandroli@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
555 South Flower Street
Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494

*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*

WAYMAKER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

LOS ANGELES HOMELESS SERVICES AUTHORITY, a joint powers authority,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES

Case No. 2:26-cv-07056 PA (AJRx)

**PLAINTIFF LOS ANGELES HOMELESS SERVICES AUTHORITY'S EX PARTE APPLICATION FOR PRELIMINARY RELIEF UNDER 5 U.S.C. § 705, FOR A TEMPORARY RESTRAINING ORDER, AND FOR PRELIMINARY INJUNCTION**

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as the Secretary of the U.S. Department of Housing and Urban Development; and DOES 1-10,

Defendants.

WAYMAKER

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 3

A. Congress's Approach to Addressing and Alleviating Homelessness: The Local Continuum of Care ..... 3

1. Congress Revamps Funding for Homeless Services in 2009 ..... 4

2. Congress Designed the CoC Program to Prioritize Funding Consistency and Respect for Local Decision-Making ..... 5

3. Timing and Administration of the Consolidated Application ..... 6

(a) Annual Administration of the CoC Program ..... 6

(b) The Consolidated Application ..... 8

B. LAHSA ..... 9

1. LAHSA As Collaborative Applicant ..... 10

2. LAHSA As HMIS Lead: Tracking the Unhoused and Providing Key Data to Government and Stakeholders ..... 10

3. LAHSA As CES Lead: Matching Persons Experiencing Homelessness With Services and Permanent Housing ..... 12

4. LAHSA As Administrator of PIT Count ..... 13

5. LAHSA As Grant Recipient for Itself and Subgrantees ..... 14

(a) The Grant Cycle ..... 14

(b) LAHSA's FY 2025 Unfunded Grants and Subgrantees ..... 14

C. The Trump Administration Seeks to Contravene Congressional Priorities for Homelessness Funding ..... 16

1. The Administration Signals Its Intent to Change Policy on Homelessness and to Defund the LA CoC ..... 16

2. HUD Issues the Unlawful Policy-Driven FY 2025 NOFO ..... 16

3. The District Court of Rhode Island Enjoins the FY 2025 NOFO ..... 18

4. Congress Requires HUD to Fund the CoCs per Statute ..... 18




WAYMAKER

5. The President's FY 2027 Budget .......... 19

D. The Suspension Letters .......... 20

1. The June 11 Suspension Notice .......... 20

2. The June 18 CoC Suspension .......... 22

III. LEGAL STANDARD FOR PRELIMINARY RELIEF .......... 23

IV. LAHSA IS LIKELY TO SUCCEED ON THE MERITS .......... 24

A. The Suspension of LAHSA Is Final Agency Action .......... 24

B. HUD's Suspension of LAHSA Is Likely Contrary to Law and In Excess of its Authority, In Violation of the APA .......... 26

1. HUD's Suspension of LAHSA Overrides Congressional Mandates .......... 27

2. HUD's Suspension of LAHSA from Carrying Out Programmatic Functions Exceeds HUD's Authority and Is Contrary to Law .......... 30

C. HUD's Suspension Decision Is Arbitrary, Capricious, and an Abuse of Discretion .......... 32

1. HUD Failed to Give a Reasoned, Evidence-Based Explanation for Its Suspension .......... 33

2. HUD Failed to Consider the Effect of Its Suspension Decision on the Problem of Homelessness in the LA CoC .......... 38

D. HUD's Wide-Ranging Actions Likely Violate the Constitution and Are Ultra Vires .......... 41

1. HUD's Suspension of LAHSA and LA CoC Likely Violate the Separation of Powers, the Tenth Amendment, and Are Ultra Vires .......... 42

2. HUD's Apparent Suspension of FY 2025 Grants to LAHSA Is Unconstitutional and Ultra Vires .......... 44

V. LAHSA, THE HOMELESSNESS SERVICES PROVIDERS IN THE LA COC, AND THE UNHOUSED OF LOS ANGELES ALL WILL BE IRREPARABLY HARMED .......... 46

VI. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF GRANTING PRELIMINARY RELIEF .......... 49

VII. CONCLUSION .......... 50

# TABLE OF AUTHORITIES

**Page**

## CASES

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .......... 23

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061 (9th Cir. 2019) .......... 32

*Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907 (N.D. Cal. 2025) .......... 50

*Bennett v. Spear*, 520 U.S. 154 (1997) .......... 24

*Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) .......... 43

*City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) .......... passim

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .......... 30

*City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290 (2013) .......... 44

*City of Chicago v. U.S. Department of Homeland Security*, 815 F. Supp. 3d 727 (N.D. Ill. 2025) .......... 46

*City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520 (2024) .......... 31

*Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 780 F. Supp. 3d 897 (N.D. Cal. 2025) .......... 46

*County of Santa Clara v. Noem*, 815 F. Supp. 3d 979(N.D. Cal. 2025) .......... 46

*Delta Rocky Mountain Petroleum, Inc. v. U.S. Dep't of Defense*, 726 F. Supp. 278 (D. Colo. 1989) .......... 38

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .......... 41

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) .......... 46

*Earth Island Inst. v. Muldoon*, 82 F.4th 624 (9th Cir. 2023) .......... 33



WAYMAKER

*Figg Bridge Engineers, Inc. v. Federal Highway Administration*, 2020 WL 4784722 (D.D.C. August 17, 2020) ... 34

*Frech v. U.S. Dep't of Health and Suman Services*, 2025 WL 3563196 (D.D.C. December 12, 2025) ... 39

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ... 49

*Horne Bros., Inc. v. Laird*, 463 F.2d 1268 (D.C. Cir. 1972) ... 34

*Immigr. Defs. Law Ctr v. Noem.* 145 F.4th 972 (9th Cir. 2025) ... 23

*In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) ... 45

*In the Matter of: Tracy W. Humble & Whitney Fin. Servs., Inc.*, HUDALJ 90-1450-DB, 1990 WL 10522030 (H.U.D.A.L.J. Apr. 17, 1990) ... 33

*LA All. for Hum. Rts. v. City of Los Angeles*, 792 F. Supp. 3d 1049 (C.D. Cal. 2025) ... 31, 43

*Love v. Thomas*, 858 F.2d 1347, 1358 (9th Cir. 1988) ... 41

*Morrison v. Olson*, 487 U.S. 654 (1988) ... 43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ... 32

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ... 30

*Nat'l TPS All. v. Noem*, 166 F.4th 739 (9th Cir. 2026) ... 41

*Nken v. Holder*, 556 U.S. 418 (2009) ... 23, 49

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ... 32

*Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990) ... 45

*Oregon Council for Humans. v. United States DOGE Serv.*, 794 F. Supp. 3d 840 (D. Or. 2025) ... 30, 45

*Oregon Natural Desert Ass'n v. U.S. Forest Service,* 465 F.3d (9th Cir. 2006) ... 24

*Pacito v. Trump*,
169 F.4th 895 (9th Cir. 2026) .......... 28, 29, 41

*Printz v. United States*,
521 U.S. 898 (1997) .......... 30

Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Air Force,
128 F.4th 1089 (9th Cir. 2025) .......... 24

*Rodriguez By & Through Corella v. Chen*,
985 F. Supp. 1189 (D. Ariz. 1996) .......... 49

*Rodriguez v. Robbins*,
715 F.3d 1127 (9th Cir. 2013) .......... 49

*Sackett v. Envtl. Prot. Agency*,
566 U.S. 120 (2012) .......... 25

*San Francisco Herring Ass'n v. Dep't of the Interior*,
946 F.3d 564 (9th Cir. 2019) .......... 25

*Sloan v. Dep't of Housing & Urban Dev.*,
231 F.3d 10 (D.C. Cir. 2000) .......... 39

*Television Stations*,
556 U.S. 502 (2009) .......... 28

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
967 F.2d 598 (D.C. Cir. 1992) .......... 44

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) .......... 46

*Washington v. Trump*,
766 F. Supp. 3d 1138 (2025) .......... 46

*Washington v. U.S. Dep't of Transp.*,
792 F. Supp. 3d 1147 (W.D. Wash. 2025) .......... 25

*Washington v. United States Dep't of Educ.*,
167 F.4th 1241 (9th Cir. 2026) .......... 30

*Winter v. National Resources Defense Council*,
555 U.S. 7 (2008) .......... 23

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) .......... 49

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .......... 42

**STATUTES**

2 C.F.R. § 180.125 .......... 38, 39
2 C.F.R. § 180.700 .......... 20, 32, 34, 38
2 C.F.R. § 180.800 .......... passim
2 C.F.R. § 5.3 .......... 34
24 C.F.R. § 578 .......... passim
24 C.F.R. § 587 .......... 11
42 U.S.C. § 11301(b) .......... 4
42 U.S.C. § 113260 .......... 38
42 U.S.C. § 11360 .......... passim
42 U.S.C. § 11381 .......... 4, 5, 44
42 U.S.C. § 11382 .......... passim
42 U.S.C. § 11383 .......... 4
42 U.S.C. § 11386 .......... 5, 6, 7, 8
42 U.S.C. § 12711 .......... 27
42 U.S.C. §§ 11381 .......... 4
5 U.S.C. § 704 .......... 24
5 U.S.C. § 706 .......... 26, 32
Consolidated Appropriations Act of 2026 (H.R. 7148), Pub. L. No. 119-75, div. D, 140 Stat. 173 (2026) .......... 14, 18, 45
Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12) .......... 17
Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009 (HEARTH Act), Pub. L. No. 111-22, div. B, § 1002(b)(2), 123 Stat. 1632 (2009) .......... 5

**OTHER AUTHORITIES**

Cal. Health and Safety Code § 50222 .......... 11, 43

**REGULATIONS**

77 Fed. Reg. 45422, 45427 .......... 6

## I. INTRODUCTION

The Los Angeles Homeless Services Authority ("LAHSA") is a Joint Powers Agency created by the City of Los Angeles ("City") and the County of Los Angeles ("County") to serve several key functions in the Los Angeles region's provision of services to the unhoused. Among other things, LAHSA serves as the single applicant for federal funds for the Los Angeles Continuum of Care ("LA CoC"), a regional structure created by Congress to coordinate resources to address homelessness at the local level. LAHSA has performed this Congressionally-mandated function since the 1990s.

The Trump Administration has made clear, however, that it wants to eliminate the Continuum of Care ("CoC") program, which it calls "burdensome" and "unaccountable." Despite the fact that the CoC is enshrined in statute and has received bipartisan support across five administrations, the Administration's 2027 budget attempts to defund and eliminate the program. It also expressly names LAHSA, the lead applicant for the largest CoC in the Country, as an example of the "need to overhaul" the "failed and harmful" CoC program.

Not content to debate these policy differences with Congress, on June 11, 2026, the U.S. Department of Housing and Urban Development ("HUD") sent LAHSA a letter purporting to immediately suspend it from participation in transactions with HUD. Scott Turner, HUD Secretary, has subsequently claimed that HUD "investigated LAHSA" and found "waste, fraud and abuse," but this is false. The letter contains no HUD investigative findings at all, but relies on a mash up of old news articles, out of context comments from public officials, and findings from routine public audits—most of which do not concern federal programs at all—that included recommendations that were adopted or where remediation is in progress.

On June 18, 2026, LAHSA received a follow up letter. This letter purported to suspend not only LAHSA but the entire LA CoC (85 cities including the City) from submitting a "Consolidated Application" for 2026 grant funding, although the



WAYMAKER

Consolidated Application is required by statute and regulation. Without any factual findings, the letter also purported to suspend LAHSA from carrying out "the programmatic functions delegated to it by the [LA CoC]."

HUD's actions violate the Administrative Procedure Act ("APA") and the United States Constitution and should be immediately stayed and enjoined. Neither the June 11 nor June 18 letters exhibit the "reasoned decisonmaking" required to support such a broad, summary suspension; HUD's "findings" and the remedies HUD imposes are arbitrary and capricious. There can be no doubt that the Administration's real intent is to scrap the Congressionally-mandated CoC system. Such an effort violates the separation of powers under the Constitution. Further, it violates the Tenth Amendment, as it seeks to force a federal executive agenda onto Los Angeles, when combatting homelessness is quintessentially a state and local function. Ultimately, the Administration is happy to impose its illegal policy agenda at the expense of the people experiencing homelessness in Los Angeles that LAHSA serves; on the homelessness services providers who depend on LAHSA to coordinate their funding; and on LAHSA's state and local partners in the fight against homelessness—all of whom will be irreparably harmed by LAHSA's purported suspension.

HUD has failed to consider the effect of its suspension decision on the unhoused people of Los Angeles and the providers who support them. In addition to its role as lead applicant for all federal funding to the LA CoC, LAHSA has other "delegated duties" that are equally critical to the provision of services to the unhoused and would be equally irrevocably harmed by LAHSA's suspension. One critical function of LAHSA is to run the federally-mandated information hub for the region's homelessness assistance program, the Homeless Management Information System ("HMIS"). HMIS is used by about 400 agencies and nearly 8,000 individual users to track and serve the unhoused population and is also used by countless unhoused individuals to upload documents to apply for housing. At any given time,

LAHSA's HMIS system has 175,000-250,000 active program participants. Congress requires this data to be kept and submitted in certain mandatory reports. LAHSA cannot simply flip off the switch on a system that federal, state, and local authorities rely upon and that the County—its largest funder—depends on it to maintain. LAHSA also administers the Coordinated Entry System ("CES"), without which unhoused individuals cannot be matched with providers of permanent housing.

HUD has failed to consider the balance of harms and reasonable alternatives to suspension; indeed, HUD is not interested in reasonable alternatives at all. The Administration has made no bones about its intent not only to eliminate the CoC program generally, but to disrupt the provision of homelessness services in Los Angeles specifically. Irreparable harm is therefore not only an inexorable consequence of the LAHSA suspension; it is the whole point.

The balance of equities and the public interest plainly favor immediate relief from HUD's illegal actions. This Court should grant a stay of the suspension under the APA, a temporary restraining order ("TRO"), and ultimately a preliminary injunction to ensure that LAHSA can continue to carry out its Congressionally-mandated responsibilities.

## II. STATEMENT OF FACTS

### A. Congress's Approach to Addressing and Alleviating Homelessness: The Local Continuum of Care

The Continuum of Care program ("CoC Program") is Congress's primary response to homelessness—supporting housing and other essential services for hundreds of thousands of unhoused people, including many disabled and older individuals, veterans, and families. The backbone of the CoC Program is funding permanent housing and, along with it, supporting long-term community stability. Congress has promoted this housing stability by prioritizing renewals of local, effective projects and guarding against dramatic funding fluctuations. This approach provides stability for the individuals and families it serves, promotes safer



WAYMAKER

communities, and reduces burdens on local law enforcement, hospitals, and emergency shelter resources.

### *1. Congress Revamps Funding for Homeless Services in 2009*

In 1987, Congress enacted the McKinney-Vento Homeless Assistance Act ("McKinney-Vento Act") "to meet the critically urgent needs of the homeless of the Nation" and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b). For 20 years following the Act's passage, HUD administered three separate programs—the Supportive Housing program, Shelter Plus Care program, and Section 8 Moderate Rehabilitation Single Room Occupancy program—to focus "on the longer-term housing and services needs of homeless individuals and families." (Request for Judicial Notice ("RJN") Ex. A at 10.)

In 2009, Congress passed the Homeless Emergency Assistance and Rapid Transition to Housing ("HEARTH") Act, which amended the McKinney-Vento Act to consolidate these three programs under the umbrella of the CoC Program, which is designed to support communities in responding to homelessness at the local level. 42 U.S.C. §§ 11381-11389. The HEARTH Act does this by recognizing local or regional "Continuums of Care" (a term Congress created in the Act (*id.*))—bodies responsible for coordinating HUD's federal funding along with other available resources for homelessness response within the region. *See* 24 C.F.R. § 578.3.

The CoC Program seeks to end homelessness by relying on local stakeholders to effect a comprehensive local plan. 24 C.F.R. § 578.1(b)(1)(2024). The CoC Program funds critical homelessness services administered by grant recipients either directly or through subgrantees. The CoC Program funds various programs, including permanent or transitional housing, rental assistance, rehousing support, and supportive services such as childcare, job training, healthcare, mental health services, trauma counseling, and life skills training. *See* 42 U.S.C. §§ 11360(29), 11383.

WAYMAKER

In the HEARTH Act, Congress expressly prioritized year-after-year renewals of grants. The Act requires HUD to "increase the estimated need amount" for a particular geographic area as "necessary to provide 1 year of renewal funding for all expiring [CoC grant] contracts" for that area. 42 U.S.C. § 11386a(b)(2)(B)(iii); *see also* 42 U.S.C. § 11386a(c) (HUD may adjust the geographic need formula "as necessary[] to ensure that each [CoC] has sufficient funding to renew all qualified projects for at least one year"). Congress has also taken steps to ensure that renewal projects could provide the same level of service despite rising costs. *See, e.g., id.* § 11382(f) ("[w]hen providing renewal funding for leasing, operating costs, or rental assistance for permanent housing," HUD shall "make adjustments proportional to increases in the fair market rents in the geographic area"); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, 138 Stat 25, 363 (2024) (authorizing HUD to "make reasonable adjustments to renewal amounts to enable renewal projects to operate at substantially the same levels."). One of the jobs of the Collaborative Applicant is to identify projects that qualify for the prioritized renewal funding, which are generally automatically approved by HUD.

### *2. Congress Designed the CoC Program to Prioritize Funding Consistency and Respect for Local Decision-Making*

Congress has expressly recognized the local CoC Program process as an "integral local function" "necessary to generate the local strategies for ending homelessness." HEARTH Act, Pub. L. No. 111-22, div. B, § 1002(b)(2), 123 Stat. 1632, 1664 (2009); *see also* 42 U.S.C. § 11381 (legislative focus is "community-wide commitment to the goal of ending homelessness"). Under the statute, one entity, the Collaborative Applicant—another term defined by Congress (42 U.S. Code § 11360)—is responsible for coordinating a single application for HUD program funds for the region. *Id.* § 11360a(a); 24 C.F.R. § 578.15.

HUD has recognized the primacy of local decision-making in an interim rule in effect since 2012 (*see* 24 CFR Part 578, HEARTH Act; Continuum of Care




WAYMAKER

Program ("CoC Interim Rule")) which, per HUD, "governs the CoC Program." (*See* RJN Ex. B; Declaration of Jessica Reed ("Reed") ¶ 5.)[1] The CoC Interim Rule requires that a CoC be established by representatives from "relevant organizations within a geographic area," which can include "nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, hospitals, universities, affordable housing developers, law enforcement, and organizations that serve veterans and homeless and formerly homeless individuals." The Preamble for the Interim Rule explains the rationale for this requirement: "a centralized assessment system . . . must be designed locally in response to local needs and conditions." 77 Fed. Reg. 45422, 45427 (July 31, 2012) (preamble to interim rule codified at 24 C.F.R. Part 578).

The Collaborative Applicant administrates a local competition to determine what projects and service providers will be part of its consolidated federal application (the Consolidated Application), and how it will rank them. *See* 42 U.S.C. § 11382; 24 C.F.R. § 578.9. The statute permits an individual entity to apply on its own only if it "attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner." 42 U.S.C. § 11382(i).

### ***3. Timing and Administration of the Consolidated Application***

#### (a) <u>Annual Administration of the CoC Program</u>

In the HEARTH Act, Congress set forth various requirements for HUD's administration of the CoC Program, including timing requirements, eligibility and selection criteria, conditions to which grantees must agree, and other mandates. 42 U.S.C. § 11386.

[1] All declarations cited in this brief are filed concurrently herewith in support of this Application.

As to timing requirements, the statute provides that "the Secretary shall release a notification of funding availability" for CoC grants—also known as a "notice of funding opportunity" or "NOFO"—"not later than 3 months after" Congress has enacted the relevant appropriations statute. 42 U.S.C. §11382(b). It then must announce conditional awards "within 5 months" after the NOFO application deadline. *Id.* § 11382(c)(2)(A). Once a recipient meets all relevant requirements for a final award (*i.e.*, obtaining matching funds and passing environmental review), HUD must "obligate the funds for the grant" within 45 days. *Id.* § 11382(d)(2).

HUD awards funds to eligible recipients through a national competition between geographic areas based on criteria including previous performance, according to metrics specified in the statute. *Id.* § 11386a(b). The program competition period begins when HUD publishes the Fiscal Year ("FY") CoC Program Competition NOFO and ends when HUD issues the final funding announcement for that year's conditionally awarded funds. (RJN Ex. C at 3.)

Before a Collaborative Applicant can submit a Consolidated Application as part of any year's CoC Program Competition, the applicant must be registered with HUD for that fiscal year. Collaborative Applicants must complete their registration using HUD's web-based portal. (Reed ¶ 9.) The registration process only applies to Collaborative Applicants who will register to submit the annual Consolidated Application; the registration process does not apply to project applicants or private individuals as HUD does not provide funding to private individuals. (RJN Ex. C at 2.) Non-profits and local government applicants may only apply directly where they "attempted to participate" in the regional CoC process but "believe they were denied the right to participate in a reasonable manner." 24 C.F.R. § 578.35.

HUD itself tells applicants not to change Collaborative Applicants mid-stream:

> Generally, the Collaborative Applicant approved by [HUD] during the CoC Program Registration process prior to each FY CoC Program Competition must be the same organization that will submit the CoC Consolidated Application (the CoC Application, CoC Priority Listing that lists all project applications accepted and ranked or rejected in the CoC local competition, and the Project Application(s)) during the CoC Program Competition.

(RJN Ex. C at 5.) There are limited circumstances in which a Collaborative Applicant can be changed, and it would require HUD approval.

Although the Collaborative Applicant registration period generally opens in January with a due date in April, this year, HUD did not open registration until April 1 and set an April 23 deadline. (Reed ¶¶ 11–12). Nevertheless, as it has for decades, LAHSA timely registered and was approved by HUD. (*Id*. ¶¶ 8, 13–15). Accordingly, as LA CoC's registered Collaborative Applicant, only LAHSA can access the application documents on behalf of LA CoC. (*Id*. ¶ 28.)

HUD published the FY 2026 NOFO on June 1, 2026, but the application has not been published. (*Id*. ¶ 16.) The application deadline is August 26, 2026. (*Id*.)

(b) <u>The Consolidated Application</u>

One of the critical roles the Collaborative Applicant plays in compiling the Consolidated Application is to identify and rank projects in the region, helping direct federal funds where they can best be used in coordination with local community funds and services. HUD requires Collaborative Applicants to rank projects in two tiers: "Tier 1," which are renewal projects, and "Tier 2," which are new projects. *See* 42 U.S.C. §§ 11386a(b)(2) and (c); 24 C.F.R. § 578.17. (*See* Reed ¶ 10.) Typically Tier 1 renewal projects have received about 90 percent of each CoC's annual renewal demand ("ARD"), which is generally the maximum funding available for that geographic area consistent with the goal of stability. 24 C.F.R. § 578.17(b); RJN Ex. D; Reed ¶¶ 10, 18. Tier 1 projects are typically funded so long as eligible; thus CoCs often choose to list renewal projects in Tier 1 to ensure stability in their local communities. (Reed ¶¶ 19, 21.)



WAYMAKER

The process of identifying and ranking projects is resource-intensive, especially in a large CoC like the LA CoC. (*Id.* ¶ 22.) Having a single Collaborative Applicant prioritizing projects likely to be approved helps local communities anticipate in advance the funding that HUD will provide, while using local funds to plug gaps and provide wraparound services.

**B. LAHSA**

By Congressional design and HUD regulation, all CoCs must delegate an entity to serve in four key roles: (1) as the Collaborative Applicant, which functions as the System's Chief Executive Officer ("CEO") or strategist; (2) as the HMIS Lead, which is akin to a data and systems manager responsible for the local information technology system used to collect client-level data and data on the provision of housing and services to individuals and families at risk of and experiencing homelessness; (3) as the CES coordinator, which serves as an operations manager for client flow (*see* 24 C.F.R. § 578.7; Reed ¶ 4; Declaration of Bevin Kuhn ("Kuhn") ¶ 4); and (4) as administrator of the PIT count. LAHSA also serves in a fifth role, common to many Collaborative Applicants, which is acting as a grantee, receiving funding to perform its own functions and submitting funding and reimbursement requests on behalf of subgrantees, who are service providers providing services directly to the unhoused.

In many CoC's, each of these functions is performed by different entities. In Los Angeles, the largest CoC in the United States, LAHSA performs all of them. (*See* Reed ¶¶ 24-26.)

WAYMAKER

### *1. LAHSA As Collaborative Applicant*

Since the 1990s, LAHSA has acted as LA CoC's Collaborative Applicant,[2] coordinating the application process on behalf of all government entities and service providers in the CoC. (Reed ¶ 5.) In this role, LAHSA functions as the region's strategic leader—setting the vision, aligning stakeholders, and serving as the primary interface with HUD. It is responsible for ensuring that local priorities are reflected in project selection, and guiding region-wide planning efforts to reduce homelessness. (Reed ¶ 6; Declaration of Sarah Mahin ("Mahin") ¶ 8; Declaration of Gerald C. Jones ("Jones") ¶¶ 7–8.) In this role, LAHSA acts much like a "system CEO" that steers both strategy and accountability. (Reed ¶ 6.)

### *2. LAHSA As HMIS Lead: Tracking the Unhoused and Providing Key Data to Government and Stakeholders*

Along with being LA CoC's lead applicant, LAHSA is also responsible for operating as LA CoC's HMIS Lead. (Reed ¶ 6; Mahin ¶ 6.) HMIS is a complex, federally mandated database that tracks demographic and service usage data, including a census of people using homelessness-related services. (Reed ¶ 4, n. 1.) This data is mission-critical for LA CoC's ability to continue to function. (*See* Kuhn ¶¶ 14–20.)

The HMIS database serves multiple core functions. It is the database through which LAHSA and service providers connect people with housing and related services. (Kuhn ¶¶ 25–27.) Once a person is entered into the HMIS database, they can then be matched with housing and services offered by service providers. (*See* Declaration of Kim Farnham ("Farnham") ¶¶ 7–10.) If the HMIS database were shut down, persons newly experiencing homelessness could not be assessed and added to the database, blocking them from receiving services (*see* Kuhn ¶¶ 37–38); and no

[2] LA CoC Governance Charter; *available at* https://www.lahsa.org/documents?id =8693-la-coc-governance-charter-approved-version-12-11-2024-.pdf. (*See also* Reed ¶ 5.)



WAYMAKER

applicants could be matched with housing, including about 25,000 people currently on the HMIS waitlist for permanent housing. (*Id.* ¶¶ 14, 42.)

Furthermore, federal law requires that LAHSA use HMIS to record client data and report to HUD on program performance, including the submission of several detailed annual reports which collectively are called the Annual Homeless Assessment Report ("AHAR"). *See* 42 U.S.C. §§ 11386-388; 24 C.F.R. §§ 587.7(b); 42 U.S.C. § 11360a(f)(3). (*See generally* Kuhn ¶¶ 14b, 30 (identifying mandated reports and related statutes and regulations).) HUD cannot meet its statutory obligations without the data LAHSA provides. Failure to submit these reports also could result in LA CoC's compliance rating being lowered, which in turn could result in the loss of millions of dollars in annual federal funding. (*Id.* ¶¶ 14b, 32–34.) In addition to federal law, California state law also mandates operation of an information management system for receiving homelessness service funding. *See, e.g.,* Cal. Welf. & Inst. Code §§ 8256(d), 8257(b)(13); Cal. Health and Safety Code §§ 50219(a)(9)-(10), 50220.5(b)(6)-(7), 50220.6, 50222. If LAHSA were no longer to operate its HMIS database, that critical funding also would be jeopardized. (Kuhn ¶ 14; *see also* Mahin ¶ 6 ("stability of HMIS operations is critical to the LA CoC and County-funded homeless programs").)

LA CoC HMIS is, by a massive margin, the largest in the country. (Reed ¶ 5.) LAHSA's HMIS system currently supports approximately 400 agencies and 7,700 individual users, along with profiles for 175,000 to 250,000 individual participants. (Kuhn ¶¶ 14c, 22.) For context, the next largest HMIS in the country, which covers the entire state of Washington, has only 4,000 users. (*Id.* ¶ 23.)

Administering such a massive, complex database requires highly trained and specialized staff. Currently, LAHSA employs about 50 specialized staff to administer HMIS and its related functions. (*Id.* ¶ 28.) Because of the technical, database-specific nature of these specialists' work, another entity cannot simply take

WAYMAKER

over the database, and critical data would be lost if LAHSA simply suspends its efforts. (*See id*. ¶¶ 14d, 29.)

### *3. LAHSA As CES Lead: Matching Persons Experiencing Homelessness With Services and Permanent Housing*

As the CES coordinator, LAHSA oversees the operational flow of individuals and families through the homelessness response system. CES is a federally mandated system that manages a standardized, equitable process for accessing housing and services, ensuring that those with the highest needs are prioritized. (Kuhn ¶¶ 35–36; Farnham ¶¶ 3–6.) LAHSA coordinates assessments, referrals, and placements across the provider network, maintains by-name lists, and monitors system performance to address disparities and improve outcomes. (Farnham ¶¶ 7–16.) In this operational role, LAHSA acts as the "manager of client flow," ensuring that resources are matched efficiently and fairly to those in need. (*Id*. ¶¶ 10–12; Mahin ¶ 8 (LAHSA facilitates "matching of permanent supportive housing resources to eligible homeless households").)

To administer CES, LAHSA must ensure that two databases, HMIS (discussed above) and the Resource Management System ("RMS") work in harmony to match people with available housing. (Kuhn ¶¶ 37–42.) RMS is a database that hosts real time inventory of available housing resources across the CoC. (*Id*. ¶ 37.) LAHSA employs a specialized staff of 39 employees who just help match eligible individuals with permanent housing. (Farnham ¶¶ 10–12.)

The CES program depends on the continued functionality of both the HMIS and RMS databases in order to generate the thousands of housing matches LAHSA makes each year. (Kuhn ¶¶ 42–43.) If the functionality of HMIS or RMS were disrupted, or LAHSA's role in running CES were suspended, no new housing matches could be generated, and the 25,000 people currently on the waitlist for permanent housing would be stuck in limbo, with no viable way to get housing placements. (*Id*. ¶¶ 43–44; Farnham ¶¶ 17–18.) Furthermore, if the RMS database

were nonfunctional, LAHSA's CES team would not know how many housing units were available, which could result in people sleeping in the streets while vacant units go unfilled. (*See id.*)

#### *4. LAHSA As Administrator of PIT Count*

HUD mandates that a point-in-time ("PIT") Count be conducted biannually. (Declaration of Paul Rubenstein ("Rubenstein") ¶ 4.) The agency relies on these PIT Counts as another part of its AHAR to Congress that provides critical information, such as nationwide estimates of the unhoused population, and includes information about the demographic characteristics of unhoused persons, service use patterns, and the capacity to house persons experiencing homelessness. (*See* Kuhn ¶¶ 30–31; Rubenstein ¶ 3.)

For the last ten years, the CoCs in Los Angeles County have elected to conduct a PIT count every year. (Rubenstein ¶ 8.) The LA CoC has delegated this responsibility to LAHSA. (*Id.*) This duty requires LAHSA to design and execute an enumeration methodology that is fully compliant with HUD standards. (*Id.* ¶ 9.) Operationally, LAHSA manages the logistics of the unsheltered Adult street count by recruiting, training, and deploying community volunteers, public employees, and professional outreach workers across LA CoC census tracts. (*Id.*)

LAHSA also partners with academic institutions to conduct detailed demographic surveys and executes rigorous data validation and quality assurance protocols. (*Id.* ¶ 10.) Concurrently, the agency directs the sheltered Housing Inventory Count in coordination with emergency, transitional, and safe haven housing providers. (*Id.*) LAHSA formally submits this finalized data to HUD to secure and maintain the region's eligibility for federal homelessness funding. (*Id.*)

For 2026, LAHSA conducted the unsheltered PIT Count in January (*id.* ¶ 12), and submitted its initial data to HUD in the spring. If the proposed HUD suspension takes effect, LAHSA likely will not be able to complete its 2026 PIT Count process. (*Id.* ¶ 14.) Should that occur, HUD would not have an accurate count for the Los



WAYMAKER

Angeles area (the largest homeless population in the country) to include in its AHAR to Congress. (*Id.*; *see also* Mahin ¶ 5.) And, since HUD mandates that the PIT Count occur within a 10-day period at the end of January, it would be difficult for the LA CoC to conduct the 2027 PIT Count.

#### ***5. LAHSA As Grant Recipient for Itself and Subgrantees***

##### (a) <u>The Grant Cycle</u>

HUD operates under a reimbursement model, whereby grantees are expected to provide services first and then submit requests for reimbursement. (Reed ¶ 44.) No reimbursement requests can be processed until HUD has confirmed an award with a fully executed grant agreement. (Reed ¶ 44), after which a grantee can seek reimbursement through HUD's electronic funding system. (*Id.* ¶¶ 45–46.)

After award letters are sent, recipients generally rely on the promise of federal dollars in their operations, even though there is often a significant delay between the issuance of award letters and the provision of executed grant agreements. (*Id.* ¶ 45.) During this period, grantees are in a form of limbo—they have the promise of funds but no executed grant agreement they could use to demand payment, and no funds available to draw down. (*Id.* ¶ 45.)

##### (b) <u>LAHSA's FY 2025 Unfunded Grants and Subgrantees</u>

In conjunction with HUD's national priorities for CoCs, the LA CoC's portfolio of grants, as submitted by LAHSA as the Collaborative Applicant, is over 90 percent dedicated to permanent housing, with 75 percent allocated to permanent supportive housing for individuals with disabilities who require housing on a long-term basis. (Reed ¶ 41.) LAHSA's own organizational portfolio, as a direct grant applicant, includes transitional housing for youth and domestic violence survivors, in addition to permanent housing. (*Id.* ¶ 42.)

Due to the grant cycle, LAHSA's FY 2024 grants are expiring and will continue to expire monthly throughout 2026. As further discussed below, in the Consolidated Appropriations Act of 2026 (H.R. 7148) (the "2026 CAA"), Congress



WAYMAKER

expressly required HUD to issue 2025 awards. CAA, 2026, Pub. L. No. 119-75, div. D, 140 Stat. 173, 399 (2026). The HEARTH Act then requires funds to be obligated no later than 45 days of an award. 42 U.S.C. § 11382(d)(2). But LAHSA has not received signed grant agreements for its expiring grants. (Reed ¶ 54.) Fourteen of LAHSA's already-expired grants cover twelve specific service providers who are now floating their own costs with no immediate path to reimbursement for the funds that HUD has agreed to—and was in fact ordered by Congress—to disperse. (*Id.*) HUD's suspension therefore threatens to leave service providers without the funds they need to continue operating. (*Id.* ¶¶ 54, 58.)

The projects for which HUD has approved awards but whose grant agreements have expired (or will expire by June 30) include the following organizations: 1736 Family Crisis Center; A Community of Friends; The People Concern; Jewish Family Services; House of Ruth Claremont; SRO Housing Corporation; Penny Lane; Rainbow Services; Jenesse Center; Project New Hope; Antelope Valley Domestic Violence Council; and Downtown Women's Center. (*Id.*) Several of these organizations serve survivors of domestic violence and transitional age youth. (*Id.*; Declaration of Shiva Berjis ("Bergis") ¶¶ 3, 6.) HUD's failure to follow Congress's express directions in renewing these funds poses immediate existential risk to these organizations. (Declaration of Pat Bell ("Bell") ¶¶ 4–5; *see also* Berjis ¶¶ 5-6.) Under HUD's suspension notice, these organizations are soon likely to face an urgent lack of funds that may threaten their ability to continue providing critical services to the unhoused. (Reed ¶ 58; *see, e.g.,* Berjis ¶¶ 5–7.)

Further, many of LAHSA's subrecipients, which are direct providers of services to the unhoused, do not have the resources or bandwidth to compile an application to HUD. (Reed ¶ 37.) They rely on LAHSA and cooperate with it to assemble the information needed to submit applications on their behalf. (*Id.* ¶ 37; Bell ¶¶ 8–9 (House of Ruth "does not have the capacity" to apply to HUD



WAYMAKER

ourselves”); Berjis ¶¶ 8–9 (Penny Lane, a subgrantee, “depend[s] on LAHSA to provide application to HUD on [its] behalf).)

### C. The Trump Administration Seeks to Contravene Congressional Priorities for Homelessness Funding

#### *1. The Administration Signals Its Intent to Change Policy on Homelessness and to Defund the LA CoC*

On July 24, 2025, President Trump issued an Executive Order (the “Executive Order”) embracing a new policy focused on “ending crime and disorder” on the streets by prioritizing criminal enforcement, drug treatment, institutionalization, and civil commitment of the mentally ill. (RJN Ex. E.)

That same week, Amy Perkins, a LAHSA Commission member and homelessness advisor to L.A. County Supervisor Lindsey Horvath, met with senior representatives of HUD, and a senior HUD political appointee told her that he would recommend there be no HUD funding coming to Los Angeles. (Declaration of Christopher Pelham (“Pelham”) Ex. 1).

#### *2. HUD Issues the Unlawful Policy-Driven FY 2025 NOFO*

Prior to the change in administration, in a bipartisan bill, Congress authorized HUD to run a single competition to cover awards for both FY 2024 and 2025. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. F, tit. II, § 242. This allowed HUD to solicit and review applications once and use the results of that competition to make awards both for FY 2024 and, once funds were appropriated, for FY 2025.

Consistent with Congressional mandates, HUD issued a NOFO for fiscal years 2024 and 2025 (“the FY 24-25 NOFO”), which, as it had for decades, prioritized permanent housing solutions to homelessness. Communities undertook their local processes and applied to the combined FY24-25 NOFO. HUD made FY 2024 awards in January 2025. Funding became available for FY 2025 awards in March 2025. On March 15, 2025, a bipartisan Congress then enacted a continuing resolution appropriating $3.544 billion for the CoC and related programs. Full-Year



WAYMAKER

Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12).

Because HUD had issued a two-year NOFO, no new FY 2025 NOFO was required. If, however, HUD wanted to issue a new NOFO for awarding 2025 funds, it was required to do so within three months, that is, by June 15, 2025. *See* 42 U.S.C. § 11382(b). But HUD did not issue a new NOFO by June 15, 2025.

On July 3, 2025, HUD announced its mere intention to publish a new FY 2025 NOFO. (RJN Ex. F.) This was not only late but insufficient to meet Congress's mandate: it provided few details beyond stating that the NOFO would "seek to provide opportunities for new types of projects including street outreach and transitional housing programs." (*Id.*)

Congress took notice. On November 13, 2025, members of the Senate, including Patty Murray, the Vice Chair of the Senate Committee on Appropriations, sent HUD Secretary Turner a letter to express "deep concerns regarding the instability the entire homeless support system could face if funding delays, uncertainty, and rushed policy changes continue." (RJN Ex. G at 1.) The letter noted that HUD's planned 2025 NOFO appeared to propose "harmful and potentially illegal changes that could result in nearly 200,000 older adults, chronically homeless Americans with disabilities, veterans, and families being forced back onto the streets." (*Id.*)

On November 13, 2025—eight months after Congress appropriated FY 2025 funds for the CoC Program and mere weeks before awards normally would have issued—HUD issued a new FY 2025 NOFO. (RJN Ex. M.) In one sentence, HUD rescinded the FY24-25 NOFO (as it applied to FY 2025) with no explanation. (*Id.*) In HUD's own words, the FY 2025 NOFO was intended to effect "the most significant policy reforms and changes in the program's history." (RJN Ex. H.)

### *3. The District Court of Rhode Island Enjoins the FY 2025 NOFO*

The FY 2025 NOFO was challenged in two lawsuits filed in the District of Rhode Island: one filed by a coalition of national nonprofits, CoC providers, and municipal governments, *National Alliance to End Homelessness v. United States Department of Housing and Urban Development*, Case No. 1:25-cv-00636, filed December 1, 2025 ("*NAEH*"); and the second filed by a group of Attorneys General, *State of Washington et al. v. United States Department of Housing and Urban Development*, filed November 25, 2025 ("*State of Washington*"). Plaintiffs sought preliminary and permanent relief to enjoin the FY 2025 NOFO, primarily on the basis that it contravened the statute and Congressional intent. (*NAEH*, Dkt. No. 5; *State of Washington*, Dkt. No. 11.)

HUD withdrew the NOFO on December 8, 2025, just prior to a hearing on plaintiffs' requested preliminary relief. (*NAEH*, Dkt. No. 39; *State of Washington*, Dkt. No. 41.) On December 23, 2025, the Rhode Island District Court issued orders in both matters staying the 2025 NOFO and ordering HUD to preserve the status quo ante. (*NAEH*, Dkt. No. 52; *State of Washington*, Dkt. No. 68.)

### *4. Congress Requires HUD to Fund the CoCs per Statute*

On February 3, 2026, Congress stepped in. In the CAA, Congressed increased HUD's budget earmarking over $4 billion for homelessness services—an increase of $366 million. 2026 CAA, 2026, Pub. L. No. 119-75, div. D, 140 Stat. 173, 399 (2026). The 2026 CAA gave HUD certain deadlines by which it had to make new awards for 2025 or simply renew the 2024 expiring grants. *Id.* (*See generally* Complaint ¶ 82.)

All of LAHSA's 2024 grants were subsequently renewed by HUD for 2025, with the awards confirmed in writing. (*See* Reed ¶¶ 50-54.) This amounts to $248.2 million in HUD awards for FY 2025. (Declaration of Matthew W. Szabo ("Szabo") ¶ 4; *see* Reed ¶¶ 24, 53.) But none of LAHSA's grants have been formalized with

grant agreements, despite the fact that HUD is statutorily required to commit their funding. (*Id.* ¶ 54.) For those subgrantee organizations whose grants expired in quarter one (ending March 31, 2026), or whose grants have or will expire in quarter two (ending June 30, 2026), despite the fact that HUD has confirmed these organizations' 2025 grants through award letters, these organizations have been (or soon will be) providing services without an avenue for reimbursement. (*Id.* ¶¶ 50-54.) In total, 12 organizations are already operating under expired grant agreements, which means they are funding their own operations but anticipating the federal funds guaranteed by the award letters. (*Id.* ¶¶ 54, 58; Bell ¶ 4; Berjis ¶¶ 4–6.) As each month passes without the grant commitments that HUD was required by Congress to provide, LAHSA and its subgrantee service providers will have no ability to access their grant funding, without which these organizations may not be able to continue to serve the needs of the unhoused in Los Angeles.

#### ***5. The President's FY 2027 Budget***

On April 3, 2026, the White House released President Trump's 2027 budget, which proposes to eliminate the CoC Program, calling it "failed and harmful" and "administratively burdensome." (RJN Ex. L at 30.) The budget expressly calls out LAHSA as, in the Administration's view, "an example of the need to overhaul the unaccountable CoC system" and alleges (1) that LAHSA "has an abysmal record of reducing what is the highest number of street individuals in the United States," and (2) that an independent audit issued in March 2025 found that [LAHSA] failed to accurately track billions of Federal and local dollars." (*Id.* at 31.) Both of these claims are false,[3] but closely track similar false claims in the June 11 Suspension Notice. (Declaration of Janine Lim ("Lim") ¶¶ 5–6.)

[3] HUD Secretary Turner recently made similar claims on a podcast interview, claiming with no foundation that HUD "investigated LAHSA" and found "waste, fraud and abuse[.]" (*See* Pelham ¶ 3.)



WAYMAKER

### D. The Suspension Letters

#### *1. The June 11 Suspension Notice*

On June 11, 2026, HUD Deputy Secretary Andrew D. Hughes sent a letter (the "June 11 Letter") to LAHSA CEO Gita O'Neill advising that HUD's Office of Inspector General ("OIG") had opened an investigation into LAHSA[4] due to "[i]nformation that has come to light demonstrating that LAHSA may have committed violations of federal law in performing its obligations under HUD grant agreements." (Declaration of Gita O'Neill ("O'Neill") Ex. C.) The letter, however, provided no detail about the scope or nature of that investigation, citing "privilege." (*Id*. at 2 n. 1.) It advised that, because of that apparently just-opened investigation, the agency was "immediately suspending LAHSA from future participation in . . . transactions as a participant or principal, with HUD" and all other federal agencies pending the investigation's outcome. (*Id*. at 2.)

As a legal basis for suspension, HUD purports to rely on a single provision of a government-wide suspension framework issued by the Office of Management and Budget: 2 C.F.R. § 180.700. The June 11 Letter advised that, under 2 C.F.R. § 180.700(b) HUD has "more than adequate evidence to suspect" a basis for LAHSA's debarment (the causes for which are enumerated at 2 C.F.R. § 180.800), and that LAHSA's immediate suspension was "necessary to protect the public interest" as required 2 C.F.R. § 180.700(c). (*Id*. at 2.) According to HUD, LAHSA's purported violations of "the terms of numerous public agreements or transactions" were sufficiently serious to "affect the integrity of multiple HUD funding programs under [2 C.F.R. §] 180.800(b), and that LAHSA's actions and inactions affect its present responsibility under [2 C.F.R. §] 180.800(d)." (*Id*. at 2.)

The June 11 Letter asserts three categories of purported violations to support its decision to suspend LAHSA with immediate effect. First, HUD contends that

[4] Prior to the letter, LAHSA was not aware of any OIG investigation into LAHSA.

LAHSA has "chronic and systemic" problems with financial management and internal controls. (*Id*. at 4.) Specifically, HUD claims that, since November 2024, "audits, assessments, and lawsuits reveal consistent and continued failures related to" payments to service providers, as well as with monitoring and integrity programs. (*Id*. at 5.) As discussed further below, this is simply false: none of the "audits, assessments, and lawsuits" that HUD cites relate to fraud or misrepresentations by LAHSA. (Declaration of Christopher Williams ("Williams") ¶ 9.) In fact, outside of a 2022 HUD-OIG audit, none of those prior reviews examined LAHSA's compliance with HUD regulations. (Williams ¶¶ 6, 22.) Moreover, the Single Audit cited by HUD concluded that LAHSA's financial statements were "presented fairly in all material respects" and that LAHSA was compliant with requirements related to its Major Federal Programs. (Lim ¶¶ 56.) The June 11 Letter also omits mention of the fact that LAHSA has adopted corrective actions to remedy each of the issues raised in those reviews. (Williams ¶¶ 15, 21, 34, 38, 42; Lim ¶¶ 5–8; Pelham ¶¶ 29–31.)

Second, the June 11 Letter raises concerns about past conflicts of interest at LAHSA. For example, HUD claims that LAHSA did not maintain a formal, written conflict of interest policy until one was adopted on September 26, 2025.[5] (O'Neill Ex. C at 9-10.) This is one of several critical misstatements in the letter, as LAHSA's written conflict of interest policy dates back to at least 2001 (although the

---

[5] The June 11 Letter extensively discusses a conflict of interest that arose in October 2024, when LAHSA approved a $2.1 million contract with a service provider that employed the husband of LAHSA's then-Chief Executive Officer, Dr. Va Lecia Adams Kellum. (O'Neill Ex. C at 9.) Dr. Adams Kellum resigned in July 2025. (*See* Pelham ¶ 24.) As discussed further below, Dr. Adams Kellum had nothing to do with the contract award. (*Id.*) Although the June 11 Letter states that it has "reason to suspect" that LAHSA has conflict of interest problems beyond this isolated incident, HUD cites no supporting evidence. (*See* O'Neill Ex. C at 10.) Notably, the letter omits to state that HUD closed its investigation of the alleged Dr. Adams Kellum conflict. (*See* Pelham ¶ 31.)

policy was amended in September 2025 to include a procedure for seeking HUD waivers of potential conflicts). (Pelham ¶ 17, Ex. 13.)

Finally, HUD asserts that suspension is appropriate because, in its recurring applications for CoC funds, LAHSA submitted periodic statements to HUD certifying that LAHSA maintained adequate accounting systems, conflict of interest protocols, and other compliance safeguards. These claims are unsupported and insupportable. (*See* O'Neill Ex. C at 8; *infra* at IV (C)(1).)

The June 11 Letter advised LAHSA that it could contest the suspension by submitting a written request for a hearing within 30 days. (*Id*. at 12.) Although the June 11 Letter made clear it was intended to have immediate effect, it was unclear whether the suspension applied only to future grants, whether it constituted a complete freeze on LAHSA spending (which would affect the millions of dollars in service provider payments currently due), and whether it applied to LAHSA's role as Collaborative Applicant, HMIS lead, CES coordinator, or PIT count administrator. The letter either appeared ignorant of, or agnostic to, the many hats LAHSA wears in coordinating services among local governments and boots-on-the - ground service providers to serve the unhoused of Los Angeles.

### *2. The June 18 CoC Suspension*

On June 18, 2026, HUD followed up with a short second letter ("June 18 Letter"). (O'Neill Ex. B.) This letter, entitled "Notice of Findings and Proposed Remedial Action," contains no fact findings at all, presumably relying on the same hodgepodge of internet sources the June 11 letter cites, but embraces new sweeping conclusions and imposes new remedial measures.

The June 18 letter states that, pending the outcome of the previously-unknown HUD-OIG investigation, "LAHSA is no longer eligible to serve as a collaborative applicant for the Los Angeles CoC or apply for" the FY 2026 NOFO. (*Id*.) Further, it states that LAHSA may not act on behalf of the LA CoC "either as

its collaborative applicant *or in its other delegated duties*[,]" which presumably includes its HMIS, CES, and PIT count responsibilities. (*Id.* (italics added).)

HUD bases these new prohibitions on a purported finding that not only LAHSA, but the entire LA CoC "do not meet the requirements of 42 U.S.C. § 11360a and 24 C.F.R. part 578 subpart B." (*Id.*) In other words, the letter purports to disqualify not only LAHSA but also the LA CoC, without any statutory or regulatory basis to do so. But the letter fails to identify any "requirement" that LAHSA, much less the LA CoC as a whole, does not meet.

Finally, HUD concludes that, in lieu of a Consolidated Application by a Collaborative Applicant as mandated by Congress, it finds it in the "public interest to allow eligible entities to submit their grant request directly to HUD." (O'Neill Ex. B.)

## III. LEGAL STANDARD FOR PRELIMINARY RELIEF

The APA authorizes courts "to postpone the effective date of an agency action" or "preserve status or rights" pending resolution of the proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. "[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Immigrant Defenders Law Ctr. v. Noem,* 145 F.4th 972, 995 (9th Cir. 2025).

To obtain preliminary relief of either type, the movant must establish (1) "a likelihood of success on the merits," (2) likely "irreparable harm . . . absen[t] preliminary relief," (3) "that the balance of equities tips in [the movant's] favor, and" (4) "that an injunction is in the public interest." *Winter v. Nat'l Res. Defense Council*, 555 U.S. 7, 20 (2008). Where "the government is the opposing party[,]" the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because an injunction is an equitable remedy, the Court may apply a sliding scale; a stronger showing on one element may offset a weaker showing on another. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).



WAYMAKER

## IV. LAHSA IS LIKELY TO SUCCEED ON THE MERITS

LAHSA is likely to succeed on the merits of its claims because the challenged actions—HUD's wholesale suspension of LAHSA in all its capacities—unlawfully disrupts Congress's carefully crafted statutory framework for the provision of homelessness services on a local basis, defies the guardrails for agency decision-making set out in the APA, and violates the Constitution.

### A. The Suspension of LAHSA Is Final Agency Action

As a threshold matter, HUD's immediate suspension of LAHSA constitutes final agency action subject to judicial review. 5 U.S.C. § 704. An agency action is final if it (1) "consummat[es] [] the agency's decisionmaking process" and (2) determines "rights or obligations" or imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotations omitted). The Ninth Circuit applies the final agency action test "in a pragmatic and flexible manner," looking to "the practical and legal effects" of the action. *Prutehi Litekyan: Save Ritidian v. United States Dep't of Air Force*, 128 F.4th 1089, 1108 (9th Cir. 2025) (cleaned up). Relevant indicia include whether the action "amounts to a definitive statement of the agency's position," whether it has "a direct and immediate effect on the day-to-day operations" of the party, and whether "immediate compliance is expected." *Id.*

This test is unequivocally satisfied here. HUD made the definitive decision to "immediately suspend[]" LAHSA's participation in the CoC Program "as a participant or principal." (O'Neill Ex. C at 2.) When LAHSA asked HUD to clarify the effect of this suspension, HUD made clear that, *inter alia*, LAHSA "may not carry out the programmatic functions delegated to it" and "is unable to submit applications for or receive funding through the FY 2026 CoC Competition[.]" (O'Neill Ex. B at 1.) HUD's pronouncements have "the status of law or comparable legal force, and . . . immediate compliance . . . is expected." *Or. Natural Desert Assn v. United States Forest Serv.,* 465 F.3d 977, 987 (9th Cir. 2006). These actions have a direct and dramatic effect on the day-to-day operations of LAHSA and LA




WAYMAKER

CoC. That debarment proceedings may later occur and HUD "might reconsider" its position "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. Envtl. Prot. Agency*, 566 U.S. 120, 127 (2012); *see, e.g., Wash. v. United States Dep't of Transp.*, 792 F. Supp. 3d 1147, 1176–78 (W.D. Wash. 2025) (February 2025 funding freeze determined final despite agency's ongoing review because freeze had immediate operational effect); *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 578–79 (9th Cir. 2019).

Here, the effects of HUD's suspension would be immediate and final: First, as to LAHSA's critical functions as HMIS lead, CES coordinator, and PIT count administrator, these roles cannot simply be stopped and later started up by LAHSA post-agency appeal. The data required by Congress and state and local entities would not exist, people experiencing homelessness would not even enter the system, much less be able to be matched to supporting services and permanent housing, and the whole system would grind to a halt. (Kuhn Decl. ¶ 14; Malin Decl. ¶¶ 5–7.) Congress, HUD, and local authorities would not receive the mandated reporting information that is critical to sensible policy making.

As to the FY 2026 NOFO, the application for which is due August 26, 2026, HUD's nuclear option of purportedly disqualifying not only LAHSA but the entire LA CoC from submitting a Consolidated Application, and instead requiring "entities to submit their grant requests directly to HUD" (O'Neill Ex. B), would shatter the Los Angeles homelessness funding structure for 2027 and cause wide disruption, including putting formerly unhoused people back onto the streets.

The process of preparing the Consolidated Application is complex and well underway. (Reed ¶¶ 29–30.) The deadline to register as a Collaborative Applicant with HUD for 2026 has already passed, and HUD has already accepted LAHSA's registration. (*Id.* ¶ 15.) LAHSA began its preparations for the Consolidated Application months ago. (*See id.* ¶¶ 34–35.) As the registrant, LAHSA is the only entity which can access the application documents on behalf of LA CoC. (*Id.* ¶ 28.)

HUD published its NOFO for FY 2026 on June 1, 2026. "[I]t takes months of advance work to prepare the application each year", requiring, *inter alia*, ranking of projects, tiered classification, narratives and data collection for scoring purposes, preparation of "more than a hundred individual project applications", and more. (*Id.* ¶¶ 17–27.) There simply is no practical or feasible way for anyone other than LAHSA to do the application. (*Id.* ¶¶ 28–30, 37–39; Berjis ¶ 9; Mahin ¶¶ 11–13.) LAHSA's suspension as Collaborative Applicant therefore would have the likely effect of denying LA CoC a Consolidated Application, given the sophistication required to prepare the application as well as the timing of the suspension, which comes in the middle of the application process with substantial work necessary to meet the August 26 deadline. (Reed ¶ 40; Mahin ¶¶ 13–14.)

Setting aside the impracticality of supplanting LAHSA as Collaborative Applicant, HUD has made clear it has disqualified not only LAHSA but the entire LA CoC from submitting a Consolidated Application in any event. (O'Neill Ex. B ("the [LA] CoC is unable to execute its responsibilities" "eligible entities [may] submit their grant requests directly to HUD").) This also represents a final agency decision, given that the application is due August 26. By the time LAHSA and LA CoC can exhaust their administrative remedies, the application window will have closed.

### B. HUD's Suspension of LAHSA Is Likely Contrary to Law and In Excess of its Authority, In Violation of the APA

Under the APA, a court shall hold unlawful and set aside an agency action "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right", or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A) (B), (C), (D). Congress created a statutory scheme and appropriated funds to address homelessness on a local basis through the CoC Program. HUD's purported suspension of LAHSA from serving as locally designated Collaborative Applicant



WAYMAKER

and performing its critical programmatic functions contravenes congressional mandates, is contrary to law, and exceeds HUD's authority.

### *1. HUD's Suspension of LAHSA Overrides Congressional Mandates*

Under the statutory scheme established by Congress, "representatives from relevant organizations" within a geographic area (including non-profits, government entities and others) choose a collaborative applicant to apply for federal funds and to perform other CoC functions. *See* 42 U.S.C. § 11360a(a); 24 C.F.R. §§ 578.5(a), 578.15; CoC Interim Rule, 24 CFR Part 578.5(a).[6] By disqualifying not only LAHSA as Collaborative Applicant but purportedly the entire CoC from submitting a Consolidated Application, in favor of HUD receiving direct applications, HUD's actions violate a Congressional plan delegating to the local CoC a voice in the direction of federal funding through the Consolidated Application. HUD's intent to abolish the CoC Program is clear and unlawful.

HUD's proposed remedial measure of permitting solo entities to apply directly is also contrary to statute and regulation in that only a CoC may apply through a Consolidated Application, unless the CoC planning process has excluded the applicant. 42 U.S. Code § 11382(i); 24 C.F.R. § 578.35. The solo entities also cannot practically conduct the balancing of applications that the Collaborative Applicant conducts. HUD apparently proposes to do this balancing itself, demonstrating its ultra vires intent.

[6] Further recognizing the importance of respecting local communities' roles in addressing homelessness in their areas, Congress took steps to ensure that HUD does not unduly interfere in state and local policymaking. In particular, 42 U.S.C. § 12711 bars HUD from "establish[ing] any criteria for allocating or denying funds . . . based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law" so long as the jurisdiction had authority and does not violate federal law.

Further, HUD's suspension violates Congress's instructions to fund fiscal year 2025 grants. In February 2026, Congress specifically directed HUD to award FY 2025 renewal projects on a timely basis to ensure that CoCs "operate at substantially the same levels[.]" 2026 CAA, 2026, Pub. L. No. 119-75, div. D, 140 Stat. 173, 399 (2026). The HEARTH Act establishes additional timing requirements. *See* 42 U.S.C. § 11382. Once a recipient meets all relevant requirements for a final award, HUD "shall obligate the funds for the grant involved" within 45 days. 42 U.S.C. § 11382(d)(2). "The word '*shall* is mandatory.'" *Pacito v. Trump*, 169 F.4th 895, 934 (9th Cir. 2026) (emphasis in original).

Notably, HUD issued renewal award letters to the LA CoC for all four quarters of FY 2025. (Reed ¶¶ 50-52.) Relying on HUD's awards, LAHSA and service providers in the LA CoC have already committed, and in some cases expended, millions of dollars for homeless assistance services for FY 2025. (Reed ¶ 44; Berjis ¶¶ 4–6; Bell ¶¶ 3–5.) Where an agency, such as HUD, changes policy, it must "show that there are good reasons for the new policy," and it must demonstrate it has considered any "serious reliance interests." *Fed. Commc'ns Comm'n v. Fox Television Stations*, 556 U.S. 502, 515 (2009). This did not happen. Neither the June 11 nor June 18 Letters makes any mention of reliance interests of the public and non-public entities which rely on LAHSA to administer the LA CoC and manage the disbursement of funds. (*See* Reed ¶ 44, 54, 58; Berjis ¶¶ 4–6; Bell ¶¶ 3–5; *see also* Mahin ¶ 13 ("By disqualifying LAHSA and the LA CoC at this stage . . . HUD is denying the LA CoC the ability to analyze its applicants, submit its own prioritization, and make plans to use other state and local funds to plug [funding] gaps").)

HUD's collective actions jeopardize millions of dollars in federal funding for an entire geographic region in need of those funds. Before HUD's recent actions, service providers already were forced to frequently self-finance due to delays in the execution of federal grant agreements. (*See* Reed ¶ 45; Berjis ¶ 5; Bell ¶¶ 4.) HUD's

actions now leave those service providers wholly exposed to the costs they fronted based on the expectation of federal reimbursement. (*See* Reed ¶¶ 56–58; Berjis ¶ 6; Bell ¶ 5.) HUD has yet to confirm whether it will execute grant agreements for the FY 2025 renewal period despite having previously issued awards for this period. (*See* Pelham ¶ 36a.) At present, there are 12 service providers without executed grant agreements; these providers may be forced to cease operations absent the previously awarded funding. (Reed ¶¶ 54, 58; Berjis ¶¶ 4–10.)

Moreover, HUD's reliance on the "remedial action" provision in subsection (c) of 42 U.S.C. § 11360a is misplaced. This provision merely states that "the Secretary may take remedial action to ensure fair distribution of grant amounts under part C to eligible entities within that area." 42 U.S.C. § 11360a(c); 24 C.F.R. § 578.13. However, HUD does not base its suspension of LAHSA on any claim that it has failed to fairly distribute grant funds to eligible entities within LA CoC. *See* 42 U.S.C. § 11360a(c); 24 C.F.R. § 578.13. In any event, HUD fails to explain how or why it is better situated than LAHSA to prioritize and distribute grant funds to the relevant organizations within LA CoC. Likewise, the suspension and debarment procedure set forth in the OMB Guidelines was not designed to permit a categorical freeze of federal funds for an entire region in contravention of the congressionally mandated funding established for the CoC Program.

Where Congress has specifically appropriated funds and directed a federal agency to obligate them on a non-discretionary timeline, the agency must spend those funds and cannot substitute its judgment for Congress's. For example, in *Pacito*, 169 F.4th 895, the Ninth Circuit ruled that the Executive Branch's defunding of a congressionally established refugee resettlement program likely violated the APA. *Pacito* recognized that "Congress established a comprehensive statutory framework for providing resettlement services to newly admitted refugees" and "directed that the Government 'shall'" provide certain services and benefits. *Id*. at 933. The court in *Pacito* then cited several statutes requiring the federal government



WAYMAKER

to provide refugees with specific services and assistance, also noting that "Congress has committed substantial appropriations to fund refugee resettlement." *Id*. at 934; *see also Wash. v. United States Dep't of Educ.*, 167 F.4th 1241, 1246–1247 (9th Cir. 2026) (finding grant cutoffs "contrary to law" where agency invoked general "best interest" provisions to enforce new, broad policy shifts and circumvent mandatory rulemaking to withhold congressionally appropriated funds); *Or. Council for Humans. v. United States DOGE Serv.*, 794 F. Supp. 3d 840, 884 (D. Or. 2025) (federal agency's termination of arts grants for a federal/state partnership likely violated the APA where Congress had established a mandatory "statutory formula" for such grant funding).

#### *2. HUD's Suspension of LAHSA from Carrying Out Programmatic Functions Exceeds HUD's Authority and Is Contrary to Law*

HUD's purported suspension of LAHSA from "carry[ing] out the programmatic functions delegated to it by the Los Angeles CoC" lacks legal authority and impermissibly interferes with the core sovereign police functions of state and local governments. (*See* O'Neill Ex. B.) When a federal agency is charged with administering a statute, "both [its] power to act and how [it is] to act [are] authoritatively prescribed by Congress." *City of Arlington, Tex. v. Fed. Commc'ns Comm.*, 569 U.S. 290, 297 (2013); *see also City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1243 (9th Cir. 2018) (affirming statewide injunction of policy "intend[ed] to cripple jurisdictions that do not assist in enforcing federal immigration policy").

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533 (2012) ("*NFIB*"). The states "thus can and do perform many of the vital functions of modern government," *i.e.*, the "general power of governing," known as "police power." *NFIB,* 567 U.S. at 535–36. Police power generally includes "the facets of governing that touch on citizens' daily lives." *Id.* at 536; *see also Printz v. United States*, 521 U.S. 898, 919 (1997) (states retain "a



WAYMAKER

residuary and inviolable sovereignty" (quoting The Federalist No. 39, at 245 (J. Madison))); U.S. Const., Amend. X.

LAHSA is a state-created entity jointly formed in 1992 by the City and County of Los Angeles to combat homelessness—a quintessential local problem. "Functionally, LAHSA is the primary entity responsible for implementing the funding provided by the City for homelessness-related services." *LA All. for Human Rights v. City of L.A.*, 792 F. Supp. 3d 1049, 1060 (C.D. Cal. 2025). It is the province of "the people and their elected leaders" to address homelessness. *See City of Grants Pass, Or. v. Johnson*, 603 U.S. 520, 556 (2024) (local officials may pass ordinances that prohibit the unhoused from camping in public spaces); *LA All. for Human Rights*, 792 F. Supp. 3d at 1092 (declining request to impose receivership on LAHSA, stating that "only the voters of Los Angeles have the power to elect representatives to solve these problems"). Reflecting their central role, state and local governments in California provide the majority of funding for LAHSA—not HUD.

Although the June 11 Letter is vague in certain respects, HUD purports to prohibit LAHSA from performing any programmatic functions which include administration of the HMIS and CES systems. These systems are used to match individuals to state-funded and locally funded housing and services. (Kuhn ¶¶ 25–27; Farnham ¶ 3.) California law requires LAHSA to maintain HMIS operations on a statewide basis and to otherwise combat homelessness. *See supra* at Section II.B.2. (Kuhn ¶ 14e.) "If LAHSA were unable to perform its HMIS and CES functions, the matching process for permanent supportive housing in Los Angeles would be seriously impaired. Families with children, individuals fleeing domestic violence, veterans, and the most vulnerable people in our community—whether in interim housing, a shelter, or on the street—would have no pathway to stable housing." (Farnham ¶ 17; *see also* Szabo ¶ 9.) Moreover, there is nothing in the Act that authorizes HUD to "suspend" a designated collaborative applicant from "carry[ing]

WAYMAKER

out the programmatic functions delegated to it by the [applicable] CoC" as HUD purports to do here. (*See* O'Neill Ex. B.) Critically, HUD made no attempt to explain how it will ensure that the congressionally mandated programmatic functions of a CoC are carried out in LAHSA's absence. HUD cannot simply abandon those functions, and this Court "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocs. v. United States Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005).

### C. HUD's Suspension Decision Is Arbitrary, Capricious, and an Abuse of Discretion

HUD's decision to suspend LAHSA also should be stayed and enjoined for the independent reason that it likely is "arbitrary, capricious, [and] an abuse of discretion[.]" *See* 5 U.S.C. § 706(2)(A). Under the APA, an agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted); *see also Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1080 (9th Cir. 2019) ("[T]he touchstone of 'arbitrary and capricious' review . . . is 'reasoned decisionmaking.'") (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52). That test is not met.

As relevant here, a suspending official may impose suspension only where that official determines both (1) "adequate evidence" exists for a cause for debarment and (2) "[i]mmediate action is necessary to protect the public interest." 2 C.F.R. §§ 180.700, 180.800 (listing recognized causes for debarment). HUD failed to set forth a reasoned, evidence-based explanation for its conclusion that "adequate evidence" exists to suspect a cause for debarment under 2 C.F.R. 180.800(b) or (d). It also failed to provide a reasoned explanation as to why an immediate suspension of LAHSA is necessary to protect the public interest; to the contrary, HUD failed to

consider how LAHSA's suspension would make the problem of homelessness in the Los Angeles region worse. *See Earth Island Inst. v. Muldoon*, 82 F.4th 624, 633 (9th Cir. 2023) (agency action is arbitrary and capricious where "the agency relied on factors Congress did not intend it to consider, [or] entirely failed to consider an important aspect of the problem").

#### ***1. HUD Failed to Give a Reasoned, Evidence-Based Explanation for Its Suspension***

HUD arbitrarily and capriciously suspended LAHSA, without adequate evidence to suspect a cause for debarment. The grounds for debarment are set forth in 2 C.F.R. § 180.800. A federal agency may debar a person who has been convicted or found civilly liable for fraud or a criminal offense. 2 C.F.R. § 180.800(a); *see, e.g., In the Matter of: Tracy W. Humble & Whitney Fin. Servs., Inc.*, HUDALJ 90-1450-DB, 1990 WL 10522030 (H.U.D.A.L.J. Apr. 17, 1990) (mortgage broker convicted of fraud debarred from HUD business for a two-year period). In stark contrast here, HUD does not base its suspension on any criminal or civil judgment. In fact, none of the materials HUD cites include audit findings, review recommendations, or even public statements detailing allegations of fraud or criminal conduct by LAHSA itself. (Lim ¶ 9; Williams ¶ 5–9.)

Instead, HUD bases its suspension decision on a suspected "'[v]iolation of the terms of a public agreement or transaction so serious as to affect the integrity of a Federal Agency program.'" (O'Neill Ex. C at 2 (quoting 2 C.F.R. § 180.800(b) (further stating that such a violation includes "willful failures to perform in accordance with the terms of public agreements, a history of such failures, or a willful violation of 'a statutory or regulatory provision or requirement applicable to a public agreement or transaction.'") But the June 11 Letter does not identify any particular agreement, transaction or contract term that LAHSA violated for any specific time period. (*See* O'Neill Ex. C at 4, n. 6 (vaguely referring to regulatory requirements related to financial management, internal controls, conflicts of interest

and mandatory disclosures that "are incorporated into the program-specific regulations governing HUD grant programs").) Nor does it assert that any violations by LAHSA were "willful," as contemplated by § 1800.800(b).

The June 11 Letter and accompanying exhibits do not reflect "adequate evidence" to substantiate a contract violation so serious as to jeopardize a federal agency program. The "adequate evidence" standard has been likened to the probable cause standard applicable in a criminal case for an arrest or search warrant. *Horne Bros., Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C. Cir. 1972). It is "less than [what] must be shown at the [criminal] trial, but it must be more than uncorroborated suspicion or accusation." *Id.*; *see* 2 C.F.R. § 180.900 ("adequate evidence is defined as "[i]nformation sufficient to support the reasonable belief that a particular act or omission has occurred"). The governing regulations contemplate the kinds of evidence that "may" be considered in making a suspension determination, namely, (1) "[t]he basic documents" (*e.g.*, the applicable grants or cooperative agreements); (2) "[a]n indictment, criminal information, conviction, civil judgment, or other official [government] findings"; and (3) "[o]ther indicators of adequate evidence" such as "warrants and their accompanying affidavits." 2 C.F.R. § 180.705(b)(1)-(3); *see, e.g., Figg Bridge Engr's, Inc. v. Fed. Highway Admin.*, 2020 WL 4784722, *4 (D.D.C. August 17, 2020) (federal agency suspended engineering company following collapse of pedestrian bridge based on probable cause findings in the National Transportation Safety Board's report).

HUD does not cite *any* evidence contemplated by 2 C.F.R. § 180.705. This may be because there are no indictments, convictions, judgments, official findings, or affidavits to cite. Instead, HUD supports its position with an amalgamation of uncorroborated hearsay information apparently cherry-picked from the internet. (Lim ¶ 9; Williams ¶ 6.)

Among other things, HUD cites online articles from LAist, a local news source, for stories about LAHSA's former CEO who resigned in the summer of

2025. Yet LAHSA's outside counsel investigated these allegations and concluded that LAHSA's former CEO did not act "improperly or unethically with respect to agreements" with a LAHSA subgrantee. (Pelham ¶ 11, Ex. 8; Lim ¶¶ 10–14.) HUD, moreover, closed out its compliance inquiry into LAHSA's former CEO—the only specific conflict concern HUD cites in the agency's June 11 Letter—and found that LAHSA took sufficient remedial action to enhance its conflict of interest policies. (Pelham ¶ 28, Ex. 22.) HUD cannot close that inquiry, credit LAHSA's remedial measures, and then recycle the same issue as a basis for adverse action—the agency's pretextual about-face is a far cry from adequate evidence.[7]

HUD repeatedly mischaracterizes facts in the June 11 Letter. (*See* Lim ¶¶ 4-28; Williams ¶¶ 5–9, 12-21; O'Neill ¶¶ 19–22; Pelham Exs. 3-9.) For example, HUD describes and attaches a November 14, 2024 LA City Controller Announcement (O'Neill Ex. C-6 (Ex. 18)), stating that "LAHSA failed to spend $513 million in public funds that were budgeted during fiscal year 2024, pointing to a lack of staff and old technology." However, the facts referenced in this announcement concern the City, not LAHSA. (Williams ¶ 7.)

Indeed, most of the audits, reviews, assessments, letters, news articles, and statements at public hearings are not relevant to federal funding at all, but address state and local grants and programs. (Williams ¶¶ 22–30.) What the letter does not state—but HUD well knows—is that state and local frameworks for funding are fundamentally distinct from the federal framework. For example, state and local funders impose a cost-reimbursable payment model—under which providers must first incur expenses, submit invoices, and then await reimbursement. (*See* Lim ¶ 17).

---

[7] Nor could HUD establish any evidence, let alone adequate evidence, that LAHSA failed to maintain conflict of interest policies at the time LAHSA made certifications to HUD. From the outset of LAHSA's participation in the CoC Program, in fact much earlier, LAHSA has maintained and enforced written conflict of interest policies. (Pelham ¶¶ 17–22.)

This structure is dictated by the funders, not by LAHSA. (*Id.* ¶¶ 17-28.) By contrast, once HUD issues a grant agreement and a reimbursement for HUD funding is requested, the federal drawdown process makes funds available within about three business days, and as a result, outstanding federal payables have rarely exceeded 30 days. (*See id.* ¶¶ 19-20.) Criticisms of payment delays under the state and local model therefore say nothing about LAHSA's administration of federal funds.

Similarly, the only audits that are relevant to LAHSA's compliance with federal laws and regulations are the federal audits which include the Single Audit and HUD OIG Audits. (Williams ¶ 6.) The annual independent audit—which includes both a financial statement audit and a Single Audit evaluating compliance with major federal programs, such as its performance in its roles as LA CoC's selected lead applicant, HMIS Lead, and CoC Coordinator—is conducted by an independent CPA firm. (Williams ¶ 11; *see* Lim ¶¶ 5-6.) The most recent Single Audit concluded LAHSA's financial statements were "presented fairly in all material respects." (Williams ¶ 11; Lim ¶5.) The Single Audit also concluded that LAHSA was in compliance with requirements related to its major federal programs, consistent with prior fiscal years.[8] (*Id.*) In other words, LAHSA most recently had a clean Single Audit. (Lim ¶ 5.) With respect to the HUD OIG audits—the only other instrument directly relevant to federal program compliance—there are no significant unresolved findings: the 2007 audit findings are resolved, and, of the 2022 findings, two are fully implemented and one is in progress, with full implementation underway. (Williams ¶¶ 15–21.) Further, none of the findings go to the integrity of

[8] The Single Audit made one internal controls observation related to "timeliness," a subjective, undefined term. (Lim ¶ 6.) But the auditor expressly did not audit internal controls and "does not express an opinion on the effectiveness of Los Angeles Homeless Services Authority's internal control." (*Id.*) Accordingly, these observations are not opinions and do not constitute findings of noncompliance with federal program requirements.

LAHSA's internal controls over federal funds, or indicate any violation of a HUD agreement. (Lim ¶ 6.)

Rather than address LAHSA's recent fully-clean comprehensive Single Audit, HUD tries to create smoke by cherry-picking notes from historical audits and reviews. Many of these, as noted above, having nothing to do with federal funding. Further, public entities such as LAHSA are subject to routine and rigorous audits for the very purpose of constantly improving internal controls in the interest of public integrity. LAHSA's job is to implement the suggested corrections, as it has. (O'Neill ¶¶ 8–14.) In the past several years, LAHSA has made significant improvements to its internal audit and control functions. (O'Neill ¶ 11; Williams ¶¶ 38, 42a.) LAHSA currently maintains a robust and independent Internal Audit function that reports directly to, and takes direction from, the Commission, with only dotted-line reporting to the interim CEO. (O'Neill ¶ 12.)

Further, none of the assortment of internet citations HUD throws together provides reasoning to support its conclusion that any conduct is "so serious as to affect the integrity of a Federal agency program;" nor does HUD identify "[a]ny other cause that is so serious or compelling in nature that it affects [LAHSA's] present responsibility." *See* 2 C.F.R. § 180.800(b), (d).

Despite this dearth of evidence, HUD broadly "finds that the Los Angeles CoC and LAHSA . . . do not meet the requirements of 42 U.S.C. 11360a and 24 C.F.R. part 578 subpart B" (O'Neill Ex. B), but HUD fails to identify any particular "requirement" that LAHSA does not meet. For decades, LAHSA has served as the Collaborative Applicant selected by the relevant organizations in the Los Angeles geographic area. It has performed the Collaborative Applicant duties by managing the application process, operating the CoC, ensuring operation of and participation by project sponsors in HMIS, distributing HUD funds to project sponsors, requiring project sponsors to establish fiscal control and accounting procedures, and arranging for the necessary surveys or audits. (Reed ¶¶ 5, 32–33; Mahin ¶¶ 3–8; Jones ¶¶ 5–9;



WAYMAKER

*see* 42 U.S.C. § 113260a(f), (g); 24 C.F.R. § 578.7.) HUD does not assert that LAHSA has failed to perform any of these functions as the collaborative applicant. HUD's decision to suspend LAHSA is arbitrary and capricious.

The HEARTH Act requires a CoC and a Collaborative Applicant, 42 U.S. Code § 11360a, and defers to the CoC its choices of Collaborative Applicant. *Id.* at (a). HUD cites no requirement in 42 U.S. Code § 11360a that LAHSA or LA CoC have not met. HUD's attempt to substitute itself to evaluate the region's projects and select service providers is baseless and illegal. The suspension of LAHSA and LA CoC is also baseless and therefore arbitrary and capricious, serving only its real goal of wiping out the CoC Program altogether.

### ***2. HUD Failed to Consider the Effect of Its Suspension Decision on the Problem of Homelessness in the LA CoC***

Even if there were adequate evidence to suspect cause for disbarment (there is not), HUD can only take the drastic action of suspending LAHSA if "[i]mmediate action is necessary to protect the public interest." 2 C.F.R. § 180.700(c). Here, in fact, it is the opposite—HUD's actions harm the public interest. HUD failed to consider how its suspension of LAHSA will affect the problem of homelessness in Los Angeles.

A suspension is a "serious" action, 2 C.F.R. § 180.700, and may only be used "to exclude persons who are not presently responsible from Federal programs." 2 C.F.R. § 180.125(b). "In government contract law, 'responsibility' is a term of art, defined to include the honesty and integrity of the contractor as well as the ability to successfully perform a contract." *Delta Rocky Mountain Petroleum, Inc. v. United States Dep't of Defense*, 726 F. Supp. 278, 280 (D. Colo. 1989). "A contractor can meet the test of present responsibility by demonstrating that it has taken steps to ensure that the wrongful acts will not recur." *Id*. The suspension and debarment system is intended "to protect the public interest" and may not be used for the

"purposes of punishment." 2 C.F.R. § 180.125(c); *Frech v. United States Dep't of Health and Human Servs.*, 2025 WL 3563196, *5 (D.D.C. December 12, 2025).

As discussed in detail in the Declaration of Christopher Williams, LAHSA's Deputy Chief Risk Officer, "LAHSA's past ten annual independent audits, all resulted in clean opinions on the financial statements and on compliance with requirements for major federal programs, with no material misstatements or material noncompliance identified." (Williams ¶ 11a.) The references in the June 11 Letter date back as far as 2007 and do not demonstrate a lack of present responsibility. (*Id.* ¶ 16; *see, e.g., Sloan v. Dep't of Housing & Urban Dev.*, 231 F.3d 10, 17 (D.C. Cir. 2000) (agency's failure to void suspensions arbitrary and capricious where acts upon which the suspensions were based had ceased prior to suspensions).

Importantly, HUD's decision, which will quickly result in a sharp reduction in services available to unhoused Angelenos, was arbitrary and capricious because it failed to consider alternative courses of action that would inflict less irreparable harm. To move people experiencing homelessness from the streets to interim and then permanent housing in Los Angeles requires a massive coordination of effort between federal, state and local funders and hundreds of providers. It takes, at minimum, months to effect changes in funding and priorities such that existing services are not cut off. The Consolidated Application serves a critical purpose in imposing stability, as Congress intended, as the region can take confidence that those projects that the Collaborative Applicant prioritizes into Tier 1 will be renewed, such that the region can be assured of their funding and focus local resources on other complimentary services. (*See* Reed ¶¶ 25, 32–33.) This is particularly critical in Los Angeles, given the size of the homelessness problem and the number of persons served, as well as the fact that local authorities provide most of the funding for interim housing. (*See* Szabo ¶4; Jones ¶ 26.)

If HUD's suspension and remedial measures are not stayed, there would be no Consolidated Application in August 2026. The entire LA CoC would be deprived of



WAYMAKER

a voice in the disbursement of federal funds, and would not know until January 2027 what HUD, on its own whim, had decided to fund. (*See* Mahin ¶ 13 ("By disqualifying LAHSA and the LA CoC at this stage in the competition, HUD is denying the LA CoC the ability to analyze its applicants, submit its own prioritization, and make plans to use other state and local funds to plug [funding] gaps"); *see id.* ¶¶ 14–16.)

A sudden announcement of HUD decisions in January 2027—would likely differ from local priorities and with no time to plan for it—would literally result in service providers' doors closing and people being put back on the streets. (*See id.* ¶ 14). "LAHSA typically applies for more than $200 million in funding for homeless services across 85 cities." (Reed ¶ 24.) "[M]ore than 32,000 people are served by LAHSA's outreach programs, the majority of whom are unsheltered" (Jones ¶ 11.) "The interruption of housing, shelter, services, and outreach will lead to preventable deaths and enormous suffering, particularly to the most vulnerable." (*Id*. ¶¶ 12–19.)

HUD has not explained why a comprehensive, undifferentiated suspension of LAHSA now is necessary to achieve its stated goal of "ensur[ing] that CoC Program funds are being used as intended—to reduce homelessness." (O'Neill Ex. C at 1.) HUD's letters ignore LA CoC's significant gains in addressing the problem of homelessness: "In the past two years, unsheltered homelessness has dropped by 14%" in the County and by 17.5% in the City." (Szabo ¶ 8.) A blanket suspension of LAHSA will hurt tens of thousands of the Los Angeles region's neediest residents, and it will without question stymie HUD's stated goal of "reduc[ing] homelessness." (*Id*. at 1.) It "threatens to leave" LAHSA and its subgrantees without the funds they need to continue operating." (Reed ¶ 58.) It "will cause layoffs among frontline workers, whipsaw organizational budgets as contracts with LAHSA are suspended, and redirect the attention of Coalition members from program delivery to crisis management and transitioning their clients back to the streets." (Jones ¶ 27.) HUD's




WAYMAKER

harsh, sweeping suspension is arbitrary and capricious because it was imposed far too broadly. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("*Regents*") (agency must consider "alternatives . . . within the ambit of the existing policy" before adopting a sweeping course); *Nat'l TPS All. v. Noem*, 166 F.4th 739, 772 (9th Cir. 2026) (agency abused its discretion when it "failed to consider reasonable alternatives or more moderate approaches" before executing the "unprecedented step of vacatur"); *Love v. Thomas*, 858 F.2d 1347, 1358, 1363 (9th Cir. 1988) (emergency suspension arbitrary and capricious in an agency's "suspending first and asking questions later" method rather than evaluating localized hardships or narrower alternatives).

HUD also fails to account for the substantial reliance interests of sub-grantee service providers, the local government, and the unhoused—all of which rely on LAHSA. The Supreme Court found an agency acts arbitrarily and capriciously if it changes course without first considering legitimate reliance interests in longstanding policies. *Regents*, 591 U.S. at 30; *see also Pacito*, 169 F.4th at 937 (federal government "likely acted arbitrarily and capriciously in terminating the cooperative agreements without first considering the reliance interests of individual refugees depending on the essential resettlement services provided thereunder"). Because the suspension likely was arbitrary and capricious and in excess of HUD's authority, this Court should enter an immediate stay of HUD's suspension under the APA and grant a TRO and ultimately a preliminary injunction.

**D. HUD's Wide-Ranging Actions Likely Violate the Constitution and Are Ultra Vires**

In addition to violating the APA, HUD's suspension of LAHSA and LA CoC violates the constitutional principles of separation of powers and federalism. The Administration has made clear that its intent is to eliminate the CoC program—a Congressional program established in the 1990s and funded in a bipartisan manner over five administrations and as recently as January 2025. The Administration's

assault on the CoC Program and LAHSA in particular began in July 2025 with the Executive Order announcing the policy objectives of "ending crime and disorder." HUD, for its part, announced its intention to effect "the most significant policy reforms and changes in the program's history." (RJN Ex. H.) This assault culminated in the President's proposed 2027 budget, in which he proposes to eliminate the CoC Program entirely and expressly named LAHSA as part of the impetus for this change. (RJN Ex. L at 31.) In the middle of this executive assault came HUD's actions in suspending and defunding LAHSA; there can be no doubt that HUD's actions are part of the agenda. Indeed, in the same week as the Executive Order was issued, a senior Administration official informed LAHSA he would recommend that no funding come to Los Angeles.

HUD's actions cannot be reconciled with the carefully-crafted statutory rules designed for the purpose of providing federal funding of homelessness services to assist local and state governments. As such, they violate the constitutional separation of powers. HUD's actions also violate the Tenth Amendment's reservation of powers to state and local governments and are ultra vires.

#### ***1. HUD's Suspension of LAHSA and LA CoC Likely Violate the Separation of Powers, the Tenth Amendment, and Are Ultra Vires***

HUD's suspension of LAHSA and LA CoC is incompatible with and directly contravenes congressional policy as enshrined in statutory law. HUD's suspension of LAHSA is clearly intended to achieve the Administration's policy goal of eliminating the LA CoC entirely. The advancement of the executive's policy agenda rather than Congress's mandate violates the constitutional separation of powers. *See City & Cnty. of S.F. I*, 897 F.3d at 1231 (Constitution "exclusively grants the power of the purse to Congress"). Indeed, the President's power is at its "lowest ebb", as here, when he contravenes the express will of Congress, "for what is at stake is the equilibrium established by our constitutional system." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring); *see also*

WAYMAKER

*Morrison v. Olson*, 487 U.S. 654, 690 (1988) (quoting U.S. Const. art. II, § 3) (the President has a "constitutionally appointed duty to 'take care that the laws be faithfully executed'").

HUD made its political objectives clear in its June 18 Letter when it announced that the entire LA CoC was "unable to execute its [regulatory] responsibilities" (O'Neill Ex. B), cutting off any Consolidated Application for LA CoC even though one is not only statutorily but practically required. (*See supra* at II(D)(2); *see also* Mahin ¶ 15; Szabo ¶ 4.) An immediate shutdown of LAHSA also precludes LA CoC from complying with its federal reporting obligations, *see* 42 U.S.C. § 11360a(f)(3), which means that grant applications will be denied as ineligible. This shutdown by the Executive Branch is entirely inconsistent with Congressional mandates and violates the separation of powers. *See supra* at Section IV.B; *see also Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (courts "presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command").

HUD's purported suspension of LAHSA from carrying out programmatic functions delegated to it by local authorities also violates principles of federalism and the Tenth Amendment. *See* U.S. Const., Amend. X; *NFIB,* 567 U.S. at 535-36 (the "general power of governing" is reserved to the states which "can and do perform many of the vital functions of modern government"); *LA All. for Human Rights*, 792 F. Supp. 3d at 1092 ("only the voters of Los Angeles have the power to elect representatives to solve these problems"). LAHSA's programmatic functions include the administration of the HMIS and CES systems under federal and state law. *See supra* at Section II.B.2; Williams ¶ 42(b). Indeed, Congress requires the Secretary of HUD to submit the AHAR, which draws on data LAHSA gathers and maintains through its HMIS system and the PIT count. (Kuhn ¶ 30; Rubenstein ¶¶ 3–4, 8.) Simply stopping this work would contravene both state and federal law. As




WAYMAKER

discussed above, the suspension not only eliminates any ability of LAHSA to carry out its functions but functionally precludes another entity from filling in the gap, crippling local governments from carrying out their core function of addressing homelessness.

Further, HUD's actions in suspending LAHSA as Collaborative Applicant, disqualifying the entire LA CoC, and barring LAHSA from performing programmatic functions like HMIS administration are ultra vires. (*See supra* at Section IV(C).) "It is central to the real meaning of the rule of law and not particularly controversial" that executive branch actors have no power to act unless authorized to do so by Congress or the Constitution. *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992). When executive agencies "act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington, Tex.*, 569 U.S. at 297.

#### ***2. HUD's Apparent Suspension of FY 2025 Grants to LAHSA Is Unconstitutional and Ultra Vires***

The suspension further threatens to deprive LAHSA of funding for its FY 2025 grants, which cover 49 subgrantees, where Congress expressly directed HUD to simply renew the FY 2024 grants. HUD may not contravene express Congressional direction now by failing to sign grant agreements where it already issued award letters to comply with Congress's direction. HUD cannot simply withhold funds appropriated by Congress outside of the statutory procedures established by Congress, which it has not followed.

As discussed above, HUD has disregarded Congress's statutory framework and funding appropriations. *See supra* at Section IV.D. While HUD frames its actions as a suspension, because of the timing relative to the application process, the "suspension" is in effect a categorical denial of FY 2025 funding not only to LAHSA but also to its subgrantees who directly serve the homeless. Further, Congress recently appropriated funds for the CoC Program and specifically directed



WAYMAKER

HUD to award FY 2025 renewal projects on a timely basis to ensure that CoCs "operate at substantially the same levels[.]" CAA, 2026, Pub. L. No. 119-75, div. D, 140 Stat. 822 (2026). "The [Appropriations] Clause has a 'fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents.'" *United States v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016) (quoting *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990)).

As discussed above, this denial of funding serves the executive's policy agenda to defund the CoC Program, not Congress's mandate to support it. *See supra* at Section IV.B. HUD may not "thwart congressional will by canceling appropriations passed by Congress. Simply put, 'the President does not have unilateral authority to refuse to spend the funds.'" *City & Cnty. of S.F. I,* 897 F.3d at 1232 (quoting *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)). *Oregon Council for Humanities,* 794 F. Supp. 3d at 876, is instructive. There, Congress had appropriated funds to be spent on the humanities, including grants in a federal/state partnership pursuant to a statutory framework. *Id.* at 857. Shortly after President Trump took office for his second term, the National Endowment for the Humanities (NEH") reviewed all open grants to determine whether they might involve subjects such as "diversity, equity, inclusion, and accommodation," or "environmental justice." *Id.* at 857. Then, in consultation with the then-newly formed Department of Government Efficiency ("DOGE"), NEH suddenly terminated open grants in the federal/state partnership, with the result that "humanities projects came to a screeching halt." *Id.* Affected states humanities councils sued and were granted a preliminary injunction. The court concluded that the Administration's failure to follow Congress's directive making funds available to states for humanities projects and allocating those funds according to the formula established by Congress was a violation of the separation of powers. *Id.* at 876. As the court explained, "[t]he

Executive Branch is not at liberty to rewrite a statute or unilaterally refuse to spend appropriated funds as directed." *Id.*[9]

## V. LAHSA, THE HOMELESSNESS SERVICES PROVIDERS IN THE LA COC, AND THE UNHOUSED OF LOS ANGELES ALL WILL BE IRREPARABLY HARMED

Absent interim relief, LAHSA, the LA CoC that it represents, and countless American citizens in greater Los Angeles will suffer serious irreparable harm. A plaintiff in an APA case suffers irreparable harm where agency action causes a "significant change in their programs and a concomitant loss of funding[.]" *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). Courts have similarly found irreparable harm in cases where plaintiffs show serious "'ongoing harms to their organizational missions,' including diversion of resources and the non-speculative loss of substantial funding." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Human Servs.*, 780 F.Supp.3d 897, 925 (N.D. Cal. 2025) (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). And where projects rely heavily or entirely on federal funding, "[a] total loss of

---

[9] Other courts have similarly ruled that the President or executive agencies likely violated separation of powers principles where they withheld Congressionally appropriated funding to achieve the executive's political agenda. *See City & Cty of S.F. v. Trump,* 783 F. Supp. 3d 1148, 1191 (N.D. Cal. 2025) ("*City & Cty. of S.F. II*") (granting preliminary injunction where the President had "acted unilaterally to attempt to withhold from every sanctuary city in the country millions of dollars already appropriated by Congress, in direct contravention of our nation's laws."); *City of Ch. v. United States Dep't of Homeland Sec.,* 815 F. Supp. 3d 727, 753–57 (N.D. Ill. 2025) (grant funding improperly withheld for a congressionally mandated program that helped states provide shelter to alleviate overcrowding at U.S. Customs and Border Protection facilities); *Washington v. Trump,* 766 F. Supp. 3d 1138, 1153-54 (2025) (federal funds improperly withheld from medical care providers who provided gender-affirming medical care in derogation of Congress's spending power); *Cty. of Santa Clara v. Noem,* 815 F. Supp. 3d 979, 1025–26 (N.D. Cal. 2025) (federal funding improperly withheld from multiple cities, counties, and municipalities that had been targeted due to their diversity, equity, and inclusion ("DEI") policies).

federal funding would be catastrophic, and [LAHSA's] need for certainty renders damages inadequate." *City & Cty. of S.F. I,* 897 F.3d at 1244.

If LAHSA remains suspended, the system for homelessness services in the Los Angeles region will immediately and significantly deteriorate. The suspension interferes with LAHSA's central role in tracking the unhoused and moving eligible persons into permanent housing through the congressionally-mandated HMIS system and CES system. "The stability of HMIS operations is critical to the LA CoC and to County-funded homeless programs." (Mahin ¶ 6.) "An immediate shutdown would freeze the housing matching process entirely, leaving 25,398 households currently on the waitlist for permanent housing . . . with no path forward." (Kuhn ¶ 14a.)

HUD's actions also will create severe, entirely unexpected gaps in funding that jeopardize the region's ability to maintain housing for current program participants. "LAHSA's use of federal CoC funds supports access to housing or shelter for almost 7,500 households[.]" (O'Neill ¶ 6.) Moreover, both the City and County rely on and provide substantial funding to LAHSA with the expectation of federal support. (*See* Szabo ¶¶ 3, 4, 7.) The suspension will increase homelessness due to funding gaps, retraumatize individuals when their access to programs and services is cut off, strain the resources of local communities, harm goodwill, create confusion and chaos, and threaten the missions of social services organizations within the LA CoC. (*See, e.g.,* Reed ¶¶ 7, 58; Berjis ¶¶ 5–10; Jones ¶¶ 10–30.) Among others, subgrantee service providers depend on LAHSA and the reliability of federal funds to make basic decisions that affect their staff and the unhoused. Homelessness services are not programs that can simply be paused and restarted. Disrupting federal funding mid-program will cause lasting harm." (Jones ¶¶ 20, 21 ("without continued funding from HUD, many programs performed by [] organizations under contract from LAHSA will suddenly be ramped down and demobilized"). For example, Penny Lane, a subgrantee since 2002, "relies on CoC

funding to pay staff and some operating costs" for its community services; without confirmation that its contract will be funded by HUD, its operating reserve will be depleted and it "will be unable to continue providing services to the residents of the building, moving forward." (Berjis ¶¶ 2–6.) And the irreparable harm is made worse by how late in the funding cycle the suspension of LAHSA is occurring with no contingency plan in place. (*See* Reed ¶ 45.)

Further, the unrealistic, compressed application timeline for a new Collaborative Applicant to be appointed and apply for the 2026 NOFO places the prospects for future funding of the LA CoC in severe jeopardy. (*See id*. ¶¶ 28–29, 55; Mahin ¶¶ 9–11; Berjis ¶ 9.) HUD's suspension "threatens the estimated $241 million in federal funding that has been earmarked by HUD for the Los Angeles CoC for the 2026-2027 year"). (Szabo ¶ 6.) As the Director of the County's Department of Homeless Services and Housing ("HHS") has recognized, "LAHSA and the LA CoC Board are best positioned to continue to guide and submit a Consolidated Application for the LA CoC. It is essential that the LA CoC retain local ability to prioritize projects in order to maintain housing stability for the 11,423 people who are currently housed using CoC funding." (Mahin ¶ 12.)

HUD's proposed solution of accepting applications from service providers directly will further throw the whole system into disarray and put people on the streets. (Reed ¶¶ 39–40.) In Los Angeles, most federal funds support permanent housing and most interim housing providers are supported by local City and County funds. (Szabo ¶ 4.) For 2027, if entities are required to apply directly, only HUD will know who has applied and will be able to rank the applicants, and the region will have no idea which projects are approved (or reapproved) for January 2027, causing huge disruptions in resources, and the likely closure of facilities and people losing permanent housing, once HUD's priorities are revealed.

Further, many service providers would simply be unable to apply for funds. For example, Penny Lane Services has been a subgrantee since 2002. (Berjis ¶ 4.) It



WAYMAKER

"depend[s] on LAHSA to provide an application to HUD on [its] behalf" and is not in a position to apply to HUD ourselves[.]" (*Id.* ¶ 9; *see also* Bell ¶ 8 (explaining that House of Ruth lacks "capacity" to prepare its own application).)

## VI. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF GRANTING PRELIMINARY RELIEF

The balance of the equities and public interest, which merge when the government is a party, *Nken*, 556 U.S. at 435, strongly favor preliminary relief. The suspension threatens to irreparably harm LAHSA and the recipients of federal grants within the LA CoC, as well as the unhoused who rely on these funds for housing and other critical services. HUD's professed concerns about LAHSA's financial mismanagement pale in comparison to the concrete harm that members of the public and the organizations that serve them would experience on the streets of Los Angeles if the suspension remains in place. "[F]ederal funding administered through LAHSA is currently housing, sheltering, or serving 11,423 people across 7,545 households." (Kuhn ¶¶ 7–9; Szabo ¶ 8.) In fact, through the LA CoC's coordinated efforts, homeless has dropped by 14% in Los Angeles County in the last two years. (*Id.*) "“[T]he interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens." *Goldberg v. Kelly,* 397 U.S. 254, 266 (1970); *see also Rodriguez By & Through Corella v. Chen*, 985 F. Supp. 1189, 1195 (D. Ariz. 1996) ("public interest in assuring that health benefits will not be erroneously terminated or denied outweighs the State's competing fiscal and administrative concerns"). Moreover, HUD faces no "harm from an injunction that merely ends an unlawful practice." *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). To the contrary, an injunction serves the interests of the general public where it ensures that federal agency actions comply with federal law and the

Constitution. *Am. Ass'n of Univ. Professors v. Trump*, 815 F. Supp. 3d 907, 976 (N.D. Cal. 2025).

## VII. CONCLUSION

For all the foregoing reasons, LAHSA respectfully requests that the Court enter a stay of the suspension under Section 705 of the APA, grant a TRO, set a briefing schedule and a hearing on whether to convert the TRO to a preliminary injunction, and ultimately grant a preliminary injunction.

DATED: June 29, 2026 WAYMAKER LLP

By: */s/ Keri Curtis Axel*
KERI CURTIS AXEL
*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*

DATED: June 29, 2026 NORTON ROSE FULBRIGHT US LLP

By: */s/ Christopher Pelham*
Christopher Pelham
*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*



WAYMAKER

**STATEMENT OF COMPLIANCE**

Concurrently herewith, LAHSA has filed an ex parte application for an order seeking leave from the Court to file this enlarged brief. The undersigned, counsel of record for LAHSA, certifies that, based on the word processing program used to prepare this memorandum of points and authorities, the memorandum of points and authorities contains 16,207 words (including headings, footnotes, and quotations but excluding the caption, the table of contents, the table of authorities, the signature block), which exceeds the word limit of L.R. 11-6.1 (7,000 words).

DATED: June 29, 2026 WAYMAKER LLP

By: */s/ Keri Curtis Axel*
KERI CURTIS AXEL
*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*