BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

JOSHUA S. HA
Counsel to the Assistant Attorney General
Civil Division

NOAH T. KATZEN
Civil Division, Federal Programs Branch

Attorneys for Defendants

BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Acting Chief, Civil Division
ALARICE M. MEDRANO
Acting United States Attorney
Acting Chief, Complex and Defensive Litigation Section
ALEXANDER L. FARRELL (Cal. Bar No. 335008)
Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, California 90012
Telephone: (213) 894-5557
E-mail: Alexander.Farrell@usdoj.gov

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| LOS ANGELES HOMELESS SERVICES AUTHORITY,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America, *et al.*,<br><br>Defendants. | No. 2:26-cv-07056-DOC-AJR<br><br>**DEFENDANTS' OPPOSITION TO *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION [DKT. 24]**<br><br>*Declaration of Dane (Dana) M. Narode filed concurrently herewith*<br><br>Hearing Date: August 6, 2026<br>Hearing Time: 9:00 a.m.<br>Ctrm: 1 (Los Angeles)<br><br>Honorable David O. Carter<br>United States District Judge |

# TABLE OF CONTENTS


DESCRIPTION PAGE

TABLE OF AUTHORITIES .... ii

MEMORANDUM OF POINTS AND AUTHORITIES .... 1

I. INTRODUCTION .... 1

II. BACKGROUND .... 3

A. HUD's grantmaking authority. .... 3

B. HUD's suspension authority. .... 4

C. Factual Background. .... 6

D. Procedural History. .... 9

III. STANDARD OF REVIEW .... 10

IV. ARGUMENT .... 10

A. Plaintiffs Have Not Demonstrated Likelihood of Success on the Merits. .... 11

1. HUD's Actions are Neither Arbitrary Nor Capricious. .... 11

a. HUD's Actions are Supported by Adequate Evidence. .... 12

b. HUD's Actions Were Reasonable and Reasonably Explained. .... 23

2. HUD's Actions Are Not Inconsistent With Law or *Ultra Vires*. .... 26

3. HUD's Actions Do Not Violate the Constitution. .... 29

B. LAHSA Has Not Demonstrated Irreparable Harm. .... 30

C. The Balance of Equities and Public Interest Weigh Against Granting an Injunction. .... 32

V. CONCLUSION .... 33

# TABLE OF AUTHORITIES

DESCRIPTION PAGE

**Cases**

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .......... 30
*Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13 (D.D.C. 2025) .......... 30
*Atwood v. Shinn*, 36 F.4th 901 (9th Cir. 2023) .......... 32
*Bangura v. Hansen*, 434 F.3d 487 (6th Cir. 2006) .......... 10
*Benisek v. Lamone*, 585 U.S. 155 (2018) .......... 10
*Bullock v. Bd. of Educ.*, 210 F.R.D. 556 (D. Md. 2002) .......... 3
*Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) .......... 31, 32
*Church v. United States*, 2013 WL 12064271 (C.D. Cal. May 15, 2013) .......... 10
*Comm'n v. Texas*, 605 U.S. 665 (2025) .......... 29
*Crawford-Hall v. United States*, 394 F. Supp. 3d 1122 (C.D. Ca. 2019) .......... 10
*Ctr. for Food Safety v. Hamburg*, 698 F. App'x 302 (9th Cir. 2017) .......... 33
*Dalton v. Specter*, 511 U.S. 462 (1994) .......... 30
*Delta Data Systems Corp. v. Webster*, 744 F.2d 197 (D.C. Cir. 1984) .......... 12
*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .......... 24
*Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100 (2025) .......... 17
*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021) .......... 23
*Garcia v. County of Alameda*, 150 F.4th 1224 (9th Cir. 2025) .......... 10
*Garland v. Ming Dai*, 593 U.S. 357 (2021) .......... 26
*Global Health Council v. Trump*,

153 F.4th 1 (2025)....29
*Horne Bros., Inc. v. Laird*,
463 F.2d 1268 (D.C. Cir. 1972)....11, 12, 16, 22
*Immigrant Legal Res. Ctr. v. City of McFarland*,
827 F. App'x 749 (9th Cir. 2020)....31
*LA All. for Human Rights v. City of L.A.*,
*792 F*. Supp. 3d 1049 (C.D. Cal. 2025)....7, 8, 13, 32
*LA All. for Human Rights v. City of L.A.* ,
2026 WL 127741 (C.D. Cal. Jan. 6, 2026)....32
*League of Cal. Cities v. FCC*,
118 F.4th 995 (9th Cir. 2024)....25
*Mainelli v. United States*,
611 F. Supp. 606 (D.R.I. 1985)....2, 22, 23
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)....24, 26
*Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018)....31
*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 (9th Cir. 2002)....10
*Roth v. United States*,
378 F.3d 1371 (Fed. Cir. 2004)....29
*RSI, Inc. v. United States*,
772 F. Supp. 956 (W.D. Tex. 1991)....16
*Sloan v. Department of Housing and Urban Development*,
231 F.3d 10 (D.C. Cir. 2000)....24
*State of Washington v. U.S. HUD*,
171 F.4th 473 (1st Cir. 2026)....3
*Tamosaitis v. URS Inc.*,
781 F.3d 468 (9th Cir. 2015)....33
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....32
*Ursack, Inc. v. Sierra Interagency Black Bear Group*,
639 F.3d 949 (9th Cir. 2011)....12
*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....30, 32
*Zerezghi v. U.S. Citizenship & Immigration Servs.*,
955 F.3d 802 (9th Cir. 2020)....12

**<u>Statutes</u>**

28 U.S.C. § 1491....29
42 U.S.C. § 11301(b)(3)....3

42 U.S.C. § 11360(3)(A) .......... 4
42 U.S.C. § 11360a .......... passim
42 U.S.C. § 11382(a) .......... 3
42 U.S.C. § 11382(d)(2) .......... 28
42 U.S.C. § 11386(b)(8) .......... 26
42 U.S.C. § 12711 .......... 27

**Regulations**

2 C.F.R. § 180.1015 .......... 5
2 C.F.R. § 180.125(a) .......... 4, 20, 22, 33
2 C.F.R. § 180.610 .......... 4
2 C.F.R. § 180.705(b)(3) .......... 16
2 C.F.R. § 180.705(c) .......... 14
2 C.F.R. § 180.715(b)(5) .......... 5
2 C.F.R. § 180.715(e) .......... 16
2 C.F.R. § 180.730 .......... 8
2 C.F.R. § 180.730(a)(1) .......... 18
2 C.F.R. § 180.740(b) .......... 16
2 C.F.R. § 180.800(b) .......... 11
2 C.F.R. § 180.900 .......... 2, 5, 12, 13
2 C.F.R. § 200.112 .......... 7
2 C.F.R. § 200.113 .......... 7
2 C.F.R. § 200.302 .......... 7, 12
2 C.F.R. § 200.303(a) .......... 21
2 C.F.R. § 578.3 .......... 4
24 C.F.R. § 578.13 .......... 4, 8, 15
24 C.F.R. § 578.5(a) .......... 3
24 C.F.R. § 578.95 .......... 8, 13

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

For years, allegations and reports of mismanagement, shoddy reporting, and conflicts of interest have plagued the Los Angeles Homeless Services Authority (LAHSA). So much so, in fact, that Los Angeles County has recently withdrawn hundreds of millions of dollars in funding from the agency[1]—a move that has been interpreted as "the biggest sign yet that local officials are fed up with LAHSA."[2] Animated by similar concerns, reviews, and reports, the U.S. Department of Housing and Urban Development (HUD) found reason to believe that LAHSA is running afoul of its federal grant obligations, especially as to financial management, internal controls, and conflicts-of-interest safeguards. Accordingly, HUD decided to suspend LAHSA from participating in federal programs on a prospective basis, pending investigation.

HUD adopted that preliminary posture over a month ago. Rather than make its case to HUD directly (as HUD expressly invited it to do), LAHSA waited nearly three weeks before saddling this Court with a 50-page request for an *ex parte* emergency temporary restraining order. This Court rightly denied that request and converted LAHSA's application into a motion for a preliminary injunction. Only then—days before the Government's opposition brief was due—LAHSA did what it could have done the day it received notice of its suspension: it requested a hearing to contest the agency's views of the facts in administrative proceedings. That proceeding is ongoing and now runs in parallel to this Court's own consideration.

Nothing about this spectacle evinces respect for agency processes or judicial resources. Regardless, LAHSA's application fails under the usual preliminary-

[1] David Zahniser & Rebecca Ellis, *County supervisors create new homeless agency, despite warnings from L.A. mayor*, L.A. Times (Apr. 1, 2025), https://www.latimes.com/california/story/2025-04-01/county-votes-to-pull-money-from-homeless-agency-despite-mayors-opposition.

[2] *L.A. County to Strip Millions from LAHSA Despite Warnings From City Leaders*, CaliforniaCityNews (Apr. 2025), https://www.californiacitynews.org/2025/04/la-county-strip-millions-lahsa-despite-warnings-city-leaders.html

injunction factors. HUD has significant regulatory leeway in suspending organizations from participation in federal programs—an agency action which is, definitionally, temporary and preliminary. All HUD must produce is "adequate evidence" to "support the reasonable belief" that LAHSA violated "the terms of a public agreement or transaction" such that the integrity of a federal program is affected. 2 C.F.R. § 180.900; *see also id.* §§180.700, 180.800. Years of public reporting—in and out of court—plainly gives HUD reasonable grounds to suspect that LAHSA is not complying with federal grant requirements for financial management, internal controls, and conflicts of interest. To succeed under the substantial evidence standard, LAHSA must show not only that these materials are not "adequate evidence," but also that no reasonable person could have reached HUD's conclusion. Both standards give agencies like HUD significant discretion, and together, they are two bridges too far for LAHSA.

Nor can LAHSA demonstrate that HUD's exercise of its ordinary suspension authority (an authority virtually every agency has) violates any statute. There is no reason to suppose that Congress somehow intended to create a shield against *any* scrutiny for homeless-assistance grants. And LAHSA cannot plausibly argue that HUD's remedial action is contrary to law when it tracks the exact words of the statute Congress enacted.

Equitable factors also counsel against LAHSA's requested relief. LAHSA invokes speculative harm to third parties, but ultimately the only harm it alleges *to itself* is a temporary suspension from future transactions with the government. And even considering potential public consequences, they cannot outweigh the public interest in HUD carrying out its mandate, or the "public interest in safeguarding the integrity of the public contracting process." *Mainelli v. United States*, 611 F. Supp. 606, 615 (D.R.I. 1985).

This Court should deny the application.

## II. BACKGROUND

### A. HUD's grantmaking authority.

Congress has long granted HUD the authority to administer homeless assistance grants. In 1987, Congress enacted the Stewart B. McKinney Homeless Assistance Act "to provide a broad range of services and assistance to homeless individuals and families." *Bullock v. Bd. of Educ.*, 210 F.R.D. 556, 556 (D. Md. 2002). That Act (and its various amendments) established a general framework for "provid[ing] funds for programs to assist the homeless." 42 U.S.C. § 11301(b)(3).

In 2009, Congress passed the Homeless Emergency Assistance and Rapid Transition of Housing (HEARTH) Act, which reorganized HUD's funding activities into a "Continuum of Care" (CoC) program. *Id.* § 11382. Under that Act, HUD "award[s] grants to local coalitions … to 'carry out projects that serve homeless individuals or families.'" *State of Washington v. U.S. HUD*, 171 F.4th 473, 480 (1st Cir. 2026) (quoting 42 U.S.C. § 11383(a)). A CoC is made up of "[r]epresentatives from relevant organizations," which include "nonprofit homeless assistance providers," "social service providers," "organizations that serve veterans and homeless and formerly homeless individuals," and so forth. 24 C.F.R. § 578.5(a). A nonprofit organization must be designated by the local CoC to apply for HUD grants. *Id.* § 578.15(a), (b). A CoC can designate more than one applicant, *id.* § 578.15(b), and if more than one application will be submitted, a collaborative applicant . . . will collect and combine the required application information from all applicants and for all projects within the geographic area that the Continuum has selected funding," § 578.9(a)(3)(i). HUD typically awards funds directly to the projects based on statutorily specified criteria, 42 U.S.C. § 11382(a).

Grants awarded under this program "shall be used to carry out projects that serve homeless individuals or families" via certain enumerated "eligible activities." *Id.* § 11383(a). These grants are subject to strict conditions. HUD "may not provide assistance for a proposed project" unless "the collaborative applicant … agrees" "to

comply" with "terms and conditions as the Secretary may establish to carry out this [subtitle] in an effective and efficient manner." *Id.* § 11386(b)(8); 2 C.F.R. § 578.3.

Congress has provided HUD with remedial authority when the CoC system fails. When there is no suitable CoC in a geographic area, HUD "may take remedial action to ensure fair distribution of grant amounts … to eligible entities within that area." 42 U.S.C. § 11360a(c).[3] This remedial provision is flexible. It empowers HUD to take "[s]uch measures" that "may include designating another body as a collaborative applicant, or permitting other eligible entities to apply directly for grants." *Id.*; *see also* 24 C.F.R. § 578.13(a).

**B. HUD's suspension authority.**

HUD has the same tools as any agency when it comes to policing and taking corrective action in response to suspected misconduct by federal partners. The agency has adopted the government-wide suspension and debarment system from 2 C.F.R. part 180. *See* 24 C.F.R. part 2424. The purpose of that system is "[t]o protect the public interest … by conducting business only with responsible persons." 2 C.F.R. § 180.125(a). That purpose requires speed and significant leeway for the agency in assessing conduct with its private counterparts. For that reason, federal agencies are directed to "handle[]" suspension and debarment actions "as informally as practicable, consistent with principles of fundamental fairness." 2 C.F.R. § 180.610.

Suspension and debarment are very different actions. Debarment is the more serious one. It operates as a "final determination that a person is not presently responsible." *Id.* § 180.605(a). Thus, in a debarment action, the agency bears the burden of proof, and "must establish the cause for debarment by a preponderance of the

[3] Section 11360a(c) refers to a "collaborative applicant." By statute, however, a collaborative applicant is defined as "an entity that … carries out the duties specified in section 11360a of this title." 42 U.S.C. § 11360(3)(A). Accordingly, as used in statute, a "collaborative applicant" also includes CoCs themselves in addition to the entities they authorize to carry out programmatic duties. To avoid confusion, this brief tracks regulatory definitions of these terms.

evidence." *Id.* § 180.850(a); *accord id.* § 180.855. A preponderance of the evidence is automatically met "[i]f the proposed debarment is based upon a conviction or civil judgment." *Id.* § 180.850(b). And causes for debarment include a "[v]iolation of the terms of a public agreement or transaction so serious as to affect the integrity of a Federal agency program," or "[a]ny … cause that is so serious or compelling in nature that it affects [the person's] present responsibility." *Id.* § 180.800.

By contrast, a suspension is a purely preliminary tool: it "immediately prohibits a person from participating in covered transactions" with the federal government "for a temporary period, pending completion of a Federal agency investigation and any judicial or administrative proceedings that may ensue." 2 C.F.R. § 180.1015. Suspension is a merely "temporary status of ineligibility for procurement and nonprocurement transactions, pending completion of an investigation or legal or debarment proceeding." *Id.* § 180.605(a). Because it does not operate as a final determination of irresponsibility, the standard for justifying a suspension is much lower than the standard for debarment. Rather than *prove* a cause for debarment, a suspending official need only determine that there is "adequate evidence to suspect" a cause for debarment and that "[i]mmediate action is necessary to protect the public interest." *Id.* § 180.700. "Adequate evidence" is not conclusive evidence; it is "information sufficient to support the reasonable belief that a particular act or omission has occurred." *Id.* § 180.900.

Upon deciding to suspend an organization, the agency must "promptly" send a Notice of Suspension advising the organization that its suspension is based on one of several grounds, including "adequate evidence that [the organization] ha[s] committed irregularities that seriously reflect on the propriety of further Federal Government dealings with [it]." 2 C.F.R. § 180.715(b)(5). The notice must also inform the organization that its "suspension is for a temporary period pending the completion of an investigation or resulting legal or debarment proceedings." *Id.* § 180.715(e). A suspension is strictly time-limited in the event such a proceeding is not initiated. *Id.* § 180.760. And regulations contemplate that suspended organizations may contest the

facts underlying their suspension before the agency within 30 days of receiving the notice. *Id.* § 180.725.

**C. Factual Background.**

The eligible applicants in the geographic area of the Los Angeles (LA) CoC consistently receive the largest amount of CoC funds of any similar group in the country. Notice of Immediate Suspension Pending Investigation, ECF No. 24-24 ("June 11 Letter") at 4 (PDF page numbers). LAHSA fills various roles for the LA CoC, including functioning as its Collaborative Applicant. Compl. ¶ 47, ECF No. 1. As such, LAHSA coordinates and submits a consolidated application for CoC funding on behalf of all eligible applicants within the LA CoC. *Id.* And, of course, LAHSA itself is a grantee. *Id.* ¶ 66. LAHSA receives CoC grants for administering the annual funding competition as a collaborative applicant, receives additional CoC funds to manage the local Homeless Management Information System (HMIS), and receives funds for homelessness projects as well. *See* Exhibit 4 to June 11 Letter, ECF 15-27 at 3-8.

On June 11, 2026, HUD sent a Notice of Immediate Suspension Pending Investigation to LAHSA. June 11 Letter at 2. The letter explained that "[i]nformation has come to light demonstrating that LAHSA may have committed violations of federal law in performing its obligations under HUD grant agreements," and that HUD's Office of Inspector General "has initiated an investigation." *Id.* HUD accordingly "[s]uspend[ed] LAHSA's participation in federal government programs," because "HUD has determined that continuing to provide additional federal funds to LAHSA is not in the public interest." *Id.*

HUD laid out its case for why it had "adequate evidence to suspect" that "LAHSA has violated the terms of numerous public agreements or transactions, including those with HUD," that "these violations affect the integrity of multiple HUD funding programs," and that "LAHSA's actions and inactions affect its present responsibility." *Id.* at 3. HUD explained that "those who receive and manage grant funds under HUD programs" are required by regulations "to ensure the integrity of those programs by

using adequate financial management and internal controls, and by safeguarding against possible conflicts of interest or improper personal gain." *Id.* at 5 (citing 2 C.F.R. §§ 200.302, 200.303, 200.112, 200.113). Furthermore, those requirements "are part of LAHSA's agreements with HUD, and LAHSA has repeatedly certified that it will follow them." *Id.*; *see also id.* at 5 n.6 (noting that "[t]hese requirements are incorporated into the program-specific regulations governing HUD grant programs").

The letter provided numerous grounds for HUD's determination that there is "adequate evidence" to suspect LAHSA did not live up to those guarantees. As to financial management and internal controls, LAHSA has repeatedly found itself under criticism from the LA City and County controllers. *Id.* This Court is already familiar with many of the relevant details. *LA All. for Human Rights v. City of L.A. ("LA Alliance I")*, 792 F. Supp. 3d 1049, 1060-68 (C.D. Cal. 2025).

For instance, in a 2023 City Council meeting, LAHSA was taken to task for failing to monitor the use of funds under a City program for transitional motel housing. June 11 Letter at 6. And in 2024, LA County's Auditor-Controller found that LAHSA was both chronically late in paying service providers, and "misused money from a government funder by using it to pay for services provided under another government funders' contract/grant." *Id.* (citation omitted); *see also LA Alliance I,* 792 F. Supp. 3d at 1064-67 (describing 16 issues identified by the Auditor-Controller "demonstrat[ing] significant deficiencies in LAHSA's fiscal oversight and internal controls"). In litigation and in ordinary administrative dealings, LAHSA has "struggled to provide requested documentation," culminating in LA County voting to withdraw funding from LAHSA in April 2025. June 11 Letter at 8; *see also LA Alliance I,* 792 F. Supp. 3d at 1070 (noting that the County Board of Supervisors "voted . . . to move more than $300 million . . . out of LAHSA to a new county agency"). Although the findings HUD cited in the Notice of Suspension do not all relate directly to LAHSA's management of HUD grant funds, when considered together, LAHSA's documented failures provide adequate evidence to suspect LAHSA's financial management and internal control problems are systemic and

also affect its HUD-assisted activity.

The picture was no better as to HUD's program regulations on conflicts of interest. Although LAHSA "certifies to HUD dozens of times each year that it will comply with these requirements and will 'establish safeguards'" to prevent conflicts of interest, it appears that, in October 2024, LAHSA "authorized its then-CEO to contract with her husband's employer to provide services for over $2 million," *id.*—even though HUD regulations state that officers who are "in a position to … gain inside information" may not "obtain a financial interest or benefit from an assisted activity … either for him or herself or for those with whom he or she has immediate family or business ties," 24 C.F.R. § 578.95(d)(1). *See also LA Alliance I*, 792 F. Supp. 3d at 1071 (noting "recent scandals involving the LAHSA CEO, her alleged favoritism in hiring, her relationship with Mayor Bass, funds given to her husband's non-profit, and her ultimate resignation in April 2025").

The letter made clear that it was not in any sense a final adjudication. June 11 Letter at 13. As the letter explained, LAHSA could contest it by requesting a hearing under 2 C.F.R. § 180.730. In that request, LAHSA would provide "[s]pecific facts that contradict the statements contained in the Notice of Suspension." *Id.* § 180.730(a)(1). And LAHSA had thirty days to submit such a request, which it ultimately did at the eleventh hour on the evening of Friday, July 10, 2026. *Id.* § 180.725; Declaration of Dane (Dana) M. Narode ("Narode Decl.") ¶ 23.

A week later, HUD sent a Notice of Findings and Proposed Remedial Action to the LA CoC and LAHSA. *See* Notice of Findings and Proposed Remedial Action, ECF No. 24-23 ("June 18 Letter"). HUD explained that, because LAHSA is suspended and no longer able to carry out its former functions on behalf of the LA CoC, the LA CoC "is unable to execute its responsibilities" as a CoC. *Id.* at 2 (citing 24 C.F.R. §§ 578.7, 578.9). Accordingly, HUD notified the LA CoC and LAHSA that it intends to take remedial action under 24 C.F.R. § 578.13 and 42 U.S.C. § 11360a(c) "to ensure fair distribution of grant amounts … to eligible entities within that area." 42 U.S.C.

§ 11360a. And, just as those authorities contemplate and permit, HUD determined that "absent a contrary decision based on your response to this Notice, it would be in the public interest to allow eligible entities to submit their grant requests directly to HUD." June 18 Letter at 2.

As with the June 11 Letter, HUD made clear that its proposed remedial action was not a final decision either. *Id.* at 3. It expressly provided the LA CoC and LAHSA with "an opportunity to respond, in writing, within 30 days from its receipt of this Notice." *Id.* Only if the recipients "elect not to respond or if HUD finds the information submitted insufficient to invalidate HUD's findings stated above" would HUD "proceed with the actions described herein." *Id.*

**D. Procedural History.**

Instead of promptly seeking an administrative hearing, LAHSA waited nearly three weeks to file a complaint raising four claims against the June 11 and June 18 Letters. First, LAHSA claims that HUD violated the APA when it suspended LAHSA, because, in LAHSA's telling, the only way to carry out Congress's CoC program is to let LAHSA participate in federal government programs at any cost. Compl. ¶¶ 109-20. Second, LAHSA argues that the June 11 and June 18 Letters were arbitrary and capricious because it disagrees that HUD provided "adequate evidence" to support a suspension. *Id.* ¶¶ 121-35. Third, LAHSA claims that these letters violate the separation of powers and are ultra vires. *Id.* ¶¶ 136-46. Finally, LAHSA argues that HUD has somehow usurped state power by not allowing it to participate in federal programs. *Id.* ¶¶ 147-52.

LAHSA also filed a 50-page *ex parte* application for preliminary relief, a TRO, and a preliminary injunction. ECF. No. 15 ("PI Motion"). The Court declined to grant *ex parte* relief and instead converted LAHSA's application into a motion for preliminary injunction.

Finally, at the edge of the thirty-day window to contest the June 11 Letter before the agency—and mere days before the Government's opposition brief was due—

LAHSA administratively responded to HUD. Narode Decl. at ¶ 23.

## III. STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary remedy never awarded as of right." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (citation omitted). "To obtain a preliminary injunction, a plaintiff must make a clear showing that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Garcia v. County of Alameda*, 150 F.4th 1224, 1229-30 (9th Cir. 2025) (citation omitted).

## IV. ARGUMENT

Little about how LAHSA conducted this case makes sense. It began by declining the agency's invitation to contest its findings in favor of waiting three weeks to file an emergency application. That emergency-now-preliminary-injunction application largely concerned itself with attacking the agency's view of the materials before it and whether the agency had "adequate evidence" to suspend LAHSA—the exact sort of matters that should be raised to the agency in the first instance. When the Court rejected LAHSA's *ex parte* gambit, LAHSA waited a week to *go back* to the agency and request an administrative hearing.

LAHSA's suit is both premature and unnecessary. "Courts are generally precluded, under the ripeness doctrine, from prematurely adjudicating administrative matters until the proper agency has formalized its decision." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) (citation omitted). An agency action must be considered "non-final" if it is the subject of a pending administrative appeal. *Church v. United States*, Case No. CV 12-3990 GAF (SSx), 2013 WL 12064271, at *6 (C.D. Cal. May 15, 2013) (quoting *Bangura v. Hansen*, 434 F.3d 487, 500 (6th Cir. 2006)). Thus, while LAHSA challenges its suspension through an administrative appeal, any judicial challenge to that suspension is incurably premature. *Crawford-Hall v. United States*, 394 F. Supp. 3d 1122, 1154 (C.D. Ca. 2019); *Church*,

2013 WL 12064271, at *6.

In any event, LAHSA cannot show entitlement to a preliminary injunction under these circumstances. Every factor of the analysis weighs against granting LAHSA's request. LAHSA is unlikely to succeed on the merits. Suspension places a temporary pause on federal program participation and is an inherently preliminary measure that aids assessment of an organization's stewardship of federal resources. There was more than enough information in the record for HUD to conclude that the low bar of "adequate evidence" was met to justify that limited action and further investigation into LAHSA, and HUD's June 11 and June 18 Letters were reasonable and reasonably explained.

**A. Plaintiffs Have Not Demonstrated Likelihood of Success on the Merits.**

LAHSA has not shown the requisite likelihood of success that could justify any sort of injunction. HUD was on firm ground when it found that there is "adequate" evidence to justify suspending LAHSA pending investigation. The HEARTH Act does not immunize LAHSA from the ordinary requirements every government grantee is subjected to. Rather, it anticipates the possibility of grantee failure and gives HUD express authority to address it. And there is no plausible argument that HUD simply declining to deal with LAHSA somehow violates the Tenth Amendment or the separation of powers.

**1. HUD's Actions are Neither Arbitrary Nor Capricious.**

At bottom, LAHSA disagrees with HUD's determination that "adequate evidence" exists of a "[v]iolation of the terms of a public agreement or transaction so serious as to affect the integrity of a Federal agency program," 2 C.F.R. § 180.800(b), or other "cause that is so serious or compelling in nature that it affects [the person's] present responsibility," *id.* § 180.800(d). Agency decisions to issue suspensions always involve "question[s] of judgment." *Horne Bros., Inc. v. Laird*, 463 F.2d 1268, 1272 (D.C. Cir. 1972). As such, this Court's "role in reviewing agency contract decisions is limited to determining whether the agency acted in accord with applicable statutes and regulations

and had a rational basis for its decisions." *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984).

***a. HUD's Actions are Supported by Adequate Evidence.***

HUD reasonably found that there is "adequate evidence" that LAHSA violated the terms of its "public agreement[s] or transaction[s]" and that such violations were "so serious as to affect the integrity" of HUD's programs. Adequate evidence means only "information sufficient to support the reasonable belief that a particular act or omission has occurred." 2 C.F.R. § 180.900. As LAHSA admits, PI Motion 34, that standard is "less than what must be shown at [a] trial, but it must be more than uncorroborated suspicion or accusation." *Horne Bros.*, 463 F.2d at 1272.

What is more, in challenging the factual findings made in the June 11 Letter, LAHSA's task before this Court is a steep uphill climb. HUD's factual findings are reviewed under the substantial evidence standard, *Ursack, Inc. v. Sierra Interagency Black Bear Group*, 639 F.3d 949, 958 n.4 (9th Cir. 2011), an "extremely lenient standard" which requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Zerezghi v. U.S. Citizenship & Immigration Servs.*, 955 F.3d 802, 814 (9th Cir. 2020) (citation omitted). So as long as *any* reasonable mind *could* agree with HUD that there is adequate evidence to support a suspension, this Court must deny the preliminary injunction.

The June 11 Letter easily clears that bar. The letter identifies the violations it suspects—namely, the litany problems with "financial management," "internal control[]," and "conflicts of interest" safeguard requirements that are "part of LAHSA's agreements with HUD." June 11 Letter at 5. In particular, federal regulations require grant recipients' financial management systems to provide for "[e]ffective control over and accountability for all funds, property, and assets." 2 C.F.R. § 200.302(b)(4). Grant recipients "must safeguard all assets and ensure they are used solely for authorized purposes." *Id.* Recipients must also "[e]stablish, document, and maintain effective internal control over the Federal award that provides reasonable assurance that the

recipient or subrecipient is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award." *Id.* § 200.303(a). They must "[e]valuate and monitor … compliance with statutes, regulations, and the terms and conditions of Federal awards," and "[t]ake prompt action when instances of noncompliance are identified." *Id.* § 200.303(c), (d). And, in the CoC program specifically, HUD requires grant recipients to comply with various conflict-of-interest guidelines and will only provide an exception when the recipient provides proper documentation. 24 C.F.R. § 578.95.

HUD exhaustively catalogued the "information sufficient to support the reasonable belief" that those requirements were violated. 2 C.F.R. § 180.900. The June 11 Letter cited years of reports—many already documented by this Court—indicating that LAHSA lacks adequate financial management and internal controls. June 11 Letter at 5-9; *see also LA Alliance I*, 792 F. Supp. 3d at 1060-71. In 2019, the LA City Controller Report "faulted LAHSA for having ill-defined goals, uncoordinated data collection, and performance metrics that were unclear and not specific." June 11 Letter at 6. In 2022, HUD's OIG "found that LAHSA failed to use $3.5 million in CoC grant awards, letting the funds expire, did not support the CoC's Homeless Management Information System (HMIS), did not submit timely annual performance reports, and did not provide supporting documentation for over $870,000 in payroll and rent costs LAHSA charged to its CoC grants." *Id.* These lax practices did not abate in the following years. In 2024 "a review by LA County's Auditor-Controller found, among other things, that LAHSA misused money from a government funder by using it to pay for services provided under another government funders' contract/grant." *Id.* And in 2025, this Court ordered a review of services provided by LAHSA, culminating in an assessment that "faulted LAHSA's limited financial oversight and performance monitoring." *Id.* at 7.

Even this year, "LAHSA and City staff have reported that LAHSA owed roughly $69 million in payments to shelter, housing, and other service providers, many of which

are more than 90 days due." *Id.* at 8. In March, LAHSA "missed the deadline for filing its federally mandated Single Audit." *Id.* at 9. And in May, the LA County Auditor-Controller's review "faulted LAHSA for its limited financial transparency, for having incomplete and inaccurate financial records, for deficiencies in cash management, for its volume of overdue payments to services providers, for failing to submit timely requests to LA County for advance funding to pay providers, for accepting late invoices from providers[,] and for failing to identify overpayments and underpayments and recoup excess advances at the end of each fiscal quarter." *Id.*

As to conflicts of interest, despite LAHSA certifying that it would "establish safeguards to prohibit employees from using their positions for a purpose that constitutes or presents the appearance of personal or organizational conflict of interest, or personal gain," that did not stop the situation involving LAHSA's former CEO. *Id.* at 10. Furthermore, public reporting suggests that, until recently, only one individual (the CEO) before then was required to file interest disclosure forms, making it "much more difficult for LAHSA to learn of any potential conflicts of interest." *Id.* The Single Audit in May 2026 noted "that LAHSA had engaged in undisclosed 'Related Party Transactions' with a subrecipient that had employed the husband of LAHSA's former CEO as one of its senior staff." *Id.* And in 2024, "LAHSA's Commissioners … authorized its then-CEO to contract with her husband's employer to provide services for over $2 million." *Id.*

HUD also explained why "[i]mmediate action is needed to protect the public interest." *Id.* at 12. The agency "has wide discretion" in making that determination, and "may infer the necessity for immediate action" either "from the nature of the circumstances giving rise to a cause for suspension" or "from potential business relationships or involvement with a program of the Federal Government." 2 C.F.R. § 180.705(c). Here, the circumstances indicated that LAHSA's compliance troubles have persisted for years and could even become worse as the County "transfer[s] … funds away from LAHSA effective July 1, 2026." June 11 Letter at 12-13. Furthermore,

LAHSA's status as "the lead agency in the largest HUD-funded CoC in the nation" made perpetuating the status quo any longer untenable. *Id.* And, if more were needed, suspending LAHSA at this time was especially appropriate while there was still time to ensure that LA service providers could participate in the FY2026 competition without disruption.

The June 18 Letter—which, contrary to LAHSA's misconceptions, is ***not*** a suspension notice but rather a remedial action letter—is equally well-founded. HUD may take remedial action if it "finds that the Continuum of Care for a geographic area does not meet the requirements of the Act or its implementing regulations." 24 C.F.R. § 578.13(a); 42 U.S.C. § 11360a(c). As the June 18 Letter explains, because LAHSA was suspended seven days earlier, it was "unable to act as [the LA CoC's] collaborative applicant or carry out other delegated responsibilities." June 18 Letter at 2. It followed that the LA CoC is "unable to execute its responsibilities." *Id.* That should have come as no surprise to LAHSA. Suspending an organization who performs "four key roles" for a CoC required "[b]y Congressional design and HUD regulation," Compl. ¶ 45—as LAHSA says it does in its complaint—should naturally mean that the CoC can no longer fulfill its responsibilities. And based on that finding, HUD is authorized to take the remedial action that it did: "permitting other eligible entities to apply directly [to HUD] for grants." 42 U.S.C. § 11360a.

LAHSA's quibbles with the above can only be explained by a generalized disagreement with the adequate-evidence standard. *First*, LAHSA suggests that articles, reports, and reviews can never constitute "adequate evidence," as if only "criminal or civil judgment[s]," HUD-OIG and federal Single Audits can ever support suspension. PI Motion 33-34, 44. LAHSA severely underrates the evidence HUD brought to bear in the June 11 Letter—evidence that includes audits, lawsuits, meeting transcripts, and other materials that easily support opening an investigation. Nor is LAHSA's dismissal of news articles a sensible line to draw. Matters significant enough to find their way into

public reporting obviously can give HUD—and members of the public, for that matter—notice of potential wrongdoing.

LAHSA's imagined hurdles before HUD can take even a preliminary and temporary action misconceives the endeavor. The adequate evidence standard requires "*less* than what must be shown at [a] trial," *Horne Bros.*, 463 F.2d at 1272 (emphasis added)—in other words, no conviction, judgment, or formal final finding is necessary. *See RSI, Inc. v. United States*, 772 F. Supp. 956, 958 (W.D. Tex. 1991). And LAHSA's selective quoting of the regulations undersells the expansiveness of what counts as adequate evidence: "indicators of adequate evidence" "may include, *but are not limited to*, warrants and their accompanying affidavits." 2 C.F.R. § 180.705(b)(3) (emphasis added). Persistent reports and allegations of negligence or malfeasance can easily support a reasonable suspicion that public agreements are being shirked. *See RSI, Inc.*, 772 F. Supp. at 958 (even an "unverified civil complaint" can support adequate evidence). And LAHSA's dismissal of HUD's evidence as "hearsay information" (PI Motion at 34) is a non-sequitur; a suspension proceeding is not a federal court proceeding, and "the suspending official is not required to follow formal rules of evidence," 2 C.F.R. § 180.740(b).

LAHSA's criticism that HUD has not produced a "criminal or civil judgment" (PI Motion at 33) is especially misguided given the nature of a suspension. A suspension—to repeat *ad nauseum*—is temporary, "pending the completion of an investigation or resulting legal or debarment proceedings." 2 C.F.R. § 180.715(e); *see also id.* §§ 180.605, 180.1015. A suspension can last no longer than the "debarment proceeding[] … initiated at the time of or during [the] suspension." *Id.* § 180.760(a). But a "conviction or civil judgment" would mean that "the standard of proof" is *already* met for a debarment action, *id.* § 180.850(b), which operates as a "final determination," *id.* § 180.605. It thus makes no sense to require a conviction or civil judgment—or a similar level of evidence—to institute a suspension because there would be nothing left to investigate.

LAHSA is thus wrong to require a "finding[] of noncompliance with federal program requirements" before imposing suspension. PI Motion at 36 n.8. The point of the suspension action is to provide a limited remedy pending investigation for final proof. Here, the evidence HUD has provided justifies that action and then some. Although HUD was not required to do so in a notice of suspension, the agency cited and incorporated exhibits as evidence that very well may prove some violations of HUD requirements. Even if it does not, it more than supports further investigation, and a temporary pause in LAHSA's participation in federal programs until that investigation concludes.

*Second*, LAHSA curiously castigates HUD for "not identify[ing] any particular agreement, transaction or contract term that LAHSA violated for any specific time period." *Id.* at 33. But the letter's reference to the regulations governing government contracting is anything but "vague[]." *Id.* The requirements in those regulations "are part of LAHSA's agreements with HUD." June 11 Letter at 5. Moreover, the letter lists out the certifications and statements with which HUD had "adequate evidence to suspect" noncompliance, and which are "expressly incorporated into each of HUD's grant agreements with LAHSA along with the further agreement that the award will be governed by HUD's program regulations." *Id.* at 11-12. LAHSA is, or ought to be, in possession of all those agreements, and many are individually referenced in an exhibit attached to the June 11 Letter. HUD's 2024 CoC Program Funding Awards, ECF No. 15-27 at 3-9. LAHSA's confusion on this point cannot be serious.

*Third*, LAHSA would have this Court close its eyes to reality and assume that failure to properly manage state and local funds has *nothing* to do with LAHSA's ability to properly manage federal funds. *See* PI Motion 36. But "[j]udges are not required to exhibit a naiveté from which ordinary citizens are free." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 122 (2025). And neither is HUD. Reports that LAHSA's management of state and local funds has been persistently sub-par obviously bears on whether HUD can expect LAHSA to comply with federal program requirements. The

adequate evidence standard does not require HUD to turn a blind eye to public reports of LAHSA's mismanagement of state and local grant programs.

*Fourth*, LAHSA accuses HUD of "mischaracteriz[ing] facts" and of "cherry-picking" audits and reviews. PI Motion at 35-36. As an initial matter, this is the exact sort of argument that LAHSA could raise before the agency. *See* 2 C.F.R. § 180.730(a)(1) (respondent should submit "[s]pecific facts that contradict the statements contained in the Notice of Suspension" to contest the agency's findings). In any event, LAHSA's spin on the facts takes turns between omitting key details, attempting to disclaim responsibility, and pushing a rosy view of its actions that HUD is not required to adopt.

Start with LAHSA's stab at excusing its former CEO's conflict of interest. LAHSA claims that HUD did an "about-face" in taking action because it "closed out" its compliance inquiry with LAHSA in a letter dated April 2, 2026. PI Motion at 34-35. But LAHSA ignores the letter's explicit, narrow scope. Its close-out was "limited to the specific issues raised," "d[id] not represent a conclusive determination regarding fraud, waste, or abuse," and "d[id] not affect the authority of HUD or any action now or in the future." ECF No. 24-58 at 2. In other words, HUD reserved the right to, among other things, refer the matter to the appropriate agency office for consideration of potential fraud, waste, and abuse associated with the specific conflict of interest at issue in the finding. There is thus nothing inconsistent about HUD suspending and proposing the debarment of Dr. Adams Kellum and of her husband. ECF No. 24-35. Nor did it preclude HUD from further investigating LAHSA's conduct with respect to that conflict.

And obviously, HUD's April 2, 2026, letter did not preclude HUD from investigating other potential conflicts of interest at LAHSA. HUD put LAHSA on notice that what HUD ultimately required as a corrective action was not merely a new policy, but a new policy "effectively implemented to prevent potential conflicts of interest that may arise with CoC grant funds in the future." ECF 24-58 at 4. The letter was not HUD's final word on LAHSA's compliance with HUD's conflict-of-interest prohibitions

and obviously did not immunize LAHSA from further agency action—especially where, as here, HUD's on-going investigation has revealed additional potential conflicts of interest that LAHSA had not disclosed to HUD at the time HUD issued the referenced close-out letter.

Moreover, as HUD has explained, it now has "reason to suspect LAHSA's conflict of interest violations are not limited to" Dr. Adams Kellum's conflict. June 11 Letter at 10. In particular, HUD "is currently reviewing what appears to be a practice of LAHSA's Commission to allow individuals with potential conflicts of interest to recuse from specific decisions without disclosing relevant interests to HUD or seeking a required exception under HUD's regulations." *Id.* Even though HUD's Field Office closed out its finding of non-compliance after Dr. Adams Kellum's departure from LAHSA, nothing in the suspension authorities or in the referenced close-out letter precludes HUD from considering that egregious conflict of interest along with others in what appears to be LAHSA's pattern of similar violations.

Next, consider LAHSA's attempt to wash its hands of the City Controller's findings about City homelessness funds. PI Motion at 35. According to LAHSA, the City Controller's announcement that it failed to spend $513 million in public funds "concern the City, not LAHSA." *Id.* It is hard to see how that can be. The referenced notice indeed discusses programs funded by the City, *e.g.*, the Inside Safe program. *See* ECF No. 24-30 at 3-4. But, as this Court well knows, LAHSA manages City homelessness programs, including Inside Safe. *See* ECF No. 24-30 at 75 ("Similar to the other City Programs, services for Inside Safe participants were managed through LAHSA."). If nothing else, the City appears to question LAHSA's stewardship of its funds, as it recently contemplated issuing "a mandate that LAHSA contract with a qualified, independent accounting firm to manage the distribution, reconciliation, and tracking of City funds[.]" ECF No. 24-33 at 15.

LAHSA attempts to distinguish its payment processes for state and locally funded services—where it acknowledges documented failings—from the processes it uses for

HUD-assisted servicers. PI Motion at 35-36. As an initial matter, LAHSA's problems go well beyond the timeliness of provider payments. *See generally* June 11 Letter. But in any event, HUD is not required to be oblivious to LAHSA's failures with regard to other public funding programs when assessing risk to its own programs. Whether there are meaningful differences between LAHSA's HUD-assisted payment processes and its other payment processes, and whether any such differences should put HUD at ease about LAHSA's financial management and internal controls, are exactly the kinds of issues HUD needs to investigate and weigh. To halt its investigation or lift its suspension in the face of LAHSA's failure to comply with other public funding programs would fall short of HUD's mandate—and the purpose of the suspension authority—to "conduct[] business only with responsible persons," 2 C.F.R. § 180.125(a).

In any event, LAHSA mixes apples and oranges by conflating and misunderstanding two financial processes—the process by which LAHSA pays service providers, and the process by which LAHSA's funders (*i.e.*, the City, County, State, and HUD) give LAHSA the funds it uses to make those payments. As to the former, LAHSA says that "state and local funders impose a cost-reimbursable payment model" on LAHSA's payments to service providers. PI Motion 35. Maybe so, but that is no way to distinguish state and federal funding. As LAHSA's interim CFO acknowledged, "[t]he contracts that LAHSA currently holds with HUD … require [LAHSA to use] the same … cost reimbursement model." ECF No. 24-32 at 53; *see also id.* ("[T]he current model that we hold with HUD is the cost reimbursement model.").

The second process—how LAHSA's *funders* give LAHSA the money it uses to pay providers—provides no real basis for a meaningful distinction either. LAHSA says that "the federal drawdown process makes funds available within about three business days," the implication being that HUD makes funds available to LAHSA on a more timely basis than state and local funders. PI Motion at 36. But that argument is undermined by the evidence cited in the June 11 Letter. As LAHSA's interim CFO recently acknowledged, the State of California provides LAHSA with "cash on hand"

with which to reimburse providers, giving LAHSA access to funds even sooner than three business days. ECF No. 24-32 at 53.

LAHSA also insists that the Court require HUD to ignore any review or assessment other than HUD OIG audits and federal Single Audits. As convenient as that would be for LAHSA, the substantial evidence standard does not force HUD to indulge such willful blindness or naiveté. Regardless, LAHSA's attempts to minimize those audits and HUD's interpretations of them founder. LAHSA appears to admit that, even after more than three years, complete resolution of the HUD-OIG audit's findings is still "in progress." *See* PI Motion 36-37. LAHSA further claims the 2022 HUD-OIG findings are irrelevant to the integrity of LAHSA's internal controls over federal funds. *Id.* That takes too stingy a view of LAHSA's federal internal control obligations. LAHSA is required to "[e]stablish, document, and maintain effective internal control over the Federal award that provides reasonable assurance that the recipient or subrecipient is managing the Federal award in compliance with statutes, regulations, and the terms and conditions of the Federal award." 2 C.F.R. § 200.303(a). HUD-OIG's findings that LAHSA failed to spend $3.5 million in CoC funds and let them expire, that LAHSA failed to support the statutorily required HMIS system under a grant provided specifically for that purpose, that LAHSA failed to submit timely performance reports, and that LAHSA failed to provide supporting documentation for over $870,000 in payroll and rent costs—*see* June 11 Letter at 5 and Exhibit 13 thereto—are obviously relevant to the integrity of LAHSA's internal controls over federal funds.

As to the Single Audit, LAHSA would have this Court view it as a "fully-clean" bill of health. PI Motion at 37. But it declares a much less favorable prognosis. The Single Audit explained that LAHSA "does not have effective controls in place to provide reasonable assurance that financial statements were prepared [properly]" and that LAHSA's "internal controls over financial reporting were not adequately designed or implemented." June 11 Letter at 8. Rather than address those statements head-on (or even quote them), LAHSA attempts to brush them under the rug in a footnote as just an

"observation." PI Motion at 36 n.8. Whatever LAHSA wants to call those concerning statements, they contribute to HUD's adequate evidence to suspect LAHSA is deficient in its financial management and internal controls.

Finally, LAHSA points to its claimed improvements over the years, in a bid for this Court to rule that its troubles are fully in the past. PI Motion at 37. That the County pulled its funding only a few days after LAHSA began this litigation suggests otherwise. Regardless, as noted in the June 11 Letter, and in the Single Audit quoted therein and above, there is adequate evidence to suspect LAHSA's financial management and internal controls remain deficient. Whether LAHSA is a "responsible person[]" for HUD to do business with is a matter for the ongoing investigation to determine. 2 C.F.R. § 180.125(a). And the point of the suspension authority is to give HUD "the right to refuse temporarily to deal with a contractor about whom there is *suspicion*, based on 'adequate evidence,' of serious misconduct." *Mainelli*, 611 F. Supp. at 614 (emphasis added). Any suspended contractor can argue that its troubled days are behind it. That is reason for a rigorous and prompt investigation, not an excuse to halt it.

In the end, LAHSA's main objection is that, in its view, the misconduct suspected in the June 11 Letter is not "so serious as to affect the integrity of a Federal agency program." PI Motion at 37 (citation omitted). But that is a quintessential "question of judgment" reserved for the agency. *Horne Bros.*, 463 F.2d at 1272. HUD could reasonably determine that LAHSA's failure to abide by its financial management, internal controls, and conflicts-of-interest safeguards is "serious" enough to affect program integrity. Indeed, a recipient's apparent inability to track and control the use of program funds, or learn of their misuse, and its apparent unwillingness to protect those funds from the control of officials with their own interests arguably go to the core of what the suspension authority is designed to address. The record does not compel rejecting HUD's reasonable conclusions on this score.

***b. HUD's Actions Were Reasonable and Reasonably Explained.***

LAHSA next insists that HUD's actions should be overturned because of a smorgasbord of policy disputes dressed up as an APA challenge. According to LAHSA, HUD failed "to consider how its suspension of LAHSA will affect the problem of homelessness in Los Angeles," "failed to consider alternative courses of action that would inflict less irreparable harm," and "fail[ed] to account for the substantial reliance interests of sub-grantee service providers, the local government, and the unhoused." PI Motion 38-41. But arbitrary-and-capricious review is not supposed to be a straightjacket. That "deferential" standard of review requires only that an agency action "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 422-23 (2021). A court "may not substitute its own policy judgment for that of the agency"; rather, its role is limited to ensuring that the agency "has *reasonably* considered the relevant issues and *reasonably* explained the decision." *Id.* (emphasis added).

HUD has met that standard here. Contra LAHSA's representations, HUD did consider the public interest: "It is not in the public interest to perpetuate the status quo, *i.e.*, to permit LAHSA to continue to receive additional millions of dollars of federal funds, as the lead agency in the largest HUD-funded CoC in the nation, when there is adequate evidence that it is not in compliance with HUD requirements and not presently responsible to participate in government programs." June 11 Letter at 12-13. That assessment is reasonable. *See Mainelli*, 611 F. Supp. at 615 (noting "the public interest in safeguarding the integrity of the public contracting process"). It is peculiar that LAHSA thinks HUD has somehow failed to consider that its suspension could have some effect on homelessness in Los Angeles when HUD's letter noted (1) that "[h]omelessness is a crisis plaguing Americans, (2) that "Los Angeles is, and for years has been, the epicenter of the homelessness crisis," and (3) that, "[i]n 2024, LAHSA was the second largest direct recipient of HUD CoC funds in the nation. June 11 Letter at 4. Indeed, HUD expressly took its action in part because of its fear that "diverting dollars from worthy programs to LAHSA merely makes the homeless crisis worse." *Id.* at 3.

And that is not even to get into HUD's accompanying "remedial action to ensure the fair distribution of grant amounts to eligible projects within the Los Angeles CoC's geographic area." June 18 Letter at 2. LAHSA's brief argument that HUD failed to show "good reasons" (PI Motion at 28) for its new policy similarly falls flat. HUD fully explained why it decided now was the time to suspend LAHSA, and that LAHSA dislikes the given reasons is no license to second-guess the agency's determinations.

LAHSA also strangely claims that HUD failed to adequately explain that LAHSA lacks "present responsibility" because "[t]he references in the June 11 Letter date back as far as 2007." PI Motion at 39. But—as HUD made clear—part of the reason HUD suspended LAHSA is that it views LAHSA's conduct as "establish[ing] a clear pattern" rather than a series of "isolated incidents." June 11 Letter at 3; *see also id.* at 3-4 (noting that LAHSA's "track record demonstrates systemic and repeated failures to comply and jeopardizes the operations of LAHSA and all parties it does business with"). It is perfectly reasonably to cite old conduct when it is part of a pattern, and when HUD's point is that "LAHSA's publicly documented difficulties" are "chronic and systemic." *Id.* at 5. Regardless, HUD *also* included numerous recent examples of suspected misconduct. And, unlike in LAHSA's inaptly cited case of *Sloan v. HUD*, here HUD does not "acknowledge that [LAHSA's] alleged improper activity … had ceased *before* the issuance of the suspension[]." 231 F.3d 10, 17 (D.C. Cir. 2000). Far from it—HUD issued this suspension in part because "LAHSA's recent Single Audit and LA County's recent review … both reveal that the issues previously identified persist." June 11 Letter at 12.

LAHSA is also incorrect that the June 11 Suspension was arbitrary and capricious purely because it did not go through an itemized list of possible alternatives. "Agencies are not compelled to explore every alternative device and thought conceivable by the mind of man." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (citation omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983) (declining to "broadly require an agency to consider all

policy alternatives in reaching decision"). For that matter, LAHSA hardly bothers with any specifics, taking issue with its "blanket suspension" (PI Motion at 40) but never suggesting anything other than not imposing the suspension at all—an alternative that HUD obviously considered. And LAHSA ignores that HUD *did* try numerous other methods of addressing and detecting potential fraud—for instance, the HUD-OIG audit and the findings process as to LAHSA's former CEO. ECF 24-58 It is neither arbitrary nor capricious for HUD to conclude that, at this point, a temporary suspension in support of an investigation was a well-tailored measure to ensure its funds are being appropriately utilized.

In any event, HUD "did not err in declining to consider alternative solutions that did not address the problem it had identified." *League of Cal. Cities v. FCC*, 118 F.4th 995, 1018 (9th Cir. 2024). HUD explained that the evidence before it suggested LAHSA "undermined the integrity of—and the public's trust in—the CoC and other HUD programs" and "put millions of dollars of HUD funds at increased risk of fraud and abuse." June 11 Letter at 11; *see also id.* at 9. HUD further expressed its concerns that LAHSA's "failures put at risk hundreds of millions of dollars from HUD[ and] taxpayers … every year," and that "diverting dollars from worthy programs to LAHSA merely makes the homeless crisis worse." *Id.* at 3-4. Thus, HUD necessarily considered and rejected the alternatives of turning a blind eye or taking half-measures.

Finally, HUD did not ignore the Los Angeles homeless population's reliance interests in procuring HUD funds. The June 11 Letter expressly noted that Los Angeles "is, and for years has been, the epicenter of the homelessness crisis in America." *Id.* at 4. It acknowledged that "LAHSA was the second largest direct recipient of HUD CoC funds in the nation" in 2024, and that LAHSA "receives and manages significant HUD funding and has since 1993." *Id.* at 4-5. But HUD also noted that it "and the public have lost confidence in LAHSA and its ability to tackle the homelessness crisis," and that, despite "receiving significant funding from the federal government, as well as state, city, and county funding, Los Angeles' homelessness crisis remains the largest in the

country." *Id.* HUD was well within its rights to determine that any reliance on the currently faulty operation of the homeless support system in Los Angeles did not outweigh the need to better manage HUD's programs.

A "reviewing court must uphold even a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) (citation omitted). And agencies are permitted to make policy calls within a zone of discretion, which courts and litigants are not permitted to supplant. *See State Farm*, 463 U.S. at 59 (Rehnquist, J., concurring). Here, HUD's decision is pellucid, reasonable, and amply explained. LAHSA's arbitrary-and-capricious claims fail.

### 2. HUD's Actions Are Not Inconsistent With Law or *Ultra Vires*.

LAHSA's statutory arguments—that HUD cannot suspend LAHSA consistent with the HEARTH Act—similarly falter. In LAHSA's telling, because Congress created a statutory CoC program and LAHSA has been an important part of the LA CoC, HUD cannot suspend LAHSA without contravening the statute. That is, LAHSA invites the Court to construe the HEARTH Act to give LAHSA immunity from the suspension process applicable to every other government grantee.

That cannot be right. Most obviously, nowhere does the HEARTH Act say that ***LAHSA*** must receive HUD funds. In fact, the statute Congress enacted contemplates scenarios in which HUD would decline to provide funds to collaborative applicants. For instance, Congress *prohibits* HUD from "provid[ing] assistance" unless the CoC "agrees … to comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386(b)(8). And the statute expressly contemplates there being no CoC "for a geographic area," and provides HUD with options to take remedial action in such an instance. *Id.* § 11360a(c). These are not commands to disburse funds to LAHSA at any cost, no matter the evidence that LAHSA has violated the terms of the grant agreements.

LAHSA's main argument vaguely invokes congressional and Executive intent, rather than focusing on what the CoC program and the June 11 Suspension actually do.

LAHSA places great emphasis on its perception that "[t]he Trump Administration … wants to eliminate the [CoC] program," and suggests that an otherwise lawful suspension can become unlawful if "the Administration's real intent is to scrap the Congressionally-mandated CoC system." PI Motion at 1-2. That is an exercise in rhetoric, speculation, and dramatic hyperbole, not law. LAHSA cannot provide any support for the notion that HUD intends to "scrap" the CoC program. The June 18 letter—in which HUD proposes a plan to move forward with the FY26 competition—proves the opposite. The June 11 Letter makes clear that the suspension decision was driven by concerns with LAHSA, not the CoC program. *See generally* June 11 Letter.

Perhaps recognizing the weakness of its invalidation-by-intent thesis, LAHSA casts about for a statutory hook. To no avail. LAHSA first suggests (PI Motion at 27 n.6) that HUD violated 42 U.S.C. § 12711, which provides that HUD "shall not establish any criteria for allocating or denying funds … based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law that is (1) adopted, continued, or discontinued in accordance with the jurisdiction's duly established authority, and (2) not in violation of any Federal law." But the only "policy" HUD would like LAHSA to adopt is to comply with the financial management, internal controls, and conflicts-of-interest safeguards it agreed to. There is no local policy adopted by a "duly established authority" permitting LAHSA to shirk the ordinary procurement processes that virtually every federal agency follows. And if there were a policy to send false certifications to the federal government, that would certainly be "in violation of … Federal law."

Neither does it do any good for LAHSA to point to broad statements of how CoCs generally function, *see* PI Motion at 27 (citing 42 U.S.C. § 11360a(a); § 11382(i)), when a more specific provision of the same statute authorizes exactly what HUD did here, *see* 42 U.S.C. § 11360a(c). LAHSA claims that HUD's "proposed remedial measure of permitting solo entities to apply directly is … contrary to statute and regulation." PI Motion 27. But the June 18 Letter perfectly tracks the language of § 11360a(c), which

authorizes HUD to "permit[] … eligible entities to apply directly for grants."

LAHSA's only response is that § 11360a(c) does not apply because "HUD does not base its suspension of LAHSA on any claim that it has failed to fairly distribute grant funds to eligible entities within LA CoC." PI Motion at 29. That is wrong—HUD expressly doubted "LAHSA's ability to operationally and effectively coordinate, manage, distribute, and monitor taxpayer dollars in a responsible manner or to execute the CoC Program's mission to combat homelessness." June 11 Letter at 5. But it is also irrelevant. Section 11360a(c) does not condition HUD's ability to take remedial action on *why* any given entity is suspended. Indeed, the standard LAHSA quotes from § 11360a(c)—ensuring "fair distribution of grant amounts"— describes *what* HUD's remedial action should do, not the remedial action's trigger or a necessary condition or required finding of deficiency. The only condition is that HUD must "find[]" that a [CoC] for a geographic area does not meet the requirements of this section" or "there is no [CoC] for a geographic area." 42 U.S.C. § 11360a(c).

In passing, LAHSA also suggests that its suspension violates 42 U.S.C. § 11382(d)(2), which requires HUD to "obligate the funds" related to a grant within 45 days of certain conditions being satisfied. PI Motion at 28-29. It is not entirely clear what LAHSA means. To the extent LAHSA suggests that the suspension impermissibly terminates grant agreements that have already been executed, that is plainly wrong. As HUD explained in the June 11 Letter, the suspension prohibits LAHSA "from future participation in procurement and nonprocurement transactions" with the Federal Government. June 11 Letter at 3. It therefore does not terminate grant agreements that HUD and LAHSA have already executed or curtail LAHSA's use of funds that it has already been granted.[4] Narode Decl. ¶ 21. In any event, § 11382(d)(2) speaks only to HUD's duty to "obligate" certain funds, not to its suspension authority. Whether HUD

---

[4] As explained throughout, suspension itself is a limited action. HUD has reserved the right to take other appropriate action regarding LAHSA's existing, fully executed grant agreements, but any such action would be distinct from those described in the June 11 and June 18 Letters. *See, e.g.,* Narode Decl. at ¶¶ 18, 21-22.

must "obligate" funds notwithstanding LAHSA's suspension poses a distinct question not at issue in this case. And whether any particular entity is entitled to payment under § 11382(d)(2) is a question for a Tucker Act suit in the Court of Federal Claims, not an APA challenge in this Court. 28 U.S.C. § 1491; *Roth v. United States*, 378 F.3d 1371, 1384 (Fed. Cir. 2004) (holding that the Court of Federal Claims has jurisdiction over suits pursuant to "money-mandating statutes").

Finally, at times LAHSA argues that HUD's actions are *ultra vires*. That cannot add anything to LAHSA's other statutory arguments. An *ultra vires* claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681-82 (2025) (citation omitted). It applies "only when an agency has taken an action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* at 681 (citation omitted). As already explained, HUD's actions fall well within its delegated and statutory authority.

Taken to its logical conclusion, LAHSA's argument would mean that—no matter how much evidence exists that LAHSA is shirking its obligations under federal grant agreements—HUD would be powerless to suspend LAHSA. That is not the law.

**3. HUD's Actions Do Not Violate the Constitution.**

LAHSA closes out its case with a half-hearted attempt to find a constitutional violation—in particular, a separation-of-powers violation, and a Tenth Amendment violation. Neither comes close to succeeding.

*First*, LAHSA argues that the suspension "eliminat[es] the LA CoC entirely," and thus "contravenes the express will of Congress." PI Motion 42. But that is just to "recast [the] statutory claims as constitutional ones." *Global Health Council v. Trump*, 153 F.4th 1, 14 (2025). It thus adds nothing to LAHSA's statutory claims. Importantly, the June 11 letter does not address the CoC at all, and the June 18 letter does not disband it. The latter simply notes that, due to its relationship with LAHSA, the CoC is presently "unable to execute its responsibilities" in the CoC program. June 18 letter at 1. But even under LAHSA's view of the facts, case law "does not support the proposition that every

action" by an agency "in excess of [its] statutory authority is *ipso facto* in violation of the constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994); *see also Ass'n for Educ. Fin. & Pol'y, Inc. v. McMahon*, 786 F. Supp. 3d 13, 32 (D.D.C. 2025) ("[I]f every statutory compliance issue triggered separation of powers concerns, virtually all APA cases would balloon into disputes of constitutional proportions."). And, as mentioned before, it does not contravene Congress's express will to take the remedial action that Congress itself provided.

*Second*, LAHSA argues that the suspension "violates principles of federalism and the Tenth Amendment" because caring for the homeless is part of the state's "police power." PI Motion at 30, 43. That is wrong. Caring for the homeless may be an archetypal "police power," but under no principle of law or logic can that mean that the Tenth Amendment therefore requires the Federal Government to fund Californian homeless programs, or to fund them on LAHSA's terms. The Tenth Amendment is not violated—and a state's sovereignty is not offended—when HUD simply declines to execute future grant agreements with one irresponsible recipient.

LAHSA's misguided Tenth Amendment argument also conflates its own well-being with that of the state writ large. LAHSA cannot show that the June 11 Letter will result in any significant reduction of CoC funds for Los Angeles, much less for California. To the contrary, the June 18 Letter shows that HUD is taking steps to ensure Los Angeles service providers are able to participate in the FY2026 CoC competition. LAHSA's attempt to elevate a contractor suspension action to the level of a debate about federalism is thus wrong on law and fact.

**B. LAHSA Has Not Demonstrated Irreparable Harm.**

LAHSA also failed to meet its threshold burden to make a "clear showing" that it is likely to suffer irreparable harm absent injunctive relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22-23 (2008). "Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

LAHSA does not identify any irreparable harm to itself. Instead, it alleges irreparable harm to third parties, including the City of Los Angeles, LA County, the homeless, other organizations, and the LA CoC generally. PI Motion at 47-49; Declaration of Matthew W. Szabo, ECF No. 15-66, ¶ 3 ("The City of Los Angeles … and LAHSA are separate entities."). But "Plaintiffs seeking injunctive relief must show that *they themselves* are likely to suffer irreparable harm absent an injunction." *Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (emphasis added); *see also Immigrant Legal Res. Ctr. v. City of McFarland*, 827 F. App'x 749, 751 (9th Cir. 2020) (district court abused its discretion by "focus[ing] its irreparable harm analysis on the prospect of harm to third parties"); *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 678 (9th Cir. 1988) (plaintiff must show "irreparable injury to itself").

To be sure, absent an injunction, LAHSA will remain suspended from its role as Collaborative Applicant for the LA CoC during the ongoing investigation. But LAHSA can be restored to that role if it prevails in this litigation, if it prevails in administrative proceedings before HUD, or if the investigation does not lead to debarment. Importantly, LAHSA does not claim, nor could it, that it has no other sources of funding to support its other, non-federal activities and allow it to remain in business during the suspension. Even the present effect of the June 11 suspension is limited: it simply prohibits LAHSA from participating in future transactions with the federal government during the pendency of the ongoing investigation. June 11 Letter. Because it applies only to future transactions, the June 11 suspension does not affect grant agreements that HUD and LAHSA have already executed or curtail LAHSA's use of funds that it has already been granted. Narode Decl. ¶ 21.

LAHSA insists that it is "unclear" whether the June 11 suspension "constitute[s] a complete freeze on LAHSA spending." PI Motion at 22. At this time, however, HUD has not taken separate agency action to impose specific conditions on LAHSA's use of its existing grant funds. Narode Decl. ¶ 18. Nor has HUD made any determination

about what action, if any, it will take with respect to funds that were preliminarily awarded to LAHSA, but which cannot be subject to a new transaction with LAHSA in light of the suspension. *Id.* ¶ 21. In short, LAHSA's concerns do not stem from the suspension itself, but from hypothetical future agency action. Such speculative injury cannot "constitute an irreparable harm justifying injunctive relief" from the suspension. *Caribbean Marine Services*, 844 F.2d at 675.

**C. The Balance of Equities and Public Interest Weigh Against Granting an Injunction.**

LAHSA also fails to make a "clear showing" that the balance of equities and public interest weigh in favor of an injunction. *Atwood v. Shinn*, 36 F.4th 901, 903 (9th Cir. 2023) (citation omitted). Even when a plaintiff shows that it will suffer irreparable harm (which LAHSA has not), "courts must balance the competing claims of injury and must consider the effect on each part of the granting or withholding of the requested relief," paying "particular regard" to the "public consequences" of an injunction. *Winter*, 555 U.S. at 24 (internal quotation marks omitted).

The public consequences favor denying the application. LAHSA's June 11 suspension serves the public interest because LAHSA has exhibited a "clear pattern" of "wanton mismanagement of public funds." June 11 Letter at 3. That pattern has been publicly documented and is well-known to this Court. *See LA All. for Human Rights v. City of L.A. (LA Alliance II)*, 2026 WL 127741, at *8 (C.D. Cal. Jan. 6, 2026) (noting that audits have "uncovered significant and substantial issues with LAHSA's management of its finances and issues with its record-keeping"); *LA Alliance I*, 792 F. Supp. 3d at 1061 (summarizing LAHSA's "persistent pattern of dysfunction"). HUD also found that LAHSA has a pattern of conflicts of interest and false statements. The June 11 Letter substantiates these findings in detail, and HUD's findings merit respect. And, of course, there is also the *per se* irreparable harm suffered whenever the executive branch is enjoined from carrying out its mandate, *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025)—here, "[t]o protect the public interest … by conducting business only with

responsible persons," 2 C.F.R. § 180.125(a).

The public interest also favors deferring judicial review of the suspension until LAHSA's administrative challenge to that suspension is resolved. Even where not required by statute or regulation, exhaustion of administrative remedies serves the public interest by "prevent[ing] premature interference with agency processes so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review." *Ctr. for Food Safety v. Hamburg*, 698 F. App'x 302, 303 (9th Cir. 2017) (quoting *Tamosaitis v. URS Inc.*, 781 F.3d 468, 478 (9th Cir. 2015)).

On the other side of the equation, LAHSA touts the role of the LA CoC in reducing homelessness. But LAHSA is not the LA CoC. While LAHSA's suspension means that *it* cannot act on behalf of the LA CoC, the duties it performed for the LA CoC prior to its suspension can be performed by others, including HUD itself. Narode Decl. ¶ 10. And LAHSA's June 11 suspension does not require any significant change to the total amount of HUD funding to eligible applicants within the LA CoC's geographic area. *Id.* ¶ 22. HUD may, of course, adjust individual grants or awards through *future* agency action. *Id.* But even such adjustments would not necessarily reduce the amount of funds for that geographic area in the FY2026 CoC competition or in future competitions.

## V. CONCLUSION

Defendants respectfully request that the Court deny LAHSA's motion for a preliminary injunction.

Dated: July 13, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General

JOSHUA S. HA
Counsel to the Assistant Attorney General
Civil Division

NOAH T. KATZEN
Civil Division, Federal Programs Branch

BILAL A. ESSAYLI
First Assistant United States Attorney
DANIEL A. BECK
Assistant United States Attorney
Acting Chief, Civil Division
ALARICE M. MEDRANO
Acting United States Attorney
Acting Chief, Complex and Defensive Litigation Section

*/s/ Alexander L. Farrell*
ALEXANDER L. FARRELL
Assistant United States Attorney

Attorneys for Defendants

**Local Rule 11-6.2 Certificate of Compliance**

The undersigned counsel of record certifies that this Opposition Brief contains 33 pages, which complies with the page limit set by the Court's Order dated July 2, 2026. *See* Dkt. 21, n. 1 ("In light of Plaintiff's significantly oversized brief, Defendants may file a brief of up to fifty-one pages in their Opposition.").

Dated: July 13, 2026

/s/ *Alexander L. Farrell*

ALEXANDER L. FARRELL
Assistant United States Attorney