Keri Curtis Axel (Bar No. 186847)
kaxel@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
smalzahn@waymakerlaw.com
Ashley E. Martabano (Bar No. 236357)
amartabano@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

Christopher Pelham (Bar No. 241068)
christopher.pelham@nortonrosefulbright.com
Abigail G. Urquhart (Bar No. 310547)
abigail.urquhart@nortonrosefulbright.com
Alex Scandroli (Bar No. 345278)
alex.scandroli@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
555 South Flower Street, Forty-First Floor
Los Angeles, California 90071
Telephone: (213) 892-9200
Facsimile: (213) 892-9494

*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*

WAYMAKER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| LOS ANGELES HOMELESS SERVICES AUTHORITY, a joint powers authority,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES DEPARTMENT OF HOUSING AND | Case No. 2:26-cv-07056-DOC-AJR<br><br>**PLAINTIFF LOS ANGELES HOMELESS SERVICES AUTHORITY'S REPLY IN SUPPORT OF EX PARTE APPLICATION FOR PRELIMINARY RELIEF, TEMPORARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION, AND MOTION TO STAY AGENCY ACTION PURSUANT TO 5 U.S.C. § 705** |

URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as the Secretary of the U.S. Department of Housing and Urban Development; and DOES 1-10,

Defendants.

**Date: August 6, 2026**
**Time: 9 a.m.**
**Courtroom: Dept. 1**

**First Street Courthouse**

WAYMAKER

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1
II. ARGUMENT .......... 2
A. The Suspension Is Final Agency Action, and the Case Is Ripe .......... 2
B. LAHSA Is Likely to Succeed On the Merits .......... 4
1. LAHSA's Suspension Is Not Supported By Adequate Evidence .......... 4
(a) HUD Misstates Its Evidentiary Burden for Suspension .......... 5
(b) HUD Lacks Adequate Evidence to Support a Suspension .......... 7
(c) HUD Has No Evidence of False Certifications .......... 9
(d) HUD's Conflict of Interest Claims Are Unfounded .......... 9
(e) HUD Cannot Connect LAHSA's Practices Regarding State and Local Funds to its Federal Requirements .......... 10
(f) HUD's Claims Regarding the 2022 HUD OIG Audit and the 2025-2026 Single Audit Are Misleading and Wrong .......... 12
2. HUD Lacks Authority To Disqualify LAHSA As the Collaborative Applicant for the LA CoC .......... 13
(a) HUD Has Not Made the Required Findings or Followed the Applicable Suspension Process Under the HEARTH Act .......... 13
(b) HUD Is Statutorily Obligated to Fund FY '25 Awards .......... 16
(c) HUD's FY '26 NOFO Notice Is Contrary to Law and Not Practically Feasible .......... 18
3. HUD Likely Is In Violation of the U.S. Constitution .......... 19
C. LAHSA AND THOSE IT SERVES WILL SUFFER IRREPARABLE HARM ABSENT RELIEF .......... 22
D. THE BALANCE OF EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION .......... 23
III. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 2, 3

*Caribbean Marine Services Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .......... 23

*Chevron U.S.A., Inc. v. Hammond,*
726 F.2d 483 (9th Cir. 1984) .......... 14

*Church v. United States*,
No. CV 12-3990 GAF (SSX),
2013 WL 12064271 (C.D. Cal. May 15, 2013) .......... 3

*City & Cnty. of San Francisco v. Trump*,
816 F. Supp. 3d 1017 (N.D. Cal. 2026) .......... 21

*City of Chicago v. United States Dep't of Homeland Sec.*,
815 F. Supp. 3d 727 (N.D. Ill. 2025) .......... 20

*Cnty. of Santa Clara v. Noem*,
815 F. Supp. 3d 979 (N.D. Cal. 2025) .......... 20

*Crawford-Hall v. United States*,
394 F. Supp. 3d 1122 (C.D. Cal. 2019) .......... 3

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 19, 21

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) .......... 24

*Global Health Council v. Trump*,
153 F.4th 1 (D.C. Cir. 2025) .......... 20

*Horne Bros., Inc. v. Laird*,
463 F.2d 1268 (D.C. Cir. 1972) .......... 6

*Immigrant Legal Res. Ctr. v. City of McFarland*,
827 F. App'x 749 (9th Cir. 2020) .......... 23

*In re Padilla*,
222 F.3d at 1192 (9th Cir. 2000) .......... 15

*In the Matter of: Env't Affs. & Mgmt., Inc.*,
SBA No. MSB-621 (Feb. 8, 1999) .......... 7

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025) .......... 5

*Lion Raisins, Inc. v. U.S.*,
51 Fed.Cl. 238 (2001) .......... 8

*Murphy Co. v. Biden*,
65 F.4th 1122 (9th Cir. 2023) .......... 21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) .......... 22

*Neighbors of Cuddy Mountain v. Alexander*,
303 F.3d 1059 (9th Cir. 2002) .......... 3

*Oakley v. Devos*,
No. 20-CV-03215-YGR,
2020 WL 3268661 (N.D. Cal. June 17, 2020) .......... 23

*Pacito v. Trump*,
169 F.4th 895 (2026) .......... 18

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019) .......... 19, 21

*Silverman v. U.S. Dept. of Defense*,
817 F. Supp. 846 (1993) .......... 7

*Sloan v. Dep't of Hous. & Urb. Dev.*,
231 F.3d 10 (D.C. Cir. 2000) .......... 5, 7

*United States v. Maes,*
546 F.3d 1066 (9th Cir. 2008) .......... 14

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) .......... 23

*Watt v. Alaska*,
451 U.S. 259 (1981) .......... 14

*Winter v. Nat'l Res. Defense Council*,
555 U.S. 7 (2008) .......... 24

**STATUTES**

2 C.F.R. § 180.125 .......... 2, 7, 8

2 C.F.R. § 180.130 .......... 15

2 C.F.R. § 180.700 .......... 7

2 C.F.R. § 180.705 .......... 6

24 C.F.R. § 578 .......... passim

24 CFR § 583 .......... 8, 17

42 U.S.C. § 11360 ........ 14
42 U.S.C. § 11382 ........ 17
42 U.S.C. §§ 11381-11389 ........ 14, 15, 18
5 U.S.C. § 704 ........ 3

WAYMAKER

## I. INTRODUCTION

LAHSA's application for preliminary relief (Dkt. 24) demonstrated that the June 11 suspension letter ("June 11 Letter") from the U.S. Department of Housing and Urban Development ("HUD"), and the remedial measures HUD announced in its June 18, 2026 letter ("June 18 Letter"), were based on partisan policy-making, not adequate evidence, and that HUD's actions were final, violated statutes and policies adopted by Congress, and were unconstitutional. Then, on July 16—while HUD was supposed to be negotiating an order "maintaining the status quo with respect to LAHSA's provision of services" (Dkt. 21 at 2)—HUD further proved LAHSA's point, by noticing a new funding application process that would overturn the decades-old Congressionally-mandated Continuum of Care ("CoC") Program by denying the Los Angeles CoC ("LA CoC") its statutory right to submit a regional, consolidated application for HUD funding.

Through the suspension, HUD is attempting to effectuate in 2026 what the Trump Administration has announced that it wishes to do in 2027: eliminate the CoC program in Los Angeles. The July 16 announcement makes clear that HUD intended its actions to be final. Given the express dictates of the Homeless Emergency Assistance and Rapid Transition to Housing ("HEARTH")Act, however, HUD cannot accomplish this objective without violating the statute, the Separation of Powers, the Take Care Clause, and the Tenth Amendment.

In its opposition, HUD sidesteps the purpose of its actions and downplays their effects. HUD traffics in conclusory (and unsupported) allegations, not facts. It fails to identify a single item of adequate evidence—not an agreement, not a certification—that could even potentially support suspension. It fails to refute, or even reference, any of LAHSA's 13 supporting declarations. HUD also does not and cannot explain why it approved new grant awards to LAHSA on May 21, 2026—just twenty-one days before the suspension—and authorized millions in drawdowns on the day of and after the suspension, yet purports that "immediate action is

necessary to protect the public interest." HUD's opposition makes plain that its actions are not based on a careful evaluation of the evidence and law, but are reverse-engineered to meet policy objectives.

Notably, HUD devotes only a page and a half of its 33-page opposition to the issue of irreparable harm. HUD admits that it intends to preclude LAHSA from acting as the LA CoC collaborative applicant, but does not address LAHSA's Homeless Management Information System ("HMIS"), Coordinated Entry System ("CES"), and Point-in-Time Count ("PIT") functions. Indeed, HUD does not mention CES or the PIT Count *even once in its brief,* despite the fact that these are significant, fundamental services on which local, state, and federal authorities all rely. The unrefuted evidence is that no person in Los Angeles County moves from interim to permanent housing without LAHSA's role as CES coordinator. (Dkt. 24-3 ¶6). HUD also simply ignores the financial paralysis imposed on twelve specific provider organizations presently providing services without funded contracts; the threatened collapse of the nation's largest HMIS system (Dkt. 24-6 ¶14); and the threatened freezing of 25,398 households on the permanent supportive housing waitlist (*Id.*)

A federal agency may exclude persons from covered transactions only to protect the public interest from a present, evidence-based risk. It may not exclude a person for the purposes of punishment. 2 C.F.R. § 180.125. What HUD has done here is use its suspension authority as an instrument of an expressly stated policy to destroy a congressionally mandated program—by punishing the entity most associated with that program. The Court should enjoin it.

## II. THE SUSPENSION IS FINAL AGENCY ACTION

Ignoring the controlling two-part test in *Bennett v. Spear*, 520 U.S. 154 (1997), HUD asserts "an agency action must be considered 'non-final' if it is the subject of a pending administrative appeal." (Dkt. 25 ("Opp.") at 15). That is not the law and it confuses the status of the pending administrative proceedings. Rather,

under *Bennett*, an agency action is final the moment is consummates the decisionmaking and carries legal consequences.

HUD's cited cases are distinguishable. In two of the cases, the agency vacated its own decision, thus rendering it non-final. *See Church v. United States*, No. CV 12-3990 GAF (SSX), 2013 WL 12064271, at *2, 4-6 (C.D. Cal. May 15, 2013) (administrative appeals office sua sponte vacated and reopened its previously final decision in an immigration matter); *Crawford-Hall v. United States*, 394 F. Supp. 3d 1122, 1154 (C.D. Cal. 2019) (after court vacated agency action as ultra vires, it remanded to the agency for a final decision). In the third case, the court merely ruled that "forest-wide monitoring and reporting duties" are not "final agency actions" because they "do not mark the culmination of the agency decisionmaking process, nor do rights or obligations flow from them." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002). In contrast, here, HUD has "formalized its decision[.]" *See id*. It has not vacated or otherwise rendered its suspension decision inoperative. HUD recently put an exclamation mark on the finality by issuing a July 16 Notice of Funding Opportunity ("NOFO") notice, proving it intends to permit eligible entities to apply directly to HUD and bypass LAHSA. (*See* Declaration of Jessica Reed, filed herewith ("Reed Reply Decl.") ¶¶ 12-13). HUD's latest action further confirms that the consequences of the suspension are not hypothetical, tentative or preliminary. HUD is restructuring the competition on the premise that LAHSA has been removed. An action that is already reshaping a live funding competition is not premature.

LAHSA has requested an administrative hearing, but there is no pending administrative appeal. In any event, an otherwise-final action remains final despite an "appeal to superior agency authority" unless a rule both makes the appeal mandatory and renders "the action meanwhile . . . inoperative." 5 U.S.C. § 704. LAHSA's response under 2 C.F.R. Part 180 is neither required, nor has HUD rendered the suspension inoperative.

WAYMAKER

## III. LAHSA IS LIKELY TO SUCCEED ON THE MERITS

### A. HUD Fails to Show a Need For "Immediate Action"

HUD has not adequately explained why "immediate action [in the form of a suspension] is necessary to protect the public interest." *See* 2 C.F.R. § 180.700(c). Given HUD's role in administering the CoC program, it surely is not too much to ask it "reasonably consider" how a suspension LAHSA will affect the provision of homelessness services in the LA CoC before it implements such a suspension. *See Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Contrary to HUD's assertions, it did not do so.

HUD cites to a couple of stray statements in its June 11 Letter that describe the scope of the homelessness problem and identify LAHSA as the second largest direct recipient of HUD CoC funds in the nation. (*See* Opp. at 28.) Critically, there is no analysis or reasoning anywhere in the June 11 Letter as to how LAHSA's suspension might affect the continuity of homelessness services in the region. Indeed, the June 11 Letter utterly ignores the central programmatic roles that LAHSA performs for the region as HMIS Lead, CES Coordinator, and PIT Count Administrator. Even though the June 11 Letter does not identify any actual federal funds that were or are being mismanaged by LAHSA, HUD claims it took "action in part because of its fear that 'diverting dollars from worthy programs to LAHSA merely makes the homeless crisis worse.'" (*Id.*) It is evident the Administration's policy goal is to divert funds away from the CoC program entirely, or at least away from Los Angeles. Given HUD's professed concern that Los Angeles "is the epicenter of the homelessness crisis in America" (*id*. at 30), it strains reason to conclude that an immediate suspension of LAHSA in the middle of an application process is necessary to protect the public interest. The June 11 Letter does not once consider how a suspension could disturb the infrastructure for the provision of homelessness services.



WAYMAKER

Moreover, HUD did fail to consider less drastic alternatives. In the ordinary course, HUD raises concerns in performance reviews and follows a process set forth in its own regulations before taking remedial actions or imposing sanctions. *See* 24 C.F.R. § 578.107. The purpose of such remedial actions is to "prevent a continuation of the deficiency; to mitigate, to the extent possible, its adverse effects or consequences; and to prevent its recurrence." *Id*. § 578.107(b). For this reason, HUD has a range of tailored remedies available to address specific concerns. *See id*. HUD did not do this. It arbitrarily and capriciously issued an across-the-board suspension of LAHSA without undertaking the appropriate process, and failed to give a reasoned explanation for its decision.

**B. LAHSA's Suspension Is Not Supported By Adequate Evidence**

***1. HUD Misapprehends the Evidentiary Standard and the Evidence Required To Meet It***

As an initial matter, HUD understates its evidentiary burden. HUD contends it "has significant regulatory leeway" in ordering suspension, calling it a "temporary and preliminary" agency action. (Opp. at 2.) Federal agencies, however, may not impose suspension with superficial factfinding and unfettered discretion. *Sloan v. Dep't of Hous. & Urb. Dev.*, 231 F.3d 10, 17 (D.C. Cir. 2000) ("disqualification from government contracting is a very serious matter"); *see also Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 108 (D.D.C. 2025). (holding that "an agency may not impose even a temporary suspension without providing the 'core requirements' of due process: adequate notice and a meaningful hearing.")

Moreover, there are several problems with HUD's claim that the suspension is just a preliminary measure pending an ongoing investigation. (Opp. at 17.)

First, HUD's actions are not temporary. (*See supra* at III(A).) The June 18 "remedial action letter" (Opp. at 15) includes determinations that LAHSA "is no longer eligible to serve as a collaborative applicant for the Los Angeles CoC, or apply for [FY 2026] funding" (Dkt. 24-23), and does not make LAHSA's eligibility



WAYMAKER

contingent on the results of a HUD-OIG investigation. That HUD intended its remedial measure to be immediate and final is confirmed by the July 16 NOFO notice, which begins the process (to be completed within 7 days) of permitting individual entities within the LA CoC to apply directly for CoC grants, bypassing the LA CoC entirely. (Reed Reply Decl. ¶ 13, Ex. 4.)

Second, contrary to HUC's claims, neither HUD's suspension nor its remedial action was ever tied to an ongoing investigation. HUD's Associate General Counsel Dane Narode's declaration puts the lie to this claim, stating that, on May 29, 2026, HUD-OIG commenced an investigation of LAHSA based on a referral from HUD itself. (Dkt. 25-1 ¶ 4.) In other words, HUD asked its OIG to investigate LAHSA, and then waited less than two weeks to suspend it. HUD's sidelining of LAHSA has nothing to do with pending investigations and nonfinal factfinding—HUD has decided to effect the administration's agenda with respect to LAHSA irrespective of the evidence adduced in any investigation, or any response or rebuttal by LAHSA.

Third, HUD tries to suggest that the "adequate evidence" standard can be met based on the types of uncorroborated information sufficient to "open[] an investigation." (Opp. at 15.) This is insufficient. While "adequate evidence" encompasses may not be co-extensive with the the Federal Rules of Evidence, the evidence "must be more than uncorroborated suspicion or accusations," *Horne Bros., Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C. Cir. 1972), and a suspending official must consider the evidence's credibility. 2 C.F.R. § 180.705(a). News articles and uncorroborated allegations in public sources do not meet the test. *Cf.* 2 C.F.R. § 180.705(b)(1)-(2) (types of evidence for consideration include "[a]n indictment, criminal information, conviction, civil judgment" or "other official findings by Federal, State, or local bodies that determine factual or legal matters"). Contrary to HUD's claim, the factual threshold for opening an investigation is not the same as the threshold for the much more serious and consequential step of suspension. *See In*

*the Matter of: Env't Affs. & Mgmt., Inc.*, SBA No. MSB-621, at *13 (Feb. 8, 1999) ("Though suspicion may warrant investigation, it does not warrant suspension.").

Finally, and as discussed further below, HUD does not demonstrate that it has considered, as required, whether suspension is "necessary to protect the public interest" under 2 CFR 180.700(c). HUD advances the circular claim that it is necessary to protect the public interest where a contractor is not responsible. (Opp. at 33). But, as discussed further below, the analysis of whether LAHSA has "present responsibility" includes an analysis of mitigating factors, notwithstanding a history of misconduct or other issues. 2 CFR § 180.125(b) and (c); *Sloan*, 231 F.3d at 14; *Silverman v. U.S. Dept. of Defense*, 817 F. Supp. 846, 849 (S.D. Cal. 1993) (requiring the agency to consider "favorable evidence of responsibility and "ensure that all findings" "are based on the presence of a realistic and articulable threat of harm to the government's proprietary interest"; "government contractors must be afforded a meaningful 'opportunity to overcome a blemished past,' to ensure that an agency 'will impose debarment only in order to protect the government's proprietary interest and not for the purpose of punishment.") (citation omitted).

### *2. HUD Lacks Adequate Evidence to Support a Suspension*

As to the merits, HUD fails to contend with the fact that suspension should not be based on stale information. *See Sloan*, 231 F.3d at 17. The longer HUD waits to take action, the less it can rely on the exigency of suspension. 2 C.F.R. § 180.700. HUD cannot credibly maintain that immediate action was necessary on June 11, 2026, based on a historical record it had known for years, and after approving LAHSA as a grantee just three weeks earlier. HUD notes that similar issues were advanced by the L.A. Alliance in a May 8, 2025 motion for receivership, and in this Court's June 25, 2025 order. (Alliance Litigation Dkt. 899, 991.) HUD never explains why it did not commence an investigation then; yet it purports that its recently-opened investigation compels "immediate action" now. *See Inchcape Shipping Servs. Holdings Ltd. v. United States*, 2014 WL 12838793, at *2 (Fed. Cl.



WAYMAKER

Jan. 2, 2014) (government waited over a year after audit results to suspend contractor, casting "serious doubt on [its] claim that immediate action was necessary").

Moreover, HUD's claim that immediate action is needed is belied by the fact that it has awarded LAHSA multiple grants on an annual basis for years, and made an award *as recently as May 21, 2026*. (Reed Reply Decl. ¶ 3.) By regulation, at the time of the May award, HUD was required to evaluate LAHSA's "performance in previous years against the plans and goals established" in its application," and evaluate factors such as a "history of inadequate financial management accounting practices," and "indications of mismanagement on the part of the recipient." 24 CFR § 583.235(c)(1). (*See* Reed Reply Decl. ¶ 2.) Having just approved multiple awards to LAHSA under this standard, HUD simply cannot justify a suspension now. *Lion Raisins, Inc. v. United States*, 51 Fed.Cl. 238, 249 (2001) (where USDA continued to awards contracts during period of misconduct, USDA "acted arbitrarily and capriciously by deeming plaintiff both responsible and non-responsible for the same time period and based on the same evidence").

HUD improperly diminishes the importance of LAHSA's remedial efforts (Opp. at 22), which also bear on LAHSA's present responsibility. HUD asserts that "whether LAHSA is a "responsible person" is a matter for the ongoing investigation to determine" (Opp. at 22), but that would be too late. HUD must assess present responsibility before suspension, 2 CFR § 180.125(b), and cannot wait until its vaguely-described investigation is complete.

Overall, HUD gives short shrift to the fact that LAHSA has made significant and comprehensive improvements over at least the last ten years, such that old audits are not reflective of its current state. HUD never addresses LAHSA's leadership changes, strengthened audit and risk structure, and reforms to data governance, financial oversight, provider monitoring, and housing-matching operations. (*See, e.g.,* Dkt. 24-21 ¶¶ 8-12 and Dkt. 24-66 ¶ 42.)



WAYMAKER

### *3. HUD Has No Evidence of False Certifications*

HUD's allegation that it has adequate evidence of LAHSA making false statements or certifications to HUD is wholly unsupported. HUD points to pages 11-12 of its letter (Dkt. 24-24 at 2) which sets out various certifications LAHSA routinely makes in the consolidated application. But HUD fails to point to a single specific LAHSA statement—including date, recipient, or content—and links it up with any evidence the statement was false. HUD cannot meet its due process obligations by merely handwaving at years of certifications without specifying, by date and medium, what statements it alleges, and how it alleges them, to be false. Further, the general certifications HUD cites are, for the most part, prospective and made subject to the "best knowledge of the signatory." (*Id.* at 11). There is simply zero evidence that any LAHSA official ever made a certification that was not true and accurate to the best of their knowledge at the time. At best, the June 11 Letter disputes the adequacy of LAHSA's policies and controls—not whether LAHSA misrepresented that the policies and controls were in place.

### *4. HUD's Conflict of Interest Claims Are Unfounded*

HUD's repeated assertions that it has found reason to believe that LAHSA has been operating with undisclosed conflicts of interest (see Opp. at 1, 2, 8) only demonstrates the lack of evidence it possesses and its own lack of credibility. Simply put, the conflict of interest claims are false and HUD knows it.

In its opposition, HUD states that, in October 2024, LAHSA "authorized its then-[Chief Executive Officer ("CEO")] to contract with her husband's employer to provide services for over $2 million." (Id.). HUD knows that LAHSA did no such thing; rather, LAHSA started working with Upward Bound House ("UBH") long before Dr. Adams Kellum became LAHSA's CEO; Dr. Adams Kellum recused herself, on the public record, from dealings with UBH; LAHSA's total disbursements to UBH did not increase after Dr. Adams Kellum became CEO; pursuant to LAHSA's conflict of interest policy, LAHSA's Commission approved



WAYMAKER

further work with UBH without Dr. Adams Kellum's involvement or presence (due to her recusal); and Dr. Adams Kellum's staff inadvertently applied her signature to documents through Adobe (that is, she did not execute any documents relating to UBH). (*See* Dkt. 24-36 ¶¶ 11, 23; Dkt. 24-44, Dkt. 24-55.) HUD accepted the facts that LAHSA documented through its internal investigation and closed out its investigation; HUD cannot ground its suspension on factual inferences that it well knows to be false.

HUD points to no new issues arising since its closeout to justify further suspicion or investigation of LAHSA's conflict of interest policies or practices. HUD ominously suggests other conflict of interest issues exist (Opp. at 19 ("HUD's ongoing investigation has revealed additional potential conflicts of interest that LAHSA had not disclosed"), but fails to identify any.[1] There can be no "adequate evidence" where HUD cannot even identify any supposed "additional potential conflicts of interests" with specificity, much less any false statements or certifications referencing them. HUD's statutory and due process obligations demand much more than a vague, unsupported allegation.

#### ***5. HUD Cannot Connect LAHSA's Practices Regarding State and Local Funds to its Federal Requirements***

HUD glosses over the fact that, because state and local reimbursement structures are very different from federal ones, findings and allegations related to LAHSA's administration of state and local funds simply do not translate to how it administers HUD funds. The June 11 Letter repeatedly emphasizes LAHSA's ability to reimburse providers from state and local funds. (*See* Dkt. 24-17 ¶¶ 23-28; *see also* Axel Reply Decl., Ex. 1 ¶¶ 18-29). However, there are differences in how these

[1] HUD cannot controvert that LAHSA has not only implemented a new policy, but given it effect. (Pelham Decl. ¶ 29.) LAHSA's conflict waiver exemption request refutes the suggestion that it presently allows Commissioners with potential conflicts to recuse without requesting a HUD waiver. (*Cf.* June 11 Letter at 10)



WAYMAKER

programs are administered, particularly in the speed with which HUD, the State of California, and the City and County of Los Angeles reimburse service providers through LAHSA. As a result, historical criticisms of LAHSA's administration of state and local funds are not necessarily relevant to its administration of CoC funds. HUD, however, states that these differences are for an investigation to sort out. (Opp. at 20 ("whether there are meaningful differences between LAHSA's HUD-assisted payment processes and its other payment processes, . . . are exactly the kinds of issues HUD needs to investigate and weigh")). As noted above, because it has already taken the serious step of suspending LAHSA, HUD cannot defer such important analysis until after its investigation.

The federal drawdown process is "significantly more timely than many local reimbursement processes." (Axel Reply Decl., Ex. 1 ¶ 19.) With state- and locally-funded programs, the provider incurs and records the expense; submits it to LAHSA; LAHSA records the expense; LAHSA submits a reimbursement request to the state or local funder; and then LAHSA must wait for the funder to review and pay that request. (*Id.*) The invoice appears as an accounts payable on LAHSA's balance sheet. By contrast, for CoC funds, LAHSA "draws funds directly from HUD's . . . system and those funds are generally deposited within three business days." (*Id.* at 20.) To pretend these two payment processes are the same, when HUD allows a drawdown directly from a funded account, but the local requires the reimbursement request to be reviewed and then funds to be sent to LAHSA, is absurd.

HUD erroneously asserts that the State has provided LAHSA sufficient "cash on hand" to cover reimbursements, suggesting that there is no external delay for such funds. (Opp. at 20-21). LAHSA does not have sufficient funds from State sources to "pre-pay" service providers before the reimbursement process. LAHSA's annual budget exceeds $900 million. (Dkt. 24-17 ¶ 13.) For LAHSA's fiscal year 2025-2026 budget, only 9% of that came from federal sources. (Axel Reply Decl.,



WAYMAKER

Ex. 3 (June 18, 2026 LAHSA Budget Update).) And 9% of it comes from State sources, which have their own reimbursement model, including "cash on hand" as the government notes. (Dkt. 24-32 at 53.) LAHSA does not have the remaining 82% of over $900 million on hand. For the vast majority of the remaining funds, LAHSA is required to follow the specific payment processes for local funders outlined above.

Finally, HUD need not look to LAHSA's processing of state funds as a proxy for its federal reimbursement speed; the Single Audit evaluates LAHSA's management of federal funds annually, and there was no issue identified. (Dkt. 24-26 (June 11 Leter, Ex. 9 (FY2025 Single Audit).)

### *6. HUD's Claims Regarding the 2022 HUD OIG Audit and the 2025-2026 Single Audit Are Misleading and Wrong*

As to the 2022 HUD OIG Audit: (1) HUD complains that LAHSA failed to spend $3.5 million in CoC funds in 2022, but omits that HUD accepted LAHSA's corrective actions and formally closed out this finding over a year ago. (Axel Reply Decl., Ex. 4 ¶ 11, 21, Ex. 5.); (2) As to HMIS, contrary to HUD's insinuation, there was no finding related to a problematic failure of HMIS; rather, the audit "identified documentation deficiencies related to certain salary and rental costs associated with HMIS and Planning grants" (Axel Reply Decl., Ex. 4 ¶ 20) and LAHSA has since provided additional documentation (Axel Reply Decl., Ex. 4 ¶ 11, Ex. 5.); (3) Similarly, HUD brings up a failure "to provide supporting documentation for over $870,000 in payroll and rent costs" (Opp. at 21), but this too is a documentation question rather than an indication of misuse in funds. (Axel Reply Decl., Ex. 4 ¶ 11, Ex. 5); (4) HUD notes the audit's finding that "LAHSA failed to submit timely performance reports" (Opp. 21), but timeliness "is not defined by the Uniform Guidance" (Axel Reply Decl., Ex. 1 ¶ 6), and therefore does not amount to a deviation from an established or required internal control. In any event, as discussed above, an audit that occurred in 2022 is stale.

As to the 2025-2026 Single Audit, HUD stoops to pulling a phrase out of its sentence, claiming that the auditor found "internal controls over financial reporting were not adequately designed or implemented" (Opp. 21) but the rest of the sentence (and page) makes clear this relates only to the "timely identification and correcting of accounting matters or timely preparation and provision of information necessary for financial reporting and audit purposes. (June 11 Letter, Ex. 9 p. 50). This finding led to an audit recommendation concerning enhancing LAHSA's financial closing process to support more timely financial reporting. (Id.)

HUD also omits that the Single Audit—which represents the most comprehensive and independent evaluation of LAHSA's compliance with major federal program requirements and its performance in its role as CoC Lead Applicant, HMIS Lead, and CoC coordinator—did not "identify any instance where LAHSA failed to comply with federal laws or contractual obligations." (Axel Reply Decl., Ex. 1 ¶ 40). It concluded that LAHSA's financial statements "presented fairly in all material respects, the respective financial position of the governmental activities and the major fund of" LAHSA. (*Id*. at 1; C. Dkt. 24-66 ¶ 11).

### C. HUD Lacks Authority To Disqualify LAHSA As the Collaborative Applicant for the LA CoC

Even assuming this Court does not set aside LAHSA's entire suspension as arbitrary and capricious (which it should), HUD's prescribed remedial actions should be enjoined as unlawful. HUD cites no caselaw to support its claim that it can use the suspension and debarment system to disqualify LAHSA from serving as the collaborative applicant or from performing its programmatic duties under the HEARTH Act. Nor can it. The actions taken by HUD in its June 18 Letter are extraordinary, unprecedented, in excess of its authority, and are contrary to law.

#### *1. HUD Has Not Made the Required Findings or Followed the Applicable Suspension Process Under the HEARTH Act*

In an attempt to claim remedial authority to disqualify LAHSA as collaborative applicant and to suspend its programmatic functions, HUD collapses

two distinct and separate statutory and regulatory frameworks. Relying on the suspension and debarment system in 2 C.F.R. part 180, HUD first argues that it "has same tools as any agency" to suspend federal partners from participating in government programs. (Opp. at 9.) It then argues that LAHSA's suspension "should naturally mean that the CoC can no longer fulfill its responsibilities" such that it may exercise its remedial authority under the HEARTH Act, 24 C.F.R. § 578.13(a). (*Id*. at 15.) It cites no authority for that proposition. Where two different statutory or regulatory frameworks interact, courts seek to harmonize them "'to give effect to each if we can do so while preserving their sense and purpose.'" *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 490 n. 8 (9th Cir. 1984) (quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981)). "[A] regulation does not trump an otherwise applicable statute unless the regulation's enabling statute so provides." *United States v. Maes,* 546 F.3d 1066, 1068 (9th Cir. 2008).

HUD admits, as it must, that its remedial authority is conditioned on a finding that a CoC does not meet the "requirements" of the HEARTH Act or there is no CoC for a geographic area. (Opp. at 33.) *See* 42 U.S.C. § 11360a(c); 24 C.F.R. § 578.13(a). The "requirements" of the HEARTH Act, as applied to the CoC program are found in 42 U.S.C. §§ 11360a(f), 42 U.S.C. §§ 11381-11389, and the Act's implementing regulations, 24 C.F.R. Part 578, which translate its requirements into specific operational duties for a CoC. *See* 24 C.F.R. §§ 578.5, 578.7, 578.9 (describing duties such as CoC operation, maintaining a Governance Charter, monitoring reports of recipients, designing the collaborative application process, and establishing funding priorities.)

HUD has failed to identify any specific "requirements" of the statute or regulations that LAHSA or the LA CoC do not meet, or have failed to execute. That should end the matter. HUD's remedial authority under 24 C.F.R. 578.13 is designed to ensure that CoCs comply with the requirements or standards for, *inter alia*, coordinated planning, funding allocation, and service delivery targeted at

addressing homelessness within specified geographic areas. *See* 42 U.S.C. § 11386a; 24 C.F.R. §§ 578.7(c), 578.9, 578.53. HUD can take remedial action only if a CoC fails to meet these benchmarks, thereby protecting equitable and effective distribution of grant funds. *See* 24 C.F.R. § 578.13(a).

The suspension and debarment system in 2 C.F.R. part 180 is not "requirements of the Act or its implementing regulations" within the meaning of 24 C.F.R. § 578.13, but represents standards set forth by the Office of Budget and Management ("OMB") and which apply to federal contract administration generally. These OMB administrative and financial management standards may "apply to recipients and subrecipients" of federal homelessness grants, "except where inconsistent with the provisions of the [HEARTH] Act or this part." *See* 24 C.F.R. § 578.99(e); *In re Padilla*, 222 F.3d at 1192 (9th Cir. 2000). Thus, if there is a conflict between the OMB standards and the HEARTH Act, the HEARTH Act and its implementing regulations control.

HUD must follow the more specific remedial procedures in the HEARTH Act before suspending LAHSA. The specific regulations for the HEARTH Act direct HUD to undertake a performance review process before taking remedial actions. *See* 24 C.F.R. § 578.107. Upon the conclusion of this process, the available remedial actions may include, *inter alia*, "suspending disbursement of grant funds[.]" *Id.* § 578.107(b)(1)(v). HUD has not followed that process here. It should not be permitted to circumvent the specific procedures set forth in the HEARTH Act by falling back on the more general system for suspension and debarment.

The suspension and debarment system was not designed to address the situation presented here. By its terms, the legal effect of a suspension or debarment is limited to excluding a specific person's involvement in "covered transactions." 2 C.F.R. § 180.130. This regulation is not so capacious as to permit an official to suspend a collaborative applicant from applying for federal funding on behalf of an entire region under the HEARTH Act. Nor does it authorize an official to suspend a

WAYMAKER

collaborative applicant from acting as HMIS Lead or performing other programmatic functions. HUD does not cite a single prior instance where it has ever used the suspension tool to disqualify a collaborative applicant or an entire CoC as it has done here. It is inconsistent with the HEARTH Act for a suspension under 2 C.F.R. part 180 to be used as a means to disqualify a collaborative applicant acting on behalf of a region, especially where HUD has not followed the applicable remedial procedures for grant administration under its own regulations for the HEARTH Act. *See* 24 C.F.R. § 578.107.

Rather than engage in reasoned decisionmaking as required by the APA, HUD simply recites that LAHSA is suspended and treats that fact as sufficient to disqualify LAHSA and the entire LA CoC. (June 18 Letter at 1 ("[b]ecause LAHSA may not participate in federal programs, it may not act on behalf of the Los Angeles CoC"). HUD cites no legal authority or prior historical practice for this proposition but relies on its own *ipse dixit*. (Opp. at 15 (arguing that suspension "should naturally mean that the CoC can no longer fulfill its responsibilities"). HUD's reasoning does not withstand scrutiny under the arbitrary-and-capricious standard.

### *2. HUD Is Statutorily Obligated to Fund FY '25 Awards*

HUD concedes LAHSA's suspension "does not terminate grant agreements that HUD and LAHSA have already executed or curtail LAHSA's use of funds that it has already been granted." (Opp. at 33.) Instead, HUD threatens not to fund FY '25 grants that—based on a Congressionally-set timelines—HUD already awarded and was required to fund. HUD's actions are not a permissible exercise of administrative discretion, but represent defiance of a non-discretionary statutory mandate.

While HUD sought to upend Congressional priorities through the FY '25 NOFO, Congress and the courts intervened, enjoining the FY '25 NOFO and setting deadlines by which HUD had to renew FY '24 grants for FY '25. (*See* Dkt. 24 at 26.) As to LAHSA's grants, HUD met these deadlines, renewing all of LAHSA's

2024 subgrantees (Dkt. 24-62 ¶¶ 50-52), including LAHSA itself, as recently as May 21, 2026. (Reed Reply Decl. ¶ 3.) In issuing these award letters, HUD had to evaluate and determine the eligibility of the grantee, LAHSA, as well as its subgrantees, before approving their awards. 42 U.S.C. § 11382(d)(1); 24 CFR § 583.235(c).

After the awards were approved by HUD, the HEARTH Act required that the funds be obligated—*i.e.*, legally committed with grant agreements—within 45 days. 42 U.S.C. § 11382(d)(2); 24 CFR § 583.410.[2] But LAHSA has not received signed grant agreements for 49 already-awarded grants and, in every case, they are now overdue. (Dkt. 24-62 ¶¶ 50-53, 57; see also, Reed Reply Decl. ¶ 3.) HUD is customarily dilatory in executing grant agreements, often leaving grantees and subgrantees to fund their own operations for months with no path to reimbursement. (Dkt. 24-62 ¶¶ 50.) Here, however, HUD seeks to take advantage of its sloppy practices to deny funding altogether for award recipients including LAHSA, House of Ruth, and Penny Lane, among others, who have already provided, and are continuing to provide, services under the awards. (Dkt. 24-2 ¶¶ 4–10; Dkt. 24-1 ¶¶ 4-5). HUD cannot now use the suspension system to excuse its failure to comply with the statutorily mandated timeline.

HUD's attempt to distinguish funding under signed and unsigned grant awards fails, and undermines HUD's claim that LAHSA is an untrustworthy recipient and administrator of HUD funding. Given the grant cycle, LAHSA has at least six months (and in some cases longer) to administrate HUD funding under already-signed grants. This represents millions of dollars in federal monies. (Reed Reply Decl. ¶ 7.) Were LAHSA the irresponsible actor HUD contends, surely it

[2] The grant agreement is a formal post-award step by which a grantee agrees to provide services and HUD commits the funds, which are then available to draw down within HUD's eLOCCs system. *See* 24 CFR § 583.400. (*See also* Axel Reply Decl., Ex. 1¶ 20).



WAYMAKER

would cut off LAHSA's access to such monies. But HUD has not disturbed LAHSA's access to the FY '24 and already-executed FY '25 grants, likely because it knows it cannot meet the legal standard to de-obligate the funds under 24 C.F.R. 578.107. In any event, the distinction is necessarily arbitrary and capricious, in that, in either event, LAHSA is legally entitled to the obligation of funds.

HUD's reliance on 42 U.S.C. § 11386(b)(8) is unexplained, and fails. (*See* Opp. at 26.) Section 11386(b) merely includes a list of assurances that a collaborative applicant must provide to HUD. *See* 42 U.S.C. § 11386(b)(8) (catch-all requiring applicant to "comply with such other terms and conditions as the Secretary may establish"). HUD never claims that LAHSA's suspension, or the remedial actions HUD has taken, are based on its Section 11386(b)(8) authority.

Because the suspension authority does not authorize HUD to contravene its existing funding obligations under the Act, HUD is acting contrary to law.[3]

### *3. HUD's FY '26 NOFO Notice Is Contrary to Law and Not Practically Feasible*

HUD's recent attempt to rewrite the NOFO process for Los Angeles County based on its suspension of the LA CoC's collaborative applicant also contravenes the HEARTH Act, which requires regions to submit one coordinated application. While 24 C.F.R. Section 578.13(a)(3) permits HUD to allow a specific entity to apply directly for funding as a remedial measure, that remedy is rooted in the existing regulatory scheme. Under 24 C.F.R. § 578.35(b), solo applicants who appeal the CoC determinations of eligible applicants are allowed to apply for

[3] Although HUD asserts in passing that contract claims belong in the Federal Court of Claims under the Tucker Act, it does not contend that this Court lacks jurisdiction to decide this dispute. (*See* Opp. at 34.) It clearly does. LAHSA's claims arise under the APA and the U.S. Constitution and it seeks injunctive and declaratory relief, which are within the purview of this Court. *See Pacito v. Trump*, 169 F.4th 895, 925 (2026). Moreover, whether HUD is obligated to execute a grant agreement under the HEARTH Act is a separate question than whether HUD has breached a contract or has a contractual payment obligation under an existing agreement.



WAYMAKER

funding outside of the COC process as a remedy when the CoC has "denied" individual applicants "the right to participate" in the CoC "in a reasonable manner." 24 C.F.R. § 578.35(b)(1). But that provision assumes the "solo applicant" continues to operate within the CoC system. Here on the other hand, HUD is effectively removing the entire LA CoC from the CoC program without any legal authority.

HUD's remedial choice is unprecedented because it applies to all applicants within the CoC, not just those selective applicants who allege their preclusion from the CoC application process. HUD's expansion of the remedial action to take individual applications would serve to effectively disband the entire LA CoC. This runs contrary to the entire statutory and regulatory framework of the CoC Program, and the Congressional mandates behind the appropriation of CoC funds. As with the suspension of LAHSA, there is no factual record or findings to support the imposition of such a sweeping and broad remedial action.

**D. HUD Likely Is in Violation of the U.S. Constitution**

Although this Court does not need to reach the constitutional claims if it finds that LAHSA has a likelihood of success under the APA, it also should find that LAHSA is likely to succeed on its constitutional claims. HUD gives short shrift to these claims and does not engage with LAHSA's cited authority, failing to address a single Ninth Circuit case (and only one Supreme Court case).

As to the separation of powers violation, HUD offers only the abstract claim that the "case law 'does not support the proposition that every action' by an agency 'in excess of [its] statutory authority is *ipso facto* in violation of the constitution (Opp. at 29-30, citing *Dalton v. Specter*, 511 U.S. 462 (1994)). But LAHSA did not ground its constitutional claims solely in HUD's (numerous) statutory and regulatory violations. Nor did the Supreme Court preclude a theory that "action in excess of statutory authority" "rise[s] to a constitutional claim." *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019) ("Statutory and constitutional claims are not mutually exclusive."); *Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1025,

WAYMAKER

1043 (N.D. Cal. 2025) (granting preliminary injunction where county government had shown likelihood of success on constitutional claims); *see also City of Chicago v. United States Dep't of Homeland Sec.*, 815 F. Supp. 3d 727, 750 (N.D. Ill. 2025) ('[I]t cannot be right . . . that as long as an official identifies some statutory authorization for his actions, doing so . . . precludes constitutional review.'").[4]

LAHSA's argument, which HUD never addresses, is that HUD has violated the separation of powers and the Take Care clause by seeking to eliminate the CoC program generally, and the LA CoC specifically. In a different part of its brief, HUD claims that LAHSA's policy-based claims are unsupported and hyperbolic (Opp. at 27), a claim it can make only by ignoring LAHSA's evidence, including: (1) the Administration's 2027 budget, which seeks to eliminate what it calls the "failed and harmful" CoC program (RJN Ex. L at 30-31), and takes shots at LAHSA in particular (*id.*); (2) a HUD official's comment that it would recommend that no HUD funding to Los Angeles (Dkt. 24-37.), and (3) Secretary Turner's wholly-false public claims that HUD had performed an investigation and found "waste, fraud and abuse" (Id. ¶ 3).[5] HUD has only further proven its intent to overstep Congress through its July 16 announcement of the new NOFO that expressly precludes the LA CoC from submitting a collaborative application.

---

[4] *Global Health Council v. Trump*, 153 F.4th 1, 15 & n. 11 (D.C. Cir. 2025) is out of circuit and inapposite. There, a divided panel ruled that foreign aid grantees could not bring a constitutional claim for Presidential impoundment of foreign aid where judicial review of statutory claims was unavailable under the APA. *See id*. at 14. That is not the case here: Because LAHSA's statutory claims are reviewable under the APA, its constitutional claims are not an end-run around statutory limits.

[5] HUD's sole supporting declaration only further proves that no HUD investigative findings supported the suspension: HUD claims an OIG investigation was opened only on May 29, 2026—less than two weeks before the June 11 Letter—and that was done only "based on a referral from HUD." (Dkt. 25-1 ¶¶ 6-7.)

Under these circumstances, LAHSA has shown a likelihood of success on its constitutional claims. *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) ("[A] challenge to presidential action will be considered constitutional, and therefore justiciable . . . , so long as a plaintiff claims that the President has 'violat[ed] . . . constitutional separation of powers principles' because the President's action lacked both 'statutory authority' and 'background constitutional authority.'" 929 F.3d 670, 696–97 (9th Cir. 2019) (quoting *Sierra Club*, 929 F.3d at 889-90)); *see also City & Cnty. of San Francisco v. Trump*, 816 F. Supp. 3d 1017, 1036 (N.D. Cal. 2026).

That test is met here. LAHSA's constitutional claims are independently based on violations of background constitutional principles, including the Appropriations Clause, the Take Care Clause, Separation of Powers, and the Tenth Amendment. Moreover, unlike the base closure statute at issue in *Dalton*, 511 U.S. at 464, none of the statutes or regulations at issue assigns any role to the President or imbue HUD with unfettered or unreviewable discretion over federal homelessness assistance.

HUD also erects a straw-man arguing that the Tenth Amendment does not "require[] the Federal Government to fund Californian homelessness programs, or to fund them on LAHSA's terms." (Opp. at 35.) This misstates LAHSA's position. LAHSA's Tenth Amendment claim arises from HUD's interference with LAHSA's performance of its various programmatic functions such as HMIS Lead and CES Coordinator. (Dkt. 1 ¶ 150.) It also arises from HUD's interference with the LA CoC's choice of LAHSA as its collaborative applicant. (*Id.* ¶ 151.) HUD acknowledges that "[c]aring for the homeless is an archetypal 'police power.'" (Opp. at 35.) Yet it largely ignores the wide-ranging effect of its actions on the ability of state and local governments to address the problem of homelessness. HUD's opposition brief barely mentions LAHSA's role as HMIS Lead and never once mentions its roles as CES Coordinator or PIT Account Administrator. The HEARTH Act was designed to support community-driven strategies to end

homelessness. HUD may not usurp the efforts of local or state governments to provides homelessness services pursuant to state and local law.

## IV. LAHSA WILL SUFFER IRREPARABLE HARM ABSENT RELIEF

HUD's irreparable-harm rebuttal largely rests on the premise that LAHSA's harm runs to others, not to itself. But LAHSA has shown direct harms to itself. HUD concedes that "absent an injunction, LAHSA will remain suspended from its role as Collaborative Applicant for the LA CoC during the ongoing investigation[.]" (Opp. at 36.) While LAHSA may continue to draw down on federal funds tied to existing grant agreements, HUD has immediately suspended its participation in future transactions with the federal government. (*Id.*) These are direct irreparable harms.

A preliminary injunction is the only way to ensure that LAHSA will be able to perform its statutory designated role as collaborative applicant for the upcoming FY '26 NOFO deadline on February 26, 2026. No later ruling can restore it to a competition it was excluded from; the harm cannot be undone.

LAHSA also has suffered direct harm to itself and its subgrantees from HUD's failure to execute pending grant agreements. HUD tries to avoid an irreparable harm finding on this point by claiming it has not yet decided "what action, if any, it will take" regarding these already-awarded funds. (Opp. at 36-37.) But HUD cannot avoid harm by sticking its head in the sand—every day that HUD avoids a decision leaves LAHSA and its subgrantees unpaid. LAHSA and its subgrantees rely in significant part on federal funding to finance their work. (See Reed Reply Decl. ¶¶ 5-9). Without an injunction, LAHSA will lose the ability to fund nearly 60 employees. (*Id.* ¶ 10).

HUD's cited cases do not preclude this Court from considering harms to LAHSA's organizational interests and its mission. In *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018), the Ninth Circuit held that a plaintiff can meet the irreparable harm requirement by taking into consideration the harm to the local environment where the plaintiff has his own

interest in the environment. It reasoned the plaintiff had connected "his recreational and aesthetic pursuits on Idaho's rivers" to anticipated injuries to local species. *Id.*[6] As a joint powers agency, LAHSA has a direct and compelling interest in the provision of homelessness services in the LA CoC. Indeed, the very reason that LAHSA was formed was to coordinate and facilitate the delivery of homelessness services throughout the region, by executing the functions delegated to it. *See Oakley v. Devos*, No. 20-CV-03215-YGR, 2020 WL 3268661, at *17 (N.D. Cal. June 17, 2020) (injuries to sovereign interests and public policies may constitute irreparable harm). Further, "[d]eprivation of constitutional rights unquestionably constitutes irreparable injury." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013).

Here, the mere fact that HUD recently opened up a pathway for solo applicants in the LA CoC to apply directly to HUD does nothing to address the irreparable harm to LAHSA. HUD has not explained how it will evaluate solo applications, rank or prioritize projects, or balance community needs without a consolidated application prepared at the local CoC level as contemplated by the HEARTH Act. Inevitably, this solo application process will mean that HUD officials will prioritize the Administration's own preferred policy goals or interests (such as faith based housing and a shift away from permanent housing to transitional housing) over choices of the local community that LAHSA was formed to serve.

## V. THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION

When balancing the equities, this Court should give great weight to the interests of the public in the provision of homelessness services.

---

[6] HUD's remaining cases are inapposite in that the record supports non-speculative harm both to LAHSA and third parties. *Cf. Immigrant Legal Res. Ctr. v. City of McFarland*, 827 F. App'x 749, 751-52 (9th Cir. 2020) (only demonstrated harm was to third party detainees); *Caribbean Marine Services Co. v. Baldrige*, 844 F.2d 668, 674-75 (9th Cir. 1988) (harm found too speculative).

HUD's assertion that it or third parties can "step in" to perform LAHSA's functions is an ambitious claim lacking evidentiary support. It is not supported by a single declaration, a single operational plan, a single identification of a person or entity to perform these functions, or a single description of how HUD proposes to replicate the 39-person PSH Matching Team (Dkt. 24-3 ¶10), the 400-agency HMIS network, or the years of institutional relationships that constitute LAHSA's CES operation. LAHSA demonstrated in its moving papers that preparing the Consolidated Application requires months of advance work, including coordination among 140-plus providers, community prioritization decisions, Tier 1/Tier 2 ranking, narrative development, data compilation, and electronic submission. (Dkt. 24-62 ¶¶ 16-42.) None of this can be reasonably replicated by any other entity within the five weeks that remain before the deadline. HUD's assertion to the contrary without any evidentiary support carries no weight under *Winter's* requirement that the balance of harms be assessed on actual evidence. *See Winter v. Nat'l Res. Defense Council*, 555 U.S. 7, 20 (2008); *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 636 (9th Cir. 2023). The government's speculation that harm can be avoided does not constitute evidence that harm will be avoided. A transition of the nation's largest CoC's collaborative applicant, HMIS lead, and CES operator functions to a new entity would require months of planning, coordination, data transfer, and relationship-building. (*See* Dkt. 24-16 ¶14; *see generally* Dkt. 24-3). There are not months available before the August 26 NOFO deadline. The transition argument is therefore not an answer to irreparable harm—it is evidence of irreparable harm: the very scale of what would need to be transferred demonstrates why any interruption is catastrophic and irreversible on the relevant timeline.

HUD's hollow assurances that LAHSA's "suspension does not require any significant change to the amount of HUD funding" and "adjustments would not necessarily reduce the amount of funds" to Los Angeles do not provide comfort. (Opp. at 38.) HUD has assiduously avoided making any representations that it will

maintain continuity of federal funding. The abrupt suspension creates chaos in the middle of the application process for the FY '26 NOFO and threatens the $241 million earmarked for the LA CoC. (Dkt. 24 at 46-48; Dkt. 24-6 ¶ 14a; Dkt. 24-21 ¶ 6; Dkt. 24-65 ¶ 6.) The risk of irreparable harm to the public is too great to not issue a preliminary injunction.

HUD's interest in preventing "wanton mismanagement of public funds" (Opp. at 36) does not outweigh LAHSA or the public's interest in continuity of homelessness services. HUD has not submitted any actual evidence to substantiate its claims of harm. It has made no effort to identify any federal funds that are or have been mismanaged by LAHSA. The only declaration submitted by HUD confirms that, between June 11 and June 29, 2026, HUD authorized LAHSA to draw over $4.5 million from existing grant funds—without identifying any impropriety in any of those 47 draws. (*See* Dkt. 25-1, ¶ 19.) In the absence of any actual evidence of harm to the federal government, HUD's hypothetical interests in preventing waste, fraud and abuse do not weigh heavily.

Finally, the equities are not served by deferring judicial review until LAHSA's administrative challenge to its suspension is resolved. That guarantees that LAHSA will not serve as the collaborative applicant for the FY '26 NOFO, it jeopardizes federal funding for the entire LA CoC, and almost certainly will mean that some individual service providers fall through the administrative cracks and are forced to cease their operations. Without the ability to draw down federal funds to support ongoing operations in real time, LAHSA's operations would be negatively impacted and it would be forced to lay off employees and cease providing services.

## VI. CONCLUSION

For the foregoing reasons, LAHSA respectfully requests that the Court grant a preliminary injunction in its favor or enter an administrative stay of HUD's actions.

DATED: July 20, 2026

WAYMAKER LLP

By: */s/ Keri Curtis Axel*
KERI CURTIS AXEL
*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*

DATED: July 20, 2026

NORTON ROSE FULBRIGHT US LLP

By: */s/ Chris Pelham*
CHRIS PELHAM
*Attorneys for Plaintiff*
*Los Angeles Homeless Services Authority*

WAYMAKER