UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION - LOS ANGELES)

| | |
|---|---|
| LOS ANGELES HOMELESS SERVICES AUTHORITY, | CASE NO: 2:26-cv-07056-DOC-AJR |
| Plaintiff, | CIVIL |
| vs. | Los Angeles, California |
| DONALD J. TRUMP, ET AL., | Thursday, August 6, 2026 |
| Defendants. | (9:13 a.m. to 3:11 p.m.) |

HEARING RE:
MOTION FOR PRELIMINARY INJUNCTION

BEFORE THE HONORABLE DAVID O. CARTER,
UNITED STATES DISTRICT JUDGE,
PRESIDING

APPEARANCES: SEE PAGE 2

Courtroom Deputy: Karlen Dubon

Court Reporter: Recorded; CourtSmart

Transcribed by: Exceptional Reporting Services, Inc.
20079 Stone Oak Pkwy.
Ste 1105-237
San Antonio, TX 78258
361 949-2988

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

**APPEARANCES**:

For Plaintiff: KERI CURTIS AXEL, ESQ.
SCOTT MATTHEW MALZAHN, ESQ.
EMILY STIERWALT, ESQ.
Waymaker LLP
515 South Flower Street, Suite 3500
Los Angeles, CA 90071
424-652-7800

CHRISTOPHER K. PELHAM, ESQ.
ABIGAIL URQUHART, ESQ.
ALEX JORDAN SCANDROLI, ESQ.
Norton Rose Fulbright US LLP
555 South Flower Street, 41st Floor
Los Angeles, CA 90071
323-892-9200

For Defendants: AUSA ALEXANDER LAYNE FARRELL
AUSA JOSHUA SUNG-JUN HA
AUSA DANIEL BECK
FAUSA BILAL ALI "BILL" ESSAYLI
Office of the U.S. Attorney
Civil Division
300 North Los Angeles Street
Suite 7516
Los Angeles, CA 90012
213-894-5557

For Intervenor: MARK D. ROSENBAUM, ESQ.
FAIZAH MALIK, ESQ.
JONATHON ARTHUR JAGER, ESQ.
Public Counsel
610 South Ardmore Avenue
Los Angeles, CA 90005
213-385-2977

ROBYN C. CROWTHER, ESQ.
ABIGAIL NICOLE FALK OROZCO, ESQ.
Steptoe LLP
633 West Fifth Street, Suite 1900
Los Angeles, CA 90071
213-439-9400

SHAYLA R. MYERS, ESQ.
Legal Aid Foundation of LA
7000 S. Broadway
Los Angeles, CA 90003
213-640-3983

**APPEARANCES**: (CONTINUED)


For Intervenor: CATHERINE SWEETSER, ESQ.
Schonbrun Seplow Harris Hoffman & Zeldes, LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
310-396-0731

For LA Alliance: ELIZABETH A. MITCHELL, ESQ.
Umhofer Mitchell & King
767 S. Alameda Street, Suite 270
Los Angeles, CA 90021
213-394-7979


Also present: GITA O'NEILL, LAHSA Interim CEO

**Los Angeles, California; Thursday, August 6, 2026; 9:13 a.m.**

**(Call to Order)**

**THE COURT:** There's a motion to intervene by LA CoC. I'd like to take that motion first so we know who's joining us today or not.

**MS. AXEL:** Your Honor, should we make our appearance in the LAHSA matter?

**THE COURT:** Please, but come on down and go to the lectern because I've got Courtsmart. We're recording it, and --

**MS. MITCHELL:** Your Honor, can we sit in the jury box?

**THE COURT:** Absolutely. In fact, I'd encourage you to be present throughout the day. I think there may be a lot of things that affect a lot of parties and other lawsuits.

So right back to the LA CoC and your motion to intervene. I read the papers, but your appearance please. And if you're going to stand, go to the lectern so we have you close to the microphone. You're more than welcome to be seated if you'd like to. I'm not affronted by that.

**MS. AXEL:** I'll make the appearance, Your Honor. For LAHSA, my name is Keri Curtis Axel. I am with the Waymaker Firm. With me at counsel table from my firm is Scott Malzahn.

**THE COURT:** And who's that?

**MS. AXEL:** Right here.

**THE COURT:** Okay. Thank you very much, Plaintiff.

**MS. AXEL:** And Emily Stierwalt, who we've not filed an appearance for, Your Honor, is an associate at our firm and we will --

**THE COURT:** Let's approve your appearance so you can be at the table and speak if you'd like to.

**MS. AXEL:** Thank you. You want me to do you? Okay and also co-counsel at Norton Rose, this is Chris Pelham, and we have in the gallery here Abigail Urquhart and Alex Scandroli. And, of course, we have LAHSA representatives as well, Your Honor. I know you're familiar with the interim CEO Gita O'Neill. All of the declarants that we offered from LAHSA, Your Honor, are also present, and I've seen several of LAHSA's commissioners, including Commissioner Sheikh. I saw Commissioner Szlasa.

**THE COURT:** At any time you folks need to communicate with your counselor or vice versa, go ahead and do that. I'm not going to be affronted by movement around the courtroom. You need to get information back to the counsel who are making their appearances today.

**MS. AXEL:** We really appreciate that and there are at least a couple of other commissioners. I saw Szlasa and Perkins commissioners also here, Your Honor.

**THE COURT:** And the purported intervenors in this matter for LA CoC.

**MS. MYERS:** Good morning, Your Honor. Shayla Myers of the Legal Aid Foundation of Los Angeles on behalf of the proposed plaintiff intervenor, Los Angeles Continuum of Care.

**THE COURT:** So will you now be representing the intervenors in the LA Alliance matter and also representing if the Court approves intervention and the intervenors in the LA CoC matter?

**MS. MYERS:** Yes, Your Honor, but for purposes of any -- because the matters are entirely separate, but to the -- for purposes of any appearances in which the Court requires both, we have significant additional counsel for the LA Alliance matter, which is why Catherine Sweetser is here. And so just for purposes of ensuring that you can hear from all parties without having to change hats, she'll be appearing for the LA -- for the intervenors. Thank you.

**THE COURT:** And where is Catherine Sweetser? Where is she located? Where? Well, come on up.

**MS. MYERS:** And so we have additional counsel on behalf of the LA CoC.

**THE COURT:** Okay. And you're welcome to be seated in the jury box or over here, whatever is comfortable. Then counsel?

**MR. ROSENBAUM:** Good morning, Your Honor. Nice to see you again. It's Mark Rosenbaum from Public Counsel on behalf of LA CoC. With me from Public Counsel are Faizah Malik

and Jonathan Jager.

**THE COURT:** All right. Thank you very much.

**MS. CROWTHER:** Good morning, Your Honor. I'm Robyn Crowther from Steptoe LLP for the LA CoC, and with me is my colleague Abigail Orozco, who is in the gallery.

**THE COURT:** All right. And you're more than welcome to come forward. We'll find chairs for you if you need to so you can communicate quickly.

Now are there any purported conflicts? A lot of these cases intertwine with each other or could because of the funding mechanisms. Do I hear any concerns so far about alleged conflicts that might arise? Let's just move on. Let's not create a problem if there's not a problem. All right, counsel, your argument concerning intervention.

**MS. MYERS:** Okay. Thank you, Your Honor, and I'd also like to say that the chair of the Los Angeles Continuum of Care board, Ben Kay, is here, along with the vice chair Josh Decell and they're here this morning --

**THE COURT:** Thank you very much.

**MS. MYERS:** -- representing the CoC. We also have other CoC board members here as well, including I think I saw Suzette Shaw is here. There's also a number of other CoC board members.

**THE COURT:** And let me stop. Once again, the same courtesy. If you need to convey information, just don't worry

about the Court. Come up informally. Talk to your counsel. I'd like to have that information conveyed so the counsel is accurate in terms of making their representations. Counsel?

**MS. MYERS:** Thank you, Your Honor. As I said, we're here today representing the Los Angeles Continuum of Care, which is a critical and yet often underappreciated aspect of the homeless response system. The Los Angeles Continuum of Care is an entity that is mandated by Congress to exist in every region under the McKinney-Vento Homeless Assistance Act. It was created to bring together partners throughout the region to set the priorities for federal funding on behalf of the region.

The Continuum of Care in Los Angeles we often have not heard of because it is a functional and collaborative space. It is, as Your Honor knows, within Los Angeles there is often a lot of consternation and conflict and the CoC is a place within the Los Angeles homeless services response system of deep collaboration. It is a spot where entities throughout the region come together to do what Congress mandated them to do, to set the priorities for the region. And so they have done that seamlessly for decades.

As a result of that collaboration and stability, the Los Angeles Continuum of Care has been able to set priorities that prioritize permanent supportive housing, that prioritize funding resources, that have brought and keep 11,000 formerly

unhoused individuals in housing, shelter, and services. The Continuum of Care and the federal funding that comes along with that collaboration is a tentpole of homeless services around which all other funding circulates. That 11,000 -- the 11,000 people who were housed as a result of it and the $240 million of federal funding that it brings to the region is a bright spot in collaboration and stability.

And as a result of that, the folks who were unhoused, who were formerly unhoused are now stably housed as a result of that collaboration and stability. All of that changed, Your Honor, when HUD came to Los Angeles and suspended the Los Angeles Homeless Services Authority and, in turn, has indicated that they will effectively disband the CoC. And, Your Honor, that is why we are here under Rule 24 to intervene in this case.

And the interest at stake here is very, very clear. HUD has indicated that if Los Angeles Homeless Services Authority is suspended, then the CoC will not be able to perform its congressionally mandated community collaboration that is a foundational point of the homeless services response system here. And that's enough, Your Honor, for purposes of intervention. It's very, very clear that if LAHSA's interests are affected in this litigation, so too are the CoC's interests, and that's why we're here today.

Importantly, Your Honor, while the interests of the

CoC and the Los Angeles Homeless Services Authority are aligned, there is no question the CoC believes very strongly and will argue very strongly that the suspension of LAHSA is illegal and that the immediate suspension is against the public interest and should not be allowed to go forward. It's also important to note, Your Honor, that the interests of LAHSA and the CoC are not coextensive. If LAHSA is suspended, the CoC continues to have arguments about why the remedial measures that HUD has made clear will be placed on the CoC are also illegal against the congressional mandate that dictates how the CoC functions and should not be allowed to proceed against the CoC. So the interests are aligned but not co-extensive, and again, that's sufficient for purposes of Rule 24.

And the last thing that I will say for purposes of intervention is why now? I think HUD, in response to the ex parte application, argued that the CoC was late. But, Your Honor, we expect they may argue that we're early as well. The CoC moved to intervene at exactly the time that it was clear that intervention was necessary to preserve the CoC's rights. While LAHSA and the CoC received a letter on June 18th indicating that HUD may take remedial measures and that they may choose to effectively disband the CoC and allow individual applicants to apply to HUD directly, that letter was explicit that it was contingent upon receiving additional information from the CoC related to the remedial measures.

And so the CoC did what HUD asked. The CoC responded on July 17th, providing additional arguments about why the remedial measures against the CoC were illegal, were unsupported by the record, and should not be allowed to go forward. And, Your Honor, on July 21st, HUD responded, making it explicitly clear that if LAHSA remains suspended, that HUD will take remedial actions against the CoC. And so as a result of that, it's July 21st, that was the trigger date to the CoC, that made it clear that they needed to intervene in this lawsuit because the decision before the court today, i.e. the suspension of LAHSA, would directly impair their rights.

And so within the course of 10 days, they moved as expeditiously as possible to get their moving papers before Your Honor. The timing in this case is entirely of HUD's making. HUD decided, after what they purport to be a record of years of violations and bases for suspension by LAHSA, HUD chose to immediately suspend LAHSA 10 days into the competitive funding competition. That, Your Honor, is the chaos that is ensuing in Los Angeles, was HUD's decision to immediately suspend LAHSA, and in turn, take remedial measures against the CoC.

The CoC has moved to intervene because their interests are at stake here, but they've also moved to intervene as quickly as we have, Your Honor, because HUD has made it clear that on August 10th, or after this Court makes a

ruling, but whichever is earlier. So by August 10th, they will take remedial actions against the CoC. So that is another reason why we're appearing today.

And finally, Your Honor, and I think Your Honor is well aware of this, August 26th is the deadline for the CoC to apply for $240 million in federal funding. Your Honor, as we laid out at the beginning, the Continuum of Care is a stable site of funding. It's a stable site of housing. Service providers, funders, and unhoused folks, 11,000 of them, rely on the stability of the CoC. That is the interest that we are here protecting, and it is why intervention is appropriate, and Your Honor, it is why intervention is necessary right now. And I'm happy to answer any questions that you may have.

**THE COURT:** Are there objections to intervention in this matter? And if so, I'd like you to be heard.

**MR. HA:** Good morning, Your Honor. Joshua Ha for the U.S. Government. I also have with me Daniel Beck, Alexander Farrell, and Bill Essayli from the U.S. Attorney's Office.

**THE COURT:** All right. Thank you. And once again, identification, U.S. Attorney is here.

**MR. FARRELL:** Assistant U.S. Attorney, Alexander Farrell.

**THE COURT:** Thank you. It's a pleasure.

**MR. BECK:** Assistant U.S. Attorney, Daniel Beck.

**THE COURT:** Thank you. It's a pleasure, sir.

Counsel.

**MR. HA:** So the Government does oppose LA CoC's intervention. Our primary objection is a timeliness issue. As I understand it, and I think as they made plain just now, their interest in this case is that they oppose the direct to HUD application process, which we mentioned in the June 18th letter. That June 18th letter made it very clear that the direct to HUD application process was predicated on our suspension of LAHSA, and that's what this case has been about since day one.

There really is not -- I don't think there's a good excuse for them to have sought intervention days before this P.I. hearing, which, again, this is a very --

**THE COURT:** Pull the microphone just a little bit closer to you.

**MR. HA:** Sorry. Sorry, Your Honor. So we oppose mainly on timeliness grounds. We also just don't think that this is a great case for permissive intervention or intervention as of right. Again, this case has always been about whether HUD is authorized to suspend LAHSA. To the extent that issue is in this case, that interest is very well represented. To the extent there are orthogonal issues, such as whether the LA CoC is able to find a different collaborative applicant in the next couple of days, the LA CoC --

**THE COURT:** Would you repeat that?

**MR. HA:** To the extent there are additional issues, for instance, whether the LA CoC is able to find a different collaborative applicant in the next couple of days, you know, that could have been grounds for a different suit, but I don't think it's a great idea to bring that into this case right now, especially given Your Honor's first minute order, which made clear that this is not a good case for rushed deliberations or rushed briefing.

To the extent, though, that you're considering this motion any further, the Government would like to have the opportunity to file a written opposition in the next seven days.

**THE COURT:** I would like to resolve the matter today. If I'm going to allow either intervention as permissive or as a matter of right, then I would want to hear those arguments by all parties today.

**MR. HA:** Understood, Your Honor.

**THE COURT:** Anything else you'd like to add?

**MR. HA:** No, think that's all.

**THE COURT:** Counsel, let me turn to the table if there's any of you gentlemen. All right.

Then any other parties who'd like to make a comment on this matter?

**MS. AXEL:** Your Honor, LAHSA does not --

**THE COURT:** And if you're going to once again speak,

go to the lectern, or if you'd like to just remain seated so the microphone's closer. I need you close to that mic.

**MS. AXEL:** I see. Understood, Your Honor. Perhaps I will just sit next time.

Just briefly, Your Honor, LAHSA does not oppose the intervention. I think under either grounds, the test is met, Your Honor, here. I think as we flagged in our papers, I think we interpreted the June 18th letter to be very broad in terms of disbanding the CoC and disallowing them to submit the, you know, or even to pick another collaborative applicant. I think we viewed it very broadly. It did have some language in there that could be interpreted to be conditional. I think then the issuance of the revised NOFO, I think, made it very clear what HUD's intentions were to the extent they were not clear before. And, Your Honor, I think you appreciate how giant the subject matter is here, how large, how difficult, how complicated. Everyone has boards and stakeholders, and I think that the CoC moved with all due diligence and it was sufficiently timely for the Court to consider the motion.

**THE COURT:** LA Alliance, do you have any comment you'd like to make? I don't think that this is necessarily your issue, but if it is, I want to be courteous.

**MS. MITCHELL:** Not on the intervention, Your Honor.

**THE COURT:** County, City, any comment you'd like to make? I want to be courteous and make certain. Intervenors

with LA Alliance? All right.

As a legal matter, I find that both the criteria for permissive and as of right have been met. I'll follow that up with a written opinion so you have appellate review available to you and the Court's thoughts, but I'm concerned about further delay in this matter. I think clearly you've met the permissive and as of right standard, and if I delay this further, I think that we're going to be in a very difficult position in trying to decide these issues fairly for both sides.

So I'm going to welcome the counsel for the board or the CoC board in this matter, but make certain you're ready to proceed and argue today because there won't be further continuances in this matter. Are you ready today?

**MS. MYERS:** Yes, Your Honor.

**THE COURT:** All right. Now, we got into a little bit of the argument by the parties, but this will be the time for argument. You have unlimited time. I may have questions, but I think I will delay those, and I think it would be appropriate if we started with LAHSA in this matter, as the plaintiff. And there will be rebuttal also, but it will be shorter. So this is your presentation, and then after all of the parties have argued, rebuttal.

**MS. AXEL:** Thank you, Your Honor. And just to introduce the -- sort of how we would like to structure the

argument, if the Court is willing. Your Honor, I will handle the primary argument here affirmatively, although my partner, Scott Malzahn, is prepared to address the constitutional claims, so I would hand him the podium briefly to address those in the middle of my argument, if the Court is amenable to that. And then the rebuttal would be divided between me and Mr. Pelham from Norton Rose. Is that fine? Okay.

All right, Your Honor. We submit that LAHSA has conclusively demonstrated that a preliminary injunction is warranted to enjoin HUD's unlawful suspension. LAHSA is likely to succeed on the merits. It will suffer irreparable harm, absent relief. The balance of equities tips strongly in its favor, and an injunction is in the public interest.

I'll be frank, Your Honor. We believe HUD's letter is pretextual. It's an active attempt to disrupt Los Angeles' infrastructure for assisting people experiencing homelessness and to wrest policy away from this region. And the timing, as Ms. Myer said, is strategic. Ten days into the 2026 NOFO.

We have called HUD's letter a mashup or a hodgepodge of articles and old facts. There's no adequate evidence or reasoned decision-making reflected in it. It's a politicized hit piece that does not represent a good faith exercise of authority by a government agency. And I want the Court to focus on this. None of the criticisms in that letter actually have anything to do with LAHSA's core functions, which I think

this Court understands very well. The Court is well familiar with the critical roles LAHSA plays. And also, the information we put in on those critical roles is completely unrebutted by the Government. They don't address our declarations, not even once. The Court should consider those facts unrebutted and accept them for purposes of this argument and for purposes of its ruling.

So, first, with respect to the HMIS system, this is not mentioned in HUD's letters at all. Not mentioned in their brief. HUD has identified absolutely no issues with regard to how LAHSA manages HMIS for all of the four -- the region's four CoCs, yet the suspension would render LAHSA unable to continue to support this congressionally mandated data system. It provides all of the data that the homelessness support funders rely on and which HUD itself submits to Congress. This data, of course, Your Honor, is also known and relied on in the LA Alliance matter.

Some of the questions that the special master posed today would be best answered by the people in this courtroom here from LAHSA, who know exactly who the outreach workers are on the streets, who are the ones that provide the dashboards that show how the beds are used. Those people are at LAHSA, and that's a large staff of about 50 people on the HMIS system alone. And I think, as the Court also knows, that system has made great strides in the last few years to integrate RMS data,

to provide a live dashboard, to provide real data that the Court can look at or the special master can look at at any time. Without LAHSA, Your Honor, that whole system grinds to a halt.

Two, coordinated entry. Coordinated entry system and LAHSA's role as the coordinated entry lead is also not mentioned in HUD's letters or briefs, not even once. This is also a requirement of HUD, that you have a coordinated entry lead. And without this responsibility, Your Honor, which intersects with the HMIS data but is different, has a whole different staff, no one moves from interim or transitional housing to permanent supportive housing. Nearly 25,000 people on the CES waitlist cannot move without the matching services that LAHSA provides and its team, and that's another team of about 40 people.

Also not mentioned in HUD's brief or letters at all, Your Honor, the PIT count or the homeless inventory count. These are also HUD requirements and key to measuring the impact of existing programs. Everything the Court wants to know about the homeless people on the streets or the amount of inventory is made available because of these services that LAHSA provides. This is key to stakeholders at every level of government.

Four, Your Honor, the collaborative applicant role. Again, Your Honor, very interesting, none of the facts in that

letter have anything to do with LAHSA's collaborative applicant role. LAHSA does this role very well. HUD provides, in fact, a scorecard. When the NOFO is submitted to HUD, how HUD determines and evaluates the competition, it actually literally scores the NOFO application.

Since at least 2021, LAHSA has consistently ranked highly, ranking well above the median. These scores are key to the region receiving the complete funding that it might be allowed to access. For fiscal year '24, the last time there was a scoring, LAHSA scored 175 out of a maximum of 200 points. Given how much bigger the LA CoC is, of course the Court knows, by an order of magnitude, on every measure, this is a very impressive outcome. LAHSA is the only entity that can prepare that consolidated application by August 26th, and I will come back to this point later.

Five, Your Honor, LAHSA's role as grantee itself, receiving money from the federal government. If anything, HUD's melange of mostly old sources comes closest to a critique of LAHSA as an administrator of funds. But HUD has consistently awarded funds to LAHSA for decades, and literally just approved LAHSA as a grantee and approved LAHSA's grants to all of the fiscal year '24 grantees. So all of the fiscal year '24 grantees were renewed for 2025, and that happened in April and May of this year. And in fact, LAHSA received the final letter awarding the Q3 and Q4 grants on June 2nd, Your Honor,

eight days then before this letter.

In awarding LAHSA those funds in May and June of 2026, under the NOFO, HUD was required to consider the very same factors that it purports to consider now. And I'm literally reading from the 2024 NOFO, Your Honor, but for HUD to award those funds to LAHSA, it had to consider things like LAHSA's ability to account for funds in compliance with applicable reporting and recordkeeping requirements. It had to consider LAHSA's timely use of funds. It had to consider LAHSA's timely submission and quality of reports. It had to consider whether LAHSA met program requirements. I could go on and on.

So just on June 2nd, HUD confirmed that LAHSA met these factors. And then, again, in what is just the right hand not talking to the left hand because we have political appointees making a decision that don't square with what the line people are doing at HUD, HUD turns around and sends this peremptory letter. The fact that HUD's criticisms do not align with what LAHSA actually does undermines its claim that it has adequate evidence. It doesn't square what it claims to be adequate evidence with anything that LAHSA is actually doing or the legal standard.

The big picture takeaway here, Your Honor, is that the people that wrote the letter at HUD don't know what LAHSA does and how critical it is to the region, as you do, as

everyone in this courtroom does. The Court should therefore view every so-called representation, evidence, or finding in that letter with suspicion. These actions are contrary to law, arbitrary and capricious, unconstitutional, and intentionally so. Further, and without doubt, HUD has failed to consider the reliance interests and public interest in issuing the peremptory suspicion. The actions will hurt the unhoused in Los Angeles and all of the stakeholders who serve them, and that is HUD's whole point.

Turning to likelihood of success on the merits specifically, Your Honor, to go through our legal analysis. The APA claims present simple, direct, legal issues that this court can reach. First of all, I don't think I need to say much about final agency action. The test is clear. This is the final action of the suspension officer. It immediately suspends LAHSA, and it has immediate legal consequences, and therefore the test is met.

The legal issues I think that this Court can quickly reach that immediately argue for the Court finding in LAHSA's favor are HUD has not identified any violations of public agreements or transactions, and has failed to find that LAHSA lacks present responsibility. HUD also did not apply the CoC regulations. There are specific regulations applying to the CoC program for performance reviews, sanctions, and remedial measures. Instead, they went straight to the OMB suspension

and debarment rules. And when you have a more specific regulation, Your Honor, under the case law interpreting the APA, that's what you should apply. And that's what HUD has always done in the past. This action is totally unprecedented.

HUD also failed to consider the reliance interests of third parties, the balance of harm, reasonable alternatives to suspension, and HUD wholly failed to show that immediate action is in the public interest. And, Your Honor, you could decide the whole thing on that basis, which is one of the two prongs for them to actually suspend someone immediately, as they have done. The Court should find these actions violate the APA.

There's two prongs to the APA that we've argued. One is that HUD's actions were contrary to law. Usually that is harder than the arbitrary and capricious prong, Your Honor. But we submit it is clearly met here. And let me go back, and I know the Court looked up when I mentioned it, to applying the wrong regulations. And so I think that's the first area where HUD's actions were contrary to law.

HUD is required to act in accordance with 24 CFR 578.107. And that requires it to take certain steps before imposing a sanction like this. The statute is literally part of the CoC program regulations -- sorry, the regulations are part of the CoC program regulations, and it's called sanctions. And it begins with a performance review. If HUD determines preliminarily that the recipient or a subrecipient has not

complied with a program requirement, which is ultimately what it says it's finding in the June 18th letter, HUD will give the recipient notice and an opportunity to demonstrate that the recipient has complied. They skip that step. Didn't do it at all. Then if the recipient fails to demonstrate HUD's satisfaction that the activities were carried out in compliance, HUD then may take certain remedial measures.

Those -- there's a list of them in the regulation. This is provision three of 24 U.S.C. 578-107. Those remedial actions, though, also have to be designed to prevent a continuation of the deficiency, to mitigate it, and to prevent its recurrence. They're much more measured than just cutting someone off. That -- and HUD did not even try to follow this regulatory structure.

The Court has in the record an example of where HUD has followed this regulatory structure, and that is with respect to the conflict issue with regard to Dr. Adams Kellum. And we've attached the letters to Mr. Pelham's declaration, and the Court can look at -- this is how this is done. You get a letter from HUD's local field office, and it says, we are examining this. Please send us all this information. And you do that, and then they come back with a finding. And in that case, as we've said, the finding was, okay, it's been resolved. You updated your conflict of interest policy check, done. There was, in fact, no conflict. There was just a failure to

disclose it as quickly as possible to HUD.

So in fact, the conflict itself was addressed, and that's how that process works. Should work at the field level, and then go up. This is not that. I mean, this is why this Court can look and say, this actually is pretextual. It's top-down. It doesn't follow the way the regulations are usually applied.

The second way in which the Court can find that HUD's actions were contrary to law is that the HUD violated the HEARTH Act because it made no findings that the CoC did not meet the requirements of the HEARTH Act. And I'm sure that the CoC is going to address this factor as well, but we've also addressed it in our papers.

The requirements of the HEARTH Act are in the HEARTH Act, 42 U.S.C. 11-360. They're not, again, this whole suspension and debarment regime. If they're going to find, if HUD is going to purport to find that the CoC does not meet the requirements of the HEARTH Act, then it has to look at the HEARTH Act, and its implementing regulations. And those requirements include things like the CoC charter, designing the collaborative application process, all those things that the CoC is supposed to do, and then delegate doing. That's what HUD would really look at and would have to analyze if it were going to reach a conclusion that the CoC was not meeting its requirements. There's nothing like that. That June 18th

letter, as the Court knows, is a page and a half.

The third way in which HUD has acted contrary to law, and this is related to the second point, Your Honor, is usurping the CoC's role that Congress created to give power to the region. Without these findings, without HUD finding that the CoC was not meeting its responsibilities, there also was no basis for this remedial measure of direct-to-HUD solo applications. There's just no way that that test is met, Your Honor, without actually going through what the requirements of the HEARTH Act are as applied to the CoC.

And finally, Your Honor, under the contrary-to-law factor, HUD has failed to obligate the fiscal year 2025 grant funds. They must sign the grant agreements, they must obligate these funds, where Congress gave it a non-discretionary timeline. They had 45 days to do it, they have not done that, and there's a lot of irreparable harm that I'll get to at the end, Your Honor, with respect to not signing those grant agreements.

We have service providers, they're here in this courthouse, whose grants expired in quarter one or quarter two. We're already starting to see additional grants expire in July. Your Honor, these actually are boots-on-the-ground service providers in LA County, serving people that were unhoused. These are domestic violence programs, these are programs for the disabled. These people now have depended on

these awards, which have been awarded. They have an award letter, but HUD has not carried through. And really, HUD runs late on these things all the time. The criticisms about timing are a little rich, because the NOFO this year and last year were months late. The grant agreements are routinely late from HUD.

So I think this is just a negligence, that these weren't done in a timely manner, but once the letter goes out, they're taking advantage of the fact, and these are real organizations that have relied on this money to meet their budget that will literally not be able to serve people very soon and are running at a deficit if these funds don't come through.

Let me turn, Your Honor, then, to the arbitrary and capricious prong. So under the arbitrary and capricious prong, Your Honor, we have to look at what the action -- what the standard is for suspension. A suspending official may impose suspension only upon determining the adequate evidence -- there's adequate evidence of a cause for debarment, and that immediate action is necessary to protect the public interest.

And I'm going to address both of these, but as I said up front, Your Honor, there is no need for immediate action here, and that the claim that there is is disingenuous when LAHSA has been approved for grants for decades, when many of these facts, many of the sources they cite were well-known to

them, they've closed investigations such as conflict of interest and accepted that there actually was no merit and moved forward on them, and then just this year, literally eight days before the letter comes out, they approve LAHSA itself for further funding.

There's just no way, given those approvals this year of LAHSA's grants, they can then say eight days later, there's a need for immediate action. There is not.

First, as to adequate evidence though, Your Honor, HUD claims that there is a violation of the terms of a public agreement or transaction so serious as to affect the integrity of a federal agency program. They haven't identified a violation. Even if the Court takes as true the things in the letter, which you should not, and again, our facts are unrebutted, we've put in declarations. We've responded to each of those. Some of what they say in the letter is just false. It's just flat out untrue. And we actually have gone through each one of those findings and distinguished them or explained them all. You should accept that because it's unrebutted.

But that said, even if the Court takes them as true, I know the Court has done many criminal cases. Many of us in this courtroom were former Assistant United States Attorneys. There is -- you know, the Court knows what it looks like when you find a violation of law and you explain that, and then you

actually back up specific facts that speak to that violation. You can't claim there's a violation of a terms of public agreement. You can't claim there's a false certification without actually saying, here's the certification and here's the reasons it's false, or here is the provision of the agreement that you signed. And here's how the things you said are false. Their response to that is to say, well, you've made a lot of certifications over the years about you have an internal controls. Yes, those are made in good faith. Those are made based on the systems that someone like Ms. O'Neill sits in a meeting and talks to you and gets her certifications from her people who work for her about the controls they're put in place. Those are not false certifications simply because you later have an audit that finds that a particular control was missed for that particular year. I think the Court knows this.

So even if you take all of those together, there's no nexus between this like hodgepodge of facts and actually any particular violation of an agreement. And there's also no cause so serious or compelling to affect present responsibility. Suspension may only be used to exclude persons who are not presently responsible. And on that basis, Your Honor, I think you should just reject all of this old evidence. You've been doing this longer than I have, but the Court knows that there's a world of difference between the systems and the

data that we have now and what something looked like in 2007. And it's different management and it's different personnel and the Court should just reject that outright as stale.

We have to look at present responsibility. And present responsibility also requires the Government to look at whether corrections have been made. Of course, they're not willing to do that and they simply say when we say corrections have been made, anyone can say they make corrections. They have to consider those corrections. And again, Your Honor, LAHSA is a public entity and is a joint powers entity. So it has many masters. It has many funders who do their own audits or reviews or assessments. All are at different levels of detail. As a public entity where nearly everything it does, Your Honor, is publicly available on the website, it's part of that transparency that there would be audits, reviews, and assessments. That those audits, reviews, and assessments would flag things that LAHSA should work on. That's how public companies work that are traded on the stock market.

The whole point to having that accountable system is for those changes to be made to prevent bigger problems. So, Your Honor, there is no adequate evidence. There also is no need for immediate action. And HUD doesn't even address this prong, really. There is no need for immediate action. Their argument is just simply circular. They just say, well, it's

not a responsible actor, therefore we need immediate action. That is not actually the analysis that they need to do to show that immediate action needs to happen right now to suspend LAHSA.

There's a lot of places in their brief where they say, well, we need to at least look into this. Fine, look into that. The fact that they want to look into something or to investigate something or to audit something does not show that they need to immediately suspend LAHSA in order to do it. And they absolutely have to show for the suspension to be lawful that there was a need for immediate action.

HUD's claim that immediate action needed is also undermined by the staleness of its evidence, old evidence that they've sat on for a long time, clearly, Your Honor, cuts against any immediate need to move on this. And two, the fact that HUD just awarded loss of funds in April, May, and June, as I've already said. I think, Your Honor, that definitively cuts against any immediate action argument.

HUD never explains to Your Honor how its actions affect the continuity of services to the housed. There's no analysis of this at all. So, Your Honor, the suspension test here is just simply not met. As a matter of the APA law, Your Honor, also HUD is required to consider the reliance interests of others. And this will overlap with our irreparable harm argument, Your Honor. But there are substantial reliance

interests here. Again, as the Court well knows, for having administrated the LA Alliance matter for all these years. Those reliance interests include the sub-grantee service providers, as I referred to, Your Honor, the boots on the ground. And those service providers, Your Honor, are harmed in two ways. First, by the unexecuted grant agreements. The fact that awards were made that they have relied on as part of their budgets and prior providing services, and then HUD has just stalled and not signed the grant agreements and funded them. And also, those -- they're also harmed because many of these same service providers are not in a position to directly apply.

So getting to the direct-to-HUD, you know, proposed remedy, we've given you two declarations, and I believe both of our declarants are here, Your Honor, Penny Lane and House of Ruth. Both who serve a variety of populations but include domestic violence survivors. And both of those entities, Your Honor, are both ones whose grants expired in Q1 and have been operating for more than a quarter without the funds that they were awarded. And two, they have said they are not in a position to directly apply.

So these small service providers, many of whom are strung out in different areas. One of them is out in east, you know, east Los Angeles County somewhere, Claremont, I believe. Many of them are in, like, smaller places like that, Your

Honor. These people need funds, too, and they need to apply as well. And they rely on the collaborative applicant to do that.

The reliance interests also include local government entities who may not receive the data they need or whose own attempts to implement good policy are interfered with if LAHSA goes offline or if LAHSA can't fulfill its delegated duties. There is no substitute, as I said, Your Honor, for LAHSA's services with respect to the HMIS database and the Coordinated Entry Program and the PIT and the HIC accounts. There's no substitute for that. Everyone needs that data. That is not expertise that can just be transferred.

And they fail to consider the reliance interests, Your Honor, of the unhoused, including 25,000 people in the Coordinated Entry System that are pending permanent housing and the 11,000 individuals served by federal funding. There's no consideration of this. They pay lip service to doing this on behalf of the unhoused. It cuts exactly the other way, as I think the Court knows. They have not considered these interests.

And I'll return to this a little bit further on irreparable harm, but at this point, I'll turn to my colleague to address the constitutional law arguments.

**THE COURT:** Thank you. Are all counsel still comfortable without a recess at this time or would you like a

recess? All right. Then let's hear your argument, please.

**MR. MALZAHN:** Good morning, Your Honor. This is Scott Malzahn on behalf of LAHSA. And as my co-counsel indicated, I'll be handling the constitutional claims here. The actions taken by HUD are, in effect, an attempt by the executive branch to substitute its judgment for the will of Congress. HUD's actions not only violate statutory law, not only violate the APA, but also violate the U.S. Constitution and the Tenth Amendment. And in particular, I'm going to focus on the Separation of Powers Doctrine, the Appropriations Clause, and the Take Care Clause.

Now, HUD argues in its briefing that LAHSA's constitutional claims merely recast the statutory claims as constitutional ones. And as support for this argument, HUD relies on out-of-circuit authority from the D.C. Circuit that is distinguishable. It doesn't cite any case law from the Ninth Circuit for this proposition. And as this Court is well aware, it's bound to follow Ninth Circuit law. And the law in this circuit is clear. In Sierra Club v. Trump, which was issued in 2019, the Ninth Circuit held that statutory and constitutional claims are not mutually exclusive. They can coexist with one another. And the Court in the Ninth Circuit has laid out the test that governs here. A challenge to executive action will be considered constitutional and judiciable so long as the plaintiff shows that the executive

action lacked both statutory authority and background constitutional authority. And here, you have both of those elements present.

My co-counsel has already discussed in detail how there is a statutory violation here and how the various remedial actions taken by HUD lack statutory authority. I'll touch on those in this argument as well, but they provide part of the basis, not the sole basis, for the constitutional claims.

There are three main arguments here on the constitutional front. First, I'd like to focus narrowly on these grant agreements that remain unsigned, even though award letters were issued as recently as May and June of this year, shortly before the HUD suspension went into effect.

Under Article I of the Constitution, Congress was given the power of the purse. It has the appropriations power. And the purpose of the appropriations clause is to assure that public funds will be spent according to the judgments reached by Congress, not according to the individual favor of Government agents. The executive branch's corresponding obligation under Article II of the Constitution is to faithfully execute the law, and that's not what it's doing. Instead, it's seeking to substitute its policy judgments for that of Congress.

Now, remember, as my co-counsel indicated before,

there's a statute here that was passed by Congress that lays out exactly how HUD is supposed to act. And the obligations there are not discretionary. It's mandatory. Under 42 U.S.C. Section 11382, section (d)(2), Congress imposed a 45-day clock on when HUD must, quote, obligate funds. That means once an award letter is issued, HUD is required, mandated, to obligate the funds for the grant within 45 days, and it hasn't done that. Instead, even though it had issued award letters in May and June, it just decided to not sign any grant agreements, despite the fact that there are all these reliance interests, service providers and LAHSA, expecting, according to the statute, that they'd be receiving these funds.

You know, the Court in Pacito v. Trump talks about what the word shall means, which is a pretty simple thing. The word "shall" imposes a mandatory duty. This isn't a case where HUD has discretion to not sign the grant agreements. These grant agreements cover a wide range of services. They deal with, you know, funds that are necessary to support HMIS, CES, and CoC planning. It also covers subgrantees. These are essential services for the provision of homelessness services in the LA region. And HUD does not have the unilateral authority to just refuse to spend the funds. There is no dispensing power within the executive branch. That's a basic canon of constitutional law that dates back, you know, more than 50 years.

You know, recently the Ninth Circuit has dealt with these issues in city and county of San Francisco v. Trump, where it found that an executive order that imposed a funding freeze on sanctuary cities violated the separation of powers, because the administration had not even attempted to show that Congress had authorized it to withdraw grant money from jurisdictions that did not agree with the current administration's immigration strategies.

Another decision, although not from the Ninth Circuit, but from a district court up in Oregon, I think is particularly instructive here. That is Oregon Council v. the United States DOGE Services. And we discuss it quite extensively in our brief. What this case and that case share in common is a very detailed statutory scheme created by Congress that imposed mandatory duties on a federal agency. And rather than follow the specific guidelines set forth in the statute, the administration went off script and just elected its own policy choices to implement in contravention of the will of Congress, and that is a constitutional violation.

So the second argument that I'd like to focus on from the constitutional perspective is the suspension of LAHSA as a collaborative applicant. Once again, HUD here is improperly seeking to substitute its policy choices over the legislative choices that Congress made. It's clear through this direct to HUD application process that HUD now wants to run the show.

That it wants total discretion over how funding is dispersed, at least within the City of Los Angeles. Maybe this is a first step. Maybe they'll be seeking to expand that to other jurisdictions, but that's not what Congress decided when it enacted the HEARTH Act. There's a very detailed statutory scheme that sets out how this works, and under that detailed statutory scheme, there's supposed to be one collaborative applicant for the region. And that one collaborative applicant helps set the priorities, ranks individual projects, coordinates with local and state entities and other stakeholders, and puts together the consolidated application.

It was Congress's will to empower the local community, so that the local community would be able to drive decision making that was best at the local level. This direct to HUD application process just ignores the statutory scheme that Congress created, and instead seeks to substitute its own judgment for that of local jurisdictions.

Similarly, you can see that in that they're trying to disband the LA CoC, concluding that it's unable to execute its responsibilities in the absence of a collaborative applicant. So this is a violation of the Constitution. It violates the separation of powers, and HUD doesn't have the authority that it seeks.

The third argument I'd like to briefly touch on is the Tenth Amendment claim, which in some respects is similar.

I think the strength of this claim depends in part on how far HUD is seeking to push its actions. And it appears, although their remedial letters have been vague at various points, that they're effectively seeking to shut down LAHSA from performing any services, from performing the essential work that's needed to run the HMIS system, CES. These databases that help make the entire system work for better or for worse in the region of Los Angeles. And if the HUD is coming in here and trying to shut down basically state and local governments from addressing the problem of homelessness entirely, that raises serious Tenth Amendment concerns.

I'll now turn the argument back to my co-counsel.

**(Pause)**

**MS. AXEL:** And, Your Honor, I will address irreparable harm and the public interest, which are obviously very related here in concluding my argument. Strikingly, as we pointed out in the reply, HUD says very little about irreparable harm, Your Honor, and that's because LAHSA has conclusively proven it. There is no merit to HUD's claim that LAHSA failed to show harm to itself. The case law is clear that any significant change in programs with a concomitant loss of funding constitutes irreparable harm in an APA case. Ongoing harm to an organizational mission, diversion of resources, non-speculative loss of funding satisfies the standard for irreparable harm. All of those apply to LAHSA.

LAHSA itself suffers direct harm from the suspension, exclusion from future federal transactions, inability to fund nearly 100 employees, and exclusion from a funding competition that cannot later be undone once the application window closes. There is also substantial harm to third parties, Your Honor. And you can consider that both under the irreparable harm prong and under the public interest prong. And that's because those third parties here are LAHSA's stakeholders, the City and the County. We are part of, of course, the joint powers agency. And also the service providers that LAHSA serves as its sub-grantees. Your Honor, those are part of LAHSA's organizational mission. So LAHSA's organizational mission includes all of those service providers. And indeed, it even includes the unhoused population that it serves, because LAHSA's entire mission is to serve the unhoused.

Dividing up the irreparable harm argument by each of LAHSA's functions, as I structured the argument in the first place, with respect to all of sort of the data management that LAHSA engages in, the HMIS system, the CES system, the PIT and HIC accounts, suspension would immediately harm LAHSA on all of those functions, leading to the layoff of at least 100 employees. Suspension would also harm the intervener, CoC, making it impossible for the CoC to fulfill its congressionally mandated duties of providing and serving the HMIS system, the homeless and infantry accounts, and the CES, which moves people

into permanent supportive housing. It would harm the City and the County, the stakeholders and the service providers. As to HMIS, Your Honor, like the numbers are staggering. 400 agencies in the county use that system. There are nearly 8,000 users. There are more than 20,000 customer service tickets that are issued associated with people having questions about the services. LAHSA serves all of those.

It would also harm, and I know the Court is very concerned about this, the 175,000 to 250,000 clients, meaning unhoused people in the HMIS system at any given time, and 25,000 people awaiting permanent housing in the CES system. HUD's only response to that is speculation. Well, maybe somebody can come in and serve those. The Court should not countenance speculation here. That's all it is, is speculation.

As established here, and I know the Court is familiar with Bevin Kuhn, who testified in the Alliance matter, there are 50 people alone on the HMIS system. She identifies an example of an employee that took one year to get onboarded to actually -- the systems are so complicated, as the Court, I think, understands too. The HMIS system and the RMS system have to speak to each other and actually for the coordinated entry system to work, to actually identify people and move them into permanent supportive housing. That process of making those systems speak together is complex and it's taken years to

effect. And now it operates very smoothly and well, but there are dedicated people who know that, who operate that. They work at LAHSA.

There is no speculation that somehow you're going to just, what, move those people to somewhere else? No. I mean, again, we're in a land of speculation that is not appropriate in the context of analyzing irreparable harm. The Court's job is to analyze irreparable harm on the record before it. And the record before it here is that LAHSA is the moving party, LAHSA is the plaintiff, and LAHSA is the one who would suffer all of these harms. And everything else is just speculation.

I'm sure that they will also note, and I know that the Special Master put this in the record, that the County and the City have offered to work together somehow to take over these functions. Again, the City and the County have a well-established path to work together and that is LAHSA. And that has been working for decades. It's imperfect. We're not here to say it's not. You know, the Court knows all the issues. But those entities working together is complicated and this is a structure for them to work together. And they have done it successfully with respect to these systems, again, as the Court well knows.

So the speculation that somehow something else would happen and take its place, the Court should not engage in that. LAHSA exists to perform these functions, does it well, and they

would not easily be transferred and restructured into something else. As the Court knows, that would be another, you know, decisional nightmare.

Moving to the consolidated application, Your Honor, with the August 26th deadline looming, LAHSA's suspension harms the entire region in denying it the ability to submit a consolidated application. That's the best way for it to access all of the available 241 million in federal funding that would be available for 2027. There's no way to transfer that collaborative application at this point. Work began months ago. We provided the declaration of Jessica Reed, Your Honor, who is the person most knowledgeable on this. This is her entire job. There is a detailed process of evaluating, ranking service providers against the metrics and the priorities that HUD established. So to the extent HUD in its new NOFO identifies priorities, that it has changed somewhat this year's NOFO from prior years, LAHSA is the best person actually to rank and sort and actually meet those metrics that HUD provides.

There's a lot of due process that's built into this process. Many service providers want to be considered. There's a process by which LAHSA has evaluated those applications. They've provided hearings. They've actually allowed people to challenge them. There's an appeal process. All of that has already happened. We provided a page of the

PowerPoint that showed the ongoing activities, and in fact, LAHSA's entire 2026 NOFO planning schedule is available on the internet. We've printed copies should the court be interested in looking at them. These planning activities have been happening since January.

The actual application, Your Honor, again, it's pretty rich when HUD complains about timing issues. The actual NOFO application has not yet been released. So the form itself, they know what the NOFO is. They know what the metrics are that they're going to have to meet, and there's a detailed explanation of what priorities HUD has this year. But the actual application that one needs to fill out is not released. That last year was a 126-page document alone. And in addition to that, each of the direct service providers, the direct applicants and the sub-recipients have each pages, separate pages that have to be filled out.

These have to go into HUD's e-SNAP system, which is not an easy system to operate. Ms. Reed has been offering office hours so that other direct applicants actually can sit with her and learn like what they're going to need to do to fill out these forms. And when the actual application is released, it's a complex grant writing exercise, and it's going to have to be done on a very short-term time. Submissions are needed for the entire CoC, and it will require a lot of data. And as I started with at the beginning, Your Honor,

then it's scored. So you can't just throw this together. You have to know what has been successful in the past, what HUD is looking for with respect to certain answers, what sort of data one needs to submit. It requires a dedicated team that has experience, particularly on such a short timeline here.

HUD's proposed solo application process would also cause irreparable harm. That's HUD's unlawful alternative. As I said, no later ruling would restore LAHSA's role in a competition it was excluded from. So that's irreparable harm to LAHSA should the suspension be reversed. It would deny funding to service providers who depend on the collaborative applicant. As I mentioned, many of these service providers can't do this themselves. They rely on the collaborative applicant to put together the consolidated application and help them fill out all their forms. It would deny the CoC the ability to have the voice that Congress intended, and it would entirely disrupt the system, leading to funding gaps, causing people to lose housing vouchers and be back on the streets.

And I want to just cover that because it's a slightly different point, Your Honor. When the consolidated application goes in and LAHSA prepares it, the CoC approves it, the entire region knows exactly what is being applied for. And pursuant to HUD's policies, they generally approve at least the renewal applicants. They have strong congressional mandates to do that, to approve the renewal applicants. That provides the

region knowledge in advance to plan. So I know the Court is very concerned about gaps in the system, and much of the LA Alliance has been trying to address gaps in the system, particularly with respect to transitional housing. What happens with the consolidated application is the region, the CoC, and all of the stakeholders can look and say, okay, HUD is likely to fund these people, these types of services. We then can plan to go fund these types of services. And traditionally that has been -- HUD has done more permanent supportive housing, literally housing vouchers. And then that has left the state and local governments to fill the need with more getting people off the street.

Again, I know the Court is very familiar with that. But so what happens if there's no consolidated application? What happens if there's direct applications to HUD? The region has no idea what to expect. All of a sudden, in January 2027, HUD may make its own priorities, announce totally different recipients from previous years, and, in fact, they may be funding people that the City or the County used to fund organizations, while people who are now receiving housing vouchers, because HUD traditionally paid these providers, all of a sudden are on the streets, back on the streets, because their housing vouchers are not being paid. That consolidated application is so critical to allowing all of these funders to make their determinations. And that, Your Honor, then, is the

irreparable harm, another aspect of irreparable harm that the Court can consider.

There is also irreparable harm happening right now today, not in the future, with respect to the grant agreements not signed, the awards that we're making. We're talking about 2027 funding based on the 2026 NOFO. But actually, right now, we are in the fiscal year 2025 based on the 2024-25 NOFO. And after litigation and congressional intervention and the facts set forth in our brief, Congress had to get involved, because HUD actually has to release its NOFO in the summer and didn't release the 2025 NOFO until November. And then there was litigation to enjoin it, which was successful. The District Court of Rhode Island enjoined that.

After that, Congress stepped in and said, we're appropriating the 2025 monies. HUD, spend it. Make these award letters and do them by X date, and HUD did that. They simply approved all of LAHSA's previous 2024 grants for 2025. But there we're stalled.

So now we're in fiscal year 2025 from a funding perspective. But with the grant agreements not signed, none of that funding is happening. And so as grants expire from Q1 forward, and these are the service providers I talked about, and LAHSA itself, whose planning grant just expired in June, all of those now are not being funded for fiscal year 2025, although those awards have been made and Congress required them

to be made. That's immediate harm. That hurts LAHSA. LAHSA's already performed significant functions in reliance on the grant money, including just even during the time, Your Honor, since we've moved this court for a preliminary injunction, LAHSA published the PIT count, I mean, again, it's doing the responsible thing to continue to try to serve these functions. I'm sure that the HUD is going to rely on that PIT count as it always has in the data that it gives Congress. LAHSA continues to move forward. LAHSA continues to work with HUD's TAs on the various aspects of its programmatic functions, and it continues to work on the consolidated application, but it's not being funded for that.

It also hurts service providers. As we mentioned, as of June 30th, 12 service providers were operating without funding. As of July 31st, updating the information from the court from our briefing, five more had their grants lapsed, and many of those providers are people who serve the disabled. So the failure to fund these agreements, Your Honor, is causing real human need.

Again, Your Honor, our evidence of irreparable harm is overwhelming and unrefuted, and that evidence also, Your Honor, carries the day in terms of the public interest. The public interest favors LAHSA entirely. HUD's claims that it intends to secure funds for the unhoused through this action is disingenuous. It's refusing to sign agreements to implement

awards to providers of services for the unhoused right now. It's refusing to give the 2025 monies. How is that helping the unhoused?

HUD's path of solo applications would also create funding gaps and, as I explained in detail, throw the whole system into disarray. Some service providers cannot apply directly. They simply would not be able to get any funding from HUD for 2027, even though they may have relied on it for many years.

We provided you two declarations, including organizations who serve survivors of domestic violence. As I mentioned, the five providers who just fell off of funding mostly serve the disabled. Many of these providers need a collaborative applicant. This threatens the receipt of 241 funds, 241 million in funds for 2027, and that HUD funding currently serves more than 11,000 people across 7,500-plus households.

The solo applications also would cause the region not to know who applied. As I explained before, that also cuts against the public interest. And, Your Honor, I'm sure you're going to want to discuss, it also will make it very difficult for the City and the County to implement the settlement without the backbone of support that LAHSA provides through all of these systems. Coordinated entry is critical. HMIS is critical. LAHSA's counts are critical. All of that, all of

the parties to your LA Alliance team need in order to comply with the settlement.

So, in summary, Your Honor, I think, as we said, we think there are direct legal issues here the Court can raise -- can reach on what we think is an overwhelming record. There are violations of the APA and the Constitution that the Court can easily find. And we're asking for a stay pursuant to Section 705 of the APA and a preliminary injunction pending hearing on a permanent injunction.

**THE COURT:** All right. Thank you. Counsel, we'll take a 15-minute recess and come back at that time. We'll hear arguments next if it's acceptable to all parties from HUD. Thank you.

**(Recessed at 10:21 a.m.; reconvened at 10:42 a.m.)**

**THE COURT:** All right. Let's call the court back to order then if you'd be seated. And on behalf of HUD, would it be acceptable if HUD argues this matter next or would you like the city or county to proceed here?

I'll get to the COC in just a moment, I want to hear from HUD next. What's your preference?

**MR. HA:** We're okay if the COC argues first.

**THE COURT:** COC argue? All right. Agreement of everyone, hopefully, then the COC will argue next.

And once again just identify yourself for the record because we're on CourtSmart.

**MS. MYERS:** Thank you, Your Honor, Shayla Myers from the Legal Aid Foundation of Los Angeles. On behalf of the plaintiff intervenor Los Angeles Continuum of Care. And, Your Honor, since we're joining the case now we don't want to add significant additional arguments that HUD didn't have a chance to previously add to, but we are going to address some of the significance of the preliminary injunction and why it's necessary for purposes of the continuum of care and preserving the status quo.

Your Honor, where Ms. Axel left off on behalf of LAHSA is where I want to start, which is the irreparable harm and the public interest that is served by a stay, but more importantly, the public interest that is not served by a suspension of LAHSA.

HUD has made the decision in this case to move forward with an immediate suspension of the Los Angeles Homeless Services Authority, an agency that is responsible for coordinating the homeless service response system for tens of thousands of unhoused people. They are responsible for the delegated duties of the continuum of care. They coordinate the HMIS system, they coordinate the CES system, they submit the collaborative application on behalf of the continuum of care and they also coordinate the homeless response system with funding resources throughout the region.

HUD made the decision to immediately suspend LAHSA.

When it made the decision to do that, it had a statutory and regulatory obligation to do so only if the immediate suspension was necessary to protect the public interest.

And, Your Honor, they did not make that finding and procedurally and substantively. Their failure to do that means that this case is incredible straight forward in terms of the substantive legal issue that it presents Your Honor with.

Your Honor, HUD had its disposal other remedial measures and other ways to address any concerns that it had about LAHSA's performance. There's no question, Your Honor, that if HUD had believed based on the record before it, built over years that they submitted on their June 11th letter, that they could have moved forward with debarment procedures against LAHSA.

If they had done so then, Your Honor, LAHSA would have been entitled to pre-depravation notice and an opportunity to be heard before those proceedings kicked in. And, Your Honor, from my client's interest, the COC would have been given an opportunity to take measures to ensure that the COC could continue to perform its congressionally mandated obligation to coordinate services on behalf of the community.

Your Honor, HUD also could have taken the approach of moving through the regulations that apply to the COC. And that is under 24 CFR 587.107 and my colleague at LAHSA mentioned those regulations as well.

And that procedure, Your Honor, specifically applies to grants and recipients of grants through the continuum of care program, which is the distinct program that is at issue here for purposes of HUD suspension of LAHSA.

And under that procedure, Your Honor, had HUD taken those steps again, they would have been required to provide notice and an opportunity to be heard before taking remedial measures against LAHSA and again for purposes of the COC, the COC would have been in a position to address accordingly.

Your Honor, both of those are strong procedural remedies that were available to HUD and HUD chose instead to drop a bomb into the region and disrupt the most stable part of the homeless services response system, which is the continuum of care, which is built on federal funding.

When HUD chose to do that, to take the extreme measure of immediately suspending LAHSA, it had an obligation to do so and find that it was necessary to protect the public interest.

Your Honor, in that regulation, 2 CFR 180.700 that regulation has constitutional significance, Your Honor, for purposes of due process. Because we all know that in general when the government wants to take an action like suspension, in general, entities are entitled to pre-depravation notice and an opportunity to be heard.

Which is why for purposes of the regulation, the type

of immediate suspension that HUD has taken against LAHSA is available only in those circumstances where it is necessary to protect the public interest. Your Honor, that is simply not the case here.

As Ms. Axel pointed out for purposes of outlining the harm that is occurring in the community now, the immediate suspension is causing irreparable harm to the community. It is causing irreparable harm to the continuum of care which will be deprived of its ability to submit a congressionally mandated collaborative application.

And it is also causing instability in the most stable program that this region has when it comes to homelessness services, Your Honor. And the harm that that is causing is being felt, as LAHSA also pointed out, it is being felt by service providers, by government entities, it is being felt by everyone associated with the continuum of care and it is being felt by the community of unhoused residents who have done the incredibly hard work to get off the streets. And they rely on the funding and stability that the COC provides here.

Your Honor, we know that HUD did not take the public interest into account. And the one significant thing that I will add is that HUD has taken the position that the continuum of care will be suspended and effectively disbanded if LAHSA's suspension remains in place.

But HUD never took that fact into account when it

assessed the public interest at stake in suspending LAHSA. Your Honor, and that is incredibly significant for purposes of APA violations here.

HUD was aware of the implications of suspending LAHSA on the COC. They have said that from the beginning. They said that since June 18th, if they suspended LAHSA, then the COC would be disbanded, and there would be a direct to HUD application process.

HUD never considered the implications of that when it moved forward with its suspension, even though under the Administrative Procedures Act it was required to consider the significant outcomes and the significance of the implications to third parties, but that is a significant factor that HUD never considered when it moved forward with the immediate suspension.

And to be clear, Your Honor, the impact and significance of the direct to HUD application process cannot be understated. The entire purpose of the continuum of care program as mandated by Congress is that it gets all the stakeholders in the room and the stakeholders decide together collectively what the regional priorities are and apply for funding together.

As I said, when we moved to intervene, the COC's positioning in the homeless response system is incredibly important, because it serves as a temple of stability for the

rest of the region. It is a place where entities that don't necessarily get along all the time come together to set priorities together.

Just this week the COC board set the priorities for the continuum of care for that funding. And by setting those priorities, it allows other funders in the region to move around that funding, that stable funding source.

But HUD by coming in and immediately suspending LAHSA and in turn indicating that they will disband the COC and allow direct to HUD applications have removed that congressionally mandated function from the COC and prohibited the LA Region from collaboratively and collectively deciding its own priorities and setting its own stable path for the year.

And the disruption of that cannot be overstated, Your Honor, if the COC's collaborative application if they are not allowed to submit the collaborative application then it will be a free for all with individual service providers applying directly to HUD and HUD setting the priorities for the region with disregard for what is needed or what the community has prioritized themselves.

And that, Your Honor, is the Congressional intent of the COC program, is it to rest that responsibility with the community. HUD's implementation of immediate suspension brought about that distinct result. And, Your Honor, HUD failed to consider the implications of that when they decided

to move forward with suspension. And that, Your Honor, is a very clear cut legal issue that is at stake in this case.

HUD's decision to immediately suspend LAHSA at the timing that it did, suggests that HUD's decision to disband, to suspend LAHSA and therefore disband the COC is the design, not a bug, of HUD's actions at this point.

HUD has attempted in numerous other instances and in numerous other ways to seize control away from communities for purposes of community planning. Until now, Your Honor, those efforts have been thwarted. First by Congress who continued to dedicate resources and funding to the COC program to the tune of $4.1 billion.

Congress has reiterated its commitment to the COC program and to community control. So Congress has stopped it. Your Honor, other courts as well have thwarted HUD's attempts to undermine the COC process by issuing rulings that have prevented past years FY 20 -- past years NOFOs from going forward, Your Honor.

This is just HUD's latest attempt to take community control away and insert its own priorities into that funding stream. They are attempting to do it to a single COC, but it is the largest COC in the country to the tune of $240 million.

And, Your Honor, there's a lot of money that comes into the region, but that $240 million is significant. It's significant to the providers who receive it, to the funders who

supplement it, and to the 11,000 unhoused residents and who have done the hard work of getting off the streets.

Some of them have been in this housing for decades, who will potentially lose their housing as a result of the disruption and if nothing else, they will lose the stability that they have built by moving into this housing that has been funded by the COC.

And, Your Honor, HUD has said that they -- they have said that they are not necessarily moving forward with the remedial measures against the COC, but they have made it very, very clear that if LAHSA remains suspended, that they will move forward with the remedial measures against the COC. Which means they will effectively disband the COC. They will take the COC's congressionally mandated obligation to bring stakeholders together and set the priorities for the region. They will take away the stability that is built by the collaboration that occurs through the COC application process, and they will put forward an unprecedented and illegal process that is not supported by the statute or regulation that allows individuals to apply directly to HUD.

They had said that they will do this on August 10th or after this Court's ruling, whichever is first or whichever is earlier. Your Honor, which means that as of August 10th HUD intends to take remedial actions against the COC.

That action would itself be illegal. The 2026 NOFO

is currently subject to federal challenge in Rhode Island. This amended NOFO has the exact same problems that the underlying NOFO has in terms of HUD setting its own priorities outside of congressional intent. And if -- Your Honor, if the suspension remains in place against LAHSA, the COC would be subjected to that illegal NOFO, which itself is a significant harm.

Your Honor, we are here on behalf of the COC because the impact of HUD's decision to immediately suspend LAHSA has direct and significant impacts on the COC. HUD understood those impacts, were the natural of its suspension, they made that clear, but they never considered the impact on the COC. They never considered what it meant to do an end run around the congressional mandates that dictate the existence of the COC. That unto itself is an incredibly straight forward legal issue that itself is sufficient to support the likelihood of success on the merits prong and it also supports the irreparable harm and public interest at stake in this case. Thank you, Your Honor.

**THE COURT:** Let me turn to HUD for a moment. Would your preference be to have the city and county respond next, would your preference be for you to argue on behalf of HUD at this time? And the reason for that is, I'm not sure how the city and county will align themselves, but I can speculate that they may be aligning themselves as a real party in interest

because of the funding. So why don't you talk about it amongst yourselves, so that there isn't a dual rebuttal for a moment. Then you choose the order.

**(Pause)**

**MR. HA:** If we are fine if the city and county go next.

**THE COURT:** All right. So the city and county then would argue next and I think that's wisdom on your part so you hear the arguments in case they are aligned.

And when you argue to the Court, on both of the entities, I have previously written and expressed my belief that the City and County in this matter are the real parties in interest. That while LAHSA is the focal point of these hearings to the joint powers agreement is the representatives of the City and County representing the citizens of the City and County that are real the parties in interest in this matter.

And I've explicitly have stated that this in times enable the cycle of blame shifting, when data inconsistencies or compliance issues arise, the City points to LAHSA, in turn LAHSA attributes its problems to a lack of information or cooperation from the City. I've written quote, that this dynamic has fostered a system in which responsibility with entities is deflected, allowing both entities to evade accountability with no single party willing to take

responsibility.

LAHSA has been subject though to various numerous audits and reviews by various entities over literally decades. These investigations have uncovered a dysfunctional system with shortcomings that call into question its effectiveness. It uncovered significant and substantial issues with LAHSA's management of its finances and issues with recordkeeping. And these issues are back decades.

So when you're arguing on behalf of all of the entities, my response to each of you is, what took you so long? What took you so long? You knew about the opinion of June, when I handed down my initial decision, went back to decades where HUD was on notice, auditor controller reports, the County's own, you know, findings. And I also documented them in the attorney's fees award that I handed down in January so you're aware of them.

So for the City and the County, and by the way, you also heard an argument that this is going to intertwine potentially even the veterans lawsuit, that this has carryovers to LA Alliance, it may have carryover to the intertwined financing that goes on with the veterans lawsuit that's pending.

So, counsel, who'd like to argue on behalf of the County or the City, which one would like to go first? Pleasure to see you.

**MS. HASHMALL:** Good after or I guess good morning still, Your Honor. Mira Hashmall for the County.

Given the August 26th deadline to submit the necessary funding --

**THE COURT:** Pull that microphone just a little closer and, yeah, just because we're on CourtSmart. And would you introduce yourself. I certainly know who you are, but once again for the record, one more time.

**MS. HASHMALL:** Thank you, Your Honor. Mira Hashmall here for the County of Los Angeles.

Given the August 26th deadline to submit the necessary funding applications in response to HUD's NOFO, the County believes that maintaining LAHSA's continued role as a collaborative applicant is the best way to maintain stability in the region, housing and support programs for people experiencing homelessness.

If the Court decides that LAHSA is unable to continue, the County and the LA County Development Authority are ready and committed to stepping in. The County has reached out to the City to discuss potential collaborative approach to the HMIS lead and see if management entity, in the event the Court rules that LAHSA cannot continue.

Ultimately the County will work decisively and collaboratively to avoid imminent harm and I think Your Honor has heard a compelling argument about that imminent harm, the

region could suffer if there is a lapse in this critical funding for all of the programs and the service providers serving this very, very vulnerable population for continued funding from HUD is essential to the region's housing and support programs. And we all do rely on that funding, Your Honor, and so the County is not a party to this matter, but the County does believe the status quo is essential to maintaining continuity of services to our some of most vulnerable. Thank you, Your Honor.

**THE COURT:** Counsel, I'm aware of the July 24th letter.

**MS. HASHMALL:** I'm sorry, Your Honor?

**THE COURT:** I'm aware of the July 24th letter.

**MS. HASHMALL:** Yes.

**THE COURT:** To the COC Board.

I'm going to read from page 205. LACDA is well qualified to serve as the interim collaborative applicant. LACDA is well positioned and qualified to serve as the interim collaborative applicant on a one time emergency basis and to immediately assume the responsibilities necessary to preserve continuity of the COC program, administrative and coordinated functions, including those associated with the fiscal year 2026 COC program funding cycle.

LACD has the organizational capacity, administrative infrastructure, grant management experience, regional reach and

familiarity with federal funding requirements necessary to immediately step into the role of interim collaborative applicant.

I don't know what this Court's ruling is going to be. I'm going to carefully listen today. Do you stand by that statement?

**MS. HASHMALL:** Yes, Your Honor.

**THE COURT:** And that would then include -- well, strike that.

One of the historical issues that's faced the City and County over decades has been the lack of cooperation that goes back to the 1980s. We can pull editorials. And the disagreement between the City and the County over everything from acuity to what responsibilities, what funding streams would entail from everything from architecture to services.

The City has joined, but has in a sense simply stated that they're willing to cooperate and be involved. If you were the collaborative applicant in the future or on an interim basis, how would you function with the City? And step over, you can talk to the City, they're right there, if you'd like to. But what I don't want to see is a decision by the Court that would cause any harm. There's an interim basis here, an interim period.

But I'm also deeply concerned about the historical disagreements between the City and the County and I don't want

those repeated.

**MS. HASHMALL:** Your Honor, there's no doubt that the City and County at times have had different priorities with regards to funding, programs, beliefs about the efficacy of interim housing versus permanent supportive services and housing associated with that. But I think -- I don't want to speak for the City, I know the County is very much attuned to the urgency tied to the deadline, just a few days away.

And so, you know, there obviously are always opportunities for greater collaboration and I know my county stakeholders are committed to that. But we're also committed to making sure that this essential regional system of support does not collapse because that deadline comes and goes and the collaborative applicant is not ready and capable of meeting that deadline.

**THE COURT:** You have $241 million right now that's in a sense before us. A preliminary injunction is what I'm going to call a temporary measure. When would you be prepared to go to trial?

**MS. HASHMALL:** I'm not a party, Your Honor.

**THE COURT:** All right. Well, you might be drawn into it.

**MS. HASHMALL:** Yeah, I'm seeing --

**THE COURT:** I expect if it goes to trial you'll --

**MS. HASHMALL:** I'm seeing that. You know, I defer to

the parties on how the process of this litigation should proceed. I'm just here to speak on behalf of the County with regards to hoping that we can maintain continuity.

**THE COURT:** Why I'm asking that, because when you represent that you're an interim capacity, you know, to serve in this role, the question would be first of all how quickly and second, how long you are willing to sustain that.

Now, you don't have to answer that. I just want you to take that back to the Board, your council, you represent them. But you're standing by this statement to the Court; is that correct?

**MS. HASHMALL:** Yes, Your Honor. And I certainly will convey your comments to my client.

**THE COURT:** Well may be too late. Because I'm going to be writing as soon as we finish this. I'm going to come back to you for just a moment after I hear from the City.

**MS. HASHMALL:** Okay.

**THE COURT:** Thank you. And thank you for your courtesy, I appreciate it.

**MS. HASHMALL:** Thank you, Your Honor.

**THE COURT:** On behalf of the City?

**MR. SOMMER:** Good morning, Your Honor, Randall Sommer, Deputy City Attorney on behalf of the City of Los Angeles. The City does not have additional argument to add to what's already been before the Court but I'm happy to answer if

you have additional questions.

**THE COURT:** Give me one moment to look at this letter one more time. And this is the letter that I'm referring to we docketed it as Docket 46 for the record.

**(Pause)**

**THE COURT:** You also have substantial resources, HACLA is one of those, and by you I understand it's a separate entity but in a sense it's not. If there was a transition from LAHSA to another collaborative entity, what efforts would the City make to cooperate with the County or vice versa in making that transition so that we don't have 11,000 people discarded on the streets or that we have a -- or deaths that occur that we could hopefully have stopped? Because what I'm referring back to is regardless of what's being said in my court today, there has been a history of non-cooperation and bickering between the City and the County which has been extraordinary harmful, that's why LAHSA was created. How are you going to make that transition so that we don't literally discard 11,000 souls on the street, which is detrimental to our public, devastating to them and will cause death? Other than promising me that you're going to do that again and again?

**MR. SOMMER:** Yes, Your Honor. I -- let me just say at first to note that the letter, as it states, is advising the COC that should interim governments changes become necessary the City is prepared to partner, right.

**THE COURT:** I've given you a hypothetical.

**MR. SOMMER:** So --

**THE COURT:** If it did --

**MR. SOMMER:** If it did as --

**THE COURT:** -- and LAHSA was no longer the cooperative applicant, how that transition would take place.

**MR. SOMMER:** The letter states, the City is committed --

**THE COURT:** I read the letter.

**MR. SOMMER:** Right. So I don't have anything to add other than what's in the letter, Your Honor.

**THE COURT:** It's not disappointing, but I know as counsel, all of you are able representations, I really think that these decisions are at the executive level. I don't think attorneys can make these decisions.

So I don't think you can really respond and that's not your fault. Okay?

**MR. SOMMER:** Thank you, Your Honor.

**THE COURT:** Yeah. All right. Now, any other parties wish to speak? We're going to have rebuttal in just a moment. LA Alliance?

**MS. MITCHELL:** Thank you, Your Honor, Elizabeth Mitchell on behalf of LA Alliance for Human Rights. And thank you for allowing the Alliance to be heard today. We are not a party to this case, but we are an interested party certainly

for a number of reasons, not the least of which is to ensure that the settlement that was reached between LA Alliance and the City and LA Alliance and the County are maintained and that any interference with funding does not impact that settlement.

As I understand it, my conversations with the City thus far it has not and will not and I expect that to continue because the agreements that the Alliance has with the City and the County are not with LAHSA, they are with the City and the County, so I think --

**THE COURT:** Repeat that for me, I want to hear that one more time.

**MS. MITCHELL:** Yes, Your Honor. The agreements that are involved in the LA Alliance case are not with LAHSA, and frankly they're also not with HUD. They're with the City and they're with the County and we expect compliance with the City and County settlement agreements regardless of the outcome of today.

I do think it is also important to ensure that the record before this Court in this case accurately reflects the extensive history that this Court has already developed on these issues over the last six years. Because we filed the LA Alliance case in March of 2020. And this Court has spent more than five years developing what is likely the most comprehensive judicial record anywhere concerning LAHSA's governance, financial controls, transparency and institutional

accountability.

It is important that that history of the record there also be part of the record here, particularly because I suspect whatever happens today, whatever the decision the Court makes will be appealed.

And I think it's important that the record be fulsome before the Court, so LA Alliance respectfully requests that the Court take judicial notice of the docket and history of proceedings in that case, LA Alliance versus the City of Los Angeles, Case No. 20-cv-02291, including the Court's orders, hearing transcripts, the Alvarez & Marsal independent assessment, the Special Master's reports, the historical audits and findings that have been presented throughout those proceedings.

I think this is important, Your Honor, because that record reflects deficiencies in financial oversight, contract management documentation, performance monitoring, data reliability and institutional accountability on LAHSA's part.

The independent reviewers from Alvarez & Marsal found fragmented financial systems, inadequate documentation, and inability to reliably trace significant expenditures, insufficient monitoring of service provider invoices, and an inability to verify substantial portions of the services and bed reporting that formed the basis of public expenditures.

In short, what Alvarez & Marsal found was a complete

lack of financial controls, which has created conditions where fraud, waste and abuse of taxpayer dollars can proliferate and as we have seen from recent prosecutions which are pending, seems like they did proliferate.

The Special Master's reports reached similar conclusions regarding the need for structural reform, governance changes and improved accountability on behalf of LAHSA. Those findings were not isolated and were consistent with historical audits going back 20 years, and reviews spanning multiple administrations, multiple governing bodies, and multiple independent reviewers.

You Honor, this, what we're talking about today, is not a dispute about a single audit, even a single administration, or a single accounting error, it is a 20-year pattern of recurring findings by independent reviewers identifying substantially the same institutional deficiencies, despite repeated promises of reform. And that pattern has persisted across administrations, both local and national.

Now, I have heard today, and I have read in the papers and other places that things have changed in LAHSA and we sincerely hope that is true. But that does not change 20 years of dysfunction, Your Honor.

And so what I've also heard and seen, both in the papers and today, is that there are alternatives to LAHSA as the collaborative applicant. I'm hearing the County saying

that they are ready to step up, I'm hearing the City saying that they are ready to help, and I'm hearing that HUD has offered direct funding to service providers, which I recognize is a change to housing that's traditionally been done with the COC.

But I would submit, Your Honor, that there are exigent circumstances here that should be considered. Because as we have noted in this court day after day and year after year, when we started this case there were three people dying a day unhoused on the streets of Los Angeles.

Today we are capped out somewhere around seven or eight people dying every day unhoused here in the City of Los Angeles. And so the question has to be asked, is the institution working? And I would submit, Your Honor, it is not. And that is not a personal judgment on anybody here, the new interim CEO, I have tremendous amount of respect for, but I do think there's an element of too little too late of what we're seeing and I would echo the question that Your Honor asked, which is what took you so long, HUD. Because we have been desperate here in the City for change and for reform for years and we have not seen it coming.

Now, I recognize that suspension is a drastic action and the legality of that I am not here to weigh in on. That is up to the Court's decision and that it something the parties have discussed. But I do think that it is important to point

out and identify the extreme institutional failures that we have seen over and over again. And I think when you have extreme failures, I think extreme action is necessary.

I do think, Your Honor, because this is an equitable proceeding I would also observe that there's a distinction between harm to an institution and harm to the public. There is no question, at least in my mind, that losing funding or administrative responsibility is harmful to LAHSA as an institution. I think that's probably a fact.

But LAHSA was created to serve people experiencing homelessness and to help the City and County manage the homelessness response system. It was not created to preserve itself.

Is the public and are people experiencing homelessness, in particular, served by continuing to support a demonstrably failed institution? And our answer would be no.

How many more people would have been served with a functional COC? I would submit a lot. If the federal government concludes that a different administrative structure is necessary to improve accountability while maintaining services through our lawful mechanisms, the broader question is whether preventing HUD from continuing that process would ultimately cause greater harm to the public, to taxpayers, and to most importantly the people experiencing homelessness and we submit that it would.

That's all we have, Your Honor. I'm happy to answer questions if the Court has any.

**THE COURT:** We'll have another round just in a moment.

**MS. MITCHELL:** Thank you.

**THE COURT:** Are there any other persons before HUD, the parties than HUD?

And make sure you pull the microphone closer, I certainly know who you are, but repeat your name for the record because we're on CourtSmart.

**MR. HA:** Thank you, Your Honor, may it please the court, Joshua Ha for the Government.

Through the McKinney-Vento Act and other appropriations, Congress sought to deliver funds to combat the homelessness crisis. HUD is committed to ensuring those funds make it to the people who need it most. That includes making sure that the middleman, here LAHSA, is a responsible partner in that endeavor.

At bottom, this case is about whether HUD is allowed to temporarily pause entering into new agreements with LAHSA while LAHSA is under investigation.

**THE COURT:** Remember my statement, when you speak about LAHSA, you're speaking about the City and the County. In other words, the segmented idea that LAHSA separates itself, no, the City is LAHSA, the County is LAHSA and LAHSA are the

City and the County and that's the public.

So while we focus on LAHSA, is the City and the County they're also real parties in interest here.

**MR. HA:** Yes, Your Honor. So as I was saying, the question here is whether HUD can temporarily pause entering into new agreements with LAHSA while LAHSA is under investigation. It plainly can do so, especially on the heels of LA County itself taking the significantly more aggressive approach of withdrawing funds.

This Court --

**THE COURT:** Would you repeat that?

**MR. HA:** Oh, I said, we -- it plainly -- HUD can plainly suspend LAHSA especially given the fact that the County itself decided to withdraw funds quite recently.

This Court should accordingly deny the motion. So first, LAHSA cannot demonstrate any likelihood of success on the merits. Suspension is an agency action and under the arbitrary and capricious standard, agency action must be only reasonable and reasonably explained. HUD's temporary suspension was both.

Before I get into the merits any further, though, I do want to address something. LAHSA and the LA COC have said that HUD's actions were pretextual and we would like to push back pretty strongly both legally and factually.

So legally, the controlling precedent is quite clear

that Courts are not supposed to look behind the government actions to try to figure out if maybe there was some other purpose behind them. What matters is what the government action does, what HUD actually did.

But factually, I think the modified NOFO indicates that HUD isn't trying to uproot the COC system. Under the modified NOFO, 60 percent of funds is going to renewal projects, that is, we are trying to approximate what COC normally would do in these circumstances.

The other 40 percent of funds goes to new projects, but they are treated just like how new projects are treated in any other COC. Furthermore, HUD has no intent to run this competition forever. It is just -- what HUD is doing here is consistent with statutes and regulations and on the basis that HUD does not think LAHSA should be the middleman at this time.

**THE COURT:** How do you make the transition though from what seems to be Congress' structure and certainly the statute is being argued as well as there are processes and procedures that encompass local control, because local people are best able to know the community nationwide?

How do you support these services and guarantee this transitional period, in other words, legally, pragmatically, how do you step into the role of LAHSA or another collaborative entity or applicant that's local? You're a national organization, you're not local.

**MR. HA:** Right. So I acknowledge that this is going to be a new process, but I do want out that the statute does say that if a collaborative applicant for a geographical area does not meet the requirements, that the Secretary may take remedial action and that such measures may include permitting eligible entities to apply directly for grants.

And, you know, as I mentioned before, the way HUD is trying to implement this is to try to approximate what COCs usually do in these circumstances. So in the usual COC competition, 60 percent of funds will go to -- you know, up to the local COC to decide. And just as a matter of practice, usually the local COCs will use those to go to projects that they funded in the past year.

So likewise here, HUD for that 60 percent of funds in the Tier 1 projects, HUD designed its directed HUD process to make sure that those funds go to renewal projects. And in this area, that usually means going to housing services.

But to go back to -- so I did want to make sure that to put on the record that we do push back pretty strongly against the idea that there is some pretextual motive other than the usual administrative determination that an organization for which there is probable cause or reasonable suspicion, that they are not complying with federal program requirements should be suspended.

I also want to push back on the characterization of

the standard which applies here. Adequate evidence is a pretty low bar. I don't want to -- I hesitate to lean too heavily into that, because I do not want to suggest that we need a low bar to succeed here, but adequate evidence has been likened to probable cause. It's not supposed to be a final determination and that's because suspension itself is not supposed to be a final determination.

So I don't think LAHSA is correct to try to say that oh, well if Your Honor wouldn't consider the evidence we put forth to satisfy a criminal conviction, that means that the suspension was improper. That's just not the standard.

And on top of that, then you have to layer on under the APA that substantial evidence review applies. And that just puts another -- that just makes this case even easier, just on the standard alone.

That said, there's just more than enough evidence before HUD to decide to temporarily suspend LAHSA. The Court is aware of much of it, but just to name a few examples.

The 2007 HUD OIG audit reported that LAHSA did not perform on site physical monitoring, did not properly perform it's 100 percent source documentation desk review for at least two of its project sponsors, failed to ensure that HUD grants were spent in accordance with those requirements, or that grant activities were fully maximized. That is on Docket 24-27, pages 63 to 64.

The 2019 City Controller report indicated that LAHSA used unclear metrics. The 2022 HUD OIG report found that LAHSA failed to use millions of dollars of COC funds, which then expired and did not properly document its HMIS system support.

A 2024 County audit showed that LAHSA inappropriately used funding from other sources to pay sub-recipients prior to receiving reimbursement from the actual funder.

**THE COURT:** Just a little slower.

**MR. HA:** I'm sorry. And that LAHSA had unreliable data that hindered its ability to monitor contract performance.

As Your Honor is well aware, the independent assessment noted LAHSA's deficient performance monitoring and observed that this affected service quality and effectiveness.

The 2025 single audit which HUD was made aware of in May of 2026 found that LAHSA did not have effective controls in place to provide reasonable assurance that financial statements were properly prepared. And that LAHSA's internal controls were not adequately designed to ensure timely identification and correction of accounting measures.

And also in May 2026, the County review criticized LAHSA's recordkeeping, which could quote, impair reporting accuracy and accountability for county funds.

Now, we heard several arguments that the information is somehow stale, but as Your Honor points out, the question is not like -- is not whether it's stale, it's why did it take so

long.

The -- as LAHSA themselves say, the question when it comes to present responsibility is whether the organization has quote, taken steps to ensure that the wrongful acts will not recur. The fact that we are still talking about a lot of the same issues as we were talking about in 2007 indicates that the steps were not taken to ensure that wrongful acts will not recur.

As for why now, we -- HUD was made aware of -- two of the reports I mentioned we were only made aware of in May 2026, the 2025 single audit and the 2026 County review.

**THE COURT:** Just a moment.

**MR. HA:** Sorry.

**THE COURT:** 2025 single audit. Why don't you identify further.

**MR. HA:** Sure. That -- you can find that by the way on Docket 24-26. It was appended to the June 11th letter.

**THE COURT:** And what, from my memory, what is that audit?

**MR. HA:** So that was the single audit which was released to us in May 2026.

**THE COURT:** And what is that audit?

**MR. HA:** I'm sorry?

**THE COURT:** What is that audit?

**MR. HA:** It was an audit of LAHSA's internal controls

basically.

**THE COURT:** The A&M audit?

**MR. HA:** Sorry?

**THE COURT:** Was that the A&M audit? I don't have a photographic memory, what was that audit?

**MR. HA:** I'm sorry.

**THE COURT:** Step over to the table and they can help you, okay?

**MR. HA:** Okay.

**THE COURT:** Is that the A&M audit? Which audit was it? You've just given me a docket number and I don't want to slow down anybody.

**MS. AXEL:** It is not the A&M assessment, Your Honor.

**THE COURT:** I can't hear you.

**MS. AXEL:** It's not the A&M assessment, Your Honor. LAHSA's single --

**THE COURT:** Okay. We're going to find what that audit is, we've just allowed an audit and that docket number and I want to know the audit you're referring to.

**MR. HA:** It's the federally required audit of their financial statements that all grant recipients have to submit annually.

**THE COURT:** All right. Now, you're aware of my rulings in June of 2025, correct?

**MR. HA:** Yes.

**THE COURT:** You're aware of my attorney's fees award in 2026; is that correct?

**MR. HA:** Yes.

**THE COURT:** You've seen the extensive history of HUD finding extraordinary deficiencies over decades of LAHSA, correct?

**MR. HA:** Yes.

**THE COURT:** Why did you approve LAHSA as the collaborative applicant then in April of 2026? Now, you can step over and talk to your colleagues before you answer that. I'd be very careful with that answer.

**(Pause)**

**THE COURT:** And also you can toss in A&M's audit and the County's audit, et cetera.

**MR. HA:** So I'd like to introduce Bill Doolittle.

**THE COURT:** Sure, absolutely.

**MR. HA:** He is a managing counsel in the Office of the General Counsel at HUD.

**THE COURT:** Yeah, you're more than welcome, thank you.

**MR. HA:** Thank you.

**MR. DOOLITTLE:** Thank you, Your Honor. Just to answer the specific question, during this time period HUD has been using all of the tools that LAHSA seems to want us to keep using. Our OIG has done audits, we have done document requests

to them, we have tried other enforcement tools and surely, although we're not a party to the Court's other case, we're paying attention to it.

So we have used those tools and ultimately when we got these -- the audits that counsel referred to from May of 2026, it just became clear, you know, the time for half measures has passed. But -- so we have been taking other action up to that point. Thank you, Your Honor.

**THE COURT:** Thank you, sir, I appreciate it. So, counsel, please continue.

**MR. HA:** Thank you, Your Honor. And I would also say that that also demonstrates that it's just not true that we did not consider alternatives, when we were deciding whether to take the suspension action.

And, of course, it was not lost on HUD that LA County viewed much of the same evidence and apparently decided that LAHSA's issues were serious enough to withdraw the funding this past year.

Now, LAHSA suggests in its reply brief that a lot of the issues are just about documentation, or it's just about monitoring, but those are -- that's not really a defense and it does not really give us much comfort. I mean, those are not victimless malfeasances.

I would point Your Honor to any number of indictments, even the Alexander Soofer indictment just recently

where someone turned out to have gotten $5 million of funding from LAHSA and used it for personal purposes over the course of seven years. I would think that documentation or monitoring or oversight would have helped there.

Finally, as I was referring to earlier, HUD's decision was also reasonably explained. I would refer this Court to the June 11th letter which sets out in detail why HUD decided to suspend LAHSA at this time. The APA is not a straitjacket and even less than --

**THE COURT:** The June 11th letter?

**MR. HA:** Yes, the June 11th letter.

**THE COURT:** It was a warning letter. Your June 18th is actually the suspension letter, isn't it?

**MR. HA:** No, Your Honor. So the June 11th letter is the notice of suspension. The June 18th letter just sets out that the further remedial action of the direct to HUD process.

**THE COURT:** Okay.

**MR. HA:** So the APA is not a straitjacket, even less than clear, agency decisions must be upheld if their reasoning can be reasonably discerned. But here, HUD's reasoning is pellucid. We considered reliance interests. We expressly noted LAHSA's financial footprint and the homelessness crisis in the City.

We also considered and even tried alternatives, as my colleague just noted. We just decided that given all these

considerations, the best course is to investigate LAHSA and pause its federal participation in the meantime.

LAHSA cannot identify any statutory violation because everything we did here was explicitly authorized by statute. LAHSA is, of course, correct that regulations and statutes contemplate in a perfect world, that a collaborative applicant will compile an application to send to HUD. But those same regulations and statutes also recognize that sometimes that would not be the case.

Section 11, 360(a), Subsection C explicitly says that when a COC is not functioning for a geographical area, HUD may allow for direct applications. I think it's very hard for LAHSA to say that chaos will ensue if they are suspended on the one hand and say that there is still a functioning COC in the region that on the other hand, to say that we cannot take this remedial action.

And on top of that, I don't think it can really be disputed that a COC without a collaborative applicant cannot run a COC competition.

And so HUD merely followed what the statute said it could do when it decided to implement a direct to HUD application process.

I would also like to turn to the constitutional arguments that I think LAHSA and the LA COC raised.

So as to the constitutional question, the question

here isn't whether HUD's intent violated Congress' intent. The question is whether what HUD actually did violates what Congress told it to do. For all the reasons I just said, we expressly followed Section 11, 360(a), Subsection C to the letter. We -- our letter literally quotes that statute.

And LAHSA's argument merely confirms that their constitutional claims don't really add anything. Now, LAHSA says that this case is different perhaps because Congress legislated under its appropriations authority, but Congress is always legislating under some Article 1 authority, that doesn't make every statutory violation a separation of powers problem. Felton v Spectre (phonetic) from the Supreme Court makes that point.

So I don't think that's enough to say there's a constitutional claim here. But it also means that it doesn't add anything to this case, like either -- sorry, either HUD followed the statute or it did not. For the reasons we said, we did, but if we did not, that's not a constitutional problem, that's a statutory problem and that's what this case is about.

I also heard -- I think I also heard LA COC's try to insert a procedural due process claim here. Well, to that, I'll talk about this more later, but procedural due process those claims are channeled through the Matthews v Eldridge framework. And one of the questions you asked when determining what processes due is you consider the government's interest in

having streamlined procedures. And there's a very big government interest in making sure that responsible people are contracting with the government.

I think the fact that virtually every agency has the same suspension authorities is testament to the idea that the public interest says that contact first and check later is not good policy.

As to the Tenth Amendment argument, California obviously has a police power to combat the homelessness crisis. But it is a very different thing to say that the Tenth Amendment is violated when the federal government does not use federal taxpayer dollars to provide it to LAHSA. I just don't think you can draw that equivalence at all.

I'll now turn to the equities. As to the equities, as I mentioned before, the public interest is not served by a contract first and check later policy, especially here where funds are limited and we need to make sure that these funds are getting to the right hands.

As discussed earlier, there's record evidence that from audits and reports, that sometimes funds are allowed to expire, that they don't end up reaching the people who need it the most.

And as the LA Alliance pointed out, the public interest does not necessarily cut in LAHSA's favor. Now LAHSA says that we are being very speculative, saying oh, that well

things may not go so badly, but we're not the ones moving for a preliminary injunction. They're the ones who have to show that the balance of the equities and that irreparable harm go in their direction and they're the ones who are providing speculation saying that the sky will fall if we just follow what Congress said we should do.

**THE COURT:** Anyone you want to consult at any time, counsel, please, there's no issue.

**MR. HA:** Okay.

**(Pause)**

**MR. ESSAYLI:** I just want to add a few words, Your Honor. I'm Bill Essayli on behalf of the United States.

I just want to zoom out and explain why we're here today, Your Honor. We are here because we simply cannot continue to fund failure and that's what's been happening with the millions and millions of dollars of federal tax dollars that have been entrusted to LAHSA, which I agree with Your Honor, is just a fiction of the County and the City.

Millions and billions of dollars have been entrusted to public officials to take care of the people who are out on the streets, people who are, it was referenced, seven people die every night on the streets of Los Angeles. That's why we're here today, Your Honor.

What we're doing has not worked, we're here to change it. Are we late? Yes. But are we here now? We're here now,

Your Honor.

I'm extremely disappointed that there are no elected officials here. You are right. This is not an attorney problem. This is a leadership problem. I'm the presidential appointee. I'm the highest federal appointed person in this district, Your Honor. I'm here. This is important to me. It's important to HUD, it's important to the United States and we want to get this right.

I am extremely disappointed not one County supervisor, not one City Council member bothered to show up to this hearing today and I think that says a lot about how seriously they're taking the issues that this Court has highlighted and identified. And whether it really calls into question, Your Honor, whether we can entrust them with another single dollar of taxpayers, to get the help to the people who need it.

I've walked skid row many times, I've been out on the streets. The money is not getting to the people that need it. I did a ride along with LAPD just two weeks ago in McArthur Park, the officers told me they encountered a homeless couple with young children and they wanted help, they wanted to go to a rehab bed. The County shut them down. They said, we don't accept people from LAPD.

And they called -- LAPD called LAHSA said, we don't do that, we can't help you. The officers had no idea what to

do. I think they finally got ahold of a private program that was able to take them in. And I'm sure there's many, many more stories like that. I'm out on the ground, Your Honor, help is not getting to the people that need it and the only thing I've heard today is arguments about, you know, letting their bureaucracy function as is. We cannot do that, Your Honor, it is unconscionable.

This is really a question of whether anyone at the County and the City has the proper control, competence, and culture to oversee these funds and these programs, we're talking about a lot of money. Do we have a perfect answer? No, Your Honor. It's the best we can do right now.

We are more than willing to work with the Court to fashion something if the Court doesn't feel HUD can do it as is, we want to find a way to do it. But I'm not sure the County or the City is a responsible player.

In 2020 we had 66,000 unhoused people on the streets of LA. Today we have 73,000, despite the billions. That is shameful.

So I can get into -- I mean, there's so much evidence in how the money's been mismanaged. I've now brought several indictments, Your Honor, in this matter. In October I indicted Mr. Taylor who was -- sold a piece of property to LA City in Cheviot Hills. Your Honor, he purchased that property for 11 million and in the next month, sold it to the City for $27.3

million.

Had the City conducted a basic appraisal they would not have wasted about $16 million of taxpayer money which could be used for other places. That's just one example.

My colleague eluded to another indictment I brought January of this year, Mr. Alexander Soofer. Mr. Soofer was entrusted with $23 million. He was in charge of taking care of 600 unhoused people. He was supposed to use that money to pay to get them housed in motels and he was supposed to provide them three hot meals a day.

He did not pay the hotel bills, LAHSA went and paid it again, they double paid for the same people. And the three hot meals a day, he had Ramen soup and a microwave is what he spent the money on. The rest he bought a mansion in Westwood. He bought a home in Greece. He went on vacation at the Four Seasons in Hawaii and he went on a shopping spree in Hermes (phonetic). That's where the money went, Your Honor.

And without saying too much, there will be more indictments coming in this space very soon here. So I just want to stress, this is a big deal, Your Honor. What we do today matters. I think that's why there's so many people here and we want to get it right and we want to work with the Court on that. And with that, I'll turn it back over. Thank you, Your Honor.

**(Applause)**

**THE COURT:** Did you want to continue, counsel, or?

**MR. ESSAYLI:** We'll submit.

**THE COURT:** Submit?

**MR. ESSAYLI:** Yeah.

**THE COURT:** All right. We're going to go to lunch and let me just toss out to you, if there's any opportunity here with this crisis, first of all, when we come back with the Board, why don't you explain the amendment that took place last week. I think that the parties are aware of it, but I'm not certain because there the Board has implemented some amendments which I think will be very helpful going forward. But I don't know. But I want you to explain that amendment so we're all aware of what occurred because there's a lot of movement over the last week, let alone a few days.

Second, whether LAHSA continues on with -- your reference and I know that they're commendable and I say that to you, I know you're really making an effort as the director, I want to pay you that compliment, you can see the frustration on the other side that it's got to the point that they're going to take action.

But whether you continue on or there's a transition to another cooperative applicant, really sort out in your minds how that would take place. In other words, as you reach your frustration level to move this forward, by the same token, there's a responsibility to make certain we don't harm people

in this transitional period or kill people, and this is the equitable time.

And so if we were to make that transition, what would that look like. How would -- in fact, if I bore down on you without embarrassing you, you specifically take the place of LAHSA in this transitional time and guarantee these services as we decide whether you continue on or you don't continue on, whether there's another applicant. I just toss that out to you, because it's great responsibility.

The second thing is, let's just put it out on the table. There's a struggle that's gone on for a long time between the City and the County and the County seems to be moving away from LAHSA. I have no comment whether that's good or bad, that's a decision, but the County seems to be striking out on its own in an attempt to bring that responsibility within the County and you've seen that with the withholding of the $300 million, but we've got $241 million on the table right now and whatever we rule or wherever this takes us, there's going to be more money in the future.

But by the same token the City's been in an interesting position and, Ms. Hamburger, you've joined -- not you, but the City's joined in the letter and pledging support. I read recently, I don't know if it's true or not, but some of those decisions have been delayed by the City not until 2027.

And so if that's the case, in a sense, if you're

withdrawing money in this matter and the County's going one way and the City's going another way or not making a decision, then it's interesting as this money is intertwined how one party who may be striking out and trying to form their own entity, and another party is still deciding what to do how that plays out in terms of the folks on the street and the citizens here.

So whether it's LAHSA or another interim cooperative applicant, I just ask you to be careful in making this request, that you believe you can truly service in this interim period of time while we're pending trial, and you're not in a position of taking that responsibility and quite frankly not being able to service the folks on the street because this is a temporary order. That harm would be irreparable.

The second thing is, when are we going to set the matter for trial? This isn't a scheduling conference, but watch out, if we go forward, which obviously we're going forward in some form, I'm going to set a very short trial date, you can think February and that's going to shock you.

One reason is, I don't want to go through the process again in 2027, which is we having another hearing; number two, whatever this interim process is, putting you on alert that we're going to trial in 2027 in February, puts you in a position of responsibly thinking over the lunch hour if there can be any cooperation.

So our motto over the lunch hour, cause the least

amount of harm, keep the most folks in housing or shelter in this interim period of time, curtail the death rate as much as possible, because this will become an equitable decision by the Court. And irreparable harm and the public interest are the most important factors probably that I'm going to consider.

If there's any way we can get to a cooperative level on that, then I think HUD's in a terrific position without being criticized for taking this on and all of the ills that could befall it, and I think that for LAHSA, you would continue to exist in this period of time or there might be another collaborative applicant who came in, but at least we wouldn't have the dramatic transition where your services were cut.

And what I'm worried about is that the timing of another cooperative applicant coming in in this period of time and replacing you, and the harm that's caused, even if you -- not you, but the agency has been accused of past deficiencies.

So if you can talk, you're not required to, but if there's a way that we can get through this interim period of time, because I'd love to give this to the American public. I think they would be fascinated with this case and their wisdom. Don't you?

**(Laughter)**

**THE COURT:** Okay. Now, why don't you go to lunch and why don't we come back at 1 o'clock. Okay? Thank you very much.

**(Recessed at 11:53 a.m.; reconvened at 1:32 p.m.)**

**THE COURT:** First of all, we're back on the record and thank you for your patience. Quite a bit has happened just over the lunch time. The Court was contacted by the Special Master, Michele Martinez, Mayor Bass had phoned over, apparently wanted to talk to the Court. I didn't think it was appropriate in terms of -- the court is always open, but in the middle of the hearing, I'm a little uncomfortable.

So the Special Master spoke to the Mayor. And the City's prepared, I believe to make a representation. So we've held that up and, sir, if you'd come forward. I think I know what that representation is, but I would like a record and I don't want to be the one who conveys this.

**MR. SOMMER:** Thank you very much, Your Honor. Again it's Randall Sommer for the City.

There's two points, Your Honor. The first is that I think we want to make clear on the record that the City agrees with LAHSA and the COC and the County that LAHSA needs to be able to continue to operate in the short term at least, in order to complete this process for the NOFO. There's just not sufficient time to put some alternative structure in place and irreparable harm will occur and will happen to the very people that we are all trying to help in this process, okay.

The second thing that I need to say is that if ultimately LAHSA is not going to be in the long term, assuming

the -- continue to assume the functions that it has, the City needs to state that it wants to become or be one of the collaborative applicants and be the collaborative applicant for funding of programs that are in the City.

The City needs to be able to control and manage the portion of the funding of services for homelessness within the City. That's what I wanted to say, thank you. Anything else?

**THE COURT:** Would you thank the Mayor for her participation.

**MR. SOMMER:** I will, Your Honor.

**THE COURT:** Always willing to talk to, especially the executive branches, Board of Supervisors, the Mayor, but I appreciate her talking to Michelle.

Would you remain for just a moment?

**MR. SOMMER:** Yes.

**THE COURT:** Okay.

**(Pause)**

**THE COURT:** There are two significant collaborative applicants now potentially before the Court. The development of the County's representation that they're prepared in this interim period of time, and also would make an application to make the collaborative applicant on a more permanent basis. And now the City's representation that you would take the position of being a collaborative applicant on behalf of the City. And one of the things that's changed, so we all hear

that, are the amendments.

And I'd like Shayla Myers now to come up, so we have a record. I'm aware of the amendments, but I want to make sure all counsel are aware of the COC Board's amendments that just occurred.

So if you'd remain for just a moment, that way the Mayor's aware of what's occurring here.

**MS. MYERS:** Thank you, Your Honor, Shayla Myers with the Legal Aid Foundation of Los Angeles on behalf of the LA COC, the plaintiff intervenor.

Yes, Your Honor, after the COC received notification from HUD that HUD was moving forward with suspending LAHSA, the COC worked with all due diligence to ensure that they were in a position where they could change the collaborative applicant should that prove necessary.

And so they went through the structured process, outlined in their charter to amend the charter. It had previously specifically designated LAHSA as the COC or as the collaborative applicant. The charter now retains LAHSA as the collaborative applicant, but gives the COC the ability to appoint a new collaborative applicant.

And, Your Honor, importantly and I think we cannot escape this as we talk about this, it's not just the collaborative applicant where the charter designates authority. The COC is responsible for designing a collaborative applicant.

They are also responsible for designating a CES management lead and an HMIS lead and the charter now has processes by which to do that.

It also contemplates that -- it's in the charter and that those roles can be performed by different entities. And, Your Honor, I think this is really important to point out that the structural changes that the COC made were part of adherence to its procedures.

The COC is a collaborative body that is doing its level best under the circumstances to perform its functions with fidelity to its procedural processes. And that's what it did here. And importantly, Your Honor, that is what the COC is prepared to do in the event that it is required.

LACDA sent a letter to the COC indicating that in the event it was required, they could move forward as a collaborative applicant. And the COC Board has been moving with fidelity to its charter to assess whether or not LACDA could serve as a collaborative applicant.

And the City of Los Angeles has not provided that representation to the COC, but it's important to note under statute and regulation, the ability to appoint the collaborative applicant rests with the COC. And, Your Honor, that's why we thought in large part it was important for the COC to be part of this case now.

**THE COURT:** Does that mean that -- first of all, Long

Beach is its own COC, Pasadena is its own COC, but the region, the rest of Los Angeles has been designated as a COC.

**MS. MYERS:** Exactly, Your Honor.

**THE COURT:** But you can have more than one collaborative applicant now because of the amendment. So within the City, the remaining region, which was and is represented by LAHSA, you could first of all have one -- more than one collaborative applicant --

**MS. MYERS:** No, Your Honor.

**THE COURT:** So one collaborative applicant.

**MS. MYERS:** The HUD regulations and by statute, the continuum of care is required to designate one collaborative applicant and that's part of the structure that says that they operate contiguously, right. That they speak with one voice.

**THE COURT:** So if there were two entities that had the ability to be the collaborative applicant, one the County, the other the City, do HUD rules preclude the City being a collaborative applicant and the County being a collaborative applicant?

**MS. MYERS:** Well, I think, Your Honor, it's --

**THE COURT:** Hold on, that's a yes or no, it's real simple.

**MS. MYERS:** Sure.

**THE COURT:** Yes or no?

**MS. MYERS:** It can't be answered because they're not

offering the same thing, Your Honor.

**THE COURT:** Understand that.

**MS. MYERS:** The County is offering to be the collaborative applicant for the continuum of care as it currently exists. If the City were to perform the role of collaborative applicant for the City of Los Angeles, it would fracture the existing continuum of care and new continuums of care would have to be created and structured to account for the City and then everyone else.

**THE COURT:** I understand that that takes a longer period of time --

**MS. MYERS:** Exactly, Your Honor.

**THE COURT:** -- but it doesn't take a longer period of time for a collaborative applicant, so.

Now I want to propose, not a ruling, but isn't it obvious that no matter what happens, that LAHSA would continue to be the collaborative applicant for at least some period of time and the City eventually will have to decide whether they're going to either become their own COC or collaborative applicant, I'm going to mix those, or to contract with the County or number three, remain with you. And that's been delayed some period of time and only recently I think within the last day or so did the City apparently approve some amount of money to a special master to help make that decision. Now, I may be wrong about that, but.

The second is that why wouldn't the Court consider other entities, for instance, it might be argued that the Housing Authority has the ability, HACLA has the ability, why wouldn't the Court give 60 days for instance or some reasonable period of time for any other collaborative applicants, so that we don't just have two representations today in court, and if that were so, then HUD would examine those to make their decision and therefore have time to think -- hold on, I'll be right with you, I know there's all sorts of problems of the Gordion knot, I get it, we've learned this of years and years of bureaucracy and rules, so I understand that.

But then why wouldn't HUD then have time to consider if they want to keep the present position or if there's a collaborative applicant, you're subject to the local congression intent, the local folks, give you time to sort that out. And in the interim period of time we would not take the stark God awful situation of 11,000 people hitting the street, and/or a lack of care, and I know you're desperately trying to implement, and save lives.

If that occurred, my question to you would be this, I'd want to know what was happening on the national level with HUD, and I want to know if Los Angeles was being punished. Because on August 26th we have a due date, there's some time frames after that in which, you know, funding is decided.

We're already late in terms of the application so I

don't see why there wouldn't be some flexibility on your part, but if that occurred, I want to make certain with all of these COC across the country that Los Angeles wasn't taking a back seat and this money was divvied out and being punished.

Now, I want -- no, I want you to talk amongst all your folks. Take some time with this. Because then I would be concerned and probably -- yeah, have a conference, just make sure you're -- just spend some time with each other.

So the question is very simple, I don't want Los Angeles put at the back of the line or being punished nationwide, if in fact, we gave time for and fairness and due process, other people who wanted to come in, entities that are a collaborative applicant, HUD would have all of these people now or entities on the table. And you select from that.

Because if the plaintiffs are right, Congress would seem to have this empowerment of local people to make these decisions. And if any of you folks who are out in the audience and you have these parties up here, I'm not worried about the formality, you're more than welcome to come up and consult with the attorneys.

And for LAHSA, that means that the City may choose to continue on with you, they may decide, no, they want to be their own collaborative applicant and they may decide they want to team with the County and we'd have that continuum if you would, because I think as we play this out, they're going to be

the continuum anyway for a period of time.

**MS. AXEL:** After August 26th?

**THE COURT:** Yeah. 60 days after I wrote my opinion, or we could make it August 26th, a few days doesn't matter.

So back to the United States Attorney, by the way, I appreciate your presence and your input, I want you to know that.

**MR. ESSAYLI:** Yeah. Thank you, Your Honor. I think the issue with the 60 days is that there's statutory deadlines for applications. I think it's December. We've extended the deadline so that way LA would have more time to respond to this and for us to figure this out.

**THE COURT:** Let me stop you. Let me walk you through that for just a moment.

**MR. ESSAYLI:** Yes.

**THE COURT:** Let's say I gave 60 days.

**MR. ESSAYLI:** Yes.

**THE COURT:** Hold on and we have all sorts of rules and regulations that we want to obey, but let's not kill people okay.

I gave 60 days from August 26th, help me, October? A couple of months, we're up to December.

**MR. ESSAYLI:** He's making a call as we speak, the bureaucrats at HUD are going to figure that out. But we would be open to that. I think we would be open to that, Your Honor.

I think we --

**THE COURT:** Hold on, they're making a frown. I know you can't represent that yet.

**MR. ESSAYLI:** Yes.

**THE COURT:** I know you're trying. But the end result is also I can make the order and put you in an interesting position.

**MR. ESSAYLI:** Yes.

**THE COURT:** You like cooperation?

**MR. ESSAYLI:** We'll get --

**THE COURT:** Probably hinting to you that that might be an order and then we fly in the face of contempt, et cetera, we don't want to do that.

**MR. ESSAYLI:** They're making a --

**THE COURT:** So who are we talking to in Washington, D.C.? I'm just joking with you.

**(Laughter)**

**MR. ESSAYLI:** But, Your Honor, I just want to address a couple of things that were said earlier about letting the City and the County work together. I think they've tried that, it's called LAHSA and it didn't work.

So I think -- we think it's important --

**THE COURT:** Maybe you choose one collaborative applicant --

**MR. ESSAYLI:** Correct.

**THE COURT:** -- and you maintain your present position, which gets everybody back in court. It may be that you go with the County or the City, I don't know how that works out, but I want to give everybody a chance --

**MR. ESSAYLI:** Yes.

**THE COURT:** -- to participate.

**MR. ESSAYLI:** We would welcome that, Your Honor. We want to make the right decision. We don't want to be rushed, but time is of the essence --

**THE COURT:** Yep.

**MR. ESSAYLI:** -- and we don't want the status quo to continue.

**THE COURT:** When I leave tonight, unless we have some kind of resolution, I start to write.

**MR. ESSAYLI:** Okay.

**THE COURT:** And my law clerks, when are we coming in, Saturday, Sunday? We're writing continuously. In other words, you don't have any more time.

**MR. ESSAYLI:** What about 45 days, Your Honor?

**THE COURT:** Yeah. Well, no, not from today's date.

**MR. ESSAYLI:** Oh, okay.

**THE COURT:** If I took the position that I was going to give everybody a shot at being a collaborative applicant, so far I know the County is stepping up, I know the City is now stepping up through the Mayor, there may be HACLA as a separate

entity, I don't know if that works with the County, they're a separate entity in a sense, so is the Housing Authority --

**MR. ESSAYLI:** So they would apply to --

**THE COURT:** You want everybody on the table.

**MR. ESSAYLI:** Yes. I --

**THE COURT:** And the COC Board then would be looking at these folks, you know, everybody would have a fair shot rather than just having -- remember, the City's position is coming to me over the lunch hour.

**MR. ESSAYLI:** Yes.

**THE COURT:** And so if we're being fair and due process is going to be followed, I'd want to make certain that we don't shut off any other potential applicant but they don't have a lot of time.

**MR. ESSAYLI:** Can I join that phone call, Your Honor?

**THE COURT:** Yeah, please.

**MR. ESSAYLI:** Okay. Thank you.

**THE COURT:** Go do the phone call and I'll let get off the bench. No, let's wait. Let them make the phone call, okay. Yeah, we may be -- we have time for the adversarial system, this could work out. It could work out.

Now let me get off the bench for a moment so it's not so formal, just visit amongst yourselves. Let the folks make the phone call.

**(Recessed at 1:48 p.m.; reconvened at 1:54 p.m.)**

**THE COURT:** Okay. Then, folks. All right. We're back on the record and all counsel and the parties are present. Let me turn this over to the United States.

**MR. ESSAYLI:** Thank you, Your Honor. We've been conferring with people in D.C. There's a practical issue with the -- continuing the deadline, but we want to continue it somewhat. The selection process is done nationwide at once, so it's not that only LA's applications that can be considered alone, they all have to be considered at the same time. So any delay delays the entire review and selection process for the entire nation. With that said, I've gotten them at least to agree to 45 days as the most.

**THE COURT:** Okay.

**MR. ESSAYLI:** I do think that would be sufficient time, Your Honor, and that's going to delay it nationwide, but it's so we can do it right. So that way people can apply to be the collective applicant.

We have on request, Your Honor, though is that at the deadline, the COC may make a recommendation as to who that applicant should be, we'd like to submit our recommendation based on the applications of who we think would best serve in that role and for Your Honor to decide.

**THE COURT:** So that you have input.

**MR. ESSAYLI:** I'm sorry?

**THE COURT:** The COC would make that initial

determination, the Court wouldn't.

**MR. ESSAYLI:** They would make the initial determination, but if we don't agree, we'd like to be --

**THE COURT:** You'd have input to the COC.

**MR. ESSAYLI:** What's that?

**THE COURT:** You'd have input to the COC.

**MR. ESSAYLI:** We have input to the COC, but if we don't agree, let's say they select LAHSA again, we want to reserve the right to come to Your Honor and ask for one of the other applicants.

**THE COURT:** There's no way to deter you. In other words, you'd always have an open courthouse door, but I don't want to represent the Court would take that at the time. Right now initially under the structure it lies with COC, the Board.

**MS. MYERS:** Yes, Your Honor, under both statute and regulation and to be clear, HUD's only rules, the COC is responsible for choosing the collaborative applicant. Nothing in HUD's rules allow them to --

**MR. ESSAYLI:** Actually they do, Your Honor.

**MS. MYERS:** -- choose the collaborative applicant.

**MR. ESSAYLI:** When the COC has failed as they've done here, the statutes allow HUD to step in in the place of the COC. Excuse me, Your Honor, that is in statute and I want to be clear. We stand on our papers that this injunction should be denied in whole, but we do hear the Court's concerns about

continuity of care. We want to work with the Court, but to suggest that we're acting in bad faith or contrary to law is inaccurate, Your Honor, and we do have a seat at the table. We are the federal government and it is our money. Thank you, Your Honor.

**(Applause)**

**THE COURT:** All right. Have a seat. Let's not get into rapid -- have a seat.

Now, let's do this. Let's have another go around. You've heard the comments, I've made no ruling. We've thrown a lot of ideas, so let me start once again with LAHSA.

So this is the last round.

**MS. AXEL:** Okay. Your Honor, I think the very first thing is, I was just asking to be heard on the limited purpose of kind of the negotiation, but broader comments in rebuttal too --

**THE COURT:** You can do both.

**MS. AXEL:** I can do both, okay.

So the first thing, Your Honor, is with respect to the immediate NOFO and the collaborative application, the consolidated application that's due August 26th, it's certainly our position and I at least know that the City shares this position, I believe the COC shares this position, the Court should grant the preliminary injunction and allow LAHSA to continue in that role and get this application in on time.

You heard what Mr. Essayli said, which came from HUD directly on the call, that they actually -- this is a competition, they conduct amongst the regions, they need time to evaluate these applications. And so it just doesn't make any sense to try to extend it and do it 45 days later. We're 20 days away, we've done all the work.

And as we've said before, nothing they've identified actually colors anything that we do with respect to the collaborative application. There's not one word in the letter that touches on those rules and responsibilities and how LAHSA has executed them. And as I said, the Court has evidence that just at the most recent one, we scored very highly.

There's another practical consideration, Your Honor, which is that LAHSA itself is not only the collaborative applicant but also the grantee and has sub-grantees underneath it. And we talked about, a lot of these are boots on -- these are boots on the ground, other than LAHSA itself which gets certain grants for certain functions, these are boots on the ground service providers, in fact, almost all of the domestic violence portfolio that the COC administers goes through LAHSA, LAHSA applies for it.

Most of the chronically disabled permanent housing goes through LAHSA. LAHSA applies for it. LAHSA is then the renewal applicant. So the Court heard that in terms of evaluating the priorities under the consolidated application

high weight is given to the renewal applicant, LAHSA is that.

So there are ways, and regulatory ways in which that can be transferred. There's a project transfer that can take place, that is going to require HUD approval, that is also going to take some time. Even assuming the City and the County could agree on something in 45 days and I'll get to that later.

So, Your Honor, it seems the clear path is, even if the Court wants to fashion something where you only grant the preliminary injunction for a 45 day period or a 60 day period or something like that, incentivizing the parties then to reach some agreement by that mark, we still strongly maintain we should get the consolidated application in on time. And then the Court can still have us back in 45 days, having only extended the permanent injunction -- preliminary injunction that long.

LAHSA, of course, would like to see it continued through the trial and we are prepared for the expedited trial that the Court had referenced. I will also say, Your Honor, that we do reject that the City and the County are real parties in interest.

I really think as a matter of the Rules of Civil Procedure they're not. I understand the Court's view about stakeholders, but the joint powers agreement has legal effect. LAHSA has a formal structure, and you know, one of the commissioners said to me at the break, Your Honor, it's almost

like forced marriage counseling, but that's what happens. This is a brokered structure that works.

The electeds do nominate people for this Board. They do then have to sit in session and talk to their electeds and come to an agreement about what LAHSA should do. That agreement includes filing this lawsuit and seeking to enjoin this. Those commissioners who report to their electeds all join in that, that is the process by which the City and the County agreed.

And what I heard, Your Honor, was the County wants to be the collaborative applicant, but so does the City, maybe they want to break up the COC, that is not agreement. We had no shred of an agreement and our communications with people at the, you know, executive level that run these things is that they are not talking, there is not an agreement, nor is there anyone who really believes they can step up and take over this function in the short term.

I will also say and I am going to, since this is longer, I'm going to give Mr. Pelham a chance to talk. Let me just --

**THE COURT:** My input is that your executives would like to be more involved with less attorney involvement. Let me be very blunt about this.

**MS. AXEL:** I'm sure that that's true, Your Honor, and they should, that would be very efficient. But, I mean, there

have been meetings where the executives from various agencies have been together at the table, they talk to Gia (phonetic) as well. She is not hearing at that level that the collaborative application can be taken over.

And again, talking to my people who work for LAHSA, this transfer typically takes, even in a smaller COC a year or years. So this is just not anything that anyone who actually is at the executive level and runs these agencies thinks can be done immediately.

And as I said, there are actually technical rules that have to be dealt with, and that's not even getting to HMIS and SGIS (phonetic).

**THE COURT:** Counsel, I would encourage you not to pursue this --

**MS. AXEL:** Okay.

**THE COURT:** -- line of reasoning. I don't want to call you on this, but --

**MS. AXEL:** No problem.

**THE COURT:** You finish your comments, but if this is the level of understanding you have, I'm appalled.

**MS. AXEL:** Okay. Well, I'm happy to take your feedback and address --

**THE COURT:** I'm happy to bring the members of the Board of Supervisors over here to contradict you.

**MS. AXEL:** Well, I think, Your Honor, we were talking

about executive level people versus elected.

**THE COURT:** I am too, that's not your level, that is the Board of Supervisors level.

**MS. AXEL:** Okay. I think we were talking about a different level, because I was talking about the people that actually administer the programs as opposed to the elected.

**THE COURT:** I've heard the Board of Supervisors or the Mayor or the Council?

**MS. AXEL:** Yes, the elected level.

**THE COURT:** Spokesperson, you don't make decisions, you don't make policy.

**MS. AXEL:** I'm not saying that I did, Your Honor. We were talking about actually the practical ramifications of transferring the collaborative application.

Okay. With respect to the Alliance record, Your Honor, I think we would say with respect to that, that there has been a motion by LA Alliance counsel to make that record part of this one. Your Honor, we would object to that. LAHSA was not a party to that and we strongly disagree with many of the aspects of that record. The Court said yourself earlier that really no party there was incentivized to speak up for LAHSA, because it's very easy to blame LAHSA for other miscommunications that happened at other levels. And so LAHSA didn't have a role, didn't get to cross-examine people.

There are statements, in fact, and Ms. Mitchell said

that I have heard from LAHSA employees that are simply in their view not true, information was provided to Alvarez & Marsal, they didn't know how to read it. We did have a whole trial about that. I'd be happy to put that information, I know the Court knows a lot about it, but LAHSA didn't have a chance to have its voice heard.

And so we just think it would be inappropriate to -- the Court can take judicial notice --

**THE COURT:** Counsel --

**MS. AXEL:** Okay. Just one more on this point, Your Honor.

**THE COURT:** No, just --

**(Pause)**

**THE COURT:** I can't tell you the hours spent with my special master and even the Court getting involved with the lack of information coming from LAHSA, hours. And if I have to make a record of that, I can start producing lots of witnesses. Do you really want to go there?

**MS. AXEL:** But what I would like, Your Honor, is I was just --

**THE COURT:** You really want to start producing witnesses on this issue? Because I'm happy to call in A&M. I'm happy to go through what the special master went through. I'm happy to go through the streams of information that this Court had to look at in terms of discovery obstacles here.

If you want to pursue this, I'd be happy to pursue this tomorrow.

**MS. AXEL:** Two things, Your Honor, I guess. We think that's an appropriate part of trial. They've raised a lot of issues in their letter, this is one of them, we would like to chance to address that. And we do think that's an appropriate issue for trial.

**THE COURT:** This is not a reflection, this might have been a prior regime also.

**MS. AXEL:** Understood, and we appreciate the history the Court has here, Your Honor, we do. We're just simply saying we weren't at the table, there are things that we'd like to speak to and so we understand the Court can take judicial notice of its own orders in that case, indeed we've put some in our request for judicial notice, we don't fight that at all.

But just with respect to some of the facts, there are many things that we did not have a chance to respond to, that at a trial I think we would like to respond to. And we don't think that that entire record is judicially noticeable, given that we were not a party at the table.

I would also say before I turn it over to Mr. Pelham for a second, that you know, I think Mr. Essayli's comments here and I think Mr. Ha's argument, I think there's a significant thing that's missing. And that is the immediate action prong under the suspension regulations.

They really didn't address it and I think everything that Mr. Essayli said actually points out, they don't have a reason for immediate action here. In fact, what I heard him say was, I hear you, Your Honor, you know, we didn't read your orders before, we weren't here earlier, but we're here now and it's late, but at least we're finally here.

All that says to us, Your Honor, is there's not a need for an immediate action, and so this Court should stay the suspension and allow the process to proceed on a more normal trajectory toward a debarment hearing and we get our due process. That's all we're really asking for.

The other thing he said, Your Honor, I thought was, you know, his indictment of the City and the Council sort of illustrates the need here for a way for these parties to cooperate. And I understand the Court is trying to incentivize that, you know, you're going to do with what you're going to do with the stakeholders in the room. But again, that's a process that is not going to happen in 20 days and would take some time.

I will have some closing points with respect to the effect of the two settlements, but I think that those few points that Mr. Pelham would like to make on the facts and I would turn it over to him, if that's okay.

**THE COURT:** Absolutely.

**MR. PELHAM:** Thank you, Your Honor.

And very briefly, Your Honor, I don't -- I understand that the Court has a number of things in consideration, but I do want to stress that LAHSA, Your Honor, should be evaluated independent of its stakeholders, in terms of its fiduciary capacity with respect to HUD funding, but also with the present time in mind and not the LAHSA that Your Honor confronted last June in the course of the Alliance litigation and that order.

And I just want to remind the Court. So our motion -- excuse me, our -- yeah, our motion, the declaration of Ms. O'Neill, the interim president, which is the interim CEO of LAHSA, she sets out, Your Honor, several things that have changed with the agency in the 12 months since Your Honor considered remedial action in the Alliance litigation. So it's not only Ms. O'Neill's appointment as interim CEO, it's also the fact that LAHSA has, as of just recently a new CFO, it also has a new deputy chief of risk management, it's also improved its internal audit function. It has, again as set forth in the declaration, it has issued an RFQ for outside accounting assistance.

So, in other words, Your Honor, it's not the same. It's not the same organization and we really stress that because as Ms. O'Neill's declaration makes clear, LAHSA took inside the observations, not only by Your Honor and special master, but also your record from the Alliance litigation and it has taken those things seriously.

And we respectfully submit that HUD's action requires a consideration of LAHSA's present responsibility and that requires a view of how things stand today and not data points that go back to 2007.

Now, my counterpart stressed two data points since Your Honor's order that by themselves predicate this significant suspension action and one is an audit by the County's auditor controller and one is findings from the single audit.

If we start with the --

**THE COURT:** What? What?

**MR. PELHAM:** The single audit. The internal single audit. So both supposedly are recent data points that have come since Your Honor's order that justify present action. Respectfully they do not. Because neither of them make a finding as to LAHSA's noncompliance with regulatory requirements or with program requirements.

So specifically with respect to the single audit, Your Honor, I commend your attention in our reply brief, we quote, that the single audit did not identify instances where LAHSA failed to comply with federal laws or contractual obligations.

And we have -- I also commend Your Honor's attention, declaration from Janine Lim, who's currently the CFO. In her declaration she indicates the single auditor did not express an

opinion on the effectiveness of LAHSA's internal controls. And the single auditor actually concluded that LAHSA was compliant with requirements related to its major federal programs, which is also consistent with previous fiscal year audits.

The -- so much has been made about the delivery of information with respect to both audits, the auditor controller review and the single audit happened at the same time. That's set out in the declarations, Your Honor, and that's why there was some delay in providing information to those two, but again, neither of them made a finding that LAHSA was not in compliance with its federal program requirements.

The auditor controller report did make observations about payment delay on state and local funded projects. Your Honor, respectfully HUD relies heavily in their June 11 letter on LAHSA's payment delays with respect to state and local funded programs. We do not -- we do think -- we do not think that those findings or those observations are applicable to an analysis of LAHSA's fiduciary responsibilities on the federal side, and that's just a function of the payment cycle that's different between the two.

LAHSA for cost reimbursement programs on the state and local side, it reviews reimbursement requests from providers, then it submits those to City and County, they review those receipts or those requests and then payment is made. Long cycle.

On the HUD side, the federal side it is much faster, it's usually a three day turnaround on the draw down because the providers can access a funding portal directly. And so, Your Honor, the fact that there are payment delays on the state and local side, we do not think translate into a finding that LAHSA is presently irresponsible on the federal side.

In any event, Your Honor, I also commend your attention, the declarations make clear, that even on that state and local side, LAHSA has made up for us to tighten its communication with providers and shorten those payment lags.

Your Honor, there's been some discussion, but what if we bypass -- what if HUD bypasses LAHSA, the City and the County, any government agency, local government agency and goes directly to direct providers, agencies who are on the ground.

Your Honor, our submission there is this, there is just not a record -- there's not a record provided by HUD that there's an ability to find at that level, organizations bypassing state and local government, bypassing LAHSA, bypassing other government stakeholders, organizations to fill that breach in the areas that LAHSA currently fills.

We just -- we have no information about the organizations that HUD is considering as direct applicants. We don't know what those direct applications would look like. We don't know what the capacities of those organizations would be.

What we do know, Your Honor, and again I just

respectfully commend it to your attention, we do know at least two providers have indicated that they can't apply directly, they just don't have the infrastructure framework, so they rely on the relationship with LAHSA.

Your Honor, what I would commend to the Court is what HUD is doing is conflating two different factual predicates. There's the factual predicate that allows them to initiate investigation because they think that there may be malfeasance or wrongdoing and then there's the factual predicate that allows them to initiate a suspension.

They've conflated the two respectfully. What they've said is well, the things that caused us to investigate or the things that prompt us to investigate are the same things that prompt us to suspend you. It should be a two stage process.

We have not raised issue with HUD's ability to investigate, to audit, to review, that's a different -- however, that's a different factual predicate. That does not automatically mean that because you now have a basis to review, you also have a basis to suspend. And again suspension is a significant and dramatic consequence and it is permanent, it is not simply temporary. It will, as Your Honor knows, it will affect LAHSA's ability to participate in the 2026 NOFO and it may have impact far beyond that.

Your Honor, that's -- unless the Court has questions, those are the major factual points I wanted to stress. I'll

defer again to my co-counsel.

**THE COURT:** Thank you very much.

**MR. PELHAM:** Thank you, Your Honor.

**MS. AXEL:** Thank you, Your Honor, just a few more points. With respect to addressing, you know, HUD's legal arguments I know the Court has the issues in mind and they're in our briefs, so I'll just make one -- I think we responded to most points in our briefs.

I'll just make one limited point which was, Mr. Ha made a statement that we had not identified a violation of regulation and statute and I think we very clearly have and Ms. Myers also made the same argument.

I mean, HUD failed to follow the COC regulations relating to sanctions. Those are the more particularized regulations that apply in this instance and they would have given notice and an opportunity to be heard prior to any remedial measures. They didn't follow that regulation. They've never addressed how the HEARTH Act and those regulations interact with the OMB reg that they did choose to use. And it's really the more specific statutory and regulatory framework that applies.

Secondly, they also made no finding that COC did not meet the requirements of the HEARTH Act. There was also just something vague said like well, we found that, you know, the COC could not apply because LAHSA can't apply. And that's not

their -- again, they have to consider the continuum of care portion of the federal statute of the HEARTH Act in determining that the COC could not meet the requirements. They did not do that.

So I think we applied both of those. And as I said, when I was up here before, they've never addressed the immediate action part. And I think all of their conduct and previous knowledge cuts against immediate act.

I'll turn to a few more practical matters because I know the Court is interested in those. The Court asked about the effect on the LA Alliance settlement and the VA Settlement. And again, the Court is far more familiar with those than I am.

With respect to the LA Alliance we already talked about how the HMIS system provides the data backbone that the City relies on and the County also substantially relies on. And so those metrics that the Court asks for regularly, like simply rely on LAHSA to provide them, and those are extremely complex systems.

As I used the example before, you know, Ms. Kuhn, who you're familiar with who testified previously and who administrates that whole system has 50 people who work for her, it took a year to get somebody up to speed, that just cannot be easily transferred in any short period of time to anybody else. And the Court will not be able to get the data, simply it'll just be a blind spot then.

They also, the staff pointed out to me one additional factor, which was a little bit more direct to the LA Alliance settlement, which is also that they actually leveraged federal funding to make the commitments that are made to this Court as part of this settlement.

So -- and that specifically has to do with the time limited subsidies that provide an additional 2,000 beds. And my understanding is that federal funds pay for the housing navigators that help literally like procure apartments that then are used as part of the time limited subsidies to actually get people off the streets. That's a component of federal funding that is partnered with the state funding to help make the settlement.

And so these are all overlapping. And LAHSA also provides the CES data structure, data infrastructure that the housing navigators use and funnels that funding, so they do both of those things. So in that respect the LA Alliance too is also implicated.

As to the VA settlement, Your Honor, none of us on our team is an expert in your settlement, so -- but we just over the lunch period brainstormed about how the VA might be affected because the Court had raised it.

So in response to your question, the VA uses the HMIS infrastructure to house people. They use LAHSA's supporting matching tools. And, in fact, they have in the past one of the

big issues with veterans has been actually identifying them. The VA has apparently had a lot of money to house veterans, but actually just hasn't been able to connect with them necessarily to get them off the street. That's the infrastructure that LAHSA provides.

And, in fact, Ms. Kuhn told me over lunch that in a recent meeting with a TA from the VA, that person said, with LAHSA's tools as they are now implemented we believe we can end veteran homelessness in Los Angeles County. And that is a statement from a VA TA to Ms. Kuhn, you know, so in that sense if that is Your Honor's objective with respect to getting veterans off the streets, causing LAHSA to lose the HMIS and CES systems would definitely have an impact on veteran homelessness.

Finally, Your Honor, I just want to raise as a highly practical matter if the Court does not grant a preliminary injunction for LAHSA here, and give it a substantial runway and we would ask for that runway to be through the date of trial and we would take a trial date. But even a shorter time period, I must say, Your Honor, we're not sure LAHSA's -- you know, we would get to trial.

And maybe that is fine with the Court, but it is something that you should consider in terms of public interest and irreparable harm here. HUD is not funding LAHSA's grant agreements, right, not to its service providers, the people on

the street, but not to LAHSA as well.

They had one expire for the planning grant in June, one's come up now in Q-3, another one is coming forward, and this whole situation, the suspension letter, and the instability is causing LAHSA to have other funders lose confidence and question and LAHSA has a big budget that is not just, you know, HUD money.

So other funders are losing confidence and we have a really great problem, Your Honor, with potential brain drain. You cannot keep employees around and we have highly, highly skilled employees with advanced degrees and marketable skills.

As the Court knows, with the County's change in funding, LAHSA laid off about 200 -- eliminated about 250 positions last year. They restructured, that restructure provided stability and security to people. Okay. This is what we're going to do, this is how we're streamlined, this is how we're reorganized, we can keep people in these positions, we can make promotions, we can, you know, we can make people feel that their jobs are secure. Now we can't.

And so setting aside an orderly transfer of HMIS, if we don't have stability at LAHSA, there's no orderly transfer of HMIS. If Bevin Kuhn and people like her leave, Your Honor, there will be effects, the system will break, it will not work. It took years to make these systems talk together.

So I just want to leave the Court with that. We need

stability at LAHSA, we need a preliminary injunction for a period of time, if the politicals then work out some other solution in the long term, that's fine, but if that is not handled in an orderly process, you know, there will be all kinds of deleterious consequences for the community. Thank you.

**THE COURT:** Thank you. Let me turn to the COC Board.

**MS. MYERS:** Thank you, Your Honor, Shayla Myers on behalf of the LA COC. And, Your Honor, I think you've long since recognized the public interest at stake in addressing homelessness in the region. And I think the COC Board shares your concern. And the COC Board would speak as passionately as we possibly can, Your Honor, about the need for stability within the region right now within this particular spot -- pot of funding within -- for this particular population that is served.

When I stood up here this morning, Your Honor, to talk to you about why the COC needed to participate in this case it is because the COC is uniquely positioned, relative to bringing together and promoting collaboration in parts of -- in a community that is not even remotely known for its collaboration on any fronts, but this has historically, Your Honor, been a place of collaboration. And as a result of that, it has been a place of stability.

And what that stability means is that 11,000 people

who have been brought inside, who did the hard work to come inside after being unhoused, sometimes for decades, now have stability as a result of this funding.

The COC, Your Honor, is doing exactly what Congress mandated it to do. It's bringing together stakeholders. That's the County, that's the City, that's LAHSA, that's LACDA, that's HACLA, that's every -- that is every abbreviation that you have said in the courtroom today, bringing them altogether to come to the table to set the region's priorities.

And as a result of the region's priorities that are set, Your Honor, they come up with rankings and they come up with a strategy for obtaining federal funding. And, Your Honor, that is what the COC has been doing since April when LAHSA became the collaborative applicant, it's what's been doing since June 1st when the collaborative application process opened, when HUD submitted it's NOFO, that is what they have been working on systematically to come up with rankings, to come up with the community's priorities and to put together the consolidated application to put forward the community's demands for congressionally allocated funding. They did exactly what Congress said and we are now 20 days away from that application process, Your Honor.

What is happening right now is a crisis in Los Angeles at a place where we have previously not seen crises. And that crisis is happening because of HUD's decision to

immediately suspend LAHSA.

Your Honor, HUD had before it numerous opportunities to take action against LAHSA, to take the dramatic action that perhaps many, many folks in the room, many folks in the community, perhaps in the courtroom have suggested was necessary against LAHSA. They had the ability based on the record that they have built, as Ms. Mitchell pointed out over 20 years, they had the opportunity to bring debarment proceedings against LAHSA.

They also had the opportunity to use the regulatory process that is outlined, to bring sanctions against LAHSA. If they had done that, Your Honor, I don't know that we would be here in the same form that we are here today. We would certainly not be before you imploring you to bring process and stability back to the one place in the system that has stability and control.

But that is not what HUD chose to do here. They chose to immediately suspend LAHSA and they did so without addressing the concomitant crisis that we are under here now. They made the decision that they would suspend LAHSA and therefore the COC and undermine the collaborative application process, which was clearly going to happen. That is HUD's reasoning, Your Honor, it is clearly what was going to happen as a result of this.

They did not take that into account at all and that

is to Ms. Axel's point, they did not take into account one of two prongs of the legal reasoning necessary to address an immediate suspension. And as a result of that, Your Honor, we are here. We're in the middle of yet another crisis.

And for the 11,000 people who had crises every day in their lives, they are feeling it today. This shift in the application process is not simply an administrative process that HUD is asking for. This shift in using a collaborative application process to the direct to HUD application process is a dramatic shift that is unprecedented, Your Honor, and it is unsupported in federal law.

They're attempting to do an end run around the COC process, the congressionally mandated community control that remains in statutes and it remains the COC's obligation to the community.

I know that that has been dismissed, that HUD has said that they are simply -- they're going to do their best to abide by the process. But, Your Honor, they cannot replicable the single most important aspect of the COC application process, which is a community collaboration and the community coming together to establish its own priorities.

If, Your Honor, that HUD is allowed to move forward with the suspension of LAHSA immediately and the LA COC Region is not allowed to submit the -- its collaborative application, the community will have no voice in how its priorities are

ranked and they will have no way to strategically protect the funding that is coming to the region.

This is not just about setting the priorities within the 60 percent tier, Your Honor, this is protecting the 40 percent application, the 40 percent of funding, this is about protecting the $240 million that has been allocated for the region and it's about ensuring that the community can come together and apply for that money together.

**THE COURT:** The $241 million it's already earmarked, dedicated, whatever word we want to use, is simply a matter of who's going to distribute it, isn't it?

**MS. MYERS:** No, Your Honor, not even remotely. So $143 million is what we call Tier 1 funding. And that's the money that has been earmarked and that's what counsel for HUD spoke about. That is -- that's where the rankings of the projects matter for purposes of what gets into the top tier. And they had said --

**THE COURT:** Just a moment, hold on.

**MS. MYERS:** Sure.

**THE COURT:** But that money in a sense has already been approved.

**MS. MYERS:** Yes, Your Honor, through Congress.

**THE COURT:** I used the word dedicated, earmarked, whatever.

**MS. MYERS:** Yes, Your Honor. That money --

**THE COURT:** So that money -- so the answer is yes.

**MS. MYERS:** For the most part.

**THE COURT:** Okay. For the most part.

**MS. MYERS:** And then, Your Honor, for the first time HUD has reserved some conditions that would allow it to not send the money to the region.

**THE COURT:** Yeah, but basically --

**MS. MYERS:** For the most part, yes, Your Honor.

**THE COURT:** -- it's already been, for want of a better word, approved.

**MS. MYERS:** Yes, Your Honor.

**THE COURT:** I'm going to say again, if this is already earmarked, dedicated, approved by Congress --

**MS. MYERS:** Uh-huh, why does it matter?

**THE COURT:** Right. Then we're simply talking about who's going to approve and control this money.

**MS. MYERS:** No, Your Honor. What it actually comes down to who is going to get the money and which priorities determine.

**THE COURT:** Then I'll use your words, who's going to get the money.

**MS. MYERS:** Your Honor, what we mean is, who will remain housed.

**THE COURT:** I'm sorry?

**MS. MYERS:** Who will remain housed. Your Honor, that

is literally the question that we are confronting today.

**THE COURT:** Who will what?

**MS. MYERS:** Which unhoused folks who came in off the streets are going to continue to be housed.

**THE COURT:** So then we're back to the housing first discussion or are we back to the discussion of interim housing, are we back to the discussion of the 30 percent of this administration?

**MS. MYERS:** Your Honor, that is a component of it.

**THE COURT:** Sure.

**MS. MYERS:** But at the end of the day, Your Honor, the COC has the responsibility from Congress to bring the parties together and set priorities for the region. And, Your Honor, they do so not just about the money that is coming in, but they do that in conversation with all of the other money that is coming into the system.

Your Honor, as a result of the LA Alliance settlement, for example, there's significant additional resources that are being put to interim housing. Because of the state funding, there's a significant additional money that's coming in as well.

The COC's job, Your Honor, is to not allocate the money based on ideology, right, not based on housing first or substance abuse, none of that. It's a balancing system. And that's what the COC does.

So the COC sets its priorities, and based on the balancing of the system, and Your Honor knows as well as anyone else, that when you have an unbalanced system, when you have someone who comes into interim housing and they don't move into housing, then they fall back into the streets. And, Your Honor, we're seeing that, we're seeing that the 25 percent increase in homelessness was about people falling into homelessness because there wasn't permanent housing available.

So the COC's job is to balance the portfolio and it's about ranking projects that are performing well versus not. HUD does not have to take any of that into account. Congress has set the stage for the community to develop its application and it has spent months, painstakingly doing so. And so that is the immediate harm that we are talking about here, Your Honor.

They have had to make incredibly complicated decisions to put forward the strongest application possible to keep the most amount of funding in the region. But, Your Honor, what it comes down is that this Court has an opportunity to bring process back into the chaos that has been created by the immediate suspension.

And Your Honor has the ability to do that where HUD was unwilling to do that. We need to take the moment that we are in, Your Honor, and we need to move forward. And Your Honor has the ability to do that, but it is not possible to get

out of the crisis moment that we are in and actually affect actual change unless there is an opportunity for the COC to submit the collaborative application. And the way to do that is to allow LAHSA to submit the collaborative application that the community has been preparing, that service providers with the input of unhoused folks, with the input of the government officials that the entire community has been coming together to prepare, that application is 20 days away from being submitted.

They need the space and the time, Your Honor, to be able to do that. Your Honor, this is a crisis years in the making, HUD made a decision to immediately suspend LAHSA in the middle of the application process for federal funding.

That was a decision that HUD made, Your Honor. Your Honor has the opportunity to slow that process down, to give the community a chance to actually apply for the funding and then give the COC the opportunity and to do what HUD has refused to do, which is to take into account the allegations against LAHSA, the suspension of LAHSA, the potential debarment of LAHSA and make a decision about a new collaborative applicant or to maintain the collaborative applicant, but to do its congressionally mandated duties at this point, Your Honor.

I cannot stress this enough. No one, HUD in its letter, has said that the COC has not functioned. They have functioned incredibly well over years. They have -- because of their strong functioning, they have continued to bring money

into the region, increasing funding year over year, which means more and more people are brought inside and they need the opportunity for stability to be able to continue to function. And so we would ask, Your Honor, that you grant a suspension or that you stay the suspension, issue a preliminary injunction and give the parties enough time for this to calm down.

But, Your Honor, likewise, we hear your position and we hear your concern. So we would ask that the Court set a rigorous trial date. These are very straight forward legal issues that can be easily presented, some of the issues are straight issues that will be presented on the administrative record.

The first thing that we would ask is that you order HUD to prepare the administrative record in this case, as expeditiously as possible. They have very good lawyers on their team, they have very smart lawyers on their team, they can prepare that record very fast and move this case to trial as quickly as possible, because then that will get us the certainty that we need.

And, Your Honor, I would just -- the last thing that I would say is that the collaborative applicant can be changed. HUD regulations, the statute provides that the collaborative applicant can be changed if necessary. The problem here, Your Honor, is the timing that has created the chaos and so we would just ask for that to be addressed.

**THE COURT:** Okay. I may come back to you, but thank you very much. With your permission, can I turn to the City and the County so that HUD has the last word, or would you like to argue now? Last time we turned to the City and the County, but I'm happy to --

**MR. ESSAYLI:** Yes, Your Honor, they can go.

**THE COURT:** So on behalf of the City.

**MR. SOMMER:** Thank you, Your Honor, Randall Sommer.

Ms. Axel already mentioned to the Court the City agrees that for the time being that the preliminary injunction should be granted, that the -- that LAHSA should be permitted to submit the NOFO and then some period of time after that, the parties can have time to determine what the path is forward, but that there's no time to do that now and there will be irreparable harm if the preliminary injunction is not entered.

**THE COURT:** Thank you very much. On behalf of the County?

**MS. HASHMALL:** Good afternoon, Mira Hashmall here for the County of Los Angeles.

As I articulated earlier, the County supports LAHSA's request for injunctive relief, just because these deadlines are so imminent and the stakes are so high. The status quo is essential to making sure that that NOFO submission deadline can be met, those programs can be funded, and the services for those vulnerable population are not jeopardized.

**THE COURT:** Thank you. How long -- if you decide to continue on, to become a collaborative applicant and maybe even if your own COC, how long do you need concerning the collaborative applicant, not the COC?

**MS. HASHMALL:** Your Honor, my understanding from our team is that the application for something like this is usually issued six to nine months before the submission deadline. So there's a huge amount of work that is in the typical cycle goes in, to meeting this submission. My understanding is this year's timeframe is completely unprecedented with regards to the fact that the application's not been issued by HUD and the deadline is about two weeks away. My understanding is that's typically months long.

So I -- you know, how that's going to work in 2026 I don't know. But with regards to creation, standing up and implementing a new COC, that too is a long process. There's a regulatory framework that I don't know yet, hopefully don't need to know imminently and that takes time too, Your Honor.

**THE COURT:** It's longer obviously than the collaborative applicant.

**MS. HASHMALL:** That's right, because it has to do with the entire regional system. And I think that the reason that there is a regional COC is because homeless folks don't just stay in one city, you know, they go for shelter and housing where it best suits their needs and so you have to look

at it regionally in order to not have NIMBY-ism and other inefficiencies built into the structure.

**THE COURT:** Okay. Thank you very much. Let me turn to HUD.

**MS. HASHMALL:** Thank you.

**MR. ESSAYLI:** Your Honor, I'm a little concerned about what the County just said, but the Board of Directors have issued a letter to Your Honor, and to quote from there, it says that they are prepared, well positioned and qualified to serve on an emergency basis and to immediately assume the responsibility. So the position of the County Board of Supervisors I'm not sure why that's not consistent with the position of County counsel.

**THE COURT:** I take that as immediately also.

**MR. ESSAYLI:** Yes. It says it's immediately, Your Honor.

Your Honor, we're going to submit on our papers. We ask that the preliminary injunction be denied in its entirety. To the extent the Court is considering an equitable proposal for the preliminary injunction, I would ask on behalf of HUD that we have until close of business tomorrow to submit to Your Honor a proposed timeline and plan for the selection of a collaborative applicant, as Your Honor appears to be contemplating.

**THE COURT:** Okay. Thank you.

**MR. ESSAYLI:** Would we be allowed to do that, Your Honor?

**THE COURT:** Pardon me?

**MR. ESSAYLI:** May we file that by close of business tomorrow?

**THE COURT:** I'm starting to write tomorrow morning, so absolutely.

**MR. ESSAYLI:** Okay. Thank you, Your Honor.

**THE COURT:** Back to LA Alliance.

**MS. MITCHELL:** Elizabeth Mitchell on behalf of LA Alliance. Your Honor, I don't have a lot more to add to this. I will say that we keep kicking the very expensive and dysfunctional can down the road. And a year ago, we asked the Court to appoint a receiver because we believed the failures had become institutional rather than episodic and we still believe that to be true today.

I don't hear anybody saying that it's not true any longer, I suppose. I hear things are getting better and maybe that they are getting better, but it also seems -- well, I guess I would just remind the Court, the Court exercised restraint a year ago. And did not impose a receiver.

In large part because it believed that the political branches needed an opportunity to work this out without a judicially imposed resolution. Respectfully, Your Honor, that appears to be what is occurring now, is that the political

branches are working it out and again, whether HUD ultimately proves right or wrong is not for LA Alliance to say, but I am hearing proposals on delays in order to get another alternative applicant in and that seems to be an appropriate response in order to allow the system to come together in a way that is maybe more functional, without a collaborative applicant that has not qualified itself. And I would submit on that, Your Honor, thank you.

**THE COURT:** Okay. Would counsel give the Court about 15 to 20 minutes just to go over my notes? I don't think I have any other questions, but I'd like just that courtesy from you for a moment in case I do, but I think I'll probably bid you goodbye after that that, but I'd like about 20 minutes and then we're recess. Thank you very much.

**(Recessed at 2:43 p.m.; reconvened at 3:10 p.m.)**

**THE COURT:** First of all, counsel, thank you for your courtesy. If you'd be seated.

I have no further questions. I'm going to release you this evening and I want to pay all of you a compliment. I thought the arguments before the Court were excellent and I really appreciate the time and effort you've put into it, so we're in recess and travel safely. And you'll hear from me, thank you.

**(Pause)**

**THE COURT:** Well, counsel, so you know also, for the

U.S. Attorney I've already granted your motion to submit by Friday, I think you heard that. And I will take judicial notice but it's going to be limited. I'm going to limit to the opinion of Kuhn 2025, which was 991 and also to the attorney's fees order Docket 1127, that sets it out as well as the exhibits. So I think that will cover the record.

All right. Counsel -- Ms. Myers?

**MS. MYERS:** Yes, Your Honor, if they're going to submit something by Friday we would just ask that we be allowed to submit something on Monday or Tuesday in response?

**THE COURT:** Sure, Monday by 5 o'clock.

**MS. MYERS:** Okay. Thank you, Your Honor.

**MS. AXEL:** We would join.

**THE COURT:** All right. Travel safely and we have another matter this evening.

**MR. ESSAYLI:** Thank you, Your Honor.

**(Proceedings concluded at 3:11 p.m.)**

* * * * *

**CERTIFICATION**

**I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

**August 7, 2026**

**Signed** **Dated**

***TONI HUDSON, PRESIDENT***