**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| LOS ANGELES HOMELESS SERVICES AUTHORITY, a joint powers authority,<br><br>    Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES, DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as the Secretary of the U.S. Department of Housing and Urban Development; and DOES 1-10,<br><br>    Defendants. | **Case No. 2:26-cv-07056-DOC-AJR**<br><br><br>**ORDER GRANTING PRELIMINARY INJUNCTION [24]** |

## I.    INTRODUCTION

This case is about whether the Trump Administration's Department of Housing and Urban Development ("HUD") can abruptly suspend funding that supports shelter, housing, and services for over 11,000 individuals in 85 cities across the Los Angeles region.[1] The practical effect of LAHSA's suspension by HUD is that the Los Angeles Continuum of Care ("LA CoC") cannot apply for federal homelessness funding for Fiscal Year 2026. Also at stake is approximately 241 million dollars already earmarked for the Los Angeles region by Congress, as well as immediate future funding for homelessness in the next fiscal year. This has great consequences for the Los Angeles region and impacts the region's ability to compete with other cities across the country for limited homelessness funding nationwide.

Citing concerns of fraud and fiscal mismanagement, HUD stripped the authority of the Los Angeles Homeless Services Authority ("LAHSA") on June 11, 2026 to apply for funding on behalf of the LA CoC, flying in the face of Congressional mandates. Plaintiff-Intervenor, LA CoC, described this decision in a recent hearing as dropping a "bomb into the region."[2] The federal funding that the LA CoC relies on supports 140 projects supporting 89 veterans, 1,030 families, 1,923 children, 823 transition-age youth, 1,627 seniors, and 901 individuals impacted by intimate partner violence. Plaintiff-Intervenor Complaint at 3.

However, HUD has been complicit in this crisis and has been on notice of the very accusations it now brings against LAHSA concerning fraud and fiscal mismanagement. For decades, LAHSA and HUD have been in a joint partnership in failure. A 2001 HUD audit found that "…LAHSA violated grant agreements by failing to conduct onsite monitoring of service providers and failing to conduct any formal monitoring of subgrantees prior to awarding renewal grants."[3] Conducted shortly thereafter, HUD said its 2007 audit "warned of system accountably and compliance failures that have persisted for decades."[4] However, HUD has

---

[1] Motion of Proposed Intervenor Los Angeles Continuum of Care to Intervene as Plaintiff (Dkt. 37) at 1.
[2] Aug. 6, 2026 Hearing Transcript ("Hr'g Tr"), (Dkt. 57) at 53-12.
[3] *LA All. for Human Rights v. City of L.A. ("LA Alliance I")*, 792 F. Supp. 3d 1049, 1060 (C.D. Cal. 2025).
[4] HUD's June 11, 2026 Letter at 5.

taken no action until now—weeks before what was a critical funding deadline—disabling Los Angeles from competing for funding.

LAHSA is a Joint Powers Authority formed in 1993 through an agreement between the City and County of Los Angeles. Half of the governing board of LAHSA is appointed by the mayor of Los Angeles and the Los Angeles City Council.[5] The other half of LAHSA's governing board is appointed by members of the LA County Board of Supervisors.[6] This "has, at times, enabled a cycle of blame-shifting. When data inconsistencies or compliance issues arise, the City points to LAHSA. In turn, LAHSA attributes its problems to a lack of information or cooperation from the City."[7] As the Court wrote, "[t]his dynamic has fostered a system in which responsibility is routinely deflected, allowing both entities to evade accountability, with no single party willing to take responsibility."[8] HUD has also been complicit in this blame-shifting cycle. In so doing, all of these entities have effectively abdicated governance.

HUD began the annual CoC funding process later than normal this year when it opened the registration on April 1, 2026.[9] Despite this delay, the process appeared to be proceeding as it had in the past and LAHSA was timely registered and again approved by HUD. Due to this approval only LAHSA can now access the application documents on behalf of LA CoC. In other words, there was no path forward for the LA CoC to apply for funding in this coming cycle a few short weeks later by August 26, 2026.[10]

The public complaints and reports regarding LAHSA's operations are well-publicized and date back decades. Instead of proactively initiating an investigation into LAHSA before this year's registration process began, HUD chose to suspend LAHSA on the eve of critical deadlines when no reasonable alternative exists. The deadline for the L.A. region to submit its

---

[5] Los Angeles Homeless Services Authority Commission, https://www.lahsa.org/commission.
[6] *Id.*
[7] *LA Alliance I*, 792 F. Supp. 3d at 1060.
[8] *Id.*
[9] Reed Decl. ¶ 12.
[10] This deadline was effectively vacated when a U.S. District Court in Rhode Island invalidated HUD's Fiscal Year 2026 NOFO because it was in violation of the Administrative Procedure Act on August 7, 2026. *See Washington v. Dep't of Hous. & Urb. Dev.*, No. 26-CV-436-MSM-AEM, 2026 WL 2279514 (D.R.I. Aug. 7, 2026).

application to HUD for regional homelessness grants was previously August 26, 2026. There is no reason that HUD could not have initiated its investigation and the concomitant suspension of LAHSA at the beginning of this year—or at the beginning of the funding cycle next year—and given Los Angeles time to transition without the needless loss of life. Instead, HUD chose to act precipitously to disrupt the system with no opportunity for any corrective action or time to pivot.

HUD's rash suspension of LAHSA will significantly harm the public interest. Inevitably, this suspension will result in deaths among the homeless and the displacement of over 11,000 unhoused individuals onto the streets and into the neighborhoods of Los Angeles. HUD needed to consider reasonable alternatives when it abruptly decided that the bill for LASHA's dysfunction had come due.

U.S Attorney Bilal Essaylie said in Court, "What we're doing has not worked, we're here to change it. Are we late? Yes. But are we here now? We're here now…"[11] Indictments have recently been handed down related to fraud and mismanagement of homelessness funding.[12] And as the U.S Attorney recently stated in court, there are more coming.[13] The Court has no intention of discouraging investigations of fraud. But it can't be denied that there have been years of inaction by HUD.

LAHSA may be dysfunctional. But thousands of unhoused individuals rely on these services. It may well be an appropriate policy decision to transition away from LAHSA. It is not the providence of this Court to make that policy decision. Any transition must nonetheless be gradual and measured, so that this transition does not leave calamity in its wake.[14]

---

[11] Aug. 6, 2026 Hr'g Tr. (Dkt. 57) at 88:24-25.

[12] *See* U.S. Attorney's Office, Central District of California, *Executive Director of South L.A.-Based Charity Arrested on Federal Complaint Alleging $23 Million Swindle of Homelessness Funds* (Jan. 23, 2026), https://www.justice.gov/usao-cdca/pr/executive-director-south-la-based-charity-arrested-federal-complaint-alleging-23; U.S. Attorney's Office, Central District of California, *Beverly Hills Man Arrested, Brentwood Man Charged in Separate Criminal Cases Linked to Fraud in Public Homelessness Funds* (Oct. 16, 2025), https://www.justice.gov/usao-cdca/pr/beverly-hills-man-arrested-brentwood-man-charged-separate-criminal-cases-linked-fraud.

[13] *See* Aug. 6, 2026 Hr'g Tr. (Dkt. 57) at 88:24-25.

[14] In sharp contrast to HUD's abrupt decision-making that put thousands of unhoused Angelenos at risk, Los Angeles County began a gradual transition shifting away its funding from LAHSA in April 2025 with adequate notice to the City, service providers, public, and LAHSA itself. They are now forming a separate entity to take back their responsibility of governance. David Zahniser & Rebecca Ellis, *County Supervisors Create New*

## II.   BACKGROUND[15]

### A. The Continuum of Care System

The Continuum of Care ("COC) system is a congressionally-created structure through which federal funds are meant to flow from Washington D.C. to the streets of regions throughout the country. The LA CoC is the largest in the country.[16] It has 85 cities within its ambit and interfaces with hundreds of providers.[17]

The Continuum of Care is the federal structure through which Congress elected to address the homelessness crisis. The CoC system traces its origins back to 1987 when Congress passed the McKinney-Vento Homeless Assistance Act. Pub. L. No. 100–77, 101 Stat. 482 (codified at 42 U.S.C. § 11301(b) et seq.). Congress enacted this law because "the problem of homelessness ha[d] become more severe and, in the absence of more effective efforts, is expected to become dramatically worse, endangering the lives and safety of the homeless." *Id.* Acknowledging that "the causes of homelessness are many and complex, and homeless individuals have diverse needs," Congress concluded that "there is no single, simple solution to the problem of homelessness because of the different subpopulations of the homeless, the different causes of reasons for homelessness, and the different needs of homeless individuals." *Id.* Because "the Federal Government has a clear responsibility and an existing capacity to fulfill a more effective and responsible role to meet the basic human needs and to engender respect for the human dignity of the homeless," the Legislative Branch established a program to serve the growing unhoused population with public resources, programs, and federal funding.

In 2009, Congress revamped the system by passing the Homeless Emergency Assistance and Rapid Transition to Housing ("HEARTH") Act. Pub. L. No. 111-22, 123 Stat. 1632 (codified at 42 U.S.C. § 11381 et seq.). The HEARTH Act was passed to "provide funding for

---

*Homeless Agency, Despite Warnings from L.A. Mayor*, L.A. Times (Apr. 1, 2025), https://www.latimes.com/california/story/2025-04-01/county-votes-to-pull-money-from-homeless-agency-despite-mayors-opposition

[15] The Court **GRANTS** Plaintiff's Request for Judicial Notice (the "RJN") (Dkt.17) and takes judicial notice of the documents attached as Exhibits A through M to the RJN.

[16] *See* LA Homeless Services Authority, *How LAHSA Will Unify Los Angeles County's Fragmented Rehousing System*, Medium (Mar. 16, 2026), https://medium.com/the-road-home/how-lahsa-will-unify-los-angeles-countys-fragmented-rehousing-system-d9af09d8fcde.

[17] *See id.*

efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals" and "promote access to . . . programs funded with State or local resources." *Id.* In doing so, Congress recognized the key and crucial role that local and state government must play in attacking their own individualized homelessness crises and tailoring effective strategies to the specific problems they face. *See id.*  The HEARTH Act "consolidate[d] the separate homeless assistance programs carried out under title IV of the McKinney–Vento Homeless Assistance Act (consisting of the supportive housing program and related innovative programs, the safe havens program, the section 8 assistance program for single-room occupancy dwellings, and the shelter plus care program) into a single program" by creating "Continuums of Care." 42 U.S.C. § 11301. The implementing regulations for the act define "Continuum of Care" as follows:

> Continuum of Care and Continuum means the group organized to carry out the responsibilities required under this part and that is composed of representatives of organizations, including nonprofit homeless providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, hospitals, universities, affordable housing developers, law enforcement, organizations that serve homeless and formerly homeless veterans, and homeless and formerly homeless persons to the extent these groups are represented within the geographic area and are available to participate.
>
> 24 C.F.R. § 578.3; *see also* 77 Fed. Reg. 45422, 45422 (July 31, 2012) ("Local continuums of care, which are community-based homeless assistance program planning networks, will apply for Continuum of Care grants.").

In other words, a Continuum of Care is the system through which organizations provide services to unhoused individuals in a specific geographic area.

The CoC program funds various services that are provided to unhoused individuals— either directly or through subgrantees, which includes: (1) transitional housing; (2) permanent housing; (3) supportive services, such as childcare and employment assistance; (4) rental

assistance; and (5) a database for homeless individuals and services (i.e., HMIS). 42 U.S.C. §§ 11360(29), 11383. The HEARTH Act recognized that stability is key for properly administering homeless services and that provision of services should not be disrupted if possible. Accordingly, the statutory scheme developed around ensuring that each CoC was provided with "sufficient funding to renew all qualified projects for at least one year." 42 U.S.C. 11386a(c)(1).

As mentioned above, Congress recognized that solving homelessness required an "integral local function" in order to "generate the local strategies for ending homelessness." Pub. L. No. 111-22, 123 Stat. 1632. HUD itself previously recognized and stood for this proposition:

> Therefore, HUD has required, through this interim rule, each Continuum of Care to develop and implement a centralized or coordinated assessment system for its geographic area. Such a system must be designed locally in response to local needs and conditions. For example, rural areas will have significantly different systems than urban ones. While the common thread between typical models is the use of a common assessment tool, the form, detail, and use of that tool will vary from one community to the next.

77 Fed. Reg. 45422, 45427-28 (July 31, 2012).

For a CoC to operate, it is required to have an entity or organization to fill the following functions within the system:

1) Collaborative Applicant: In this role, the entity essentially functions as the CoC's CEO by assessing the various projects and service providers who request funding and determining how they will be ranked in the application for funding. *See* 42 U.S.C. § 11382; 24 C.F.R. § 578.9.

2) HMIS Lead: In this role, the entity must function as the data and systems manager responsible for the database, or information system, that collects data on the homeless population and stores information on individuals to match them with service providers and housing options. *See* 24 C.F.R. § 578.7(b).

3) <u>Coordinated Entry System ("CES") Coordinator:</u> A role where the entity serves as an operations manager for client flow by ensuring that clients are appropriately and fairly matched with services and projects. *See* 24 C.F.R. § 576.400(d); Reed Decl. ¶ 4; 25 Cal. Code Regs. tit. 25, § 8401.

4) <u>Point-in-Time ("PIT") Count Administrator:</u> In this role, the entity conducts an estimate of the unhoused population in the region, including demographic characteristics and statistics, and submits it to Congress to determine a nationwide estimate of the unhoused population. Declaration of Paul Rubenstein ("Rubenstein Decl.") (Dkt. 24-64) ¶¶ 3-9.

## B. The Consolidated Application Process

The Collaborative Applicant—currently LAHSA—administers a local competition to determine which projects and service providers will be part of the Consolidated Application to receive federal funding. 42 U.S.C. § 11382; 24 C.F.R. § 578.9. The Collaborative Applicant also ranks the projects in terms of priority for receiving funding. 42 U.S.C. § 11382; 24 C.F.R. § 578.9. Notably, the statutory scheme restricts applications from individual applications to HUD, unless "the solo applicant has attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner." 42 U.S.C. § 11382(i).

HUD awards funds to CoCs through a nationwide competition that it runs where it must weigh various criteria, such as previous performance and supplemental funding from other sources. 42 U.S.C. § 11386a(b) (listing required criteria). This nationwide competition is run every year and begins when HUD publishes the Fiscal Year ("FY") Notice of Funding Opportunity ("NOFO") for that year. RJN, Ex. C (Dkt. 17-3). It ends when HUD announces the conditional awards. *Id.*

Collaborative Applicants must register with HUD before they can submit a Consolidated Application for their CoC. Reed Decl. ¶ 9. Collaborative Applicants complete their registration through the "e-snaps" portal that HUD operates. *Id.* (citing website available at https://esnaps.hud.gov/). Once this registration process is completed, "CoCs should not change Collaborative Applicants during the CoC Program Competition period" barring extraordinary

circumstances. RJN, Ex. C (Dkt. 17-3). The Collaborative Applicant registration process typically opens in January of each year with an end date in April. Reed Decl. ¶ 11.

The Collaborative Applicant is integral to the submission of a Consolidated Application because the entity is required to rank projects in the CoC based on its expertise and the CoC's specific local needs. Having a local entity rank these projects allows local and state municipalities to understand gaps for the coming year and gives them the opportunity to shore up any gaps with local or state funds. The Collaborative Applicant divides projects into two tiers for the Consolidated Application: Tier 1 and Tier 2. Reed. Decl. ¶¶ 10, 19. Tier 1 projects are typically renewal projects and Tier 2 projects are usually new projects. *Id.* As the CoC system is meant to provide stability year-to-year, Tier 1 projects are almost always funded. *Id.* ¶ 19.

### C.  The History of the LA CoC

The LA CoC is the largest in the county and serves 85 of the 88 cities within Los Angeles, including the city of Los Angeles itself. Reed Decl. ¶ 5. LAHSA has been the Collaborative Applicant for the LA CoC since the 1990s. *Id.*[18] However, three other cities in the Los Angeles region have remained separate and each maintains its own CoC and Collaborative Applicant: Pasadena, Long Beach, and Glendale.[19] There is no statutory requirement mandating a certain size or territory for a CoC. Communities are free to choose the size and borders that fit their needs.

As discussed above, CoCs are required to have an entity that fills four roles in the CoC: Collaborative Applicant, HMIS Lead, CES Coordinator, PIT Count Administrator. In many CoCs these roles are split across different entities, but LAHSA wears all four hats for the LA CoC. Reed Decl. ¶ 7.

Besides these four roles, LAHSA also serves a fifth role: as a grantee of federal funds itself. In this role LAHSA receives funding to perform its own functions and also submits

---

[18] *See* LA CoC Governance Charter, https://www.lahsa.org/documents?id=8693-la-coc-governance-charter-approved-version-12-1-2024-.pdf.

[19] *See California Continuums of Care (CoCs)*, Homeless Strategy, https://homelessstrategy.com/maps-for-california-continuums-of-care/ (providing a map of CoCs in California).

funding requests for its subgrantees, the service providers interfacing with the unhoused population in Los Angeles. *See* Reed Decl. ¶ 42. Since it has been operating in these roles for decades, LAHSA claims that it has built up much institutional knowledge and experience.

As the HMIS lead, LAHSA manages the HMIS database, which is the system through which service provers are matched with individuals to provide housing and other services. Kuhn Decl. ¶¶ 25-27. The HMIS database for the LA CoC is the largest HMIS database in the country, servicing 400 agencies, 7,700 individual users, and over 175,000 participants. Kuhn Decl. ¶ 22. The 11,423 currently filled housing slots for people in the LA CoC were made possible through the connections and infrastructure of HMIS. *Id.* LAHSA employs 50 specialized staff purely administer the HMIS system. *Id.* ¶ 28.

As the CES Coordinator, LAHSA "performs th[e] matching function" under which someone is moved "from temporary shelter — or the street — into permanent housing." Declaration of Kim Farnham ("Franham Decl.") (Dkt. 24-3) ¶¶ 3-9. "No other entity serves this function" in the LA CoC. *Id.* ¶ 39. LAHSA employs "a dedicated 39-person Permanent Supportive Housing ("PSH") Matching Team" to perform its functions as CES Coordinator. *Id.* ¶ 10.

As the PIT Count Administrator, LAHSA conducts a point-in-time count in the region of both the sheltered and unsheltered people experiencing homelessness. Rubenstein Decl. ¶ 8. For the last ten years, LAHSA has conducted this count every year rather than just biannually. *Id.* ¶¶ 4, 8. LAHSA claims that HUD's recent actions will disrupt the ability of the LA CoC to both conduct the 2027 PIT Count and complete the 2026 PIT Count process. Mot. at 13-14.

**D. History of LAHSA's Challenges**

The Court has repeatedly documented the problems with LAHSA. For example, the Court in the *LA Alliance* case ordered an audit of the homeless system in Los Angeles. This audit unearthed fiscal failings traceable to LAHSA. The conclusions of the audit were released in May of 2025 and LAHSA's numerous failings were extensively discussed by the Court in its Settlement Compliance Order and Attorneys' Fees Order. *See LA Alliance I*, 792 F. Supp. 3d at 1068-70; *LA All. for Human Rights v. City of L.A. (LA Alliance II)*, 2026 WL 127741, at *7-8

(C.D. Cal. Jan. 6, 2026). The Court's views have not changed. Nonetheless the Court is required to evaluate the propriety of HUD's recent response to LAHSA's shortcomings.

### E. LAHSA's Suspension

HUD's Collaborative Applicant registration period opened later than previous years on April 1, 2026 with an April 23, 2026 deadline. Reed Decl. ¶¶ 11-15. LAHSA registered as Collaborative Applicant as it has in years past, and was approved by HUD as it had been for decades. *Id.* HUD then published the FY 26 NOFO 2026 on June 1, 2026, but did not make applications available at that time. *Id.* ¶ 16. HUD later made applications available and established an application deadline of August 26, 2026. *Id.*[20]

On June 11th, HUD sent a letter ("June 11 Letter") to LAHSA stating that HUD had opened an investigation into LAHSA because of "[i]nformation that has come to light demonstrating that LAHSA may have committed violations of federal law in performing its obligations under HUD grant agreements." Declaration of Gita O'Neill ("O'Neill Decl.") (Dkt. 24-21), Ex. C (Dkt. 24-24). The letter announced that concomitantly with opening the investigation, HUD was also suspending LAHSA from future participation in transactions with HUD and other federal agencies. *Id.* at 2. The letter cited to 2 C.F.R. § 180.700 as the basis for the immediate suspension. *Id.* Under this provision, HUD claimed that LAHSA's immediate suspension was "necessary to protect the public interest" and that LAHSA had "violated the terms of numerous public agreements or transactions." *Id.* HUD also claimed that LAHSA had "repeatedly certified in its agreements with HUD that it has adequate capacity, financial safeguards and reporting, safeguards against conflicts of interest, and complies with applicable laws and regulations," but that "its track record demonstrates systemic and repeated failures to comply." *Id.* at 2-3.

HUD cited three justifications for LAHSA's suspension: (1) issues with financial management and internal controls; (2) conflicts of interest, including a specific conflict

---

[20] This deadline was recently struck down by a Rhode Island U.S District Court on August 7, 2026. *See Washington v. Dep't of Hous. & Urb. Dev.*, No. 26-CV-436-MSM-AEM, 2026 WL 2279514 (D.R.I. Aug. 7, 2026). Even though the Fiscal Year 2026 NOFO was set aside, the fact remains that for any future congressionally mandated NOFO, the LA CoC does not have an eligible Collaborative Applicant that would be able to apply for funding for the region.

involving LAHSA's former CEO; and (3) that LAHSA inaccurately certified its capabilities and safeguard systems. *See generally id.* The letter also cited a number of public reports regarding LAHSA's deficiencies, many of which have previously been referenced by this Court. *Id.*

On June 18th, HUD sent LAHSA a second letter ("June 18 Letter"). O'Neill Decl., Ex. B (Dkt. 24-23). The June 18 Letter further explains the suspension and provides that "LAHSA is no longer eligible to serve as a collaborative applicant for the Los Angeles CoC." *Id.* at 1. The June 18 Letter also bars LAHSA from its "other delegated duties." *Id.* Finally, the letter provides that instead of a Consolidated Application, HUD plans to "to allow eligible entities to submit their grant request directly to HUD" in furtherance of the "public interest." *Id.*

Since these letters—and the initiation of this litigation—HUD issued a NOFO on July 16 purporting to allow entities to submit individual applications to HUD thereby bypassing any Consolidated Application by a Collaborative Applicant for the LA CoC. Declaration of Jessica Reed ("Reed Reply Decl.") (Dkt. 35-1) ¶¶12-13.

Finally, HUD has also failed to execute grant agreements for a number of organizations who received award letters earlier this year. Reed Decl. ¶¶ 50-54. This means that certain service providers will be left without the funds they need to continue operating. *Id.* ¶¶ 54, 58. The impacted organizations include: 1736 Family Crisis Center; A Community of Friends; The People Concern; Jewish Family Services; House of Ruth Claremont; SRO Housing Corporation; Penny Lane; Rainbow Services; Jenesse Center; Project New Hope; Antelope Valley Domestic Violence Council; and Downtown Women's Center. *Id.* This lack of funding comes despite the Consolidated Appropriations Act of 2026 (H.R. 7148) (the "2026 CAA"), in which Congress expressly required HUD to issue 2025 awards. CAA, 2026, Pub. L. No. 119-75, div. D, 140 Stat. 173, 399 (2026).

## F.  Housing First Versus Treatment First

The CoC system was put in place by the federal government to support the funding and construction of "longer-term housing": that is permanent supportive housing.[21] Indeed, according to LAHSA "[t]he backbone of the CoC Program is funding permanent housing and, along with it, supporting long-term community stability."[22] Historically, the promotion of permanent supportive housing has been supported by the federal government, including by HUD through the CoC program.[23] LAHSA's funding decision have mirrored these longstanding federal priorities: "In conjunction with HUD's national priorities for CoC's, the CoC's portfolio of grants, as submitted by LAHSA as the Collaborative Applicant, is over 90% dedicated to permanent housing."[24] This philosophy called "Housing First" is built around "prioritiz[ing] providing permanent housing to people experiencing homelessness,"[25] often without preconditions or requirement to receive treatment.

Each administration has the right to set its own policy. "For at least 15 years, the [CoC] program has promoted Housing First programs, which provide long-term housing to chronically homeless people and offer, but do not require, treatment for mental health and addiction."[26] But now, the current administration has championed a shift away from Housing First by "issu[ing] a revised plan to address homelessness that shifts large sums of federal aid from long-term housing to time-limited programs that emphasize treatment for mental illness and addiction."[27] The current administration's plan promotes a "treatment-first" approach and moves around 30% of funding from permanent supportive housing toward "transitional housing" programs,

---

[21] *See* Congressional Research Service, The HUD Homeless Assistance Grants: Programs Authorized by the HEARTH Act at 10 (Aug. 30, 2017).
[22] Motion for Preliminary Injunction ("Mot.") (Dkt. 24) at 3.
[23] *See* Rachel L. Swarns, *U.S. Reports Drop in Homeless Population*, N.Y. Times (July 30, 2008), https://www.nytimes.com/2008/07/30/us/30homeless.html; Vanessa Davis and Ann Oliva, *Housing First is a Matter of Health*, National Alliance to End Homelessness (Sept. 10, 2023), https://endhomelessness.org/blog/housing-first-is-a-matter-of-health/ ("Between 2010 and 2016, Housing First became a core organizing principle in the federal government's response to housing.").
[24] Declaration of Jessica Reed ("Reed Decl.") (Dkt. 24-62) ¶ 61.
[25] *What is Housing First?*, National Alliance to End Homelessness (Aug. 2022), https://endhomelessness.org/resources/toolkits-and-training-materials/housing-first/.
[26] Jason DeParle, Pushing Treatment, *Trump Administration Limits Housing Aid for Homeless*, N.Y. Times (June 2, 2026), http://nytimes.com/2026/06/02/us/politics/housing-first-homeless-hud.html.
[27] *Id.*

which are limited to two years of aid.[28] The absolutism of each one size fits all policy causes great concern to this Court in a region like Los Angeles where the number of unhoused individuals is so high. Without additional funds from Congress, a total Housing First policy would be fiscally impossible for the Los Angeles region to maintain.[29]

The Court does not create or debate public policy. However, this Court has consistently called for fairness, transparency, and accountability on behalf of the taxpaying public when it comes to providing services to the thousands of unhoused individuals in Los Angeles. With its actions here, HUD has abruptly pulled the rug out from under hundreds of service providers, and the thousands of unhoused individuals who rely on their services without a transitional period. It is much easier to destroy a dysfunctional homelessness system than to take the time and care necessary to make the system function properly. Service providers count on federal funding and many of the systems within the LA CoC, like HMIS, are critical to their function.

### G. Procedural History

LAHSA ("Plaintiff") filed the Complaint in this matter on June 29, 2026 (Dkt. 1). It filed a Notice of Related Cases (Dkt. 16) the same day relating this matter to the *LA Alliance* case. Plaintiff also filed a Request for Judicial Notice (Dkt. 17) on the same day. Finally, Plaintiff filed an Ex Parte Application for a Temporary Restraining Order (the "Application") (Dkt. 15).

On July 2, 2026, this Court converted the Application into a Motion for a Preliminary Injunction (Dkt. 21). Plaintiff then re-filed its Application as a Motion ("Mot.") on the next day (Dkt. 24). Defendants filed their Opposition ("Opp.") on July 13, 2026 (Dkt. 25). Plaintiff filed its Reply on July 21, 2026 (Dkt. 35). The Court heard oral argument on the Motion on August 6, 2026.

---

[28] *Id.*

[29] For example, the Los Angeles region currently has over 68,000 unhoused individuals. *See* 2026 Homeless Count – LA Continuum of Care, https://www.lahsa.org/data-refresh/home/datadashboard?id=57. It may that a total Housing First policy is appropriate in a region like Boise, Idaho with hundreds of unhoused individuals. *See* Our Path Home Shares 2025 Point-In-Time Count (Sep. 29, 2025), https://www.cityofboise.org/news/planning-and-development-services/2025/september/our-path-home-shares-2025-point-in-time-count-results. But spending hundreds of thousands of dollars per unit in Los Angeles is impossible without substantial additional funding from Congress. *See* Steve Lopez, *Spending $800,000 for a Single Unit of Homeless Housing is a Red Flag for L.A.*, L.A. Times (Mar. 5, 2022), https://www.latimes.com/california/story/2022-03-05/lopez-column-hhh-homeless-housing-costs.

Plaintiff-Intervenor LA CoC filed a Motion to Intervene ("Mot. to Intervene") on July 31, 2026 (Dkt. 37), which the Court granted on August 6, 2026 (Dkt. 55). Plaintiff-Intervenor filed its Intervenor Complaint on August 10, 2026 (Dkt. 60).

Defendant filed a Statement and Proposal for Conduct of the Fiscal Year 2026 Continuum of Care Competition for Geographic Area of Los Angeles Continuum of Care (the "Statement") on August 7, 2026 (Dkt. 59). Plaintiff filed a Response to the Statement ("Plaintiff's Response") on August 10, 2026 (Dkt. 62). Plaintiff-Intervenor also filed a Response ("Plaintiff-Intervenor's Response") on the same day (Dkt. 61).

## III.    Legal Standard

### A.    Injunctive relief

A plaintiff seeking preliminary injunctive relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation omitted). A "serious question" is one on which the movant "has a fair chance of success on the merits." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

### B.    The Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), "courts, not agencies, will decide all relevant questions of law arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) (internal quotation marks and emphasis omitted). For agency policymaking and factfinding, the APA authorizes a court to "hold

unlawful and set aside agency action, findings and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Native Ecosystems Council v. Marten*, 883 F.3d 783, 788 (9th Cir. 2018). Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**IV.    Discussion**

**A. Plaintiff has established a likelihood of success on the merits.**

**1.  LAHSA's suspension is a final agency action subject to judicial review.**

An agency action is final if two conditions are satisfied. *Bennett v. Spear*, 520 U.S. 154, 177 (1997). First, the action must "mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature" and second "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177–78. In the Ninth Circuit, imperative to this analysis is a focus on the practical and legal effects of the agency action so that the finality element is "interpreted in a pragmatic and flexible matter." *Prutehi Litekyan: Save Ritidian v. United States Dep't of Air Force*, 128 F.4th 1089, 1108 (9th Cir. 2025) (cleaned up). Relevant to the application of the two-part test are factors including whether the action "amounts to a definitive statement of the agency's position," whether it has "a direct and immediate effect on the day-to-day operations" of the party, and if "immediate compliance is expected." *Id.*

The practical effect of LAHSA's suspension by HUD is that the LA CoC is unable to apply for federal homelessness funding. The deadline to register as a Collaborative Applicant with HUD has already passed, and because HUD accepted LAHSA's application, LAHSA is the only entity that can access the Consolidated Application documents on behalf of the LA CoC. Mot. at 25. Even if HUD were to allow another entity to submit the Consolidated

Application on behalf of the LA CoC, the realities of the application are such that it would be impossible for another entity to become qualified as a Collaborative Applicant by the CoC Board and also prepare the Consolidated Application given all the work that goes into preparing the application.

The Consolidated Application typically takes several months to prepare, requiring the ranking of projects, tiered classification, narratives and data collection for scoring purposes, and the preparation of more than a hundred individual project applications. Mot. at 26. Furthermore, the day-to-day impact is that the LA CoC is without a HMIS lead, CES Coordinator, and PIT Count Administrator. The functionality of these systems is imperative for people experiencing homelessness to receive services and access to housing. HUD argues that suspension is currently just a temporary measure, but it is clear to the Court that the consequences of its action are tantamount to a final action. Reply at 11. Furthermore, by issuing its July 16 NOFO notice permitting individual entities within the LA CoC to apply directly for grants, HUD has made a final decision to prevent the submission of one Consolidated Application from the LA CoC.

**2. HUD's actions are arbitrary, capricious and an abuse of discretion.**

When reviewing agency decisions, the Court must determine if the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). The Court finds that HUD did not provide a reasoned explanation as to why an immediate suspension of LAHSA, and effectively the LA CoC, was necessary to protect the public interest after relevant deadlines for becoming a Collaborative Applicant had passed. Furthermore, HUD did not adequately demonstrate that it considered important aspects of barring the CoC from being able to apply for funding with a Consolidated Application.

### a. HUD did not sufficiently explain why an immediate suspension was warranted.

The grounds for suspension are listed in 2 C.F.R. §§180.700. To consider a suspension, there must be evidence of actions that could lead to debarment and evidence that immediate action is necessary to protect the public interest. *See* 2 C.F.R. §§ 180.700, 180.800 (listing recognized causes for debarment). The Court does not take up the issue of the sufficiency of the evidence HUD cites for its debarment investigation. Indeed, much of the information HUD relies on has been discussed by the Court for years. None of this is new. Instead, the Court finds that HUD has not satisfactorily explained why an immediate suspension was necessary.

HUD relies on several factors to support its decision to suspend LAHSA: conflicts of interest, false certifications and statements, and LAHSA's financial management and internal controls. *See* June 11 Letter. The Court addresses each in turn.

First, HUD asserts that its action is warranted due to the conduct of LAHSA's former CEO who resigned in 2025 after committing more than $2 million in federal funding to her husband's employer. June 11 Letter at 1. HUD points out the approval of these funds occurred in a 2024 LAHSA commissioner meeting and was an "obvious violation of HUD's requirements." *Id.* at 9. However, HUD opened an investigation into the matter that it closed after it found that LAHSA took sufficient remedial actions to address its conflict-of-interest policies. *See* Pelham Decl. ¶ 28, Ex. 22. HUD does not explain why years after identifying this conflict of interest, LAHSA needed to be immediately suspended. The federal government can bring inditements and target investigations for misuse of funds and corruption, but should not be able to punish the citizens of Los Angeles arbitrarily and capriciously.

Second, HUD points to what it perceives as false certifications and statements made by LAHSA regarding compliance with HUD requirements. June 11 Letter at 10. Certifications are incorporated into each of HUD's grant agreements with LAHSA and HUD suspects that "possibly hundreds" of certifications could have been false. *Id.* at 11. HUD does not explain why if it suspected such widespread falsification of certificates by LAHSA in its grant agreements, HUD approved new grant awards to LAHSA for years and as recently as 21 days

prior to LAHSA's suspension. Reply at 1. HUD's own regulations required it to have evaluated LAHSA's "performance in previous years against the plans and goals established" and look to factors such as a "history of inadequate financial management accounting practices," and "indications of mismanagement on the part of the recipient" before awarding additional funding to LAHSA. 24 CFR § 583.235(c)(1).

Finally, in its June 11 Letter, HUD points to LAHSA's financial mismanagement of state and local funds and lack of internal controls as a reason for suspension. For example, as the letter explains, the LA County's Auditor-Controller found in 2024 that LAHSA was late in paying service providers, it used money from one government funder to pay for services provided under another government funders' contract/grant and that in 2017 LAHSA failed to secure repayment agreements with service providers who received $51 million in cash advances. June 11 Letter at 5. Many of these issues persisted in the 2026 review of LAHSA by the County Auditor-Controller including the volume of overdue payments to service providers.[30] *Id* at 8. Indeed, this Court has also pointed out issues with LAHSA's fiscal oversight and internal controls, as identified by County Auditor-Controller Oscar Valdez. *See LA Alliance I*, 792 F. Supp. 3d at 1063-68. Another example HUD cites is the City Controller's Office finding in 2024 that LAHSA failed to spend $513 million in public funds that were budgeted during fiscal year 2024 due to lack of staff and old technology. June 11 Letter at 6. As HUD points out, the LA City Controller also had concerns as far back as 2019 when they faulted LAHSA for having ill-defined goals and uncoordinated data collection. *Id*. at 5. HUD also points to a 2023 City Council meeting where LAHSA was mentioned for not monitoring the use of funds under a City program for transitional motel housing. June 11 Letter at 6. From these examples alone, HUD has been on notice for nearly half a decade about challenges LAHSA faced regarding financial management of state and local funds and yet took no action.

This Court ordered an audit of LAHSA in 2025 which was conducted by the firm Alvarez and Marsal Public Sector Services, LLC (A&M). HUD points to the findings of this

---

[30] HUD points out that late payments by LAHSA were also noted as an issue in prior audits conducted by the Country Auditor Controller in 2018 and 2021. June 11 Letter at 5.

audit in the June 11 Letter, particularly regarding LAHSA's inability to "accurately identify and calculate its expense" and the lack of reconciliation with services provided, making it impossible to determine how much money was spent and what services were provided. June 11 Letter at 6. During the course of this audit, LAHSA failed to provide documentation regarding the existence of nearly 2,300 housing sites for which it was responsible, which HUD mentions in its letter. June 11 Letter at 6. The Court has publicly discussed this audit several times, yet HUD decided to take no action until now.[31]

HUD also mentions its own audits as examples of LAHSA's financial mismanagement in its June 11 Letter. But this Court found that HUD has been on notice even earlier—since at least 2001. *See LA Alliance I*, 792 F. Supp. 3d at 1060. The Court noted in its opinion that a 2001 HUD audit found "… that LAHSA violated grant agreements by failing to conduct onsite monitoring of service providers and failing to conduct any formal monitoring of subgrantees prior to awarding renewal grants." *Id.* HUD itself mentions in its June 11 Letter that as far back as 2007, HUD knew of "systemic accountability and compliance failures that have persisted for decades." June 11 Letter at 5. Most recently, in 2022, HUD's OIG "found that LAHSA failed to use $3.5 million in CoC grant awards, letting the funds expire, did not support the CoC's Homeless Management Information System (HMIS), did not submit timely annual performance reports..." *Id.* However, HUD closed out this finding over a year ago. *See* Axel Reply Decl., Ex. 4 ¶ 11, 21, Ex. 5. Despite this abundance of data, HUD fails to explain why a suspension became appropriate only now, at a time when suspending LAHSA would effectively bar the LA CoC from being able to submit a consolidated application.

**B. Without injunctive relief, Plaintiff will suffer irreparable harm.**

HUD clarified in its June 18 Letter that "LAHSA may not carry out the programmatic functions delegated to it by the Los Angeles city and County Continuum of care." June 18 Letter at 1. This means "LAHSA may not participate in federal programs, it may not act on behalf of the Los Angeles CoC, either as its collaborative applicant or in its other delegated duties," and "because LAHSA is unable to act as its collaborative applicant or carry out other

---

[31] *See LA Alliance I*, 792 F. Supp. 3d at 1068-70; *LA Alliance II*, 2026 WL 127741, at *7-8.

-20-

delegated responsibilities, the Los Angeles CoC is unable to execute its responsibilities as outlined in 24 C.F.R §§ 578.7 and 578.9." *Id*. These actions by HUD will cause harm to LAHSA, the LA CoC, and most importantly the unhoused people these entities serve. Harm will also be brought onto the residential neighborhoods and businesses of Los Angeles.

All CoCs must designate an entity to serve in four key roles, as discussed previously: (1) as the Collaborative Applicant, responsible for coordinating a single application for HUD program funds for the region (2) as the HMIS Lead, which is akin to a data and systems manager responsible for the local information technology system used to collect client-level data and data on the provision of housing and services to individuals and families at risk of and experiencing homelessness; (3) as the CES Coordinator, which serves as an operations manager for client flow, *see* 24 C.F.R. § 578.7; Reed Decl. ¶ 4; Kuhn Decl. ¶ 4; and (4) as administrator of the PIT Count. Mot. at 9. The Court will address each of these four roles to identify the harm Plaintiff faces due to HUD's actions.

It is striking that LAHSA was approved by HUD in April 2026, but was then suspended by HUD weeks later. As discussed above, the deadline to be certified by HUD as a collaborative applicant passed on April 23, 2026. Now, with LAHSA suspended, the LA CoC is left with no entity that can apply for 2026 federal grant funding on behalf of the numerous organizations who rely on federal funds to serve the homeless. The amount at issue is approximately 241 million dollars and future 2027 monies. LAHSA has been the LA CoC's Collaborative Applicant since the 1990's. Collaborative Applicants help coordinate funding for the entire region, as Congress envisioned, so they are able to ensure local priorities are mirrored in project selection and serve as the primary interface for stakeholders across the region. With no time left for another entity in the LA CoC to receive HUD approval to become a Collaborative Applicant, service providers in LA will be unable to provide resources to those experiencing homelessness—undoubtably resulting in lost lives. It is estimated that the CoC's loss of this approximately 241 million dollars will result in returning 11,000 people who are currently housed to a life on the street. Mot. to Intervene at 1.

Second, without an HMIS lead, unhoused individuals—central to LAHSA's mission—in the Los Angeles region will fall through the cracks. HMIS is a federally mandated database in which unhoused people are entered into to match with housing and services. Mot. at 10. LAHSA's HMIS system is the largest in the country. Mot. at 11. It has about 175,000-250,000 individual participants and supports over 400 agencies. *Id*. If HMIS is inoperable, people experiencing homelessness will not be able to be matched with services, including about 25,000 people currently on the HMIS waitlist for permanent housing. *Id*. at 10-11. Additionally, HUD would be risking the LA CoC and LAHSA not being in compliance with federal law because HMIS is used to record client data and program performance required for congressionally mandated reports. *Id*. at 11. California law also requires the operation of an information management system for receiving homeless service funding. *Id*.

Third, LAHSA oversees the federally mandated CES system which helps ensure that those with the highest needs are prioritized for housing and services. *Id*. at 12. This requires LAHSA to coordinate assessments, referrals and placements across the provider network. *Id*. Layered onto this is the necessity for the HMIS and Resources Management System ("RMS") to work in harmony with the CES system. If either of these systems do not run properly, CES cannot be administered and those most vulnerable will not be able to receive housing or resources. *Id*. Further, if the RMS system was non-operational, the CES team would not know how many housing units were empty, which could lead to people sleeping on the streets despite unit availability. *Id*. at 13.

Fourth, LAHSA is the administrator for the Point-In-Time ("PIT") Count which is conducted biannually. The information collected from the PIT Count is sent to Congress so there can be nationwide estimates of unhoused populations, including demographic information and service use patterns. *Id*. The LA CoC has done a PIT Count every year. This means LAHSA designs and executes a methodology compliant with HUD standards and coordinates the logistics of academic institutions, service providers, and outreach workers across the LA CoC. HUD's suspension of LAHSA will likely impact the completion of the 2026 PIT Count process, resulting in an inaccurate count for the LA region.

More than 32,000 people are served by LAHSA's outreach programs and LAHSA's CoC funds support access to housing or shelter for almost 7,500 individuals. *Id.* at 47. Service providers within the LA CoC rely on millions of dollars in funding used for homeless services across 85 cities and the data management roles essential to matching those unhoused to services. HUD's arbitrary suspension of LAHSA prevents the LA CoC from having an entity serving in the four roles designated by Congress. This would result in preventable deaths, instability in the network of housing services in the region, and the return of thousands of unhoused individuals to the streets and neighborhoods of Los Angeles.

## C. The balance of hardships and public interest is in Plaintiff's favor.

The Court shares HUD's priority to prevent "wanton mismanagement of public funds." Opp. at 36. The Court has been highlighting for years the need for transparency and accountability in homelessness funding. However, the missions of both HUD and LAHSA are to ensure that lives are not lost. Federal funding to the LA CoC currently supports housing, sheltering, or serving 11,423 people across 7,545 households. (Kuhn ¶¶ 7–9; Szabo ¶ 8.) And it is imperative that federal agency actions comply with congressional mandates to ensure that federal funding is not unlawfully terminated.

Balancing these interests here requires the Court to issue its injunction. This Court cannot permit arbitrary and capricious decision-making by HUD.

## D. HUD's proposed remedy cannot stand given the illegality of the underlying suspension of LAHSA.

After HUD suspended LAHSA as the LA CoC's Collaborative Applicant, HUD determined that "it would be in the public interest to allow eligible entities to submit their grant request directly to HUD." June 18 Letter at 1. Having found that HUD's suspension of LAHSA was arbitrary and capricious, it follows that HUD's remedial action cannot stand. This Court finds that HUD should not be allowed to circumvent the will of Congress to correct the problem HUD itself created.

**1. Congress intended homelessness priorities to be determined by local entities.**

The CoC Program has been continually upheld by Congress—having been established in the 1990s and funded via bipartisan support over five administrations, including during the Trump administration in January 2025. Mot. at 41. The executive branch may take issue with the CoC program, calling it "failed and harmful" and "administratively burdensome" in the 2027 budget, but the cornerstone of American democracy is the separation of powers. RJN Ex. L at 30. The Court is concerned that the remedial plan proposed by HUD in its June 18 Letter, initiating a direct-to-HUD protocol, is a pretextual attempt to bypass the carefully constructed CoC scheme set up by Congress.

HUD claims that allowing individual applications "directly to HUD" is a substitute for the CoC process created by Congress. June 18 Letter at 1. But Congress directed that priorities for homelessness are to be set by regional entities and coordinated across local communities. This Congressional directive is on all fours with the Supreme Court's recognition that it is the province of "the people and their elected leaders" to address homelessness. *See City of Grants Pass, Or. v. Johnson*, 603 U.S. 520, 556 (2024) (local officials may pass ordinances that prohibit unhoused individuals from camping in public spaces). The congressionally mandated Collaborative Application process accomplishes this goal by taking a comprehensive view of each region, including Los Angeles.

It was the intention of Congress for the CoC Program to serve as an "integral local function" "necessary to generate the local strategies for ending homelessness." HEARTH Act, Pub. L. No. 111-22, div. B, § 1002(b)(2), 123 Stat. 1632, 1664 (2009). The Collaborative Applicant, as defined by Congress, is instrumental in coordinating a single, local application for the region. *Id.* § 11360a(a); 24 C.F.R. § 578.15. Congress contemplated applications from individual applicants only where the entity "attempted to participate in the continuum of care process but was not permitted to participate in a reasonable manner." 42 U.S.C. § 11382(i). HUD itself has recognized the importance of Congress' intent to keep homelessness funding decisions local. The preamble of HUD's own interim rule says, "a centralized assessment

system . . . must be designed locally in response to local needs and conditions." 77 Fed. Reg. 45422, 45427 (July 31, 2012) (preamble to interim rule codified at 24 C.F.R. Part 578).

### 2. HUD has failed to consider the negative consequences of its proposed remedy.

HUD's one-page remedial letter fails to demonstrate that HUD has the capacity to protect both these congressional mandates and the citizens of Los Angeles. Indeed, HUD has interjected itself into a complex system without considering the institutional knowledge local communities hold and the human lives that will be lost by its actions. As Plaintiff aptly argues, "HUD has not explained how it will evaluate solo applications, rank or prioritize projects, or balance community needs without a consolidated application prepared at the local CoC level as contemplated by the HEARTH Act." Reply at 29. The Court agrees that HUD has not communicated how its proposed application process will prioritize the local community's concerns—as Congress intended and mandated—over HUD's own preferred policy goals or interests. And HUD has also not contemplated that many service providers doing meaningful work in the community may not have the bandwidth to apply for funding directly in its rushed new process.[32]

Nor did HUD's one-page letter explain why its dramatic direct-to-HUD remedy was necessary, especially when other solutions honoring Congress's directives were available, including allowing LA CoC to identify an alternative Collaborative Applicant. Instead, HUD merely states that it has "determined that" its direct-to-HUD process "would be in the public interest." June 18 Letter at 1. But "if judicial review is to be more than an empty ritual, it must demand something better" than HUD's conclusory statement that it—not Congress, nor the elected officials of Los Angeles—may determine unilaterally what is in the best interests of the people of Los Angeles. *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019).

The federal government cannot act so precipitously to seize power from both locally-elected organizations and officials and Congress itself. HUD's actions must be measured, and

---

[32] For example, Penny Lane Services has been a subgrantee of the LA CoC since 2002 and has said that it is not in a position to apply to HUD directly itself. *Id*. ¶ 9; *see also* Bell Decl. ¶ 8 (explaining that House of Ruth lacks "capacity" to prepare its own application).)

oriented toward saving and improving the lives of the thousands of people experiencing homelessness and everyone who calls Los Angeles home.

HUD's actions here are precisely the opposite. Courts are not "required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce*, 588 U.S. at 756. The Trump administration has called the CoC Program "failed and harmful" and explicitly targeted LAHSA as "an example of the need to overhaul the unaccountable CoC System." Mot. at 19. HUD is leveraging a crisis of its own making to wrest power to itself that Congress expressly granted to local communities like Los Angeles, raising the specter of "whether HUD is punishing Los Angeles, rather than addressing a problem that actually requires remediation." Plaintiff-Intervenor's Response at 7. HUD could have worked with Congress to change homelessness funding priorities, and provided sufficient notice to the LA CoC after decades of being put on notice about the issues plaguing homelessness funding in Los Angeles. But instead, HUD arbitrarily and capriciously chose to target Los Angeles by taking away its autonomy to set homelessness priorities and its ability to fairly compete for limited homelessness funding on a national scale. This would have led to unhoused individuals returning to the streets of Los Angeles, many of whom are women, children and veterans who have nowhere else to go.

## V.    Disposition

The Court **GRANTS IN PART** the Motion for a Preliminary Injunction (Dkt. 24). The preliminary injunction, discussed below, will be valid until October 27, 2026.

First, HUD is **ORDERED** to distribute the approximately 241 million dollars that was earmarked for the LA CoC by Congress for Fiscal Year 2026 via the priorities outlined in LA CoC's Collaborative Application.[33]

Second, Respondents are **ORDERED** to preserve the status quo pending further order by this Court as follows: LAHSA shall remain the "Collaborative Applicant" so that it may complete the Collaborative Application for the 2026 funding cycle. The Court has determined

---

[33] The Court understands that the breakdown of Tier One and Tier Two funding depends on the new 2026 NOFO, impacting discretionary funds.

that it is in the public interest for LAHSA to temporarily remain the Collaborative Applicant only through the submission of the 2026 Collaborative Application so the LA CoC can compete for nationwide dollars without disrupting HUD's already compressed funding allocation deadlines. LAHSA will also function as the HMIS lead, CES Coordinator, and PIT Count Administrator in this interim period. The Court understands that under new leadership, LAHSA represents that they have improved in recent months. The decision of whether LAHSA will remain the Collaborative Applicant and in its other roles, or if another entity becomes the Collaborative Applicant, is the decision first of the CoC Board and then subject to HUD approval.

Third, the LA CoC is **ORDERED** to give notice forthwith that it is accepting applications for Collaborative Applicant, HMIS lead, CES Coordinator, and PIT Count Administrator for the Fiscal Year 2027 CoC nationwide grant competition.[34] HUD is ordered to then evaluate the applicant or applicants chosen by the LA CoC. Within 60 days of this Order, by October 13, 2026, the LA CoC shall file a written report with the Court summarizing its evaluations of all entities that have applied to be the Collaborative Applicant, HMIS lead, CES Coordinator, and PIT Count Administrator for the FY 2027 CoC nationwide grant competition. HUD shall then also file a written response regarding the LA CoC's evaluation of the applicant pool within 7 days by October 20, 2026.

Fourth, the parties are hereby **ORDERED** to be present October 27, 2026 at 9:00 a.m. in Courtroom One at the Felicitas and Gonzalo Mendez United States Courthouse (formerly known as the First Street Courthouse) for a status conference on the matter.

Fifth, HUD is **ORDERED** to preserve the administrative record of their decision-making process regarding LAHSA's suspension appeal, including both the June 11 and June 18 letters. By August 24, 2026, this complete administrative record must be lodged with the Court. Additionally, the Court must be informed within twenty-four hours of any rulings made by the Administrative Law Judge regarding LAHSA's challenge to its suspension.

---

[34] Structural governance reform may already be underway. To paraphrase Bob Dylan, you don't need a weatherman to know which way the wind is blowing.

Sixth, HUD cannot circumvent Congress' timelines for awarding Fiscal Year 2025 grants. The HEARTH Act requires that HUD obligate funds within 45 days. 42 U.S.C §11382(d)(2). HUD is **ORDERED** to execute signed agreements for every LA CoC grant it has approved for FY 25 forthwith.

Finally, the Court sets this matter for trial on February 23, 2027. The Parties are **ORDERED** to meet and confer concerning discovery cut-off, expert cut-off, dispositive motion dates, and pretrial dates. Thereafter, the Parties are **ORDERED** to file a joint status report by noon on August 18, 2026.

DATED: August 13, 2026

_____
Hon. David O. Carter, U.S. District Judge

-28-