Shayla R. Myers (SBN 264054)
Ana Zuniga (SBN 281768)
LEGAL AID FOUNDATION
OF LOS ANGELES
1550 W. Eighth Street
Los Angeles, CA 90017
(213) 640-3983
Email: smyers@lafla.org
azuniga@lafla.org

Mark Rosenbaum (SBN 59940)
Faizah Malik (SBN 320479)
Amanda Mangaser Savage (SBN 325996)
Jonathan Jager (SBN 318325)
Cassidy Bennett (SBN 347811)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
(213) 385-2977
Email: mrosenbaum@publiccounsel.org
fmalik@publiccounsel.org
asavage@publiccounsel.org
jjager@publiccounsel.org
cbennett@publiccounsel.org

Robyn C. Crowther (SBN 193840)
Mary Katherine Planchet (SBN 341006)
Abigail Falk Orozco (SBN 352267)
STEPTOE LLP
633 W Fifth Street, Suite 1900
Los Angeles, CA 90017
(213) 349-9400
Email: rcrowther@steptoe.com
mplanchet@steptoe.com
aorozco@steptoe.com

*Attorneys for Plaintiff-Intervenor Los Angeles Continuum of Care*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

LOS ANGELES HOMELESS SERVICES AUTHORITY,

Plaintiffs,

vs.

DONALD J. TRUMP, in his official capacity as President of the United States of America; UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; SCOTT TURNER, in his official capacity as the Secretary of the U.S. Department of Housing and Urban Development; and DOES 1-10,

Defendant.

Case No. 2:26-cv-07056-DOC-AJR

Hon. David O. Carter

**AMENDED COMPLAINT IN INTERVENTION**

# INTRODUCTION

1. This case challenges the Administration's attempt to use the suspension of Los Angeles's homeless services agency to gain control of hundreds of millions of dollars in federal homelessness funding for the Los Angeles region—replacing Congress's Continuum of Care ("CoC") framework that prioritizes research-backed homelessness prevention strategies and vests control with local communities to develop comprehensive and balanced solutions to the crisis, with its own agenda that favors temporary and transitional shelters, institutionalization, and the use of law enforcement to clear encampments. At stake is the future of Los Angeles's homelessness response system and the well-being of the thousands of individuals, families, children, veterans, domestic violence survivors, and people with disabilities who rely on it to obtain and maintain housing. By threatening to displace the Los Angeles Continuum of Care and its ability to set the community funding priorities and in doing so, redirect resources away from permanent housing, HUD's actions jeopardize the very housing stability those programs have created for thousands of formerly unhoused residents.

2. The Los Angeles Continuum of Care ("LA CoC") plays a critical yet underappreciated role in Los Angeles's homelessness response system. It is tasked by Congress to bring together stakeholders throughout the region to set the priorities for federal funding and determine the allocation of hundreds of millions of dollars of federal funding, in alignment with other funding sources in the community and as part of a coordinated approach to homeless assistance. In a region plagued by political and administrative gridlock, LA CoC is one entity that, by Congressional design, brings together myriad stakeholders—homeless and formerly homeless individuals, nonprofit homeless assistance providers, victim service providers, faith-based organizations, governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, hospitals, universities, affordable housing developers, and law enforcement—to work collaboratively to set the region's homelessness funding priorities. Although Los Angeles's homeless services system is

not without its shortcomings, the Continuum of Care is a bright spot—an example of successful regional collaboration and coordination, and for the past twelve years, that collaboration and coordination has resulted in year over year increases in federal funding for the region.

3. Formed pursuant to Title IV of the McKinney-Vento Homeless Services Act, LA CoC directs—in alignment with community priorities—the annual allocation of hundreds of millions of dollars in federal homelessness assistance funding across the region. These funds support 140 projects and collectively provide 11,423 people permanent housing, shelter, and services, including 1,030 families, 1,923 children, 823 transition-age youth, 1,627 seniors, 901 individuals impacted by intimate partner violence, and 89 veterans. While homelessness remains an entrenched crisis in Los Angeles,[1] there is no dispute that the permanent housing and services funded by CoC grants have been instrumental in preventing even higher levels of homelessness by keeping more than 11,000 formerly homeless residents stably housed.

4. In June, in the middle of LA CoC's annual priority-setting process and without any notice, hearing, or presentation of facts—HUD took unprecedented action to immediately suspend the Los Angeles Homeless Services Authority ("LAHSA"), LA CoC's collaborative applicant. Citing its suspension of LAHSA, HUD then indicated it would institute extraordinary remedial measures against LA CoC. These measures, if left in place, would eliminate local control of over $140 million dollars in federal funding—despite Congress's clear intent to entrust that control to the community.

5. Taken just ten days after the start of the application period for 2026's federal funding, HUD's actions threaten LA CoC's ability to carry out its congressionally mandated responsibilities and preserve the stability of housing projects

[1] The 2026 Homeless Count, for example, showed a 1.2% increase in homelessness in the County, much of which was attributed to individuals moving out of temporary shelters and back onto the streets due to lack of permanent housing placements. L.A. Homeless Servs. Auth., 2026 Greater L.A. Homeless Count, 11 (July 24, 2026) https://www.lahsa.org/documents?id=10115-hc-2026-data-ppt-slide-deck.

around Los Angeles. HUD has no authority to disregard proper procedures in order to insert its own priorities into the community process designed by Congress. Yet that is precisely what HUD is attempting to do by suspending LAHSA and effectively disbanding LA CoC as a result.

6. HUD's remedial measure against LA CoC comes on the heels of numerous failed attempts by the Administration to radically shift the CoC program away from funding renewal programs that are based on research-backed strategies that have community support and towards its own strategies to address the homelessness crisis—strategies that are often at odds with local priorities, especially in locations like Los Angeles.

7. Those efforts have been thwarted—first by the U.S. District Court in Rhode Island, which has twice struck down the Administration's attempts to seize control of the CoC program through radical changes to the national competition process in 2025 and 2026, and then by Congress, which in its 2026 allocation of homeless assistance funding, continued to invest billions of dollars in the CoC program and its research backed solutions, and importantly, to leave the majority of that funding in the hands of local communities—the backbone of the CoC program.

8. HUD's suspension of LAHSA and remedial measures against LA CoC, which will effectively disband LA CoC and divest the LA region of local control of its funding, is simply the latest attempt by HUD to seize control of hundreds of millions of dollars in federal funding and to reshape Los Angeles's homeless services response system to fit its own priorities.

9. If HUD's actions against LAHSA and LA CoC are allowed to stand, the consequences will be devastating. It will cause the disruption of one of the most functional and stable tent poles of Los Angeles's regional response to homelessness. Tens of thousands of Angelenos, including hundreds of families, veterans, domestic violence survivors, and people with severe disabilities who are finally—often for the first time in decades—off the streets and in permanent housing, will lose that stability.

And there is no evidentiary support for the institutionalization-and-criminalization approach HUD would impose in its place.

10. HUD's actions are not only ill-conceived and will have devastating consequences for the region, they are also unlawful and violate the Administrative Procedure Act as spelled out below.

**THE PARTIES**

11. Plaintiff-Intervenor Los Angeles Continuum of Care is an unincorporated association of stakeholders in Los Angeles County formed pursuant to Section IV of the McKinney-Vento Homeless Services Act.

12. Plaintiff LAHSA is a joint powers authority of the City and County of Los Angeles, created in 1993 to address the problem of homelessness in Los Angeles County. LAHSA serves as Plaintiff-Intervenor LA CoC's collaborative applicant, pursuant to federal law and LA CoC's own Charter.

13. Defendant Donald J. Trump is President of the United States. He is being sued in his official capacity only.

14. Defendant HUD is an executive department of the United States government that is responsible for administering federal housing and urban development laws. Its functions include providing affordable housing assistance, enforcing fair housing laws, supporting home ownership programs, and administering grants for urban development and disaster recovery. HUD is headquartered at The Robert C. Weaver Federal Building, 451 7th Street, S.W., Washington, D.C. 20410.

15. Defendant Scott Turner is the Secretary of HUD. He is being sued in his official capacity only. Turner maintains an office at 451 7th Street, S.W., Washington, D.C. 20410.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the action arises under federal law, including the United States Constitution and the APA, 5 U.S.C. § 551 *et seq*. An actual controversy exists between

the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

17. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; the plaintiff is located in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### A. Overview of the Continuum of Care Program

18. Congress designed the Continuum of Care program ("CoC") to support communities in responding to homelessness at the local level. In 1987, Congress adopted the groundbreaking McKinney-Vento Homeless Assistance Act "to meet the critically urgent needs of the homeless of the Nation" and "to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." In 2009, Congress passed the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act to consolidate homeless services programs funded under McKinney-Vento—the Supportive Housing program, Shelter Plus Care program, and the Section 8 Moderate Rehabilitation program—under the umbrella of the CoC program. The CoC program was created to promote housing stability by providing a continued funding source for effective projects in local communities that provide permanent housing for people experiencing homelessness.

19. Pursuant to 24 CFR § 578.5, each local region must create a Continuum of Care that is made up of stakeholders within a geographic area in order to participate in the Continuum of Care program. A primary purpose of the CoC program is to "promote community-wide commitment to the goal of ending homelessness." The local Continuum, established at the community level, coordinates the application for CoC program funds for the community from the federal government. Only applicants

designated by the CoC can apply for CoC grant funding as part of the consolidated application.

20. In Fiscal Year ("FY") 2026, Congress allocated $4.1 billion dollars in competitive funding to provide housing and supportive services for people experiencing homelessness nationally through the CoC program.

**B. Structure of the Los Angeles Continuum of Care**

21. LA CoC is the largest Continuum of Care in the country, receiving more than $200 million dollars in federal funding each year to fund over 125 separate projects that that serve over 11,000 unhoused and formerly unhoused residents.

22. LA CoC includes 85 of the 88 cities in Los Angeles County, including the City of Los Angeles. LA CoC is led by a Board that is legally required to represent the community and designed to ensure that there is genuine collaboration among stakeholders in the region. LA CoC brings together a wide range of stakeholders throughout the Los Angeles region, including people with lived experience, nonprofit service providers, and local governments to "addresses critical issues related to homelessness through a coordinated community-based process of identifying and addressing needs utilizing U.S. Department of Housing and Urban Development (HUD) funding, as well as other sources of funding." Membership in LA CoC is made up of "persons and entities interested in collaborative, solution-oriented planning to address homelessness in LA County (with the exception of Glendale, Long Beach, and Pasadena)."

23. Under LA CoC's Charter, there are 21 members of the Board who are all "committed to the communitywide goal of ending homelessness in Los Angeles County." To ensure geographic representation, eight (8) Board members are elected by the community to represent each of the eight service planning areas (SPAs) throughout the region. There are also eight (8) system partner seats representing significant partner-members of LA CoC, including Los Angeles County, the City of Los Angeles, LAHSA, the Department of Mental Health, the Housing Authority of the City of Los Angeles,

and the Los Angeles County Development Authority, which is the convening housing authority for nineteen regional housing authorities in the County. There are also five (5) at-large members. Importantly, at least three (3) of the 21 members of the Board must be people who are currently or formerly experiencing homelessness, each representing one of the three main subpopulations (Adults, Families, and Youth). This representative Board is consistent with federal requirements.

**C. Responsibilities of LA CoC**

24. LA CoC's responsibilities are set forth in federal law. As detailed below, LA CoC is responsible for (1) setting priorities for a consolidated application for federal funding and selecting a collaborative applicant to submit the application on behalf of LA CoC; (2) conducting an annual "point in time" count of people experiencing homelessness in the region; (3) managing the region's Homeless Management Information System ("HMIS"); and (4) managing the Coordinated Entry System ("CES").

**1. Consolidated Application and Collaborative Applicant**

25. Each CoC submits one consolidated application for funding. Each CoC must designate one entity, known as the collaborative applicant, to submit this application. LA CoC's Board sets the priorities that are used to rank projects for purposes of LA CoC's application for federal funding. This year's ranking priorities, like prior years, prioritize the use of federal funds to provide housing vouchers for formerly-unhoused residents who have moved into permanent housing.

26. Under the McKinney-Vento Act, although the CoC sets the priorities for rankings and remains responsible for the application, a CoC must designate one entity, the "collaborative applicant" to submit the consolidated application on behalf of the CoC. While technically the CoC itself can play the role of collaborative applicant, in jurisdictions as large as Los Angeles, which this year will include 140 projects in its application, the CoC itself does not have the infrastructure to conduct the local competition, draft the consolidated application, and administer the grants for projects

that are actually funded. Therefore, a CoC like LA CoC designates one of the larger applicants to serve as the collaborative applicant for the CoC.

27. LA CoC has currently designated LAHSA as collaborative applicant. As LAHSA has spelled out in its complaint, the role of the collaborative applicant requires an enormous amount of resources. LAHSA administers the local CoC competition, the results of which are used by LA CoC to set the region's priorities. Because the continued housing of more than 11,000 people and hundreds of millions of dollars are at stake, coordinating the local competition is a significant amount of work, which LAHSA has built into its workplan and budget. As the collaborative applicant, LAHSA can apply for (and has received) a planning grant from HUD to support its work, but that planning grant is further subsidized by the County and the City of Los Angeles.

28. In April 2026, LAHSA registered for and was approved by HUD as LA CoC's collaborative applicant. Since even before then, LAHSA has been diligently taking steps necessary to prepare the consolidated application for the CoC.

29. Importantly, however, while LAHSA plays a crucial role as the collaborative applicant, under federal law, the CoC is responsible for designating the collaborative applicant and could choose a new one were that necessary. And regardless of which entity the CoC designates to serve as the collaborative applicant, the CoC retains responsibility over the region's application for CoC funding.

**2. Other Delegated Duties of LA CoC**

30. In addition to applying for federal funding, CoCs play other roles for the region under federal law. Federal law requires CoCs to conduct an annual point in time count to identify the number of unhoused people in the region ("Homeless Count"). CoCs are responsible for managing the region's Homeless Management Information System ("HMIS"), a database used by homeless service providers to coordinate and document case management and other services to unhoused people in the region. Finally, CoCs are required to manage a centralized or coordinated assessment system

that matches individuals with housing as it becomes available, in consultation with the geographic area's Emergency Solutions Grants program funds recipient.

31. Because of the complicated nature of homeless services in Los Angeles, LA CoC has delegated LAHSA to perform each of these functions. LAHSA is responsible for conducting a Homeless Count that meets HUD's standards. LAHSA is named as the HMIS Lead and "manag[es] the HMIS on the CoC's behalf." Finally, LA CoC's centralized or coordinated assessment system is known as the Coordinated Entry System ("CES"), and LA CoC has delegated the role of CES Management Entity to LAHSA and oversight over the CES to a CES Policy Council of community members that consult on policies related to the operation of the CES.

32. Because LA CoC has designated a single agency that is already centered within Los Angeles's homeless response system, LAHSA is able to not only execute the core functions of the CoC, but also bring together other resources which support the congressionally mandated requirements of the CoC. As a result, the HMIS system is deployed to serve a number of functions in the Los Angeles region beyond what is mandated by federal law. Likewise, the CES is used to match persons experiencing homelessness with more resources than just the ones funded with CoC grant funding. These programs are integral to Los Angeles's homelessness response system.

### D. FY 2026 Notice of Funding Opportunity ("NOFO") and Prioritization of Funding

33. On June 1, 2026, HUD released its Fiscal Year ("FY") 2026 Continuum of Care Competition and Youth Homeless Demonstration Program Grants Notice of Funding Opportunity ("NOFO") (the "FY 2026 NOFO"). The FY 2026 NOFO outlines the funding process used by HUD to award the $4.1 billion dollars allocated by Congress in competitive funding for the CoC program, to be used by local communities to provide housing and supportive services for people experiencing homelessness. The CoC program is not the only source of federal funding to combat homelessness in Los Angeles, but it is the largest and most consistent. In FY 2024 and 2025, LA CoC

received more than $220,000,000 in federal funds, which has allowed LA CoC to fund more than 8,000 housing units and to provide more than 11,000 residents housing, shelter, and services.

34. The implementing statute for the CoC program, 42 U.S.C. §11380 *et seq.*, sets forth a framework that prioritizes permanent housing, stability, and a strong role for local decision-making. Because CoC funding is intended to provide stability and consistency to local communities, Congress has prioritized the renewal of existing grants to ensure stability of those projects for the formerly unhoused residents who call those units home, with an emphasis on local decision-making about which projects should receive continued funding.

35. Every year, at the start of the CoC funding cycle, HUD is required to determine how much funding is necessary to provide one year of renewals for all of the CoC's renewal grants. That amount is the annual renewal demand ("ARD") for each CoC. Los Angeles's ARD for FY 2026 is $238,849,767. In its appropriation of funds, Congress requires HUD to divide this funding into two tiers. Tier One is a minimum percentage of the ARD for each region that HUD must set aside for renewal projects. Projects that CoCs decide fall within the percentage set by Congress and HUD, or Tier One, are presumptively funded, subject only to a threshold eligibility review by HUD. Projects that fall into the next tier, Tier Two, are subject to a national competition and are not guaranteed funding.

36. In order to determine which tier projects fall into, the CoC holds a local competition to determine which projects will be prioritized for funding each year. The CoC ranks all projects within the region that are eligible for federal funding, using its own local priorities and assessments about each project's performance. Based on these rankings, the CoC can decide which projects fall into Tier One and which projects fall into Tier Two.

37. Because of the tiered funding structure, one of the most important tasks assigned to the regional CoC is to determine the ranking priorities for the community

and to score projects applying for funding, based on those priorities. This process allows local communities to prioritize Tier One funding for the projects that will make the greatest impact for the region. Doing so determines how the Tier One funding will be spent within the region. It also allows the CoC to balance federal funding dollars with other sources of funding to ensure a sustainable mix of funding for different types of homeless services. Consistent with congressional intent, CoC funding in Los Angeles has historically been used to fund permanent housing; 8,206 units of permanent housing are currently paid for with CoC funding, keeping over 10,000 formerly unhoused residents in stable housing and preventing them from falling back into homelessness.

38. The central role of local communities in controlling the allocation of federal funding at the local level is a key component of the CoC program. By requiring each region to pull stakeholders together and set priorities for the community, it ensures that the needs of the community are decided not in Washington D.C., but rather, by the community itself. It also ensures a level of local collaboration among governmental and non-governmental stakeholders that would likely not otherwise exist.

39. In FY 2026, the CoC's role in setting the ranking priorities for project applications is even more significant. As in past years, the FY 2026 NOFO sets a two-tier system for project applications. However, Congress set the minimum threshold for renewals at 60%, compared to past years' 90%. As a result, only 60% of projects that were previously funded will be presumptively guaranteed funding. The CoC gets to determine which projects fall into Tier One and will therefore presumptively receive funding. Moreover, HUD has set aside the remaining 40% of funding for new projects, meaning that the only projects that are likely to receive renewal funding in FY 2026 are the projects the CoC determines fall within Tier One of the consolidated application. In FY 2026, 60% of the ARD of $238,849,767 million is $143,309,860.20 million for Tier One projects.

40. After HUD released the FY 2026 NOFO on June 1 with a deadline of August 26 to apply for funds, as in past years, LA CoC began diligently meeting to

prepare its project rankings for the FY 2026 NOFO in accordance with its duties under federal law and its local priorities. LA CoC and LAHSA began the work of compiling the CoC's consolidated application, which included setting ranking priorities and ranking 140 separate projects to determine which projects fall into Tier One and will be presumptively funded, and which ones fall into Tier Two and may not be.

41. On July 15, 2026, LA CoC approved preliminary priorities for Tier One and Tier Two. In Tier One, which will be presumptively funded, LA CoC's preliminary ranking policy prioritizes funding site-based permanent supportive housing projects, projects that serve special populations (domestic violence and youth homelessness), projects to manage HMIS and CES, and tenant-based PSH projects. These ranking priorities are consistent with LA CoC's prior year rankings. The ranking priorities to be used for the FY 2026 NOFO were finalized on August 5, 2026.[2]

### E. The Impact of HUD's Actions Against LA CoC and LAHSA

42. On June 11, 2026, only ten days into the FY 2026 competition period, this work was all called into question when HUD took the unprecedented step of notifying LAHSA that it was immediately suspending LAHSA and preventing it from engaging in any transactions with the federal government. According to HUD, its suspension of LAHSA took effect immediately, without any prior notice to either LAHSA or LA CoC, let alone an opportunity to challenge the suspension before it went into effect. Instead, LAHSA was given 30 days to request a hearing, but HUD was clear that the suspension would remain in effect unless and until it was overturned at the hearing.

43. Although the federal regulation upon which HUD relied to immediately suspend LAHSA requires a finding that the immediate suspension is within the public

[2] On August 7, 2026, the United States District Court for the District of Rhode Island entered an order vacating HUD's issuance of the FY 2026 NOFO. *See State of Washington et al. v. HUD*, Case No. 26-CV-439 (D.R.I.), Dkt. No. 34; and *Nat'l Alliance to End Homelessness v. HUD*, 26-CV-436 (D.R.I.), Dkt. No. 41. As a result, there was no longer a FY 2026 NOFO application deadline of August 26, and the future of the FY 2026 grant cycle is currently unclear.

interest, HUD made very few findings that doing so was actually in the public interest. HUD also failed to consider significant consequences of the immediate suspension, which are distinctly against the public interest, including the disruption of LA CoC's HMIS and CES systems. And critically, as outlined below, HUD's suspension of LAHSA, if upheld by this Court, will result in remedial measures against LA CoC. Yet HUD failed to mention, let alone even consider the consequences of effectively disbanding LA CoC and disrupting the region's application for millions of dollars in federal funding, a consequence that was not only predictable but also initiated by HUD itself.

44. HUD's actions stripped LAHSA of its ability to apply for federal funds. HUD has also taken the position that the suspension prevents LAHSA from performing its other delegated duties, which include the operation of HMIS and CES, both critical segments of Los Angeles's homelessness response system without which LA CoC cannot function, let alone the rest of Los Angeles's homelessness response system.

45. On June 18, 2026, only a week after HUD notified LAHSA of its suspension, and with no prior warning, HUD sent a letter to LA CoC, informing the Board Chair that HUD had determined that because LAHSA was suspended, LAHSA could not serve as the collaborative applicant or perform its "other delegated duties." As such, HUD took the position that LA CoC is de facto out of compliance with federal law and regulations.

46. As a result, HUD notified LA CoC that it was invoking its authority to take remedial measures against the CoC, citing 42 U.S.C. 11360a(c) and 24 C.F.R. Section 578.13(a). Specifically, Assistant Secretary Ronald Kurtz informed the CoC that HUD had determined that "it was in the public interest to allow eligible entities to submit their grant requests directly to HUD." This action against LA CoC is unprecedented. In the course of suspending LAHSA, HUD effectively suspended LA CoC as well, usurping community control from the body congressionally mandated to identify, assess, and carry out community priorities and solutions to homelessness in

Los Angeles. This purported "remedial measure" effectively strips the entire LA region of its ability to make its own decisions about how approximately $144 million in dedicated Tier One federal funds will be spent in Los Angeles County.

47. Notably, HUD provided no allegations of wrongdoing or deficiencies by the CoC itself, nor did LAHSA's suspension relate to the duties LAHSA performed as the collaborative applicant for LA CoC. The letter also included no findings that LA CoC itself could not operate effectively. Nor did HUD provide any grace period for LA CoC to identify a new collaborative applicant, even though the HUD regulations and the NOFO itself allows a CoC to change its collaborative applicant at any time, including where, as here, the collaborative applicant can no longer perform its role. And critically, HUD made no finding that the remedial measure HUD chose to take against LA CoC would actually remediate the harm caused by LAHSA's suspension—which it will not. Allowing individual applicants will not remediate the harm caused by HUD's suspension of LAHSA. It has no impact on the HMIS and CES systems, which HUD has said are currently suspended.

48. The effect of HUD's intended remedial measure against LA CoC was spelled out in greater detail on July 16, 2026, when HUD issued a notice of its intent to amend the FY 2026 NOFO to include a process by which individual applicants in the LA CoC would apply directly to HUD. The process, outlined in a new Appendix III that was added to the modified NOFO, would also apply more broadly to any region where, as HUD had found for Los Angeles, "a CoC does not meet the requirements of the CoC program in accordance with 24 CFR 578.13 and 42 U.S.C. 11360a(c)."

49. Appendix III spelled out the process by which project applicants would apply directly to HUD and how HUD would rank those applications. Rather than relying on the CoC to conduct a local competition to select applications and rank them based on the communities' priorities and specific knowledge of the community and its needs, in the "direct-to-HUD" process, HUD itself will determine which projects should be funded.

50. While the Appendix III process required Tier One funding to be granted to renewal projects within the CoC, the rest of the criteria HUD intended to use to rank projects diverged significantly from LA CoC's ranking priorities, including by ranking projects based on their fealty to HUD funding priorities instead of the priorities set by the local community. These funding priorities are significantly different from the ones used by LA CoC to rank its projects.

51. On July 17, 2026, LA CoC sent a response letter to HUD, presenting its case that (1) HUD failed to provide adequate due process before suspending LAHSA; (2) HUD had made no separate findings to support its June 18 findings; (3) the issuance of a remedial action against LA CoC is premature and unnecessary because the CoC can delegate different entities to perform the functions necessary to participate in the FY 2026 NOFO; (4) HUD's "direct-to-HUD" remedial measures are inconsistent with federal law and regulations that created the CoC scheme; and (5) LA CoC must be given an opportunity to cure any potential deficiencies caused by LAHSA's suspension. LA CoC requested that HUD withdraw the June 18 letter and allow LA CoC to participate in the CoC competition consistent with the FY 2026 NOFO. Further, LA CoC requested that in the event the Court allows the suspension of LAHSA to remain place, that HUD provide LA CoC with a reasonable amount of time to cure any deficiencies caused by a suspension of LAHSA before enacting remedial measures against the CoC, including designating a new collaborative applicant and other entities to perform the CoC's duties as required by federal law and regulations.

52. Rather than respond to LA CoC directly, on July 21, 2026, in an objection to a proposed order from LAHSA to maintain the status quo before the preliminary injunction hearing in this case, HUD confirmed that it intended to implement the "direct to HUD" application process within the LA CoC if LAHSA remained suspended following the Court's ruling on LAHSA's preliminary injunction application, thus rejecting LA CoC's proposal in its July 17, 2026 response that it

could designate a new collaborative applicant and lead agency to perform the CoC's duties.

53. HUD's commandeering of the application process away from community control will be devastating for Los Angeles. Over the past several years, and consistent with congressional intent to provide a stable source of funding for permanent supportive housing, LA CoC has prioritized renewing permanent supportive housing projects. The results, while no panacea, have nonetheless been successful in ensuring that when unhoused residents move off the streets, they have a permanent place to go, rather than cycling back to homeless.

54. CoC funding currently provides rental assistance for 8,206 permanent housing units. This permanent housing is occupied by formerly unhoused residents who have found stability, often after decades on the streets. This includes domestic violence survivors, families with young children, seniors, veterans, and people with significant disabilities—individuals who without rental subsidies would be unable to afford housing and would likely end up unhoused again. For decades, and consistent with congressional intent, LA CoC has prioritized funding permanent housing projects to ensure that the progress made to move these residents off the streets is not undone by funding cuts and budget pressures.

55. Based on LA CoC's ranking priorities, this year has proven to be no exception. LA CoC's ranking criteria to determine which projects will wind up in Tier One, and will therefore be presumptively funded with grant money, prioritize continued support for permanent housing along with performance metrics to fund the most successful projects at keeping people off the streets.

56. The strategy to invest CoC dollars towards keeping formerly unhoused people in their housing was not established in a vacuum. As was Congress's intent, by allowing the local CoC to determine funding priorities, it has allowed the CoC to balance the investment of CoC dollars in permanent housing with investments in other areas of the homeless response system by other funding streams. One of the principal

aspects of LA CoC's prioritization strategy is that its investment in permanent housing is balanced by increased investment by other parts of the homeless response system in Los Angeles that fund interim shelter. Allowing local decision making about Tier One funding has allowed LA CoC and the greater homeless response system to ensure that federal funding is integrated into Los Angeles's broader homelessness system, helping to move more people off the streets and to remain in their housing.

57. On the other hand, under the "direct to HUD" application process, HUD will be able to set its own ranking factors for projects, which will replace the local priorities if individual applicants are forced to apply directly to HUD. As one example, the funding priorities outlined in Appendix III prioritize projects that adhere to the Administration's shift away from congressionally mandated, research-backed housing strategies in favor of criminalization and institutionalization objectives. The rankings HUD intended to use before the NOFO was invalidated provided up to 15 points to individual projects that committed to aiding law enforcement to clear tents and encampments on public property, arresting individuals using illegal drugs regardless of root cases, and instead supporting involuntary commitment. Tragically, such efforts have never been proven as effective in addressing homelessness. Whatever their ideological appeal, they run contrary to congressional intent, community experience, and common sense. Yet under HUD's prioritization, commitment to this strategy is given a higher priority than keeping formerly unhoused residents in their homes.

58. A likely result of the dismantling of the LA CoC ranking process in favor of HUD's priorities will be that funding that would go to pay for rental assistance to keep formerly unhoused residents in their homes will likely be slashed in favor of other forms of shelter and services. The result will be that housing stability for over 11,000 people will be placed in jeopardy, potentially adding to a Homeless Count that already this year showed homelessness up 1.2% again in the County.

59. Another result of the shift from the consolidated application to "direct-to-HUD applications" will be the timing of notifications of likely grant awards, which will

have a dramatic impact on LA CoC stakeholders' abilities to brace for the potential loss of funding that is coming down the pike as a result of the setting of a lower threshold for Tier One funding than in past years.

60. Because of the presumption of funding for projects in Tier One, projects that are in Tier One can be relatively certain they will receive funding when the CoC completes its rankings as part of the consolidated application process. The "direct-to-HUD" application process will push the timeline for a project to learn whether they will receive funding until HUD announces the results of the national competition, as opposed to when the LA COC determines which projects will be in Tier One. This uncertainty in funding will give unfunded projects only two months to find funding, or even more likely, cause them to serve eviction notices on the thousands of residents who previously relied on CoC rental subsidies to remain in their homes.

61. This inevitable uncertainty that the remedial actions against LA CoC have caused and will continue to cause is directly contrary to Congress's intent when it created the CoC program in 2009. And the weight of the uncertainty is being carried by LA CoC and the stakeholders who make up LA CoC: the service providers, funders, and government entities who were already reeling from HUD's shift in priorities in the FY 2026 NOFO. And most importantly, it is being carried by the more than 11,000 residents who receive housing, shelter, and services as a result of CoC funding, residents who have been helped off the streets and are currently in stable housing but who may wind up back on the streets if community control over that funding is taken away.

## FIRST CAUSE OF ACTION

**Violation of the Administrative Procedure Act –**

**5 U.S.C. §§ 702, 704, 706(1), (2)(A)-(D)**

**Against All Defendants**

**(Agency Action In Excess of Constitutional and Statutory Authority, Contrary to Law, and Not In Accordance With Law)**

62. Plaintiff-Intervenor incorporates the above paragraphs as if fully set forth herein, and joins LAHSA's first cause of action into this complaint in intervention, as if fully set forth herein.

63. Under the APA, a court shall "hold unlawful and set aside agency action . . . found to be (A) . . . not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity;" "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "(D) without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A)-(D).

64. An agency action is reviewable under the APA if it is a final agency action. 5 U.S.C. § 704. Final agency actions (1) "mark the 'consummation' of the agency's decision-making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

65. HUD's June 11 suspension of LAHSA and its June 18 remedial measures against LA CoC, reinforced in its July 21 and August 7 filings with the Court, constitute an "[a]gency action made reviewable by statute," 5 U.S.C. § 704; 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704. The suspension has an immediate and direct effect, with concrete consequences that qualifies as a final agency action subject to review under the APA. Indeed, "[a] suspension is effective when the suspending official signs the decision to suspend." 2 C.F.R. § 180.710.

66. HUD's suspension of LAHSA purports to prohibit LAHSA from, inter alia, carrying out programmatic functions delegated to it by LA CoC, serving as the collaborative applicant for LA CoC, and applying for federal funding under the CoC Program for fiscal year 2026, and declares that LA CoC is unable to execute its responsibilities and thus ineligible for federal funding.

67. HUD's suspension also purports to prohibit LAHSA from carrying out its other delegated duties, including the critical HMIS and CES systems, which track individuals applying for and receiving services throughout the County, as well as its duty to conduct the annual Homeless Count. The HMIS data and Homeless Count data are required by Congress and used at all levels of government to make policy decisions. LAHSA's CES role is also required by HUD's own regulations. It would contravene congressional intent for LAHSA to simply suspend these roles. HUD identifies no contractual violations or other serious issues that address these programmatic functions in any way. HUD cannot simply abandon these functions, and this Court should not "rubber-stamp" HUD's decision, as it is "inconsistent with "[HUD's] statutory mandate" and "frustrate[s] the congressional policy" underlying the HEARTH Act. *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (citation omitted) (alteration in original).

68. HUD's actions as described above are in excess of its constitutional and statutory authority, contrary to law, and not in accordance with law. HUD's actions impermissibly interfere with the core sovereign police functions of state and local governments, violates federal statutes and congressional appropriations that require HUD to fund federal grants under the CoC Program throughout the country, and disregards the legitimate reliance interests of LA CoC members and unhoused and formerly unhoused residents who rely on LA CoC funding to receive services and to remain stably housed or in shelter.

69. HUD also lacks valid statutory or regulatory authority to take the actions it has taken against LAHSA and LA CoC. Nothing in the OMB Guidelines or any other law or regulation authorizes HUD to use the suspension or debarment mechanism as an end-run around its statutory funding obligations for the CoC Program set forth in 42 U.S.C. §§ 11381-11389. HUD's remedial actions taken against LAHSA and LA CoC far exceed what would be necessary "to prevent a continuation of the deficiency; to mitigate, to the extent possible, its adverse effects or consequences; and to prevent its

recurrence," which is the applicable standard in the CoC implementing regulations, which HUD should have used when applying remedial measures against LAHSA and LA CoC for failure to comply with program requirements. 24 C.F.R. § 578.107(b).

70. LA CoC and its members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2, including by cutting off critical revenue that ensures over 11,000 people are housed or sheltered including 1,030 families, 1,923 children, 823 transition-age youth, 1,647 seniors, 901 individuals in families impacted by intimate partner violence, and 89 veterans.

## SECOND CAUSE OF ACTION

**Violation of the Administrative Procedure Act –**

**5 U.S.C. §§ 702, 704, 706(1), (2)(A)-(D)**

**Against All Defendants**

**(Agency Action In Excess of Constitutional and Statutory Authority, Contrary to Law, and Not In Accordance With Law)**

71. Plaintiff-Intervenor incorporates the above paragraphs as if fully set forth herein.

72. HUD's decision to take remedial measures against LA CoC, as announced in its June 18 letter and confirmed in court filings on July 21 and August 7, 2026 constitutes "[a]gency action made reviewable by statute," 5 U.S.C. § 704; 42 U.S.C. § 2000d-2, as well as "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and is therefore subject to judicial review. 5 U.S.C. §§ 702, 704. Although the June 18 letter was titled a Notice of Findings and Proposed Remedial Action, and HUD later indicated that the remedial action was contingent on LAHSA's suspension, HUD's conduct — including its steps to issue (later invalidated) binding competition rules and its subsequent statements to this Court —evidence the fact that the agency's decision-making process was consummated and constituted a "final agency action" for purposes of this Court's jurisdiction. 5 U.S.C. § 704.

73. HUD's remedial measures against LA CoC, if allowed to stand, will prevent LA CoC from submitting a consolidated application for federal funding under the CoC Program for fiscal year 2026, which will have the effect of preventing LA CoC from receiving federal funding based on priorities set by LA CoC, as required by Congress in its FY 2026 appropriation of federal funds to the CoC Program.

74. HUD's actions as described above are in excess of its constitutional and statutory authority, contrary to law, and not in accordance with law. HUD's actions impermissibly interfere with the core sovereign police functions of state and local governments, violates federal statutes and congressional appropriations that require HUD to fund federal grants under the CoC Program throughout the country, and disregards the legitimate reliance interests of LA CoC members and unhoused and formerly unhoused residents who rely on LA CoC funding to receive services and to remain stably housed or in shelter.

75. HUD lacks valid statutory or regulatory authority to take the actions it has taken against LA CoC. Nothing in the OMB Guidelines or any other law or regulation authorizes HUD to use the authority to take remedial measures to ensure to do an end run around the entire CoC program as its statutory funding obligations for the CoC Program set forth in 42 U.S.C. §§ 11381-11389. HUD's remedial actions taken against LA CoC far exceed what would be necessary "to prevent a continuation of the deficiency; to mitigate, to the extent possible, its adverse effects or consequences; and to prevent its recurrence," which is the applicable standard in the CoC implementing regulations, which HUD should have used when applying remedial measures against LAHSA and LA CoC for failure to comply with program requirements. 24 C.F.R. § 578.107(b).

76. LA CoC and its members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2, including by cutting off critical revenue to continue housing and shelter assistance that is currently used by 11,000

people, including 1,030 families, 1,923 children, 823 transition-age youth, 1,647 seniors, 901 individuals in families impacted by intimate partner violence, and 89 veterans.

**<u>THIRD CAUSE OF ACTION</u>**

**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**

**Against All Defendants**

**(Arbitrary and Capricious Agency Action)**

77. Plaintiff-Intervenor incorporates the above paragraphs as if fully set forth herein.

78. Under the APA, a court shall "hold unlawful and set aside agency action…found to be arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A).

79. Agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Ohio v. Envtl. Prot. Agency*, 603 U.S. 279, 292 (2024) (quotation omitted). The APA requires that an agency provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (quotation omitted) (alteration in original).

80. HUD's actions as described above are arbitrary, capricious, and an abuse of discretion in multiple ways.

81. A suspension is a "serious" action, 2 C.F.R. § 180.700, and may only be used "to exclude persons who are not presently responsible from Federal programs." 2 C.F.R. § 180.125(b). As pertinent here, a suspending official may impose suspension only where that official determines both (1) "adequate evidence" exists for a cause for

debarment and (2) "[i]mmediate action is necessary to protect the public interest." 2 C.F.R. §§ 180.700, 180.800 (listing recognized causes for debarment).

82. HUD failed to provide a reasoned explanation as to why an *immediate* suspension of LAHSA, in all of its delegated roles, is necessary to protect the public interest. The references in the June 11 letter date back as far as 2007.

83. HUD further failed to consider how a blanket suspension on LAHSA, which would then lead to the disbanding of LA CoC, will hurt tens of thousands of the Los Angeles region's neediest residents, and it will without question stymie HUD's stated goal of reducing homelessness. HUD also failed to account for the substantial reliance interests of sub-grantees, the local government, and the unhoused—all of which rely on LAHSA.

84. HUD also failed to consider how the suspension of LAHSA would force LA CoC out of compliance with its obligations under federal law or how that would impact LA CoC's ability to participate in the CoC competition. Although HUD itself later determined that, as a result of its suspension, LA CoC was out of compliance with federal regulations, there is no evidence that HUD considered this consequence when it determined that suspending LAHSA was in the public interest. As outlined above and in LAHSA's complaint, the effect of LAHSA's suspension has resulted in HUD's determination that the nation's largest CoC cannot participate in the CoC competition, which impacts not only LA CoC but all of the project applicants and service providers who must now submit their own applications to HUD rather than relying on the consolidated application already being prepared by LAHSA.

85. Nor is there any recognition that by *immediately* suspending LAHSA, it would result in LA CoC immediately losing its ability to perform HMIS and CES functions—critical functions required by federal law, and the inability to perform those duties pushed LA CoC out of compliance with federal regulations and therefore subject to potential remedial measures.

86. LA CoC and its members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2, including by cutting off critical revenue that ensures over 11,000 people are housed or sheltered, including 1,030 families, 1,923 children, 823 transition-age youth, 1,647 seniors, 901 individuals in families impacted by intimate partner violence, and 89 veterans.

## FOURTH CAUSE OF ACTION

**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(A)**

**Against All Defendants**

**(Arbitrary and Capricious Agency Action)**

87. Plaintiff-Intervenor incorporates the above paragraphs as if fully set forth herein.

88. Under the APA, a court shall "hold unlawful and set aside agency action…found to be arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A). HUD's actions as described above are arbitrary, capricious, and an abuse of discretion in multiple ways.

89. HUD failed to provide any reasoned explanation in its June 18 letter implementing remedial measures against LA CoC why it chose the specific remedial measure it chose against LA CoC. HUD provided no evidence to support its conclusion that LA CoC was not in compliance with its federal obligations, warranting remedial measures. Nor did HUD explain why LA CoC should not be given an opportunity to come into compliance after LAHSA's immediate suspension.

90. HUD further failed to consider how the "direct-to-HUD" application process would impact the grantees applying for funds through the consolidated application, who will now be required to submit applications directly to HUD. Nor did it consider how the "direct-to-HUD" application process would impact the timeline for funding will impact defunded projects' ability to seek additional funding before grants run out. This inability to plan for defunding will hurt tens of thousands of the Los

Angeles region's neediest residents, and it will without question stymie HUD's stated goal of reducing homelessness. HUD also failed to account for the substantial reliance interests of sub-grantees, the local government, and the unhoused—all of which rely on continued CoC funding.

91. LA CoC and its members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2, including by cutting off critical revenue that ensures over 11,000 people are housed or sheltered, including 1,030 families, 1,923 children, 823 transition-age youth, 1,647 seniors, 901 individuals in families impacted by intimate partner violence, and 89 veterans.

## FIFTH CAUSE OF ACTION

**Violation of the Administrative Procedure Act – 5 U.S.C. § 706(2)(D)**

**Against All Defendants**

**(Agency Action without Observation of Procedure Required by Law)**

92. Plaintiff-Intervenor incorporates the above paragraphs as if fully set forth herein.

93. Under the APA, a court shall "hold unlawful and set aside agency action…found to be…without observation of procedure required by law." 5 U.S.C. § 706(2)(D). The obligation to observe procedures "required by law" include not only procedures required by governing statutes, but also procedures required by the agency's own regulations.

94. Although HUD purported to suspend LAHSA pursuant to OMB regulations related to the suspension and debarment of government contractors, HUD ignored the applicable regulatory procedure in implementing regulations of the McKinney-Vento Homeless Assistance Act which apply specifically to sanctions against a recipient of a CoC grant.

95. 24 C.F.R. § 578.107 governs the process by which HUD can review the performance of grant recipients and take remedial measures against a recipient if HUD

determines that the recipient "has not complied with a program requirement." 24 C.F.R. § 578.107(a)(2).

96. LAHSA is a recipient of grants and at least some of the violations alleged by HUD to justify its suspension of LAHSA constitute non-compliance with program requirements.

97. HUD failed to observe any of the procedures outlined in 24 C.F.R. § 578.107, including (1) giving the recipient notice of its determination that LAHSA had not fulfilled program requirements; and (2) providing LAHSA with "an opportunity to demonstrate, within the time prescribed by HUD and on the basis of substantial facts and data that the recipient has complied with the requirements." 24 C.F.R. § 578.107(a)(2).

98. Because HUD failed to observe its own procedures, HUD also failed to make the findings necessary to take remedial measures or issue sanctions against LAHSA pursuant to 24 C.F.R. § 578.107. HUD did not find, as is required under the regulation, that the suspension of LAHSA was "designed to prevent a continuation of the deficiency; to mitigate, to the extent possible, its adverse effects or consequences; and to prevent its recurrence." Instead, the sanction taken against LAHSA, suspension of LAHSA from all federal grants, exceeds any steps necessary to remediate the harm caused by LAHSA's program violations.

99. HUD's failure to observe its own procedures, including providing notice and an opportunity to cure the deficiencies, made it impossible for LA CoC to take any mitigating steps to prevent the harm caused by LAHSA's suspension or that would prevent HUD from taking remedial measures against LA CoC. Had HUD followed its procedures, LA CoC would have been on notice and could have mitigated the harm and prevented HUD from taking remedial measures against it.

100. LA CoC and its members have suffered a legal wrong as a result of, and have been adversely affected or aggrieved by, Defendants' actions alleged herein for purposes of 5 U.S.C. § 702 and 42 U.S.C. § 2000d-2. By failing to provide LAHSA

notice and an opportunity to remedy the alleged violations and instead immediately suspending LAHSA, HUD deprived LA CoC of any opportunity to mitigate the harms caused by LAHSA's suspension, which would result in the loss of critical revenue that ensures over 11,000 people are housed or sheltered, including 1,030 families, 1,923 children, 823 transition-age youth, 1,647 seniors, 901 individuals in families impacted by intimate partner violence, and 89 veterans.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff-Intervenor requests that this Court:

A. Declare unlawful, vacate, and set aside HUD's suspension of LAHSA, to whom LA CoC has delegated its congressionally mandated responsibilities;

B. Declare unlawful, vacate, and set aside HUD's decision to take remedial measures against LA CoC based on its suspension of LAHSA, including requiring eligible applicants to apply directly to HUD for funding, instead of participating in the congressionally-mandated CoC process, including by seeking CoC funding by way of the consolidated application;

C. Temporarily, preliminarily, and permanently enjoin Defendants, including their agents, employees, partners, and any person acting in concert with them, from immediately or otherwise suspending LAHSA from fulfilling the duties delegated to it by LA CoC, including serving as the collaborative applicant for the FY 2026 NOFO, conducting the annual Homeless Count, managing HMIS, and managing CES.

D. Temporarily, preliminarily, and permanently enjoin Defendants, including their agents, employees, partners, and any person acting in concert with them, from immediately or otherwise taking any remedial measures against LA CoC;

E. Award LA CoC its reasonable attorneys' fees and costs in accordance with law; and

F. Award any other relief the Court deems just and proper.

Dated: August 31, 2026

Respectfully submitted,

LEGAL AID FOUNDATION OF LOS ANGELES

*/s/ Shayla Myers*
Shayla Myers
*Attorneys for Plaintiff-Intervenors*

PUBLIC COUNSEL

*/s/ Mark Rosenbaum*
Mark Rosenbaum
*Attorneys for Plaintiff-Intervenors*

STEPTOE LLP

*/s/ Robyn C. Crowther*
Robyn C. Crowther
*Attorneys for Plaintiff-Intervenors*

**Local Rule 5-4.3.4 Attestation**

I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED: August 31, 2026

LEGAL AID FOUNDATION OF LOS ANGELES

/s/
Shayla Myers