UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

SEP 30 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

LOS ANGELES HOMELESS SERVICES AUTHORITY, a joint powers authority,

Plaintiff - Appellee,

LOS ANGELES CONTINUUM OF CARE,

Intervenor-Plaintiff - Appellee,

v.

DONALD J. TRUMP, in his official capacity as President of the United States of America; et al.,

Defendants - Appellants.

No. 26-5367

D.C. No.
2:26-cv-07056-DOC-AJR
Central District of California,
Los Angeles

AMENDED ORDER

Before: NGUYEN, R. NELSON, and DESAI, Circuit Judges.

U.S. Department of Housing and Urban Development, et al. ("HUD"), seek a stay pending appeal of an order granting a preliminary injunction to Los Angeles Homeless Services Authority ("LAHSA") and Los Angeles Continuum of Care ("LA CoC"). Dkt. No. 8. We grant in part and deny in part HUD's motion.[1]

//

//

[1] We hereby lift the administrative stay issued on September 10, 2026. *See* Dkt. No. 14.

## I. Standard of Review

"A stay is an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citation omitted). Rather, it is "'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'" *Id.* at 433 (citation omitted).

"The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion," and our analysis is guided by four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 426. "'The first two factors . . . are the most critical,' and the 'mere possibility' of success or irreparable injury is insufficient to satisfy them." *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025), *overruled on other grounds by Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622 (9th Cir. 2026). We analyze the final two factors only when the movant "satisfies the first two." *Nken*, 556 U.S. at 435.

We review a district court's grant of a preliminary injunction for abuse of discretion. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 491 (9th Cir. 2023). We find abuse of discretion "if the district court based its decision on an erroneous legal standard or clearly erroneous finding of fact." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citations omitted).

## I. Discussion

The facts of this case are known to the parties. We therefore include only those facts necessary to the disposition of the present motion. Because the facts are rapidly evolving, our decision is intended to maintain the status quo and avoid undue disruption of the FY2026 application process.

### a. Likelihood of Success on the Merits

HUD has not made a sufficiently strong showing that it is likely to succeed on the merits, except as discussed below. When HUD suspended LAHSA on June 11, 2026, it relied on 2 C.F.R. § 180.700, a regulation that permits federal agencies to suspend federal contractors in specific circumstances. Under this regulation, an agency "may impose suspension only when that [agency] determines that . . . [t]here exists adequate evidence to suspect any other cause for debarment . . . and

[i]mmediate action is necessary to protect the public interest." 2 C.F.R. § 180.700.[2]

The district court focused on HUD's unsatisfactory explanation for the necessity of an "immediate suspension." We take the same approach and only address whether HUD provided "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted). We similarly conclude that HUD has not provided a satisfactory explanation.

---

[2] Our colleague's dissent implies that we incorrectly focus on HUD's suspension of LAHSA pursuant to 2 C.F.R. § 180.700, and ignore 42 U.S.C. § 11360a, which details remedial measures HUD may take if it determines a Collaborative Applicant cannot meet the programmatic requirements. Dissent at 1, 6–7, 17. According to the dissent, the analysis should begin and end with whether HUD's determination that LAHSA "does not meet the [programmatic] requirements" was arbitrary and capricious.

But this view misunderstands the record before us. HUD's June 11 letter to LAHSA (the final agency action on appeal) was *only* about HUD's decision to suspend LAHSA pursuant to 24 C.F.R. § 180.700. HUD's June 11 letter makes no reference to 42 U.S.C. § 11360a(c) and discusses no remedial measures. It was not until HUD's letter to LA CoC (a separate entity from LAHSA) that HUD invoked the remedial measures described in Section 11360a(c). Thus, the final agency action on appeal was HUD's decision to suspend LAHSA pursuant to 2 C.F.R. § 180.700. Accordingly, our focus is whether the suspension was arbitrary and capricious. We address HUD's remedial measure to explain its unworkability and the harm it would cause if allowed to go forward.

HUD cites numerous pieces of evidence of LAHSA's ongoing mismanagement and fraud to justify its immediate suspension.[3] Despite HUD's knowledge of LAHSA's mismanagement for many years, HUD chose to suspend LAHSA at a time when it would leave the Los Angeles region particularly vulnerable: after the deadline for Collaborative Applicants to register for the FY2026 application cycle, after HUD had approved LAHSA to be the Collaborative Applicant for the FY2026 application cycle, and after HUD had given LAHSA funds to complete the consolidated application.[4] HUD points to two audits released in May 2026 that confirmed LAHSA's ongoing alleged

---

[3] HUD also effectively prevented LA CoC from identifying a suitable alternative Collaborative Applicant. On June 18, 2026, HUD notified LA CoC of LAHSA's suspension and concluded that LA CoC was in violation of its obligations as a result, and proposed implementing its "Direct-to-HUD" remedial measure. LA CoC responded to HUD in writing within 30 days, *see* 24 CFR § 578.13, urging HUD to permit LA CoC to designate an alternate Collaborative Applicant. HUD never responded to LA CoC's letter and proceeded with the "Direct-to-HUD" application process. Counsel for LA CoC represented that the first time HUD stated it would consider an alternate Collaborative Applicant was in its reply brief on the present motion.

[4] The dissent misconstrues our holding to imply that, because HUD knew of LAHSA's alleged indiscretions "for decades . . . HUD cannot suspend LAHSA now." Dissent at 12. Instead, we conclude that HUD certainly can and should act to investigate and remedy allegations of fraud and misconduct. We focus on the timing of LAHSA's suspension because the authority upon which HUD relied to suspend LAHSA required a finding that it was necessary to act at the time it did. 2 C.F.R. § 180.800. HUD has offered no reasonable explanation as to why it was necessary to immediately suspend LAHSA when it knew of the allegations for years, and when the timing of its action would make it virtually impossible for the LA CoC to apply for federal funding.

misconduct. However, this does not provide any additional clarity on why it was necessary to suspend LAHSA during an ongoing application cycle. Accordingly, HUD has not provided a "satisfactory explanation for its action[,] including a rational connection between" its knowledge of the allegations and its decision to suspend LAHSA at a time that severely crippled LA CoC from applying for federal funding. *State Farm*, 463 U.S. at 43.

We agree that HUD, as a steward of federal taxpayer funds, has the ability and duty to address the serious allegations of fraud and mismanagement levied against LAHSA. We similarly are not aware of any law precluding the government from acting on prior known information. Rather, HUD's "explanation for its decision" to suspend LAHSA during the FY2026 application cycle, after approving LAHSA as LA CoC's Collaborative Applicant, and while knowing of LAHSA's alleged misconduct for years "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

The practical effect of the timing of LAHSA's suspension was to prevent LA CoC from applying for federal homelessness funding. Because of HUD's chosen timing, LA CoC did not have a Collaborative Applicant and the deadline to identify a substitute Collaborative Applicant had lapsed. Although HUD intended to implement a "Direct-to-HUD" application system allowing individual service providers in the LA CoC to apply to HUD in the absence of a Collaborative

Applicant, it is likely that its plan is unworkable and, at this late stage, extremely difficult if not virtually impossible to implement. Applications for the FY2026 application cycle are due on October 14, 2026, leaving individual entities, who have relied on LAHSA for years to complete their applications on their behalf, a matter of days to navigate the grant application process. The unworkability of this solution is underscored by HUD's representation at oral argument that it only recently opened the application portal and has not yet received any individual applications from any individual LA CoC entities.

At the end of the day, the parties are faced with a quickly shrinking runway. LA CoC, LAHSA, and the individual service providers (or some combination thereof) must submit applications by October 14. HUD must review and announce award decisions by December 1.[5] Because there is not "sufficient time to reasonably implement" an alternative system, the status quo will be best preserved at this late stage by permitting LAHSA to serve as the Collaborative Applicant for the FY2026 application cycle. *United States Postal Service v. California*, 609 U.S. __ (2026) (Kavanaugh, J., concurring).

[5] The dissent suggests that the Direct-to-HUD system is feasible because "[t]he October 14 deadline is not an immovable obstacle. Indeed, HUD has extended the CoC Competition deadline multiple times." Dissent at 18. But HUD's own motion seeking emergency relief suggests that it cannot extend the deadline any further because it must meet its statutory deadline of December 1, 2026 for making CoC awards, and it estimates it needs 90 days to review applications.

**b. Irreparable Harm**

HUD has also not sufficiently established that it will be irreparably harmed absent a stay. HUD claims that requiring it to continue working with LAHSA for the FY2026 competition would damage the program's reputation beyond repair, allow LAHSA continued access to millions of dollars in federal taxpayer funds despite its history of mismanagement, and require HUD to rely on LAHSA's determination of regional priorities for Tier One and Tier Two funding. HUD further states that it will suffer irreparable harm absent a stay because it faces a statutory deadline of December 1, 2026.

While we recognize that HUD could experience some reputational harm by continuing to work with LAHSA, any such harm is speculative at this stage and thus not sufficient to warrant a stay. *See Nken*, 556 U.S. at 434–35 ("[S]imply showing some possibility of irreparable injury fails to satisfy the second factor." (citation modified)). This is particularly apparent given that HUD agreed to work with LAHSA as late as April of this year, while knowing of the same allegations of fraud and mismanagement it later used to justify LAHSA's immediate suspension in June. Moreover, any harm resulting from the condensed amount of time HUD has to review applications is a direct result if its decision to suspend LAHSA while the FY2026 application cycle was ongoing. "That the government's asserted harm is largely self-inflicted 'seriously undermines' its claim for equitable relief." *Al*

*Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) (quoting *Hirschfeld v. Bd. of Elections in City of New York*, 984 F.2d 35, 39 (2d Cir. 1993)).

Conversely, the harm to LAHSA and LA CoC is imminent and impacts "vulnerable populations, critical programs, and ongoing services." *County of King v. Turner*, --- F.4th --- , 2026 WL 2489361, at *14 (9th Cir. 2026). Granting a stay would prevent LA CoC from submitting a collaborative application for the FY2026 application cycle. Thus, each individual LA CoC service provider would have to draft and submit individual applications by October 14. As described above, that is virtually impossible.

### c. Remaining Factors

Because we find that HUD has not satisfied the first two *Nken* factors, we do not analyze the final two factors. *Nken*, 556 U.S. at 434.

## II. CONCLUSION

The motion to stay is denied as to the district court's order to reinstate LAHSA as the Collaborative Applicant, Homeless Management Information Systems ("HMIS") Lead, Coordinated Entry System ("CES") Coordinator, and Point-in-Time ("PIT") Count Administrator.

The motion is further denied as to the order requiring HUD to respond to LA CoC's evaluation of the applicant pool for Collaborative Applicant, HMIS Lead, CES Coordinator, and PIT Count Administrator for FY2027.

The motion to stay is denied as to the order to execute signed agreements for approved grants to LA CoC for FY2025, to the extent that HUD has not executed the FY2025 awards solely because LAHSA is involved. HUD is ordered to countersign the FY2025 agreements and release those funds according to the standard schedule required by law irrespective of LAHSA's involvement.

The motion to stay is granted as to the district court's order to disburse the approximately $239 million earmarked for LA for FY 2026, only to the extent that order could be construed as requiring immediate disbursal of those funds before they would otherwise be due. HUD is directed to proceed with the FY2026 competition in accordance with the 2026 Appropriations Act.

The motion to stay is denied as to all other portions of the district court's order.

The panel will hold oral argument on the appeal of the preliminary injunction on October 19, 2026 at 1:00 p.m. PST at the Richard H. Chambers Courthouse in Pasadena, California.

R. NELSON, J., concurring in part and dissenting in part:

The majority's order reaches a practical solution for the dispute between the Department of Housing and Urban Development ("HUD") and the Los Angeles Homeless Services Authority ("LAHSA"). But a laudable outcome is not always a lawful one. The majority correctly curbs the most egregious excess of the district court by staying HUD's immediate distribution of any of the $239 million. But while the majority provides quick relief, it follows the district court's error and ignores HUD's fundamental statutory authority as to the direct-application process.

If you read the majority's order or the district court's order, you would be unaware that a HUD-specific statute governs this case. 42 U.S.C. § 11360a(c) grants HUD authority to allow "eligible entities to apply directly for grants" when it determines that the "collaborative applicant . . . does not meet the [programmatic] requirements." After LAHSA engaged in a repeated pattern of "obvious fraud" (which the district court fully acknowledged), HUD reasonably concluded that LAHSA did not meet the programmatic requirements. Once that determination was made, § 11360a(c) permits HUD to receive direct applications. That should have been the beginning and end of this case. HUD acted consistent with the text and congressional directive of § 11360a(c). Neither the district court nor the majority dispute that. Instead, they both ignore the statute and its requirements.

HUD also took the additional step of suspending LAHSA. But this suspension was not a prerequisite to invoke § 11360a(c). Indeed, suspension is not even addressed by Congress—but by the Office of Management and Budget's ("OMB's") regulations that cover all agency action. Suspension is a more "serious action" than a specific collaborative applicant failing to comply with the program requirements. 2 C.F.R. § 180.700. When suspending any government contractor, any agency—including HUD—must rely on a criminal indictment or cause for debarment, and it must also find immediate suspension in the public interest. *Id.* HUD's suspension under OMB's regulation was proper, as HUD is entitled to strong deference in making public interest determinations. *See* 2 C.F.R. § 180.705(c). But even if that suspension was inconsistent with the APA, that does not control the statutory trigger that HUD referenced in § 11360a(c). Congress never required a collaborative applicant's suspension to invoke the statute's remedy of direct applications. The majority's failure to mention—let alone analyze—the statutory language repeats the district court's clear error. Given § 11360a(c), HUD is not only likely to succeed on the merits—it is virtually guaranteed.

The district court erred further. It accused HUD of engaging in "a pretextual attempt to bypass the carefully constructed . . . scheme set up by Congress." But there is nothing pretextual about an agency carefully following the text of a statute. If any pretext exists, it is the district court's claim that it "does not create or debate

public policy" while dictating Los Angeles homelessness policy. The district court is woefully out of line with the law.

The district court only reached the opposite conclusion by attacking HUD's suspension decision under an OMB regulation. And even then, the district court's analysis is deeply flawed and riddled with errors. Its order portrays LAHSA's automatic reregistration in April 2026 as a surefire guarantee from HUD that LAHSA would serve as the collaborative applicant for FY 2026. In reality, as Caitlyn McKenney, HUD's Deputy Assistant Secretary for Special Needs Assistance Programs stated, "HUD does not use the registration and approval process as an opportunity to assess a Collaborative Applicant's responsibility."

The district court also failed to grapple with events HUD relied on that happened after LAHSA's reregistration, such as prominent reports in May and LA County's budget cuts that would happen in July. Above all, it was error for the district court to refuse to consider two decades of LAHSA's misconduct presented by HUD. Regardless of what HUD failed to act on over the years, HUD is entitled to say enough is enough if adequate grounds exist for suspension. Given HUD's express regulatory deference (which the district court again failed to mention), *see* 2 C.F.R. § 180.705(c), HUD is likely to succeed on APA review of the suspension as well.

It is basic administrative law that a "rational" agency action "based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute" is not arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 42 (1983). I respectfully dissent.

I

LAHSA has a long history of corruption and mismanagement. In 2007, HUD found that LAHSA "failed to conduct onsite fiscal monitoring of project sponsors, lacked required documentation, paid for ineligible expenses, and had poor cash management controls." In 2022, HUD found "that LAHSA failed to use $3.5 million in CoC grant awards, letting the funds expire, did not support the CoC's Homeless Management Information System (HMIS), did not submit timely annual performance reports, and did not provide supporting documentation for over $870,000 in payroll and rent costs."

Since 2024, audits show that LAHSA inappropriately transferred money between grants, failed to verify housing sites that it oversees, and committed "obvious fraud" by over-requesting funding. Additionally, LA County expressed concern that "LAHSA routinely pays service providers late." As recently as February 2026, LAHSA owed $69 million in payments to homelessness service providers, many of which were more than 90 days overdue. LAHSA's financial mismanagement is directly harming the quality of care that homeless individuals

receive, with service providers considering layoffs or bankruptcy because of LAHSA's delays. Audits also revealed undisclosed conflicts of interest, including large contracts being awarded to companies with personal ties to the CEO.

It is not just the federal government that has expressed concerns about LAHSA's mismanagement. In 2023, the LA City Council expressed concern that LAHSA was not following a city rule that required providers to track when homeless people leave hotel housing. Because of this failure, "LAHSA could not even determine whether it had used funding to pay for empty hotel rooms." In April 2025, LA County defunded LAHSA, effective July 1, 2026. The City of Los Angeles is considering making the same decision.

This loss of funding has further damaged LAHSA's ability to function. In April 2026, LAHSA announced that it will lay off 284 employees and eliminate an additional 130 vacant positions. This imminent defunding and layoff is part of what prompted HUD to act, as LAHSA had previously "cited lack of funds and lack of staff as explanations for its failings." Taking LAHSA's assertions as true, HUD reasonably concluded that awarding more government funding to LAHSA as it experienced further personnel shortages would jeopardize the integrity of the program and represent a disservice to taxpayers and homeless individuals alike.

Following LAHSA's renewal as the collaborative applicant in April 2026, even more bad news broke about LAHSA's systemic failures. On May 21, the Los

Angeles County Auditor-Controller released a process review blasting LAHSA "for its limited financial transparency, for having incomplete and inaccurate financial records, for deficiencies in cash management, for its volume of overdue payments to service providers," and more violations. Recently, the Los Angeles city government has also expressed uncertainty about the continued viability of LAHSA, with Mayor Karen Bass stepping down from the LAHSA Board. Mayor Bass's departure is a "crucial sign that LAHSA's days could be numbered." David Zahniser, *Bass stepped down from LAHSA. Does that mean the end for the embattled homeless agency?* L.A. Times, Sep. 12, 2026, https://perma.cc/F3AW-XRQQ.

On June 11, HUD sent a thorough 12-page letter detailing LAHSA's failures and suspending LAHSA immediately as a collaborative applicant. On June 18, HUD sent another letter reiterating that it had suspended LAHSA. But HUD noted, "[The June 18 letter] *also* serves as written notice that HUD finds that the Los Angeles CoC and LAHSA, as the collaborative applicant, do not meet the requirements of 42 U.S.C. § 11360a and 24 C.F.R. part 578 subpart B." (emphasis added).[1] Pursuant to § 11360a(c), HUD notified LAHSA that it "intends to take

[1] The majority is incorrect (Maj. at 4 n.2) that only the June 11 suspension order is before the panel. The June 18 letter was a separate final agency action finding LAHSA non-compliant with § 11360a(c) and adopting remedial measures, relying on many of the same reasons. That second action allowed HUD to adopt the direct application process, which LAHSA supposedly challenges. Only the non-compliant finding, not the suspension alone, triggers remedies under § 11360a(c). If LAHSA has not challenged the second June 18 action, as the majority suggests, then there is

remedial action to ensure the fair distribution of grant amounts to eligible projects" and either "designate another body as a collaborative applicant or permit eligible entities to apply directly for grants." Complying with 24 C.F.R. § 578.13(b), HUD gave the LA CoC and LAHSA 30 days to respond.

Because LAHSA does "not meet the requirements of 42 U.S.C. § 11360a(c)," HUD explained that service providers could submit their grant requests directly to HUD for funding consideration. Accordingly, HUD issued a notice of opportunity for funding ("NOFO") on July 16, allowing service providers to submit individual applications to HUD. HUD has since extended the deadline for direct applications twice, moving it from August 27 to September 30, and then to October 14, demonstrating its capacity and willingness to work with direct applicants and to "ensure fair distribution of grant amounts . . . to eligible entities." 42 U.S.C. § 11360a(c).

II

HUD is likely to succeed on the merits because it correctly acted pursuant to § 11360a(c) (which neither the district court nor majority dispute). In addition, HUD is likely to succeed on its regulatory suspension of LAHSA (which is sufficient but not necessary to trigger § 11360a(c)). "Judicial review under [the arbitrary-and-

---

no basis for either the district court injunction or the majority's order. Either way, HUD is likely to succeed.

capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Contrary to the majority's conclusion, HUD's actions do not "run[] counter to the evidence before the agency." Order 5 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

A

The uncontroverted evidence of LAHSA's extraordinary misconduct—detailed in HUD's June 11 letter—supports HUD's decisions under § 11360a(c) and 2 C.F.R. § 180.700. As early as 2007, HUD found that LAHSA "failed to conduct onsite fiscal monitoring of project sponsors, lacked required documentation, paid for ineligible expenses, and had poor cash management controls." LAHSA's management woes have not gone away either. HUD's decision relies on an audit of LAHSA and LA County's recent review of LAHSA, both of which were released in May 2026. The audit confirmed that LAHSA had engaged in undisclosed related party transactions and had awarded multi-million-dollar contracts to entities with close ties to the CEO. And the LA County Auditor-Controller's scathing review reported that LAHSA was failing to be financially transparent and timely pay service providers. Thus, the only evidence before HUD thoroughly justified its conclusion

that LAHSA "does not meet the requirements" to be the collaborative applicant. 42 U.S.C. § 11360a(c). And it also supported LAHSA's suspension under regulations.

HUD was not merely punishing LAHSA for past misconduct either. Its decision was based on upcoming local events that would worsen LAHSA's situation. The June 11 letter indicated that LAHSA's suspension was tied to HUD's Office of Inspector General opening an investigation into LAHSA. The letter also noted that LA County would be transferring funds away from LAHSA in the following days, and funding cuts from the City of LA would likely follow as well. Given that "LAHSA has cited lack of funds and lack of staff as explanations for its failing," HUD reasonably inferred that LAHSA's performance would only deteriorate further if it remained the collaborative applicant. In addition to funding concerns, HUD explained that it was "not in the public interest . . . to permit LAHSA to *continue* to receive additional millions of dollars of federal funds," regardless of what HUD has permitted in the past. (emphasis added). The letter also noted that "the amount of money at stake necessitates HUD taking immediate action to protect the public interest."

For these reasons, neither the district court nor the majority disputes that HUD's decision to suspend LAHSA was reasonable. The order agrees that "HUD, as a steward of federal taxpayer funds, has the ability and duty to address the serious allegations of fraud and mismanagement levied against LAHSA." Order 5. And

despite the district court's order for LAHSA to stay on as collaborative applicant for FY 2026, the district court ordered LA CoC to find a new one going forward.

B

Given the mountain of evidence making clear that LAHSA fails to comply with §11360a(c) and separately deserves suspension, the district court instead focused on the timing of HUD's suspension decision. And the majority adopts this analysis, criticizing HUD's choice "to suspend LAHSA at a time when it would leave the Los Angeles region particularly vulnerable," "[d]espite HUD's knowledge of LAHSA's mismanagement for many years[.]" Order 4. Whatever the complaints on timing, neither the district court nor the majority cite any statutory requirement for HUD to act within a certain time. Section 11360a(c) simply requires HUD to determine that LAHSA cannot meet program requirements, which no one questions.

Nor do the OMB regulations require HUD to consider the impact of its timing (although it did). And neither the statute nor regulations suggest HUD need ignore longstanding violations. Indeed, the majority's contrary suggestion is contrary to law. The majority reads a new requirement into the regulation that would significantly limit HUD's suspension authority to a short window each year. And it blesses the district court's atextual, policy-driven determination to circumvent plain statutory and regulatory direction.

The idea that the federal government is estopped from taking an enforcement action merely because it does not act at the first sign of incompetence is foreign to administrative law. It is well-established that "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Furthermore, an agency's failure to timely take an administrative action does not later preclude the agency from doing so. *I.N.S. v. Miranda*, 459 U.S. 14, 19 (1982). An agency's delay in taking action does not render subsequent action arbitrary or capricious. *Cal-Almond, Inc. v. U.S. Dept. of Agriculture*, 14 F.3d 429, 444 (9th Cir. 1993) ("[A]ppellants have cited no cases, and we have found none, holding that an agency's delay in issuing a rule makes the rule itself arbitrary or capricious."). The majority admits that it is not "aware of any law precluding the government from acting on prior known information." Order 5. But then the majority ignores this basic principle of administrative law.

The majority reasons that an agency's previous lack of enforcement action hamstrings the agency's present enforcement action. And recall that 2 C.F.R. § 180.700 is an OMB regulation applicable to any agency suspension of a contractor. Taken to its logical conclusion, the majority's theory leads to absurd results and dramatically hampers the entire government's efforts to combat hundreds of billions of dollars in fraud. Consider the infamous case of the "Quality Learing Center." In

2020, the Small Business Administration awarded the Learing Center over $200,000. Letter from Senator Joni Ernst to Small Business Administration Inspector General William Kirk (May 20, 2026), https://perma.cc/24WS-GEUH. A few years later, the Department of Health and Human Services Office of Inspector General found that Minnesota needed to improve its oversight of childcare providers to prevent fraud. *Id.* But the government never took any enforcement actions until recently. Is the federal government now estopped from immediately defunding the Learing Center? It's hard to imagine.

And in LAHSA's case, the majority adopts an even more perverse rule. Since LAHSA has been so defunct for decades, the majority concludes that HUD cannot suspend LAHSA now. The judicial branch—the district court specifically—should not be so complicit in protecting and safeguarding government waste that has led to criminal indictments of private entities engaged in LAHSA's web of fraud. *See* Department of Justice, *Two Defendants Employed at L.A.-Area Homeless Nonprofits Arrested on Federal Charges Alleging Misuse of Millions of Taxpayer Dollars* (2026), https://perma.cc/U2ZX-RPFX (announcing that Abundant Blessings was engaged in abundant fraud and Home At Last was caught at last for using taxpayer dollars to open a nightclub).

No evidence suggests that HUD assured LAHSA that its role was secure in April 2026 and then purposefully suspended LAHSA late enough to prevent another

collaborative applicant from stepping in. To the contrary, the record shows that "HUD does not use the collaborative applicant registration process as an opportunity to assess a Collaborative Applicant's responsibility," and "HUD's approval of LA CoC's registration for the FY2026 competition was not an endorsement of LAHSA." The district court's narrative that HUD pulled the rug out from LA CoC and LAHSA when LAHSA's role was guaranteed is baseless. Because HUD's suspension was not an unfair or inconceivable departure from its prior course, its timing has been mischaracterized.

C

With no support from black letter administrative law, the majority follows the district court and points to the OMB regulation stating that HUD "may impose suspension only when [it] determines that . . . [i]mmediate action is necessary to protect the public interest." 2 C.F.R. § 180.700. Focusing on "immediate," the majority complains that HUD has had "knowledge of LAHSA's mismanagement for many years" but only suspended LAHSA now. Order 4.

OMB regulations, however, commit the determination of whether immediate action is necessary solely to HUD. *See* 2 C.F.R. § 180.700. Section 180.705(c) makes agency discretion even clearer: "In deciding whether immediate action is needed to protect the public interest, the suspending official has *wide discretion*." 2 C.F.R. § 180.705(c) (emphasis added). Again, both the district court and the majority

fail even to acknowledge HUD's wide discretion. The court should "uphold a decision of less than ideal clarity" as long as "the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974); *see also Coleman Am. Moving Servs., Inc. v. Weinberger*, 716 F. Supp. 1405, 1412 (M.D. Ala. 1989) ("The suspending official need not make a formal finding" that immediate "suspension is necessary to protect the government's interest.").

When faced with the question of what justified "immediate action," the D.C. Circuit held that immediate action was not justified when the government contractor's violations "had ceased before the issuance of the suspensions." *Sloan v. Dep't of Hous. & Urb. Dev.*, 231 F.3d 10, 17 (D.C. Cir. 2000) (emphasis omitted). But when there are ongoing violations, as with LAHSA here, there is "a real need for immediate action to protect the public interest." *Id.* (emphasis omitted). This concern is especially pronounced in the fraud context, where the government will be irreparably harmed absent immediate action because "it is unlikely" that the government can "recover the grant funds once they are disbursed." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025). And the majority recognizes undisputed "evidence of LAHSA's ongoing mismanagement and fraud." Maj. 4. Because no evidence shows that LAHSA's fraud has stopped, immediate action was reasonable.

In the June 11 letter, HUD unequivocally invoked its discretion by stating that "[i]mmediate action is needed to protect the public interest." HUD further explained the public interest considerations: "It is not in the public interest to perpetuate the status quo, *i.e.*, to permit LAHSA to continue to receive additional millions of dollars of federal funds, as the lead agency in the largest HUD-funded CoC in the nation, when there is adequate evidence that it is not in compliance with HUD requirements and not presently responsible to participate in government programs." This reasonable determination falls well within an agency's "wide discretion." 2 C.F.R. § 180.705(c). And by stating that the public harm lies in permitting LAHSA to *continue* administering taxpayer funds, HUD reasonably (even responsibly) decided that imminent, future harm was unacceptable.

The majority rightly refuses to endorse the district court's lawless invocation of HUD's supposed pretextual reasons for immediate suspension. It is not pretext for an agency to follow the text of a statute. The only pretext in the record is the district court's claim that it "does not create or debate public policy" while dictating Los Angeles homelessness policy, yet again.[2]

[2] *See generally L.A. All. for Hum. Rts. v. City of L.A.*, 792 F. Supp. 3d 1049, 1053 (C.D. Cal. 2025); *see also Hous. is a Hum. Right v. Cnty. of Orange*, No. SACV19388DOCJDEX, 2019 WL 2491544, at *4 (C.D. Cal. June 14, 2019) (removing the district court from a homeless policy case because "a reasonable observer would conclude based on appearances that the District Judge is not unbiased"); *L.A. All. for Hum. Rts. v. Cnty. of L.A.*, 14 F.4th 947, 952 (9th Cir. 2021) (chastising the district court for developing an order on homelessness policy "based

We cannot invalidate HUD's actions based on pretext. "[A] court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019). And no party or the district court cite even extra-record evidence of such pretext. If HUD, in its wide discretion, had a reasonable explanation for suspending LAHSA, that is the end of our inquiry. And HUD indisputably had good reasons to suspend LAHSA, even immediately.

The majority takes a softer stance by stating that HUD acted when LAHSA was "vulnerable." Order 4. But the majority cites no evidence—in the record or elsewhere—that this was HUD's intent. Nor can the majority cite any regulation requiring such analysis by HUD—because no such requirement exists. While the majority does not err as the district court did, its conclusion is still inconsistent with the law. "[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Com.*, 588 U.S. at 781.

D

Whether or not HUD reasonably suspended LAHSA (HUD properly did so), § 11360a(c) does not require suspension before HUD can implement the remedy of

---

on unpled claims and theories" that the district court formulated by "impermissibly resort[ing] to independent research and extra-record evidence").

direct applications. As soon as HUD finds that "a collaborative applicant for a geographic area does not meet the requirements of th[e] section, *or* if there is no collaborative applicant for a geographic area," HUD can proceed with direct applications. 42 U.S.C. § 11360a(c) (emphasis added). The two distinct statutory grounds for triggering direct applications highlight that HUD can opt for direct applications even if a collaborative applicant has not been suspended.

While ample evidence supports HUD's suspension, the statute does not require a criminal indictment or cause for debarment to conclude LAHSA fails to meet the statutory criteria. In the June 18 letter, HUD stated that in addition to the suspension, LAHSA "also . . . [did] not meet the requirements of 42 U.S.C. § 11360a." HUD explained that LAHSA cannot meet the statutory criteria when LAHSA mismanages funds, falsely certifies compliance, and awards money in violation of conflict-of-interest regulations. That gave HUD a statutory basis for instituting a direct-application system regardless of LAHSA's suspension.

Moreover, HUD adequately contemplated the effects of a "Direct-to-HUD" application system that cut out LAHSA as the untrustworthy middleman. Again, HUD did not invent the direct-application system; it is the precise alternative that Congress contemplated should a collaborative applicant like LAHSA fail to carry

out its duties.[3] When HUD exercises its discretion and "finds that a collaborative applicant . . . does not meet the [programmatic] requirements," the statute authorizes the agency to "permit[] other eligible entities to apply directly for grants." 42 U.S.C. § 11360a(c). LAHSA complains that HUD is invoking the statute. But perhaps LAHSA's efforts could have been better spent complying with program requirements and not defrauding United States' taxpayers. HUD's decision is not arbitrary or capricious when it is "based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42.

Without mentioning § 11360a(c), the majority finds direct applications an inadequate substitute because of the difficulty for service providers to apply by HUD's October 14 deadline. But the feasibility of HUD's direct-application system should not be written off so quickly. The October 14 deadline is not an immovable obstacle. Indeed, HUD has extended the CoC Competition deadline multiple times. This demonstrates HUD's intent to fairly consider more applications. Rather than

[3] Rejecting the direct-application system, the district court quoted a prior Obama-era HUD regulation stating that "HUD . . . previously recognized" the importance of local input in funding decisions for homelessness policy. But that regulation recognizes that "the McKinney-Vento Act gives HUD the authority to ensure the fair distribution of grant amounts for this program, such as . . . permitting other eligible entities to apply directly for grants." 77 Fed. Reg. 45422, 45429. Thus, the district court's cited regulation undermines its characterization and shows that HUD has possessed this remedial authority across presidential administrations.

"prevent[ing] LA CoC from applying [for] homelessness funding," Order 5, HUD's stated goal for its direct-application process is to "maintain[] continuity of service for providers and beneficiaries in the Los Angeles area, help[] those service providers remain competitive without LAHSA in place, and provide[] certainty of some level of funding." With service providers in mind from the beginning, HUD designed its direct-application process to "minimize the potential disruption" to service providers by "largely mimic[ing] the way most CoCs would structure their project selections." Considering these applications is also HUD's bread and butter, as HUD routinely evaluates service providers in its annual competition. There is thus little reason to conclude that HUD cannot execute the direct-application system provided for by Congress.

The main concerns with HUD's direct-application process are not HUD's fault. The majority emphasizes that individual service providers face the tight deadline of October 14 to submit applications under the "Direct-to-HUD" system. Order 6. But HUD released its FY 2026 NOFO on June 1, 2026, with a special appendix establishing procedures and rating factors for direct applications. This original timeline gave months for service providers to apply directly and for HUD to carefully process the applications. The rush the parties now face is a result of this litigation and the Rhode Island district court's now stayed vacatur of the NOFO. In any event, the current time pressures cannot retroactively make HUD's suspension

arbitrary or capricious. And HUD has consistently demonstrated good faith in moving the deadlines and working to ensure a "fair distribution of grant amounts." 42 U.S.C. § 11360a(c).[4]

III

The other *Nken* factors also favor a stay.

A

Absent a stay, HUD—and taxpayers—will be irreparably harmed. The district court's injunction binds taxpayer dollars to LAHSA's project selection and ranking for FY 2026. Given LAHSA's history of improper influence affecting its decision-making, the injunction will force HUD to award funds to organizations that may have received LAHSA's seal of approval based on their relationship with the CEO (or her husband) rather than based on the services they provide for homeless people.

---

[4] The majority faults HUD for not actively collaborating with LA CoC to designate a new collaborative applicant before proceeding with the "Direct-to-HUD" system. Order 4 n.2. But the majority cites no such statutory or regulatory requirement for HUD to do so. As soon as "the Secretary finds that a collaborative applicant for a geographic area does not meet the requirements . . . the Secretary may take remedial action . . . Such measures may include designating another body as a collaborative applicant, *or* permitting other eligible entities to apply directly for grants." 42 U.S.C. § 11360(c) (emphasis added). The Secretary has discretion between the two options, with no statutory restriction between the two.

The majority cites 24 C.F.R. § 578.13. But § 578.13 states that "HUD must provide a 30-day prior written notice to the Continuum and its collaborative applicant and give them an opportunity to respond." HUD informed LA CoC of the opportunity to respond, and LA CoC filed a timely letter. HUD complied with the regulation.

Furthermore, leaving the injunction in place will allow LAHSA to continue managing millions of dollars in federal grants, posing an extreme risk to programmatic integrity.

Ordering HUD to distribute funding based on LAHSA's priorities is irreparable harm as "it is unlikely" that the government can "recover the grant funds once they are disbursed." *Dep't of Educ*, 604 U.S. at 651. This is especially true when the funds are disbursed in connection with an organization that the district court has described as being engaged in "obvious fraud." "[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'" *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers)). With no guarantee that the beneficiary "will repay grant money if the Government ultimately prevails," the Government faces irreparable harm. *Id.* More specifically, the Government faces irreparable harm when an injunction forces it "to disburse funds from a finite appropriation" and it "will not be able to recoup those funds once expended." *Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025).

The injunction also threatens to irreparably harm HUD's efforts to restore program integrity to homeless assistance programs nationwide. If HUD cannot hold

a bad actor accountable even when faced with a trove of evidence dating back two decades, it undermines public integrity in the program as a whole and incentivizes other fraudulent actors to abuse HUD resources without fear of consequence.

Finally, absent a stay, HUD will be unable to follow the statutory guidelines for awarding applicants funding. Section 11360a(c) authorizes HUD to directly award funding to grantees. Being enjoined from carrying out its statutory responsibility is irreparable harm, particularly when HUD is acting pursuant to a strict statutory timeline for awarding funds. *See Washington v. U.S. Dep't of Hous. & Urb. Dev.*, No. 26-1922, 2026 WL 2730937, at *1 (1st Cir. Sep. 16, 2026).

B

Equitable factors also favor a stay. The balance of harms and the public interest factors merge when the government is a party. *Nken*, 556 U.S. at 435.

In considering the balance of harms, the court considers "whether issuance of the stay *will substantially injure* the other parties," not whether the stay may potentially injure the other parties. *Id.* at 426 (emphasis added) (cleaned up). While LAHSA will experience organizational harm by not receiving federal funding, those harms do not disrupt the service providers or the homeless people they serve. Nor does the district court regard LAHSA being defunded as a harm, since the district court's injunction ordered LA CoC to start accepting applications to replace LAHSA. With or without a stay, LAHSA will experience the organizational harm of losing

out on taxpayer dollars.[5] And LAHSA has acknowledged that it will cease operating in HUD-related capacities. LAHSA, *LAHSA Commission votes not to apply to continue CoC leadership roles* (Sep. 15, 2026), https://perma.cc/Z2WY-VMVD.

Given LAHSA's inevitable defunding and cessation of all HUD-related functions, the only harm left to weigh is the potential harm to homelessness service providers caused by HUD choosing to act now. The district court concluded that defunding LAHSA will "undoubtably result[] in lost lives." The district court supports this tenuous position by reasoning that if the LA CoC lost the entire amount of its annual funding, 11,000 people may be returned to the street. This conclusion misrepresents, or misunderstands, how HUD intends to manage funding for service providers in Los Angeles. For starters, 60% of LA CoC's annual funding is statutorily guaranteed. 2026 Appropriations Act, Pub. L. No. 119-75, div. D, tit. II, 140 Stat. 173, 399 (2026). HUD followed these statutory provisions and designed its direct application program to ensure that Los Angeles receives at least the 60% of funding that it is entitled to.

It is also unlikely that the loss of one source of federal funding will result in the LA CoC being unable to provide services to the homeless people it currently helps. The district court cited no factual basis to conclude that, absent immediate

[5] Indeed, LAHSA experiencing the organizational harm of being defunded appears inevitable given the County and federal government's steps to defund it, and the City appears to be moving in the same direction.

federal funding, the LA CoC would lack "the financial wherewithal to keep [its] programs running." *Dep't of Educ.*, 604 U.S. at 652.

It is also speculative that defunding LAHSA will result in service providers within the LA CoC being defunded. The district court presumed that service providers within the LA CoC will be prejudiced because the deadline to register as a collaborative applicant has passed. But HUD has provided an alternative path for direct funding for providers within the LA CoC. And it is speculative that HUD will not treat the providers fairly as it carries out its statutory mandate to "ensure fair distribution of grant amounts" while "permitting other eligible entities to apply directly for grants." 42 U.S.C. § 11360a(c). Absent "clear evidence to the contrary, courts" apply a "presumption of regularity" when evaluating "the official acts of public officers" and "presume that they have properly discharged their official duties." *United States v. Chem. Found.*, 272 U.S. 1, 14 (1926); *see also U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) (the "presumption of regularity attaches to the actions of Government agencies"). No evidence exists, let alone "clear evidence," *Chem. Found.*, 272 U.S. at 14, that HUD will not properly discharge its duty to "ensure fair distribution of grant amounts," 42 U.S.C. § 11360a(c). If any party is guilty of unfairly distributing grant money, it is LAHSA.

The service providers may actually be helped by HUD's decision to remove LAHSA from its role as an ineffective middleman. It is undisputed that "LAHSA

routinely pays service providers late." In February, LAHSA owed $69 million in payments to homelessness service providers, many of which were more than 90 days overdue. Due to LAHSA's incompetence, service providers reported considering layoffs or bankruptcy. With HUD now accepting direct applications, these service providers may be more likely to receive timely payments. LAHSA set a low bar that HUD should have little problem exceeding.

HUD designed the direct payment program to mirror the way that CoCs select projects to reduce potential disruption for service providers. HUD's direct application program followed the statutory scheme by setting aside 60% of the annual renewal demand ("ARD") for renewal projects. The ARD is the maximum amount of funding HUD can grant to a CoC and is based on the CoC's prior year funding. Sixty percent of the ARD is guaranteed to a CoC, so a CoC's top-ranked Tier 1 projects are presumptively guaranteed funding. HUD's policy ensured that LA service providers could compete in the nationwide competition "on equal footing with other service providers around the country." HUD designed its policy to provide certainty to service providers, maintain continuity of service for beneficiaries, and help service providers compete without LAHSA.

The public interest also favors a stay. HUD determined that "[i]t is not in the public interest to perpetuate the status quo, *i.e.*, to permit LAHSA to continue to receive additional millions of dollars of federal funds . . . when there is adequate

evidence that it is not in compliance with HUD requirements." A strong public interest exists in preventing waste, fraud, and abuse in government programs. "When spending its money," the government has a strong "interest in protecting itself from fraudulent practices." *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 550 (1943); *see also Sabri v. United States*, 541 U.S. 600, 606 (2004) (government has interest in "protect[ing] the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence"); *Bowen v. Roy*, 476 U.S. 693, 709 (1986) ("preventing fraud in . . . benefits programs is an important goal").

IV

I concur in the order's stay of the district court's order "to distribute the approximately 241 million dollars that was earmarked for the LA CoC by Congress for Fiscal Year 2026 via the priorities outlined in LA CoC's Collaborative Application." Because the order does not analyze HUD's likelihood of success on this provision, I highlight the district court's error.

For starters, the district court's order was wrong on the facts. The maximum amount that the LA CoC can receive is the ARD amount of $238.8 million, not $241 million.

Additionally, the district court's remedy was contrary to law. Believing the money to be "earmarked" to LA, the district court ordered HUD to distribute $241 million in FY 2026 funding to the region. But that is not how the Homeless

Assistance Act works. The maximum funding that LA can receive is the ARD. Only 60% of the ARD is exempt from the nationwide competition, while the remaining 40% is subject to the competition. 42 U.S.C. § 11386a(a); 2026 Appropriations Act, 140 Stat. at 399 ("in allocating and awarding amounts made available under this paragraph, the Secretary shall select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant"). The district court insisted that it "[understood] the breakdown of Tier One and Tier Two funding." But either the district court did not actually understand the Homeless Assistance Act's funding, or it tried to mandate an additional $96 million in Tier Two funding to LA CoC at the expense of other parts of the country. Either error is troubling.

Even LAHSA conceded that the district court erred. It states that "to the extent that the Court misunderstood that the full $241 million was earmarked for Los Angeles, rather than a portion of that sum being subject to a national funding competition, LAHSA does not oppose a clarification of the injunction." And it is further troubling that the district court ordered $241 million to be disbursed by October 27, months before any such funds would be disbursed under the statute.

The district court's injunction is also bad policy. Absent the stay of disbursing these funds, the injunction would have directly harmed homeless people nationwide. While the district court expressed concern that not awarding LAHSA the full ARD amount would "result in death among the homeless and the displacement of over

11,000 unhoused individuals," the district court showed no concern for the homeless people outside of LA who would be harmed by the effects of its injunction. By erroneously ordering the extra 40% of the funding to stay with the LA CoC, the district court reduced the amount of funding available in the national competition by $96 million. And under the district court's own logic, the reduction of funds available to serve homeless people in other regions would result in death and displacement in communities nationwide.

Congress entrusted HUD to make challenging decisions in allocating funding between geographic regions. 42 U.S.C. § 11386a(a). The district court does not have the power or expertise necessary to intrude on this statutory responsibility. And HUD would be well within its discretion in choosing to award discretionary funds to other regions where caring for homeless people costs less due to less corruption and where its funding is able to help more people. *See* Michael R. Blood, *LA spending up to $837,000 to house a single homeless person*, Associated Press (Feb. 23, 2022), https://perma.cc/R2BJ-3V2G.

V

Because the Government is likely to succeed on the merits and will suffer irreparable harm absent a stay, I would stay the district court's injunction for LAHSA to remain the collaborative applicant for the 2026 funding cycle. I agree with staying

the district court's mandatory injunction to disburse the approximately $239 million allegedly earmarked for LA.